## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| Atlas Capital Management, L.P., | ) | Civ. No. |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| | ) | |
| Henrik Fisker, Bernhard Koehler, Joe | ) | **COMPLAINT FOR VIOLATION OF** |
| Damour, Kleiner Perkins Caufield & | ) | **THE FEDERAL SECURITIES LAWS** |
| Byers, Ray Lane, Keith Daubenspeck, | ) | |
| Richard Li Tzar Kai, and Ace Strength, | ) | DEMAND FOR JURY TRIAL |
| Ltd., | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiff, Atlas Capital Management, L.P., by its undersigned attorneys, alleges upon personal knowledge as to itself and its agents, and upon information and belief as to all other matters, based upon, *inter alia,* the investigation made by and through its attorneys, which investigation included, among other things, a review of public documents, confidential government documents obtained by third parties, Securities and Exchange Commission ("SEC") filings, analyst reports, news releases and media reports concerning Fisker Automotive Holdings, Inc. ("Fisker Automotive" or the "Company"), as follows:

## NATURE OF THE ACTION

1.      This is a securities action on behalf of Plaintiff in connection with its purchase of membership units based exclusively on Fisker Automotive preferred stock; such membership units are referred to hereinafter as "Fisker Automotive Securities."

2.      Plaintiff seeks to pursue remedies under the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act") as described below.

3.      This Complaint sets forth non-fraud claims under Section 12(a)(2) of the Securities Act (against all Defendants) and non-fraud claims under Section 15 of the Securities Act (against the "Section 15 Defendants" (defined below)).  Plaintiff's Securities Act claims are not based on any knowing or reckless misconduct – *i.e.*, they do not allege fraud, do not sound in fraud and expressly disavow any fraud-related allegations.  Rather, they are premised on the fact that there were material omissions in the disclosures related to the offerings of Fisker Automotive Securities.

4.      This Complaint also separately sets forth certain claims under Section 10(b) of the Exchange Act (against all Defendants) and under Section 20(a) of the Exchange Act (against the "Section 20 Defendants" (defined below)) who were knowing or deliberately reckless participants in defrauding investors in connection with their material omissions.

## JURISDICTION AND VENUE

5.      The claims asserted herein arise under and pursuant to (a) Sections 12 and 15 of the Securities Act (15 U.S.C. §§ 77l, 77l(a)(2) and 77o) and (b) Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

6.      This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v) and Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

7.      Venue is proper in this District pursuant to Section 22 of the Securities Act and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b) and (c).  In addition, a Fisker manufacturing plant, located at 801 Boxwood Road, Wilmington, Delaware, was purchased in October 2009 with approximately $21.5 million in Delaware state subsidies.

8.      In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications, and the Internet.

## PARTIES AND RELEVANT NON-PARTIES

9.      Plaintiff, Atlas Capital Management, L.P., ("Atlas Capital") purchased Fisker Automotive Securities and lost approximately $2 million as a result of the misconduct alleged herein.

10.     Non-Party Fisker Automotive is a Delaware corporation which has its principal place of business located at 5515 E. La Palma Ave, Anaheim, CA 92807.  On November 22, 2013, Fisker Automotive filed for bankruptcy protection in the United States Bankruptcy Court for the District of Delaware, Case No. 13-13087-KG.  Accordingly, Fisker Automotive is not named as a defendant herein.

11.     Defendant Henrik Fisker was a co-founder and director of Fisker Automotive.  He was also Fisker Automotive's Chief Executive Officer from its inception through February 2012.

12.     Defendant Bernhard Koehler was a co-founder of Fisker Automotive's predecessor entity, Fisker Coachbuild, LLC, and was Fisker Automotive's Chief Operating Officer at all relevant times.

13.     Defendant Joe Damour was Fisker Automotive's Chief Financial Officer at all relevant times.

14.     Defendant Kleiner Perkins Caufield & Byers ("Kleiner Perkins") is a venture capital firm with its headquarters in Menlo Park, CA, and is a controlling shareholder of Fisker Automotive. In addition, the profile of Kleiner Perkins partner Trae Vassallo on CrunchBase, a database about technology companies, people and investors, states that since joining Kleiner Perkins in 2002, Vassalo has "work[ed] closely with the management teams of [among others] Fisker Automotive" . Thirty-two Delaware business entities include "Kleiner Perkins" or "KPCB" in their name.

15.     Defendant Ray Lane was a Managing Partner of Kleiner Perkins and was Fisker Automotive's Chairman of the Board of Directors at all relevant times. Defendant Lane frequently spoke on behalf of Fisker Automotive in numerous press reports and was actively involved in negotiating Fisker Automotive's loan agreement with the U.S. Department of Energy ("DOE") under its Advanced Technology Vehicles Manufacturing Loan Program, or ATVM. The loan agreement is hereinafter referred to as the ATVM Loan.

16.     Defendant Ace Strength Ltd ("Ace") is an investment vehicle through which Richard Li Tzar Kai invested in Fisker Automotive. Ace is a controlling shareholder of Fisker Automotive.

17.     Defendant Richard Li Tzar Kai was a member of Fisker Automotive's Board of Directors at all relevant times.

18.     Defendant Keith Daubenspeck was a Director of Fisker Automotive and Co-founder of Advanced Equities, Inc. ("Advanced Equities") which was one of several investment banks Fisker Automotive used to raise capital. The SEC censured Advanced Equities in

September 2012 as part of a Cease and Desist Order arising out of its fraudulent practices in connection with raising capital for an unnamed company other than Fisker Automotive. Advanced Equities ceased operations shortly thereafter and is now defunct. Accordingly, Advanced Equities is not named as a defendant herein. Daubenspeck was banned from the securities industry in connection with the SEC's Order against Advanced Equities, and paid a $50,000 fine.

19.     To raise capital, Fisker Automotive also used Middlebury Group LLC and Middlebury Ventures II, LLC (together or separately, "Middlebury"), an investment bank and a Delaware limited liability company, respectively.  Due to contractual agreements which require non-jury adjudication in a jurisdiction where other Defendants have no contacts, Middlebury is not named as a defendant herein.

## FACTUAL ALLEGATIONS

### I.     Fisker Automotive's Beginnings

20.     Fisker Coachbuild LLC, the predecessor to Fisker Automotive, was founded in early 2003 by Defendants Henrik Fisker and Bernhard Koehler with a focus on creating new exterior car designs while utilizing existing luxury car engineering.

21.     On August 7, 2007, Quantum Fuel Systems Technologies Worldwide, Inc. ("Quantum Fuel Systems") (NASDAQ: QTWW) and Fisker Coachbuild, LLC, launched Fisker Automotive as a new venture to produce premium plug-in hybrid automobiles.

22.     Quantum Fuel Systems stated in Form 10-Q for the quarter ended October 31, 2007 that:

> Initial deliveries of a four-door sports sedan are anticipated to commence in December 2009. Upon formation, [Quantum Fuel Systems] owned 62% of the issued and outstanding capital stock of Fisker Automotive. On November 21, 2007, Fisker Automotive sold $5.5 million of convertible preferred stock in a

Series A financing, which reduced [Quantum Fuel Systems'] ownership percentage to 47.5%. The preferred shareholders have voting rights that are similar to the common shareholders. [Quantum Fuel Systems] has the right to appoint two of Fisker Automotive's five members of the Board of Directors. Fisker Automotive will need to raise a substantial amount of additional capital in order to complete future phases of development, testing and tooling for the new vehicle platform, which will further reduce the Company's ownership percentage in Fisker Automotive.

23.     In November 2007, in conjunction with its investment in Fisker Automotive, Quantum Fuel Systems also began providing preliminary concept development services to Fisker Automotive for a production intent hybrid-electric vehicle under a $1.0 million arrangement. Quantum Fuel Systems stated in the Form 10-Q referenced above that "[w]e anticipate expanding our services beyond this initial arrangement to develop the powertrain and software control systems for the new vehicle platform over the next twelve months."

24.     In January 2008, Fisker Automotive completed a $20 million Series B round of financing including investments from Palo Alto Investors, Gentry Venture Partners, and Defendant Kleiner Perkins.

25.     On January 14, 2008, the Wall Street Journal published a report on Fisker Automotive based on two interviews of Defendants Lane and Henrik Fisker stating in part:

The precise size of the investment in Fisker wasn't disclosed, but Mr. Lane said it was more than $10 million and 'one of our bigger investments.' Mr. Lane, the former No. 2 executive at software company Oracle Corp., will join Fisker's board. Thanks to Kleiner's investment, 'we have all the capital we need to move forward according to the plan,' said Henrik Fisker, a Danish-born former BMW AG and Aston Martin designer and now chief executive of the company he helped set up last year. Palo Alto Investors, a venture-capital concern, invested in Fisker in an earlier round of fund raising. 'We're still going to raise money later in the year, but we don't see that as a big issue,' Mr. Fisker said.

* * *

Mr. Fisker believes his company is a couple of years ahead of bigger rivals because the design of the car has been finalized. 'The car we're showing in Detroit is not your usual show car; it's actually a preview of the production car you can buy,' Mr. Fisker said.

The Karma, Mr. Fisker said, will use lithium-ion batteries, the most-promising next-generation energy-storage technology for automotive use so far. Some of those batteries, however, have been found to overheat. In 2006 and 2007, reports surfaced that lithium-ion batteries for laptops and cellphones were catching fire, leading to several recalls. Mr. Fisker wouldn't say what kind of lithium-ion battery the Karma will use, but he said safety concerns have all been 'resolved.'

26.     On or about February 14, 2008, Fisker Automotive awarded Quantum Fuel a $13.5 million contract to develop further the powertrain and software control systems for the Fisker Karma, for which Fisker Automotive expected to begin initial production and deliveries in the fourth quarter of 2009.

**II.     Additional Private Equity is Raised, and the U.S. Department of Energy Becomes a Critical Backer of Fisker Automotive**

27.     On or about December 31, 2008, Fisker Automotive applied for the ATVM Loan.

28.     Shortly thereafter, on or about March 2, 2009, Fisker Automotive raised approximately $68.5 million in Series C financing including an investment from Defendant Kleiner Perkins. Defendant Ray Lane, Kleiner Perkins' Managing Partner, was appointed to Fisker Automotive's Board of Directors in conjunction with Kleiner Perkins' investment in this financing round.

29.     At midnight on August 23, 2009, Defendant Koehler, Fisker Automotive's Chief Operating Officer, wrote a panicked email to the DOE stating that Fisker Automotive would be forced into bankruptcy if the DOE did not approve Fisker Automotive's term loan application. Defendant Koehler stated further that "[t]he latest information to delay the conditional commitment for the Karma program until we receive the approval for the Kx program is pushing our supplier base and investment group beyond the limit. . . . *We are oversubscribed in this equity round with DOE support – and nowhere without it*." (Emphasis added.)

30.     Less than a month later, on September 18, 2009, the DOE issued a $528.7 million

Conditional Commitment Letter which allocated $169.3 million for Fisker Automotive to

complete its first vehicle, the Fisker Karma, and $359 million to complete a low cost plug-in

hybrid tentatively called the Fisker Nina. The ATVM Loan document, which was not made

public, specifically stated that an "Event of Default" would include Fisker's "fail[ure] to achieve

any Milestone by the relevant Milestone Completion Date."

31.     In October 2009, Fisker Automotive bought a defunct GM manufacturing plant

located at 801 Boxwood Road, Wilmington, DE, with $21.5 million in Delaware state subsidies.

The Wilmington Delaware News Journal reported on October 28, 2009 that Governor Jack

Markell was instrumental in bringing Fisker Automotive to Delaware by, *inter alia*, "contact[ing]

a close friend, Aileen Lee, who work[ed] at Kleiner Perkins Caufield & Byers, a California

venture capital firm investing in Fisker."

32.     On or about January 13, 2010, Fisker Automotive and A123 Systems, Inc.

("A123") entered into a supply agreement, pursuant to which A123 agreed to supply A123

Batteries for Fisker Automotive's Karma plug-in hybrid electric vehicle program.  At the same

time, A123 also agreed to invest approximate $20.5 million into its new customer, Fisker

Automotive.

33.     On January 20, 2010, the Wall Street Journal published an article entitled "Car

Maker Taps Funding Karma" based primarily on interviews  with Defendants Henrik Fisker and

Lane; the article stated in full:

> Fisker Automotive Inc. said it raised $115.3 million in a round of equity financing
> that could reach $150 million in coming weeks.
>
> 'The business plan has always called for $150 million in equity,' said Ray Lane, a
> managing partner at venture-capital firm Kleiner Perkins Caufield & Byers, which

has been a major investor in electric car maker Fisker since the company's founding in 2007.

In an interview, Mr. Lane said Fisker will grab the investing momentum surrounding the company to complete the $150 million funding round in 'the next month or two.'
The start-up company, based in Irvine, Calif., decided to announce it had raised $115.3 million to close on a $529 million low-cost loan with the U.S. Department of Energy, which required Fisker to raise $113 million in equity, said Mr. Lane.

Besides Kleiner Perkins, other investors in the round so far are lithium-ion battery technology developer A123Systems Inc. and Ace Investments, a Hong Kong investment firm associated with Richard Li, chairman and executive director of Hong Kong-based telecommunications company PCCW Ltd.

The combined DOE and private-equity funding bring the luxury plug-in hybrid electric Karma program to a fully funded status, which Mr. Lane said is 'phenomenal' for a start-up vehicle technology developer and manufacturer.

Fisker's long-term business plan also calls for an annual $50 million equity funding, with the company reaching profitability in 2011, the first full year of production of the Karma, said Mr. Lane.

The business plan covers not only the Karma but also its sports version, the Karma Sunset, as well as a lower-price family car under development.

With this fund-raising target met, Fisker expects to close on the DOE loan in coming months, following an extensive period of negotiations, said Henrik Fisker, the company's chief executive and founder, in an interview.

'We've worked with the DOE for the last nine months,' said Mr. Fisker. 'It's been a very long due-diligence process. They've hired outside consultants . . . for technical due diligence, financial stress tests . . . definitely there's no other investor that has made as much due diligence as the DOE.'

Fisker was selected in September to receive nearly $529 million in low-cost loans under the DOE's Advanced Technology Vehicles Manufacturing Loan Program, or ATVM.
The funding will help Fisker finalize the development of the Karma and support the engineering and manufacturing of the family car, a plug-in hybrid slated for 2012 with a retail price of less than $48,000, before consumer-tax incentives.

The ATVM loans can cover as much as 80% of a project cost in a traditional 80% debt-20% equity financing structure. To secure the loan, the borrower is required to show the DOE it has its equity share in place. The funding tops off a series of announcements for Fisker.

Last week, A123 Systems disclosed it had made a $23 million investment in the company and that it would be the supplier of battery management systems for the Karma.

For A123, becoming a strategic investor in an electric vehicle developer allows it to get in on the engineering of the vehicle 'from scratch,' which will help on cost-cutting strategies, said David Vieau, president and chief executive of A123 Systems.

A123 Systems will invest $13 million in cash from its balance sheet, and the remainder will be in stock. Including the latest round, Fisker has raised around $190 million since its founding. Other key investors in the company include investment firm Palo Alto Investments LLC, the Qatar Investment Authority and Quantum Fuel Systems Technologies Worldwide Inc., a maker of power trains.

34.     On or about April 22, 2010, Fisker Automotive and the DOE executed the non-public final term loan and credit facility, discussed in the Conditional Commitment Letter referenced above, for the ATVM Loan. One of the "Karma Milestones" in the ATVM Loan documents required "Commencement of commercial production of the Karma vehicle" by February 2011.

35.     On or about May 5, 2010, Fisker Automotive raised an additional $145 million in Series A-1 venture capital from Kleiner Perkins, Palo Alto Investors and Advanced Equities (which raised approximately $27 million from 347 private investors).

36.     In March 2011, Fisker Automotive delivered a non-public presentation to DOE officials in which it inaccurately reported that the February 2011 Karma commercial production milestone under the ATVM Loan had been met. Fisker Automotive's failure to meet this milestone was an "Event of Default" under the ATVM Loan.

37.     On or about March 23, 2011, Fisker Automotive raised an additional $190 million in private equity including investments from Kleiner Perkins, Palo Alto Investors, and Advanced Equities.

38.     On April 6, 2011, AutoblogGreen published an article entitled "Electric vehicle newcomers still in front after first round, but for how long?"  The portion of the article discussing Fisker Automotive quoted Defendants Lane and Henrik Fisker,  and stated in relevant part:

> One of the advocates of the newer entrants is Ray Lane, Managing Partner at Kleiner Perkins Caufield & Byers who is one of the main shareholders at Fisker. He told me:
>
> > It's all about focus. Typically start-ups have to have one person that is 'the best' at something and that drives the whole culture. OEM's have lost that. They are monoliths playing out what they think the industry wants rather than trying to change the game. When you take Henrik [Fisker] out of the bureaucracy or have an entrepreneur like Elon, who isn't encumbered by "what the industry thinks", then magic happens. When the OEM's catch up, these companies need to retain what made them special.
>
> So I asked Henrik Fisker what it was that made Fisker so special that he was going to be able to compete and win against the world's leading luxury car makers, and he said:
>
> > Fisker Automotive's brand sends a clear message of 'caring' about our environment and our dependence of oil, combining this with extreme style and power, to evoke the emotional side, that made us fall in love with the automobile in the first place. This is a clear message that the driver will project by owning one of our cars: Responsible luxury.

### III.     Fund Raising and the Status of the ATVM Loan

39.     In April 2011, on behalf of Fisker Automotive, Middlebury circulated a Confidential Private Placement Memorandum (the "April 2011 CPPM") to Atlas Capital soliciting qualified investors to purchase as much as $25 million in "membership units" in Middlebury Ventures II, LLC priced at $1.34 per unit (the "April 2011 Offering").  The membership units would be based exclusively on Middlebury Ventures II's purchase of "Fisker [Automotive] Series C-1 Shares pursuant to the Fisker [Automotive] Series C-1 transaction

documents" which could be viewed only by potential investors "by following the instructions set forth on Exhibit D" to the April 2011 CPPM (i.e. the Fisker Automotive documents could not be viewed without having the password included in the April 2011 CPPM).

40.     On April 19, 2011, on behalf of Fisker Automotive, Middlebury circulated an email to Atlas Capital and others in connection with the April 2011 Offering attaching an LLC Membership Agreement between investors in the Middlebury   special purpose vehicle (i.e. Middlebury Ventures II, LLC) and Fisker Automotive stating in part:

> The attached Middlebury SPV Member Acknowledgment Form must be completed before we can accept your completed investment in Fisker Automotive.  We received this document today (Wednesday April 19th) and apologies for having not been able to send it out before now. **Fisker wants to ensure that each investor is an Accredited Investor as defined by the Securities Act and as such will not accept anyone [sic] investment without having the attached form executed**. (Bold added).

41.     On April 20, 2011, Atlas Capital invested $1,005,000.00 in Fisker Automotive Securities.

42.     As of May 2011, Defendant Kleiner Perkins reportedly owned a 12.61% and Defendant Ace owned 10.15%, equity stake in Fisker, respectively.

43.     On May 13, 2011, VentureBeat published an article headlined "Luxury hybrid electric car maker Fisker Automotive raises an extra $100M" stating in part:

> [Defendant] Lane, a managing partner at storied venture capital firm Kleiner Perkins Caufield & Byers, said Fisker Automotive also plans to go public in the future in an interview with the Wall Street Journal.   The company is backed by Kleiner Perkins, as well as New Enterprise Associates and A123 Systems Inc. (NASDAQ:AONE).   Fisker Automotive raised $190 million just two months ago to help fund the production of its electric cars.

44.     On or about June 6, 2011, Fisker Automotive raised another $115 million in venture capital including investments from Advanced Equities, Kleiner Perkins and a new investor, New Enterprise associates.

45.     On June 13, 2011, Automotive News published an article entitled "Electrifying
100" profiling Fisker Automotive and Ray Lane, stating in full:

RAY LANE

Managing partner, Kleiner Perkins Caufield & Byers Chairman, Fisker
Automotive

Chosen because: Kleiner Perkins Caufield & Byers had invested in other green
tech plays such as solar power and biofuels but hadn't found any appealing
transportation companies, said Lane, 64. Until he saw the Fisker Karma luxury
plug-in hybrid, that is. It was an electric vehicle that would appeal to more than
just green buyers, he figured. Kleiner Perkins Caufield & Byers invested what
Lane calls 'a lot by our standards' in Fisker Automotive in 2008. Lane chairs the
company's board.

Kleiner Perkins Caufield & Byers made a smaller investment in Think, a
Norwegian producer of small city electric vehicles. That stake has since been sold
back to Think. Lane says he isn't looking for more electric car companies to
invest in - for now. But he is eagerly awaiting his Fisker Karma. Several thousand
of the pricey EVs will be in consumer hands by the end of 2011, Lane says. He
will receive Serial No. 2.

Quote: 'Reduce demand for oil by 5 to 10 percent, and you start to control
pricing.'

46.     In June 2011, Fisker Automotive made a non-public presentation to the DOE that
contradicted its March 2011 representation to the DOE that it had met the February 2011 Karma
commercial production commencement milestone under the ATVM Loan.  Fisker's March 2011
representation to the DOE of its satisfaction of that milestone had avoided a default on the
ATVM Loan as of February 2011, even as Fisker continued to draw approximately $29 million
from that date through May 2011.

47.     As a result of the June 2011 presentation, the DOE issued a non-public Drawstop
Notice shortly thereafter halting any further advancement of funds under the ATVM Loan.

48.     In July 2011, Fisker delivered its first Karmas; recipients included Defendant Ray
Lane, actor Leonardo DiCaprio (who was also a Fisker investor), Former Vice President Al Gore

and General Colin Powell.  According to a July 27, 2011 conference call discussed *infra*, those

cars were not really full scale production cars, but rather "the marketing, demonstration

vehicles."

49.     In July 2011, Fisker Automotive also began preparations for a new round of

private equity financing to raise approximately $150 million by issuing Series D-1 shares of

Fisker Automotive.  To that end, Fisker prepared a PowerPoint presentation for distribution to

potential investors and also held a conference call with analysts and/or investors on July 27, 2011

which was recorded for future distribution to potential investors.  On the conference call for

Fisker Automotive were Peter McDonald, Senior Managing Director Investment Banking at

Advanced Equities, and Defendants Henrik Fisker, Bernhard Koehler and Joe DaMour. Fisker

made a replay of the conference call and the PowerPoint presentation available to Atlas Capital.

50.     On that call, Defendant DaMour discussed the  ATVM Loan and Fisker

Automotive's cash position, stating in part:

> It's important to emphasize the Department of Energy loans are low interest rate
> loans that we're drawing them down on approximately 2% interest rate.    They
> are long term in nature.  The loans are anywhere from 7 years with the Karma to
> 16 years  for the Nina, 3 years interest only and then they amortize off for the
> remaining period.  And in my experience, it's a quasi-equity structure. Again, it
> gives you an extremely [inaudible] capital base.   There aren't any significant
> drop-offs or roll-offs in debt that would need to be refinanced at a critical point in
> the company's development phase.
>
> In this round and you can see if you go down to the equity funding, what we're
> targeting and we've laid into the 11 financials, we're targeting a raise of $150
> million. To be conservative, we've assumed that we would raise $100 million in
> 2011 and then we would come back to market in the first half of 2012 to raise
> $150 million additional.  What that does, if you look at the very bottom of the
> page, is it allows us to keep our cash position very strong anywhere between $100
> to $200 million minimum cash which we think is prudent and  appropriate to run
> the business given the way we are scaling it up.  But importantly, a significant
> cash cushion which provides significant security and comfort to our suppliers and
> our dealers and all the other major partners we have that run the business with us.
> So in sum, we know we are very well capitalized today.

51.     On August 21, 2011, the News Journal (Wilmington, Delaware) published the

following article regarding Fisker Automotive's latest round of fundraising including the "hype"

that a Fisker IPO was just around the corner:

> Fisker Automotive is using a flurry of hype surrounding its first car -- the $98,000
> Karma hybrid -- to ask for another $200 million from investors, according to a
> web report from Fortune magazine.  Fortune's report said the funding round is
> being characterized as a 'pre-IPO' round, suggesting that Fisker would not ask
> investors for more money before it offered its stock publicly.
>
> John Gartner, an electric cars analyst at Pike Research, said 'it's a little unusual to
> put it that bluntly' but said the money Fisker is looking to raise is 'within reason'
> given that the company is hoping to produce and market thousands of high-end
> luxury hybrids.
>
> Fisker insiders have been looking forward to an initial public offering for some
> time. Ray Lane, Fisker's chairman and managing partner at the venture capital
> firm Kleiner Perkins Caufield & Byers, told The News Journal last summer that
> the company would sell shares publicly once the Karma was on the road.
>
> Contacted by email earlier this month, Lane said he could not 'speculate on IPO
> probability or timing.' Either way, Fisker appears to be capitalizing on some
> positive attention -- and even some star power on its side. Actor Leonardo
> DiCaprio was spotted in his silver version of the 2012 Fisker Karma, a $98,000
> plug-in hybrid and the company's first car. DiCaprio was one of the first of
> around 3,000 Karma deposit-holders to get his car. Lane also took early delivery
> of a silver Karma.
>
> Delaware, which has $21.5 million invested in Fisker, also should get a closer
> look at the car soon.  Union Park Automotive in Wilmington, the state's only
> Fisker dealer, is scheduled to receive its first Karma next month, says Fisker
> spokesman Roger Ormisher. Delaware, ultimately, is to be a second home for
> Anaheim, Calif.-based Fisker, which plans to produce its second line of hybrids at
> a Newport-area plant formerly owned by General Motors. Production there is
> scheduled to begin late next year, and the company is already hiring electrical and
> mechanical engineers to retrofit equipment left in the facility.
>
> Fisker would not appear to be short of cash, having raised north of $1 billion
> publicly and privately. The company has raised $290 million privately just in the
> last several months, which Gartner says likely gives the company confidence
> about completing another large funding round.

52.     Starting on September 15, 2011 and ending on December 2, 2011, Fisker Automotive closed on twelve rounds of sales of Series D1 stock raising a total of approximately $86 million.

53.     On November 1, 2011, Fisker Automotive confidentially informed the DOE that it would run out of cash within three days without additional government loan money or an injection of private equity.

54.     On November 4, 2011, A123 Systems, Inc. the supplier of the Karma's battery and an investor in Fisker Automotive, announced that it was lowering its 2011 revenue guidance based on a "temporary" reduction on battery orders from Fisker for the fourth quarter as Fisker Automotive "rebalanced" its inventory levels. Specifically, A123's press release stated that A123:

> revised revenue guidance range for the full year 2011 due to unanticipated developments that will impact fourth quarter revenue. . . . The reduction in full-year revenue guidance will be reflected principally in the fourth quarter.

> 'While we continued to increase our production ramp in the third quarter, we are adjusting our 2011 revenue expectations due to an unexpected reduction in orders for battery packs from Fisker Automotive for the fourth quarter as it balances inventory levels from all suppliers,' said David Vieau, CEO of A123 Systems. 'Our relationship with Fisker remains strong, and we expect that this reduction in volume is temporary as we understand the Karma plug-in hybrid electric vehicle has received EPA certification as well as an all-electric range rating of 51.6 miles from the European regulatory body Technischer Ueberwachungs Verein (TUV), clearing the way for vehicles sales. We are executing a plan that we believe will manage costs in the near term while allowing us to maintain the manufacturing and operational capabilities required to quickly ramp up production.'

55.     On November 18, 2011, the Calgary Herald (Alberta) published an article based on an interview of Defendant Lane entitled "Fisker on track to make electric sports cars, despite delays." The article stated in full:

Fisker Automotive is on track to meet production goals for its electric sports cars in 2012 despite production delays that have sharply reduced the startup carmaker's projected deliveries this year.

Production of Fisker's first vehicle, the plug-in hybrid Karma, was held up by faulty electrical harnesses and head-lights, topped off by a flood that damaged the leather for its interior, according to chairman Ray Lane. 'In production of a first vehicle, everything doesn't go the way you plan,' Lane said in a recent interview. 'Next year, we'll do exactly what we plan.'

Fisker has long said it plans to sell 15,000 Karmas next year. But a spokesman later clarified the target was now 10,000 to 12,000. Some in the industry have questioned whether the vehicle's price tag - which starts at $96,000 - will make that goal unattainable in a weak economy. Fisker's fortunes have come under increased scrutiny in the two months since U.S. solar panel maker Solyndra filed for bankruptcy after securing a $535-million federal loan guarantee. Fisker itself received $529 million in loans from the U.S. Department of Energy under a program similar to the one that funded Solyndra's factory.
Lane's comments come more than a week after Fisker battery supplier A123 Systems Inc. cut its 2011 revenue out-look 20 per cent, blaming a sharp cut in fourth-quarter orders from Fisker. A123 would not say by how much orders were cut back, and Fisker had no comment on the delays at the time.

Lane, however, said Fisker would deliver 1,500 cars this year, a lot fewer than the 7,000 vehicles the company said it would sell this year when it began production of the Karma in Finland in March. The company is building about 150 vehicles a week, Lane said.
The major delays, according to Lane, stemmed from faulty electrical harnesses and headlights. The final straw, however, came when leather for the vehicle's interior was damaged in a flood. 'The leather was useless. We had 250 cars parked and waiting for leather,' Lane said.

56.    On November 26, 2011, AutoblogGreen published an article about Fisker

Automotive entitled "Fisker says Karma will meet 15,000 production target for 2012." The

article stated further that:

A raft of production delays slowed the arrival of the first Fisker Karma. Though the initial round of vehicles were finally delivered, the delays mean that Fisker will only ship 1,500 of the four door plug-in hybrids in 2011, well short of the original target of 7,000. There has been an effort to turn Fisker into a scandal and these lower production numbers are enough to fan the flames. Fisker has received loans totaling $529 million from the Department of Energy, a number that puts the company within $6 million of the assistance lent to failed solar-panel maker Solyndra. Fisker's partners at A123 Systems have been forced to chop their

earnings estimates for 2011, since fewer Karmas out the door means fewer A123 batteries sold. To some, it all has the look of failure.

However, Fisker Chairman Ray Lane says that the issues in 2011 were a combination of difficulties faced by any start up - such as problems with the electrical system that didn't appear until production was underway - and some one-off disasters. For example, a flood soaked the initial shipment of leather delivered for the car's interior, leaving Fisker with 250 vehicles that were ready to go, except for seats, dashboards, steering wheels and every other surface that needed to be covered in cowhide.

With the Freshman year drawing to a close, Lane is convinced that Fisker will hit its mark in 2012.  According to Lane, Fisker still plans to meet projections of 15,000 Karmas delivered in 2012.  A123 is taking a more cautious approach, projecting around 7,000 vehicles. Either number would actually be very good for a car that has a base price of $96,000. Even the 7,000-unit sales number would exceed the annual sales of such well-known $100k sedans as the Maserati Quattroporte or Audi R8. Those cars don't have any green chic, though, and that might make all the difference.

57.     On November 30, Fisker Automotive confidentially informed the DOE that a

modest investment increase of $37 million at mid-month had nudged its available cash up to a

still-thin $20 million.

58.     According to a confidential Quarterly Credit Report prepared by the DOE dated

December 12, 2011 [though not then publicly available]:

Throughout November [2011] [a] Fisker investor told DOE that Fisker could not raise additional equity cash unless DOE agreed to move financial covenants and milestones that Fisker would begin to breach on December 31, 2011. During a series of internal discussions in November, DOE concluded it was in the government's best interest to move the milestones back by one year in order to remove the barrier to equity which in turn would provide sufficient liquidity and time for DOE to assess the situation and formulate an action plan and amended LARA financial covenants and milestones. On December 5, DOE sent a letter to Fisker stating that it would move the covenants in order to enable commencement of an equity investment plan described in a December 5 letter to DOE from Fisker Chairman Ray Lane.

59.     The Quarterly Credit Report also stated that:

Fisker is raising this additional equity to fund long capital requirements, additional cost resulting from delays and last minute engineering changes

associated with the Karma's project launch, and additional liquidity needed to fund cash short falls caused by the build-up of excessive inventory levels of Karma components and delays in assembly, shipping from Finland to the United States and being able to wholesale Karmas to dealers. Fisker's Board of Directors reacted to launch delays and problems with supply chain management including excessive inventories of some components and shortages of critical parts needed to complete the assembly of vehicles by appointing new executive (made public December 15) Tom LaSorda as Vice Chairman of Fisker and Richard Beattie as Fisker's Chief Commercial Officer. Fisker will prepare an updated business plan with the Assistance (sic) of these new executives.

**IV.     Fisker Automotive Issues a Capital Call**

60.     Through an obscure provision in the April 2011 Offering documents called a "pay to play" capital call provision, on December 8, 2011, Fisker Automotive's Board of Directors unanimously approved a 40% "pay to play" capital call imposed on all Fisker Automotive investors requiring funding by Christmas -- meaning that Plaintiff would be forced to invest more funds in Fisker Automotive or face a severe dilution of its existing interests in Fisker Automotive.

61.     On Sunday, December 11, 2011, Greg Osborn, of Middlebury sent a detailed email, purportedly based on his conversations with Fisker Automotive representatives, to Atlas Capital and others describing the "pay to pay" plan and stating that Fisker Automotive would hold an emergency conference call the next day to explain the situation.

62.     Osborn attempted to mollify shocked investors by describing in detail how well things were going for Fisker Automotive and describing this forced investment as a prudent step towards an initial public offering. Specifically, Osborn stated:

All,

Happy Holidays. As you know, we have a call tomorrow regarding Fisker and it is IMPORTANT that you attend or follow up during the week with your representative. I personally apologize that I have not been able to respond one on one to all of the calls the last fews (sic) days, but I have been traveling the last 10 days for various business issues and needed to be with my family this weekend.

We have been trying to get as many of the facts as possible reference recent events at Fisker in preparation of tomorrow's call.

The good news is the company;

1. Has completed approximately $100 mill in a series D funding.

2. Is operating at approximately 35 cars a day or near 10,000 a year. (full production based on 6 days a week)

3. Has received written confirmation of the DOE's plans to proceed

4. Has commitments for an additional $150 mill from current investors.

For your review enclosed is the recent DOE letter and the Cap Table pre the Series D round. At the bottom of the email we cut and paste the 'waiver' that enabled the majority shareholders to perfect this offering and process (in orange) and a UNCONFIRMED general outline of how the deal alters your effective investment.(in purple)

With that said, we wanted to inform you in advance of the importance and purpose of tomorrows call. This last minute email will most likely create more questions then (sic) answers, but it does bring to the forefront the current situation and what action is required by you by December 24th, 2011. Our experience is, after understanding the facts surrounding this and the benefits, the original reaction wears off a bit and the logic and the positives of the financial upside sets in. We will attempt to explain in detail the current environment the best we can and we will have Keith Daubenspeck, a Fisker Board member and Chairman of Advanced Equities join our call towards the end. We will also accept questions at the end via email. Please email Chris@middsec.com for questions during the call tomorrow of which we will try to reply.

*  *  *

The fact is that that there is now a 40% 'pay to play' requirement by all to be funded by Christmas for all Fisker investors. This was approved unanimously by the Fisker Board of Directors last Thursday. We share this with you now, because at first take it is very frustrating, no one likes a forced hand. What we don't want is for tomorrows call details to be overwhelmed by your initial response, hence this email may help manage that. The fact is... This offering increases the security of your investment while enhancing the total return and the potential timing of return of your investment.

We hope that after you have had the time to hear the call and understand the 'why's' and what a investor gets in return, that you will see it as quite attractive. Net net there are benefits and challenges investing with large institutions in late

stage private equity. We were fortunate to have access to participate alongside these people Kleiner, NEA, Richard Lee [sic], Quatar Holdings [sic] as they have the deep pockets and can continue to fund and preserve a company.

For the record: All large investors have voted for this and are participating. We hadn't a choice as we are a minority shareholder.

Again the dirt is in the details, and tomorrow we will explain in detail the situation the best we can. Although no one likes having there (sic) hand forced, it is compelling and provides us with great leveraged upside and we encourage participation.

Reminder...WE DO NOT YET HAVE THE OFFICIAL TERM SHEET, but this is what we understand the Board has approved.
However, even without the term sheet, all funds above $10 mill have agreed to participate.

In summary, there is a 40% capital call, if you will.

1. If you participate for 40% of your original investment by Christmas, you will get 30% PENNY warrants on your new money and your original investment.

2. If you participate for 40% of your original investment by Jan 10th or so, you will get 15% PENNY warrant coverage on your new money and your original investment.

3. If you don't participate, you are converted to a 1/2 share of common. Or have a fixed cost of approximately $2.78 … a common share.

* * *

Based on preliminary analysis, if you participate prior to Christmas your break even is approximately $2.2 billion dollars post funding and you stay in a leveraged preferred situation and your cost drops to $1.07 a share. If you elect to pass, your break even is approximately $5.5Bill.

* * *

The public offering is still anticipated to be a Feb thru April goal. Markets permitting, pricing discussions suggest a $4 to $5 bill offering price.

THERE ARE NO GUARANTEES of such a offering. THERE IS MARKET AND OPERATIONAL RISK AND YOU COULD LOSE ALL OF YOUR INVESTMENT FOR MANY DIFFERENT REASONS. SEE DISCLAIMERS IN OFFERING DOCUMENTS.

But that is the plan and hopeful goal. So, if everything continues on track, we will hit our near first quarter goal and a very positive return. I provide a detailed example below reference this.

There are many reasons why the Company is doing this now and we hope tomorrow's call will assist in explaining it and see the many positives.

The bottom line, it was imperative that the Company and the Board be PROACTIVE vs. REACTIVE in managing the companies (sic) financial well being.

Allow me to explain. As per the last business plan, the company had suggested $150 mill in 2011 revenues and confirmed it needed to raise a total of $250mill in the 4th quarter of 2011 and the 1rst quarter of 2012 to assure the DOE funding. With some of the operational delays and the Solyndra situation, felt even more compelled to reduce market risk and secure its future. They felt with the angst surrounding Solyndra and the D.O.E coupled with manufacturing stalls with the EPA sticker, flooded leather etc, it was best to secure the DOE and the company quickly without depending on the public markets in Q1 2012 and/or future financings. This wait and see approach is perceived as too risky considering the never ending Euro Crisis. Hence they felt they should take control of their own destiny and secure their $650 mill in investments to date and the DOE funds now.

The terms they have proposed seem to do both. This funding secures our investment further and the companies [sic] prospects. In response to this offering the company.

1. Has a fully funded company

2. Secures the DOE loan follow thru without reliance on the public markets and to overcome 4th quarter production delays.

3. Enables the company to fully pursue the 2012 and 2013 business plans and launch of the NINA

4. Brings in a new tier one President and Vice Chair, who hales [sic] from a top 3 worldwide auto firm. Depending confirmation tomorrow, he will join the company to compliment the team post the funding.

5. Securing the above will allow for the S1 to filed post close accelerating the potential public offering described and disclaimed above.

In summary:

The company HAS successfully raised $98 Mill to date in the series D. All new funds in the Series D will get the additional warrant coverage on their new

investment as well. The new terms have already secured an additional $150 mill on top of the $98 mill as committed by all the lead investors for a total of the $250 mill required for the DOE loan. We expect in excess e$300 mill secures a new Executive to the team.

Richard Lee [sic], Quatar [sic], Kleiner, Perkins [sic], AEI, and NEA are all participating. They all have board seats and they all voted for the offering. Other new investors in this round include, Eric Schmidt the Google CEO, John Chambers the Cisco CEO, the founder and Chairman of Salesforce.com. Participating investors include Ray Lane the Chairman of Hewlett Packard and Fisker, John Doers Family trust, John is the Chairman of Kleiner and on the Google and Amazon Boards, and myself.

In summary, the NEA (just took Groupon public) and the Kleiner team said of Fisker post this offering[:]

'With the Karma winning the Luxury Car of the Year award, the EPA and Solyndra issues behind it, a new industry President, fully funded and operational, we would expect Fisker to be one of the hottest offerings in early 2012.'

We look forward to speaking tomorrow. We remain encouraged that barring any unforeseen circumstances in the market or at the company, we will all have a very positive return on investment.

Our first reaction and probably yours....

How were they able to do this? We thought we had "full ratchet anti dilute" etc.

The board is also the majority shareholders in each class and used the below waiver to make the changes described herein.

            (j)   Waiver of Adjustment of Conversion Price. Notwithstanding anything herein to the contrary, any downward adjustment of the Conversion Price of Series D-X Preferred Stock may be waived, either prospectively or retroactively and either generally or in a particular instance, by the consent of vote of the holders of the majority of the outstanding shares of the Series D-X Preferred Stock. Notwithstanding anything herein to the contrary, any downward adjustment of the Conversion Price of Series A-1 Preferred Stock may be waived, either prospectively or retroactively and either generally or in a particular instance, by the consent or vote of the holders of at least seventy-five percent (75%) of the outstanding shares of the Series A-1 Preferred Stock. Notwithstanding anything herein to the contrary, any downward adjustment of the Conversion Price of Series B-1 Preferred Stock may be waived, either prospectively or retroactively and either generally or in a particular instance, by the consent or vote of the holders of the majority of the outstanding shares of the Series B-1 Preferred Stock. Notwithstanding anything herein to the contrary, any

downward adjustment of the Conversion Price of Series C-1 Preferred Stock may be waived, either prospectively or retroactively and either generally or in a particular instance, by the consent or vote of the holders of the majority of the outstanding shares of the Series C-1 Preferred Stock. Notwithstanding anything herein to the contrary, any downward adjustment of the Conversion Price of Series D-1 Preferred Stock may be waived, either prospectively or retroactively and either generally or in a particular instance, by the consent or vote of the holders of the majority of the outstanding shares of the Series D-1 Preferred Stock. Any such waiver shall bind all future holders of shares of such series of Preferred Stock.

* * *

We hoped this helped, enjoy the DALLAS. New York GAME!

Regards,

The team.

63.     The next day, a conference call was held to explain the "pay to play" cram down on current investors during which, *inter alia*, Defendant Daubenspeck, extolled the market demand for the Fisker Karma and how well the Company was doing.

64.     On December 15, 2011, Osborn sent another email to Atlas Capital and others attaching a cover letter from Defendant Henrik Fisker, the Fisker Automotive Holdings, Inc. Information Statement dated December 14, 2011 detailing the "pay to play" offering, and the Amended and Restated Series D1 Preferred Stock Purchase Agreement. Osborn stated further that "[o]ur counsel is currently altering the SPV documents so we can get them to you as soon as possible. We will have the proper SPV paperwork and wire instructions to you this afternoon." A conference call was also scheduled later that day.

65.     The cover letter from Defendant Henrik Fisker extolled Fisker Automotive's progress and repeated the theme that the "pay to play" capital call was merely a prudent business decision:

- 24 -

Fisker Automotive continues to make tremendous progress. We are currently at a stable production rate of 25 Karma sedans per day and have been generating revenue of almost $2 million per day. I have personally engaged with many of our retailers and first Karma customers. The enthusiasm surrounding the Karma launch and the positive reception of the Karma by our retailers and customers is overwhelming. The Karma has also received amazing worldwide media recognition and accolades. Some recent examples include:

- Top Gear "Luxury Car of the Year"

- Automobile Magazine "Design of the Year"

- Time Magazine "50 Best Inventions of the Year

That said, I realize that it has been a long, and sometimes difficult, road to get to where we are today. We have had several delays to the Karma program due to component part shortages, obtaining emissions and regulatory clearances and fine tuning the Karma to get it ready for customers. Consequently, we did not realize revenue as expected in 2011. We now believe that raising equity is a prudent course of action. Improving our cash position will allow us to continue to build momentum behind the Karma production and sales launch and maintain the 2013 launch timing of the Nina sedan.

Management and the Board of Directors have determined that it is in the best interest of Fisker Automotive to raise equity through the D-1 Financing Capital Call that is described in detail in the attached Information Statement. We have also received the approval of a requisite vote of the stockholders to proceed with the Series D-1 Financing Capital Call. I encourage you to carefully review the Information Statement and consider a further investment in Fisker Automotive. Importantly, three of our major venture capital investors, Kleiner Perkins, NEA and Pacific Century, support this action and have already made, or committed to make, their capital calls, together totaling more than $57 million.

The entire Fisker team and I are grateful for the continued support of all of our investors. As we move forward, we are working extremely hard to reward this support by maximizing shareholder value.

66.     The December 14, 2011 Information Statement had a boxed and bold face

warning to investors on its first page stating:

**NOTE THAT THIS INFORMATION STATEMENT CONTAINS TIME-SENSITIVE MATERIAL. IF YOU ACT BY WEDNESDAY, DECEMBER 28, 2011, YOU WILL RECEIVE ADDITIONAL EQUITY IN THE COMPANY, AND IF YOU DO NOT ACT BY JANUARY 20, 2012, YOU MAY LOSE 50% OF YOUR INVESTMENT IN THE COMPANY.**

67.     The December 14, 2011 Information Statement also stated that Fisker Automotive "anticipates that the first closing of the Series D-1 Financing Capital Call will happen on or about Thursday, December 15, 2011. An additional closing is expected to be held on Wednesday, December 28, 2011."

68.     On December 21, 2011, the National Highway Traffic Safety Commission sent a letter to Fisker "acknowledging" a Fisker Automotive report of a "safety recall campaign which [would] be conducted under Federal law" of 239 Fisker Karmas due a battery problem that could cause a fire.

69.     On December 27, 2011, Atlas Capital invested $374,986.00 in Fisker Automotive Securities.

70.     On Thursday, December 29, 2011, *one day after* the first deadline to invest in the mandatory pay to play capital call, Fisker Automotive publicly announced its recall of 239 Fisker Karmas due the battery fire issue.

71.     According to a report in the News Journal (Wilmington, Delaware) dated December 30, 2011, "Fisker spokesman Roger Ormisher said <u>customers were alerted of the faulty batteries last week</u> -- and insists that the company is on top of the issue." The article also noted the seriousness of this issue, quoting John Gartner, an electric cars analyst at market research firm Pike Research, as saying customers likely expected more from Fisker's Karma, given its lofty price tag, and "It's certainly not good for their company in their initial outing of the vehicle to have something come up so quickly . . . . It's a little surprising that it's happening now and it wasn't caught before the vehicle was released."

## V.    Fisker Automotive Continues Raising Cash As It Implodes

72.     On February 7, 2012, the New Journal (Wilmington, Delaware) published an

article entitled "Fisker slows work at former GM site, lays off 26." The article stated that:

> A cash crunch has forced Fisker Automotive to lay off 26 of about 100 workers
> refurbishing the former General Motors plant near Newport as a U.S.
> manufacturing base for the startup company. The layoffs, which affected both
> regular employees and subcontractors, come as Fisker trims expenses while it
> waits to qualify to draw down more cash from the Department of Energy, which
> conditionally promised to lend the automaker $529 million to help build its first
> two models and get its Delaware operations running.
>
> The company, which also laid off 40 to 45 workers at its California headquarters,
> must meet specific fundraising, production and sales goals to qualify for
> successive disbursements from the loan. Fisker is behind schedule for producing
> and selling its first model, the $108,000 Karma sedan. 'Until that happens, they're
> trying to preserve the cash that they have,' said Alan Levin, Delaware's director
> of economic development. 'And unfortunately, until they meet the milestone that
> DOE continues to set ... they're not able to access the additional capital that they
> need.'
>
> In recent weeks, the company has scaled back 2012 sales projections for the
> Karma luxury sports car, blaming mileage and emissions certification that took
> longer than expected. It also needed to recall sold models to fix a coolant hose
> problem and, later, to issue a software upgrade to tame a balky console computer.
> Fisker has said it would begin assembling the company's second plug-in hybrid
> model -- still with just the project name 'Nina' -- at the Boxwood Road plant in
> mid-2013. Prototypes were to begin rolling out of the factory this fall.
>
> A Fisker spokesman said Monday that negotiations are under way with the
> Energy Department to modify the loan achievement goals to allow some cash to
> be drawn down. 'To date we have received $193 million of the $529 million
> Department of Energy loan, mostly for the Karma program, and received our last
> reimbursement in May 2011,' Fisker spokesman Roger Ormisher said in a
> statement Monday. 'We are renegotiating some terms of the DOE agreement for
> the $336 million balance of the loan related to the Project Nina program.'
> Ormisher said the exact terms of the loan conditions are confidential. 'The DOE
> can sometimes take a little bit of time,' Ormisher said. 'We can't keep going and
> going and going without that money.'
>
> With design work on the Karma largely complete, 40 to 45 workers also have
> been let go recently at Fisker's head-quarters in Anaheim, Calif., where about 350
> to 400 are employed. Subcontractors at the Delaware plant were told earlier this

year that work would be unavailable through January. Now it looks like their return this month will be delayed, Levin said.

Glitches and delays

Fisker officials characterized the layoffs as part of the complicated process of getting a billion-dollar car company off the ground. 'A flex model of expanding and contracting staffing for development of new cars is routine in the automotive industry,' Ormisher wrote. 'Project Nina is already well-advanced. Much of the engineering, design and development is near complete, and we expect to ramp up operations again quickly.'

73.     On February 28, 2012, Fisker Automotive announced that Defendant Henrik Fisker would resign as Fisker Automotive's CEO to be replaced by Mr. LaSorda who had joined Fisker Automotive two and half months earlier as its Vice Chairman. Notably, the confidential ATVM Loan contains a "Key Personnel" covenant requiring Mr. Fisker to be "responsible for the management of the borrower." The New York Times Blogs (Wheels) reported on the Company's conference call that day as well as a post-conference call interview with Fisker Automotive spokesman Ormisher stating that:

'The D.O.E. funding has been played a lot in the media,' Mr. LaSorda said during Tuesday's call, before claiming that the company could be profitable as early as 2013 without the federal money, and with the Karma sedan as the company's primary revenue generator. The Nina launch date was uncertain, he said, but development was continuing, despite the halt in federal financing.

Roger Ormisher, a Fisker spokesman, said in a telephone interview after the conference call that talks were continuing with the Energy Department on 'agreeable milestones and deadlines.' He added, however, that the company was 'exploring other revenue sources" in the event the loan was not renewed. 'But we still have confidence that we can reach an agreement with the D.O.E.,' he said.

74.     On March 22, 2012, Greg Osborn sent another email to Atlas Capital and other Fisker Automotive investors notifying them of another "pay to play" capital call whereby the investors would again face severe dilution of their investment if they did not purchase yet more

Fisker Automotive Securities.  Osborn's email directed Atlas Capital and other Fisker

Automotive investors to Fisker Automotive's offering documents online stating:

> Dear Fisker SPV Investors,
>
> We are pleased to enclose for your review the current Middlebury Ventures 2 SPV documents for the Extended D-1 Round with a link to EXHIBIT D. Due to the magnitude of the offering documents including Exhibit D, we have separated the Middlebury SPV Ventures 2 and Middlebury Ventures 3 offering documents in two separate emails and have provided a link to EXHIBIT D, the 'CONFIDENTIAL & PROPRIETARY DISCLOSURE AND NOTICE STATEMENT DATED AS OF MARCH 5, 2012, INCLUDING, WITHOUT LIMITATION, COPIES OF ALL FISKER SERIES D-1 TRANSACTION DOCUMENTS'. This is to assist those of you with sensitive servers that block emails containing large amount of data. For your added convenience, we have provided the signature pages as a separate attachment. Please make sure you are filling out the proper SPV 2 or SPV 3 documents and wiring to the appropriate titled account.
>
> In typical Fisker fashion this offering is time sensitive and rather rushed. Our apologies. Please note this is not our doing. It has been quite a task and we are pleased to have completed these documents along with Wollmuth Maher & Deutsch in such a timely fashion. Many of you have requested from us that we provide an exact percentage of your current investment needed to maintain your current position.
>
> Since this is a moving number and the final amount of the D-1 Round will not be known until post closing, we are suggesting a 15% participation in the Series D-1 extension based on an ~ $110 million closing. (If you do not participate, there is a approximate 22% dilution based on a ~$100 million offering. Should the round grow to $150 million or more, these numbers would increase. Although the official closing date is Friday March 30th, 2012, The Middlebury SPV Funds need your funds in house Thursday March 29th so we can transfer the SPV funds direct to Fisker on the final closing date, Friday March 29th, 2012.
>
> * * *
>
> To access the Fisker Documents, (EXHIBIT D) please visit https://themiddleburygroup.securevdr.com/ and login. Then proceed to the Fisker D-1 Round Subscription Documents subfolder.
> If you experience any difficulties during the login process, please contact Max Levine via telephone at (802) 377-5161 or via e-mail at Maxlevine@middsec.com.

75.     On March 29, 2011, Atlas Capital invested $275,997.81 in Fisker Automotive

Securities.

76.     On April 2, 2012, Fisker Automotive filed a Form D/A stating that it had raised

$392 million in this latest offering.

77.     On April 19, 2012, the Detroit Free Press reported that "Fisker Automotive has

laid off another dozen workers at the former General Motors plant in Delaware that it has been

refitting with federal and state money to build a new sedan."  The article stated further that

> '[t]he layoffs, which occurred quietly Friday, come as California-based Fisker
> continues talks with the U.S. Energy Department to unfreeze loan money that
> could determine whether it ever builds a car at the plant. Meanwhile, the state
> continues to pay utility bills for the factory in hopes that Fisker will still provide
> jobs there.
>
> For now, Fisker employs only a small maintenance team at the site 'protecting
> plant assets and maintaining the facility,' said Fisker spokesman Russell Datz.
> 'We have always had a flexible business model. The plant is now ready for the
> next phase of installing new production equipment.'

78.     On June 26, 2012, the Wall Street Journal Venture Capital Dispatch Blog

published an article entitled "Fisker Pursues $87M Capital Raise, Debt Deal, Amid DOE Loan

Suspension" and extensively quoted Defendant Lane, writing:

> Even as it's trying to raise $87 million in new equity marketed to investors by
> brokerage firm Advanced Equities, along with the debt deal, the company is
> continuing to sell its first car, the luxury plug-in Karma. 'We have 1,700 cars sold
> now,' said Ray Lane, managing partner at Kleiner Perkins Caufield & Byers and
> director on Fisker's board.
>
> In the first quarter, the company said it drew in $100 million in revenue. 'I'm
> looking at about $400 million in revenue this year. That would make it the fastest
> growing start-up ever,' Lane said.
>
> These projections, he added, don't include sales in China and Middle East, where
> the company is building relation-ships with dealerships. Fisker Automotive,
> however, is not profitable, said Lane. The Irvine, Calif.-based company still needs
> new capital to finance operations and to start ordering parts and production tools
> to build its next car model, Atlantic, which is central to the viability of the

business longer-term. 'You don't make money until volumes are up,' said Lane. The company needs to build the Atlantic, which would increase its volumes, and amortize its fixed costs across more units, as well as allow Fisker to negotiate better deals with suppliers. 'We can't move forward without the debt,' said Lane, referring to the Atlantic program.'

For a while, Irvine, Calif.-based Fisker was operating under the assumption that it has $529 million in federal loans, but last year the Department of Energy, which handles the loans, suspended issuing new checks because the car company missed some milestones. Fisker delayed the release of Karma and sold fewer Karmas than it promised under the DOE loan agreement. As a result of the loan suspension, Fisker stopped additional work on a plant in Delaware where it was planning to build the cars and laid off some employees.

The company has been using equity, the most expensive capital, to pay for the development of Atlantic to date. 'We spent $130 million on the Atlantic,' Lane said. 'No one wants to spend' more equity,' he said. That is the reason Fisker is in discussions with a syndicate of private lenders, led by the Royal Bank of Canada, he added.

A spokesman for the Royal Bank of Canada didn't respond to a request for comment. Roger Ormisher, spokesman for Fisker, declined to comment on any involvement of the loans. 'We've opened every door,' said Ormisher, adding that the company is evaluating different options.   Negotiations with the DOE are ongoing, said Ormisher. He declined to discuss Fisker's cash-burn.
Should the deal with the DOE fall through and the company has to turn to private lenders, it will have to pay more than it would have in interest, said Lane. The attractiveness of the federal loan lay in its low interest rate. Under the private deal that's being negotiated now, the DOE may be partially or fully repaid the amount that it already loaned to Fisker, said Lane. In the meantime, Fisker is using the services of Advanced Equities, a Chicago-based broker, to raise a new tranche of its Series D-1 financing.

Advanced Equities, which started marketing the new tranche for Fisker in the past few days, is aiming to raise $87 million toward a $500 million target with several closings to be complete by July 16, according to a person familiar with the situation. As of early April, Fisker raised $392 million in that round.
The Series D-1 preferred shares are being sold for $1.46 each. Investors can pay an extra cent to get a warrant to buy another preferred D-1 share, and another cent to buy two shares of common stock, according to two people familiar with the offering.

'We've added warrants as a sweetener,' said Lane. Ormisher declined to comment on details of the funding. Advanced Equities' spokesman didn't respond to a request for comment. The structure of the deal essentially allows an investor to buy two preferred shares for the price of one. At the same time, the company's

previous investors are not diluted until new investors exercise the warrant, and so for the time being, the valuation of the company remains higher than it would be if investors were sold two preferred shares for half the price.

The situation with the DOE, said Lane, 'caused us to accelerate capital raising.' That is leading to certain compromises. Advanced Equities has recently been served a Wells Notice from the Securities & Exchange Commission, which indicates the SEC may enforce action against it.

Asked why Kleiner Perkins is continuing to use Advanced Equities' services in light of the SEC investigation, Lane said: 'They are good at what they do.'

79.     On August 14, 2012, LaSorda was replaced as CEO by the former head of the Chevy Volt hybrid program, Tony Posowatz.

80.     On or about August 21, 2012, Fisker Automotive announced that it was recalling 1377 Karmas – this time because of another potential fire problem.

81.     On September 19, 2012, Greg Osborn sent Atlas Capital and other Fisker Automotive investors  another "pay to play" capital call to invest in Series E Fisker Automotive preferred stock through a renamed entity Ridgemakers SPV II, LLC.  Again, the prior investors' failure to participate would result is severe dilution of their current holdings.  As with the previous offerings, investors were directed to view Fisker Automotive documents which were available only by "electronic… access."

82.     On September 25, 2011, Atlas Capital invested $352,351.79 in Fisker Automotive Securities.

83.     Combined with the funds raised by Advanced Equities and certain investments from Kleiner Perkins and New Enterprise Associates, Fisker Automotive raised approximately $104 million through this private placement offering.

84.     On or about October 16, 2012, Fisker Automotive's battery supplier, A123, filed for bankruptcy protection. Shortly thereafter, Fisker Automotive stopped production of the

Karma, laid off another 40 employees, and retained an investment banking advisory firm to find a "strategic partner" to save the Company.

85.     On March 13, 2013, Defendant Henrik Fisker resigned from Fisker Automotive's Board of Directors.  Shortly thereafter, it was announced that Fisker Automotive had hired the law firm of Kirkland & Ellis, PC to advise it on a possible bankruptcy filing.

86.     In April 2013, Fisker Automotive laid off another 160 employees (75% of its remaining workforce).

87.     On April 17, 2013, PrivCO, a private research firm, published a detailed report entitled "FISKER AUTOMOTIVE'S ROAD TO RUIN: How a 'Billion-Dollar Startup Became a Billion-Dollar Disaster'" which was "supported by over 11,000 pages of original never-before published documents obtained through multiple Freedom Of Information Act requests."

88.     On April 21, 2013, the U.S. Government reported that it had seized $21 million in cash from Fisker Automotive to fulfill the first loan payment.

89.     Defendant Lane resigned from Fisker Automotive's Board of Directors in May 2013.

90.     On September 17, 2013, the DOE put the remaining $168 million Fisker Automotive owed on the ATVM Loan out to bid in a public auction.

91.     On November 22, 2013, Fisker Automotive filed for bankruptcy protection.

### FIRST CLAIM FOR RELIEF

**For Violations of Section 12(a)(2) of the Securities Act Against All Defendants Except Kleiner Perkins and Ace Strength**

92.     Plaintiff incorporates by reference and realleges each of the foregoing paragraphs.

93.     Plaintiff does not claim for purposes of this Count that Defendants committed intentional or reckless misconduct or acted with scienter or fraudulent intent.

94.     Fisker Automotive is the issuer of the securities from which the Fisker
Automotive Securities Plaintiff purchased are derived.  Defendants, with the exceptions of
Kleiner Perkins and Ace Strength which are named as control persons in Count II below, were
sellers and offerors and/or solicitors of purchasers of the Fisker Automotive Securities offered,
including Atlas Capital.  Plaintiff purchased these securities as a result of the material omissions
set forth in ¶¶ 95-96 below.  All of the offering materials including Prospectuses and other
documents made available to purchasers of Fisker Automotive Securities as described at ¶¶ 39-
40, 60-67, 74 and 81 above, and the public statements made by various Defendants as to Fisker
Automotive's operations described herein were materially false and misleading because they
omitted to state material facts necessary to make the statements made, under the circumstances in
which they were made, not misleading; and failed to disclose material facts, as described below.

95.     Specifically, *e.g.*, all the offering documents associated with the sale of Fisker
Automotive Securities described above, and public statements by  Defendants Lane, Fisker, and
Daubenspeck described at ¶¶ 38, 45, 55-56, 63, 65, 78 above were materially false and
misleading because they failed to disclose the facts that: (i) Fisker Automotive had made
contradictory presentations to the DOE in March and June of 2011 regarding Fisker
Automotive's satisfaction of the February 2011 Fisker Karma commercial production milestone
under the ATVM Loan covenants; and (ii) as a result, the DOE issued a issued a Drawstop
Notice halting any further advancements under the ATVM Loan in June 2011 because DOE
officials believed they had been misled.

96.     Defendants Henrik Fisker's, DaMour's, and Koehler's statements on the July 27,
2011 conference call described at ¶¶ 49-50 were also materially false and misleading for the
same reasons.

97.     A confidential Quarterly Credit Report prepared by the DOE dated December 12, 2011 which was made public in PrivCo's April 17, 2013 report on Fisker Automotive's demise confirms the omitted facts described in ¶¶ 95-96 above, stating that in June 2011, "Fisker presented new information calling into question whether the [February 2011] launch milestone had been met. After receiving the June 2011 presentation, DOE halted further funding of the loan."

98.     The offering documents in connection with the March 2012 and September 2012 offerings described in ¶¶ 74 and 81, above were also materially false and misleading because it was not disclosed that Mr. Fisker's stepping down from the day to day management of Fisker Automotive as its CEO in February 2012 caused Fisker Automotive to be in default of the ATVM Loan "Key Personnel" covenant requiring Mr. Fisker to be "responsible for the management of the borrower."

99.     These Defendants were obligated to make a reasonable and diligent investigation of the statements made in various offering documents to ensure such statements were true and that there was no omission of material fact required to be stated in order to make the statements contained therein not misleading.  None of these Defendants made a reasonable investigation or possessed reasonable grounds for the belief that their statements were accurate and complete in all material respects.  Had they done so, these Defendants would have known of the material omissions alleged herein.

100.    At the time it purchased Fisker Automotive Securities, Plaintiff did not know, and by the reasonable exercise of care could not have known, of the material omitted facts alleged herein.

101.     In connection with the sale of Fisker Automotive Securities, these Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce and the United States Mails.

102.     This action is brought within one year after the discovery of the material omissions.

103.     By reason of the foregoing, these Defendants have violated Section 12(a)(2) of the Securities Act and are liable to Plaintiff, which has been damaged by reason of such violations.

104.     Accordingly, Plaintiff has the right to rescind and recover the consideration paid for its Fisker Automotive Securities and hereby elects to rescind and tender its Fisker Automotive Securities to the Defendants named herein.

## SECOND CLAIM FOR RELIEF

**For Violations of Section 15 of the Securities Act**
**Against Defendants Kleiner Perkins, Ray Lane, Henrik Fisker,**
**Bernhard Koehler, Joe Damour, Keith Daubenspeck, Richard Li Tzar Kai and Ace**
**Strength**

105.     Plaintiff repeats and realleges each and every allegation contained above.

106.     This count is asserted against Kleiner Perkins, Ray Lane, Henrik Fisker, Bernhard Koehler, Joe Damour, Keith Daubenspeck, Richard Li Tzar Kai, and Ace Strength (the "Section 15 Defendants"), and is based upon Section 15 of the Securities Act.

107.     Plaintiff does not claim, for purposes of this Count, that the Section 15 Defendants committed intentional or reckless misconduct or acted with scienter or fraudulent intent.

108.     The Section 15 Defendants, by virtue of their senior management positions, stock ownership, directorships and specific acts were, at the time of the wrongs alleged herein and as

set forth herein, each a controlling person of Fisker Automotive.  The Section 15 Defendants had

the power and influence and exercised the same to cause Fisker Automotive to disseminate

materially false and misleading offering documents.

109.   Based on each Section 15 Defendant's having been a signatory to the offering

documents and/or having otherwise participated in the process which allowed the offerings to be

completed, each Section 15 Defendant is liable to Plaintiff for violation of Section 15 of the

Securities Act.

## THIRD CLAIM FOR RELIEF

### For Violation of Section 10(b) of the Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants Except Kleiner Perkins and Ace Strength

110.   Plaintiff repeats and realleges each and every allegation contained above,

excepting ¶¶ 92-109.

111.   This Count is asserted against all defendants except Kleiner Perkins and Ace

Strength for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated

thereunder.

112.   Defendants knowingly or with deliberate recklessness, disseminated or approved

materially false and misleading statements specified herein in that they failed to disclose material

facts necessary in order to make the statements made, in light of the circumstances under which

they were made, not misleading.

113.   Defendants, with the exception of Kleiner Perkins and Ace Strength, which are

named as a control persons in Count IV below, individually and in concert, directly and

indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails,

engaged and participated in a continuous course of conduct to conceal adverse information about

the business, operations and future prospects of the Company as specified herein.

114.    These Defendants had actual knowledge of the material omission of facts set forth herein, or acted with deliberate reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them.  Defendants' material omissions in offering documents described at ¶¶ 39-40, 60-67, 74 and 81 above and Defendants Lane's, Fisker's and/or Daubenspeck's statements described at ¶¶ 38, 45, 55-56, 63, 65 and 81 were done knowingly or recklessly and for the purpose and effect of concealing material information from Atlas Capital because they failed to disclose the facts that: (i) Fisker Automotive had made contradictory presentations to the DOE in March and June of 2011 regarding Fisker Automotive's satisfaction of the February 2011 Fisker Karma commercial production milestone under the ATVM Loan covenants; and (ii) as a result, the DOE issued a issued a Drawstop Notice halting any further advancements under the ATVM Loan in June 2011 because DOE officials believed they had been misled.

115.    Defendants Henrik Fisker's, DaMour's, and Koehler's statements on the July 27, 2011 conference call described at ¶¶ 49-50 were also materially false and misleading because they knowingly, or with deliberate reckless disregard, failed to disclose these same facts.

116.    In addition, in connection with the December 2011 "pay to play" capital call described at ¶¶ 60-67 in which Atlas invested on or before December 28, 2011 Defendants concealed that fact that Fisker Automotive had initiated recall of Fisker Karmas necessitated by battery fires which Fisker Automotive announced on December 29, 2011 -- exactly one day after this financing round closed.

117.    In addition, the offering documents in connection with the March 2012 and September 2012 offerings described in ¶¶ 74 and 81, above were also materially false and misleading because it was not disclosed that Mr. Fisker's stepping down from the day to day

management of Fisker Automotive as its CEO in February 2012 caused Fisker Automotive to be

in default of the ATVM Loan "Key Personnel" covenant requiring Mr. Fisker to be "responsible

for the management of the borrower."

118.     As demonstrated by statements at all relevant times, if Defendants did not have

actual knowledge of the omissions alleged, they were reckless in failing to obtain such

knowledge by deliberately refraining from taking those steps necessary to discover whether those

statements were false or misleading.

119.     A confidential Quarterly Credit Report prepared by the DOE dated December 12,

2011 which was made public in PrivCo's April 17, 2013 report on Fisker's demise confirms the

facts stated in ¶¶ 114-115 above and supports the fact that these Defendants acted with actual

knowledge or deliberately reckless disregard in failing to disclose such material facts, stating that

in June 2011, "Fisker presented new information calling into question whether the [February

2011] launch milestone had been met. After receiving the June 2011 presentation, DOE halted

further funding of the loan."

120.     As a result of the failure to disclose material facts, the prices for Fisker securities

were artificially inflated.

121.     Had Plaintiff known the truth regarding the default of ATVM Loan covenants, the

December 2011 recall due to battery fires, and Fisker's default of the DOE confidential "Key

Personnel" loan covenant which were not disclosed, Plaintiff would not have purchased or

otherwise acquired its Fisker securities, or, if it had purchased such securities, it would not have

done so at the artificially inflated prices which it paid.

122.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange

Act and Rule 10b-5 promulgated thereunder.

123.    As a direct and proximate result of the defendants' wrongful conduct, Plaintiffs suffered damages in connection with its purchases of Fisker securities.

**FOURTH CLAIM FOR RELIEF**

**For Violation of Section 20(a) of the Exchange Act Against Defendants
Kleiner Perkins, Ray Lane, Henrik Fisker, Joe DaMour,
Bernhard Koehler, Keith Daubenspeck, Richard Li Tzar Kai and Ace Strength**

124.    Plaintiff repeats and realleges each and every allegation contained above, excepting ¶¶ 92-109.

125.    This Count is asserted against Kleiner Perkins, Ray Lane, Henrik Fisker, Joe DaMour, Bernhard Koehler, Keith Daubenspeck, Richard Li Tzar Kai, and Ace Strength (the "Section 20 Defendants"), for violations of Section 20(a) of the Exchange Act.

126.    The Section 20 Defendants acted as controlling persons of Fisker Automotive within the meaning of Section 20(a) of the Exchange Act.

127.    By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the material omissions withheld from the investing public, the Section 20 Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Fisker Automotive, including the contents and dissemination of the various statements which Plaintiff contends omit material information.

128.    The Section 20 Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged to have omitted material information prior to these statements being issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

129.     As set forth above, each defendant, as well as Fisker Automotive, violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Section 20 Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate cause result of the Section 20 Defendants' wrongful conduct, Plaintiff suffered damages in connection with its purchases of Fisker securities.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.     Awarding compensatory damages in favor of Plaintiff against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

B.     With respect to Counts I and II, Ordering that Plaintiff's purchases be rescinded and Plaintiff's funds used to purchase Fisker Automotive Securities be return to it;

C.     Awarding Plaintiff its reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury.

ROSENTHAL, MONHAIT & GODDESS, P.A.

Norman M. Monhait (#1040)
919 Market Street, Suite 1401
Citizens Bank Center
Wilmington, Delaware 19801
TEL: (302) 656-4433
FAX: (302) 658-7567
nmonhait@rmgglaw.com
**Attorneys for Plaintiff**

OF COUNSEL:

**KLAFTER OLSEN & LESSER LLP**
Kurt B. Olsen
1250 Connecticut Ave., N.W.
Suite 200
Washington, D.C. 20036
(202) 261-3553
ko@klafterolsen.com

**BERGER & MONTAGUE, P.C.**
Todd S. Collins
Douglas M. Risen
1622 Locust Street
Philadelphia, PA 19103
(215) 875-3000
tcollins@bm.net

December 27, 2013