## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

IN RE FISKER AUTOMOTIVE HOLDINGS, )   Civ. No. 13-2100-SLR
INC. SHAREHOLDER LITIGATION     )

Norman M. Monhait, Esquire and P. Bradford deLeeuw, Esquire of Rosenthal, Monhait & Goddess, P.A., Wilmington, Delaware. Counsel for Plaintiffs. Of Counsel: Kurt Olsen, Esquire of Klafter Olsen & Lesser LLP and Todd S. Collins, Esquire and Barbara A. Podell, Esquire of Berger & Montague, P.C.

M. Duncan Grant, Esquire and Christopher B. Chuff., Esquire of Pepper Hamilton LLP, Wilmington, Delaware. Counsel for Defendant Keith Daubenspeck. Of Counsel: Min Choi, Esquire of Pepper Hamilton LLP.

Vernon R. Proctor, Esquire of Proctor Heyman Enerio LLP, Wilmington, Delaware. Counsel for Defendant Peter McDonnell. Of Counsel: Steven J. Rosenberg, Esquire of Steven J. Rosenberg, P.C.

William B. Chandler III, Esquire and Ian R. Liston, Esquire of Wilson Sonsini Goodrich & Rosati, P.C., Wilmington, Delaware. Counsel for Defendants Henrik Fisker and Bernhard Koehler. Of Counsel: David J. Berger, Esquire and Steven Guggenheim, Esquire of Wilson Sonsini Goodrich & Rosati, P.C.

J. Clayton Athey, Esquire of Prickett, Jones & Elliott, P.A., Wilmington, Delaware. Counsel for Defendant Joe DaMour. Of Counsel: Peter M. Stone, Esquire and Panteha Abdollahi, Esquire of Paul Hastings LLP.

Samuel A. Nolen, Esquire and Katharine C. Lester, Esquire of Richards, Layton & Finger, P.A., Wilmington, Delaware. Counsel for Defendants Richard Li Tzar Kai and Ace Strength Ltd. Of Counsel: Glenn M. Kurtz, Esquire, Douglas P. Baumstein, Esquire, and Kimberly A. Haviv, Esquire of White & Case LLP.

Kenneth J. Nachbar, Esquire and Lindsay M. Kwoka, Esquire of Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware. Counsel for Defendants Kleiner Perkins Caufield & Byers LLC and Ray Lane. Of Counsel: Michael D. Celio, Esquire, Laurie Carr Mims, Esquire, and Sophie A. Hood, Esquire of Keker & Van Nest LLP.

## MEMORANDUM OPINION

Dated: September 9, 2015
Wilmington, Delaware

*[signature]*
**ROBINSON, District Judge**

## I. INTRODUCTION

By an order dated June 30, 2014, the court consolidated three securities fraud lawsuits filed against defendants Henrik Fisker, Bernhard Koehler, Joe DaMour, Peter McDonnell, Kleiner Perkins Caufield & Byers LLC, Ray Lane, Keith Daubenspeck, Richard Li Tzar Kai, and Ace Strength, Ltd. (collectively "defendants").[1] (D.I. 23) On July 23, 2014, plaintiffs[2] filed an amended consolidated complaint ("complaint") alleging violations of the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act"). (D.I. 24) Presently before the court are defendants' motions to dismiss the consolidated complaint. (D.I. 29; D.I. 31; D.I. 33; D.I. 36; D.I. 38; D.I. 43) Plaintiffs filed a motion for judicial notice of certain documents. (D.I. 54) The court has jurisdiction pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v), Section 27 of the Exchange Act (15 U.S.C. § 78aa), and 28 U.S.C. § 1331.

## II. BACKGROUND

### A. The Parties

Plaintiffs PEAK6 Opportunities Fund L.L.C. and MCP Fisker are Illinois-based entities. Plaintiff 8888 Investments GmbH is a Swiss-based entity. Plaintiff 12BF Global Investments, Ltd. is a company organized under the laws of the Cayman Islands with limited liability. Plaintiff ASC Fisker L.L.C. is a Florida-based entity. Plaintiff CK

---

[1] The present action filed on December 27, 2013; *CK Investments LLC v. Fisker*, Civ. No. 14-118 filed on January 31, 2014; and *PEAK6 Opportunities Fund L.L.C. v. Fisker*, Civ. No. 14-119 filed on January 31, 2014. All citations are to the present action, Civ. No. 13-2100, unless otherwise indicated.

[2] Defined below.

Investments LLC ("CK Investments") is a Maryland-based entity. The following entities are based in Texas: Plaintiff Atlas Management, the general partner and investment advisor to plaintiff Atlas Fund (collectively, "Atlas"); plaintiff Hunse Investments, L.P. ("Hunse Investments"); plaintiff Southwell Partners, L.P. ("Southwell"); plaintiff Sandor Master Capital Fund ("Sandor"); and plaintiff Pinnacle Family Office Investments, L.P. ("Pinnacle"). Plaintiffs SAML Partners ("SAML Partners") and Kenneth & Kimberly Roebbelen Revocable Trust of 2001 ("KKRR Trust") are California-based entities. Plaintiffs David W. Raisbeck ("Raisbeck") and Dane Andreeff ("Andreeff") are residents of Florida. Plaintiff John S. Lemak ("Lemak") is a resident of Texas. Plaintiff Brian Smith ("Smith") is a resident of Utah. (D.I. 24 at ¶¶ 9-25)

Non-party Fisker Automotive is a Delaware corporation which had its principal place of business in Anaheim, California. Non-parties Middlebury Group LLC, Middlebury Ventures II/III, LLC, and/or Ridgemakers SPV II/III, LLC (collectively, "'Middlebury")[3] are Delaware limited liability companies, which were also used by Fisker Automotive to raise capital. (*Id.* at ¶¶ 26, 36)

Defendant Henrik Fisker ("Fisker") was a co-founder and Director of Fisker Automotive. He was also Fisker Automotive's Chief Executive Officer from its inception through February 2012. Defendant Bernhard Koehler ("Koehler") was a co-founder of Fisker Automotive's predecessor entity, Fisker Coachbuild, LLC, and was Fisker Automotive's Chief Operating Officer at all relevant times. Defendant Joe DaMour ("DaMour") was Fisker Automotive's Chief Financial Officer at all relevant times through

---

[3] Plaintiffs Atlas, CK Investments, Raisbeck, Hunse Investments, Southwell, Sandor, Lemak, Pinnacle, Andreeff, SAML Partners, KKRR Trust, and Smith are collectively the Middlebury plaintiffs.

2

July 2012, after which he acted as a "special adviser" to Fisker Automotive. Defendant Kleiner Perkins Caufield & Byers ("Kleiner Perkins") is a venture capital firm with its headquarters in Menlo Park, California, and was a controlling shareholder of Fisker Automotive. Defendant Ray Lane was a Managing Partner of Kleiner Perkins and was Fisker Automotive's Chairman of the Board of Directors at all relevant times. Defendant Ace Strength Ltd ("Ace Strength") is an investment vehicle through which defendant Richard Li Tzar Kai ("Li") invested in Fisker Automotive. Ace Strength was a controlling shareholder of Fisker Automotive. Li was a member of Fisker Automotive's Board of Directors at all relevant times. Defendant Keith Daubenspeck ("Daubenspeck") was a Director of Fisker Automotive and cofounder of Advanced Equities, Inc. ("Advanced Equities"), which was one of several investment banks or vehicles that Fisker Automotive used to raise capital. Defendant Peter McDonnell ("McDonnell") was the senior managing director of the investment banking group at Advanced Equities and was responsible for, inter alia, marketing Fisker Automotive's Series D-1 offering. (Id. at ¶¶ 27-35)

## B. Fisker Automotive

In 2003, Fisker and Koehler founded Fisker Coachbuild LLC to create "new exterior car designs while utilizing existing luxury car engineering." (D.I. 24 at ¶ 37) On August 7, 2007, Quantum Fuel Systems Technologies Worldwide, Inc. ("Quantum Fuel Systems") and Fisker Coachbuild, LLC, launched Fisker Automotive to build plug-in hybrid cars and in the process sold $5.5 million in Series A financing. Fisker Automotive anticipated initial deliveries of a four-door sports sedan by December 2009. (Id. at ¶¶ 38-39) In January 2008, Fisker Automotive completed a $20 million Series B

3

round of financing, with Kleiner Perkins contributing more than $10 million and Lane joining Fisker Automotive's Board. (Id. at ¶¶ 41-42)

On or about December 31, 2008, Fisker Automotive applied for a loan with the U.S. Department of Energy ("DOE") under the DOE's Advanced Technology Vehicles Manufacturing Loan Program ("the ATVM loan"). (Id. at ¶ 44) On or about March 2, 2009, Fisker Automotive raised approximately $68.5 million in Series C financing, including another investment from Kleiner Perkins. (Id. at ¶ 45) On August 23, 2009, Koehler wrote an email to the DOE inquiring about the status of the ATVM loan application, because of financial concerns. (Id. at ¶ 46) On September 18, 2009, the DOE issued a $528.7 million Conditional Commitment Letter and allocated $169.3 million for Fisker Automotive to complete its first vehicle, the Fisker Karma ("Karma"), and $359 million to complete a low cost plug-in hybrid, the Fisker Nina. Fisker Automotive had to complete several "milestones" to avoid default, including raising additional outside capital by certain dates and beginning commercial production of the Karma vehicle by February 2011 ("February 2011 Karma production milestone"). (Id. at ¶¶ 47-51)

On or about January 13, 2010, Fisker Automotive and A123 Systems, Inc. ("A123") entered into a supply agreement for automotive batteries. A123 also agreed to invest approximately $20.5 million in Fisker Automotive. (Id. at ¶ 49) On January 20, 2010, an article[4] based on interviews with Fisker and Lane stated: "Lane said Fisker [Automotive] will grab the investing momentum surrounding the company to complete

---

[4] Car Maker Taps Funding Karma, Wall Street Journal, January 20, 2010 (based primarily on interviews with Fisker and Lane).

4

the $150 million funding round in 'the next month or two.'" (*Id.* at ¶ 50)  On or about

May 5, 2010, Fisker Automotive raised an additional $145 million in Series A-1 venture

capital from investors, including Kleiner Perkins and Advanced Equities (the latter

raising approximately $27 million from 347 private investors a few weeks later). (*Id.* at ¶

52)

In March 2011, Fisker Automotive made a non-public presentation to DOE

officials, representing that it met the February 2011 Karma production milestone for the

ATVM Loan, when in fact it had not. (*Id.* at ¶ 53)  On or about March 23, 2011, Fisker

Automotive raised an additional $190 million in private equity including investments from

Kleiner Perkins and Advanced Equities. (*Id.* at ¶ 54)  In April 2011, Fisker Automotive

solicited qualified investors in connection with a $100 million offering of Series C-1

Preferred Stock (the "April 2011 Offering").  The related offering documents, including a

Confidential Private Placement Memorandum dated March 31, 2011 ("March 2011

CPPM"), were available to plaintiffs and other investors. (*Id.* at ¶ 56)  The March 2011

CPPM described related party transactions and stated that "Daubenspeck, AEFC and

its affiliates, including [Advanced Equities], have an economic interest in Fisker's

success as well as the success of the Offering." (*Id.* at ¶ 56; D.I. 53, ex. E at 42)  It also

contained a statement on the cover page – "Preliminary Draft – Terms may Change

Subject to Board and Shareholder Approval." (D.I. 53, ex. E)  During the same

timeframe, Middlebury circulated a Confidential Private Placement Memorandum ("April

2011 Middlebury CPPM") to the Middlebury plaintiffs soliciting qualified investors.

Potential investors, including plaintiffs, could examine Fisker Automotive's "Series C-1

Transaction Documents" through a website link with the password included in the April

2011 Middlebury CPPM. (D.I. 24 at ¶ 57) The April 2011 Middlebury CPPM stated that Fisker Automotive had "incurred losses in the operation of our business and anticipate that we will continue to incur losses for the future." (*Id.* at ¶ 57; D.I. 53, ex. E at 44) It also disclosed that "loss of key certain key personnel without DOE consent" could trigger a default on the ATVM loan. (D.I. 53, ex. E at 44) It further included an "exculpation among purchasers" clause stating that the purchasers are relying solely on Fisker Automotive and "its officers and directors" in making the decision to invest. (D.I. 53, ex. G at 18) By May 2011, Kleiner Perkins owned a 12.61% equity stake in Fisker Automotive and Ace Strength 10.15%. (D.I. 24 at ¶ 59) On May 13, 2011, an article[5] stated that "Lane, a managing partner at storied venture capital firm Kleiner Perkins Caufield & Byers, said Fisker Automotive also plans to go public in the future . . . ." (*Id.* at ¶ 60)

Fisker Automotive continued to draw approximately $29 million on the ATVM loan from February through May 2011. (*Id.* at ¶ 64) In May 2011, after Fisker Automotive had completely drawn down the Fisker Karma portion of the ATVM Loan, the DOE issued a non-public "drawstop notice" to the Federal Financing Bank preventing Fisker Automotive from making any further draws on the Fisker Nina phase of the loan. (*Id.* at ¶ 61) In June 2011, Fisker Automotive informed the DOE that it had not met the February 2011 Karma production milestone, contrary to its March 2011 representation. On or about June 6, 2011, Fisker Automotive raised another $115

---

[5] *Luxury hybrid electric car maker Fisker Automotive raises an extra $100M*, VentureBeat, May 13, 2011.

million in venture capital, including investments from Advanced Equities, Kleiner Perkins and a new investor, New Enterprise Associates. (*Id.* at ¶ 62)

In July 2011, Fisker Automotive began preparations for a new round of financing. On July 27, 2011 (on behalf of Fisker Automotive), McDonnell, Fisker, Koehler and DaMour held a conference call with analysts and investors designed to solicit investors "for a new round of private equity financing to raise approximately $150 million by issuing Series D-1 shares of Fisker Automotive." (*Id.* at ¶ 66) DaMour discussed the ATVM loan, but did not mention that funds had been cut off. He explained that the interest rates were low and refinancing would not be needed.[6] A replay of the call and a PowerPoint presentation by Fisker Automotive was made available to plaintiffs and other investors. (*Id.* at ¶¶ 66-67) On August 21, 2011, an article[7] stated that "Fisker Automotive is using a flurry of hype surrounding its first car -- the $98,000 Karma hybrid -- to ask for another $200 million from investors . . . ." (*Id.* at ¶ 68) On September 15, 2011, Fisker Automotive began twelve rounds of sales of Series D-1 stock (ending on December 2, 2011), raising a total of approximately $86 million based on offering

_____

[6] Specifically, DaMour stated:

> We've already raised over $600 million worth of equity and when you combine that with the Department of Energy loans, which we secured, which are $530 million - that's $1.1 billion of total capital already secured for the business.
>
> . . .
>
> But importantly, a significant cash cushion which provides significant security and comfort to our suppliers and our dealers and all the other major partners we have that run the business with us. So in sum, we know we are very well capitalized today.

(D.I. 24 at ¶ 67)
[7] *Fisker asks investors for $200M more: Funding is being called a 'pre-IPO' round*, The News Journal (Wilmington, Delaware), August 21, 2011.

documents distributed in August 2011. The Amended and Restated Series D-1

Preferred Stock Purchase Agreement ("December 2011 stock purchase agreement")

states: "The Knowledge of the Company shall mean the Knowledge of Henrik Fisker,

Bernhard Koehler, and Joseph DaMour." (*Id.* at ¶ 69) The December 2011 stock

purchase agreement also contained an "exculpation among purchasers" stating that the

purchasers are relying solely on Fisker Automotive and "its officers and directors" in

making the decision to invest. (D.I. 53, ex. H at 21)

On October 20, 2011, the DOE posted a press release on its website touting the

ATVM loan program and Fisker Automotive. (D.I. 24 at ¶ 70) The DOE press release

stated in part, "[w]ith the help of a $529 million loan, Fisker is producing high

performance vehicles with an advanced hybrid electric powertrain that could

significantly improve performance and fuel economy." It explained that the two-part

loan provides $169 million for the Fisker Karma (developed in "Fisker [Automotive]'s US

facilities, including its headquarters in Irvine, California which has 700 employees and

plans to continue hiring") and $359 million for the Fisker Nina (which will be produced in

a now "shuttered General Motors plant in Delaware" and employ "more than 2,500

workers"). It also stated that "Fisker [Automotive]'s production schedule was delayed by

regulatory issues that were outside of its control, but [Fisker Automotive] has

successfully raised more than $650 million in private sector investment to support its

ongoing operations since closing its DOE loan." (*Id.* at ¶ 70) On October 26, 2011,

Fisker Automotive (with McDonnell, Fisker, Koehler, and DaMour participating) held a

conference call with investors. Plaintiffs summarized the call as "investors expressed

concerns about the ATVM Loan in light of the recent bankruptcy filing of DOE loan

8

guarantee recipient, Solyndra. Defendant Henrik Fisker stated that there was no risk of losing the DOE loan." (*Id.* at ¶ 71)

On November 1, 2011, Fisker Automotive confidentially informed the DOE that it would run out of cash within three days without additional government loan money or an injection of private equity. (*Id.* at ¶ 72) On November 4, 2011, A123 announced it was lowering its 2011 revenue guidance range "due to an unexpected reduction in orders for battery packs from Fisker Automotive . . . ." (*Id.* at ¶ 73) In November 2011, two articles[8] based on interviews with Lane stated that Fisker Automotive would meet its 2012 production goals. According to Lane, "[i]In production of a first vehicle, everything doesn't go the way you plan . . . . Next year, we'll do exactly what we plan." (*Id.* at ¶¶ 74-75) On November 30, 2011, Fisker Automotive confidentially informed the DOE that a modest investment increase of $37 million at mid-month had nudged its available cash up to a still-thin $20 million. (*Id.* at ¶ 76)

On December 8, 2011, Fisker Automotive's Board of Directors unanimously approved a 40% "pay to play" capital call imposed on all Fisker Automotive investors (the "December 2011 Capital Call"), based on "an obscure provision in the April 2011 Offering documents called a 'pay to play' capital call provision."[9] Investors faced penalties of "having each share of preferred stock converted to one-half share of common stock, as well as the severe dilution of their existing interests in Fisker Automotive" if they did not comply. (*Id.* at ¶ 79) On Sunday, December 11, 2011, Greg

---

[8] *Fisker on track to make electric sports cars, despite delays*, Calgary Herald (Alberta), November 18, 2011 and *Fisker says Karma will meet 15,000 production target for 2012*, AutoblogGreen, November 26, 2011.

[9] It is unclear in the complaint to which specific documents this refers.

9

Osborn ("Osborn") of Middlebury sent an email to certain investors detailing the "pay to play" plan and attempting to appease the investors. (*Id.* at ¶¶ 80-81) The email stated that "Daubenspeck, a Fisker Board member and Chairman of Advanced Equities [will] join our call" the next day. (*Id.* at ¶ 81) On December 15, 2011, Fisker Automotive made available to plaintiffs and other investors offering documents associated with the December 2011 Capital Call, including the Amended and Restated Series DI Preferred Stock Purchase Agreement ("December 2011 Capital Call documents"). The December 2011 Capital Call documents provided that Fisker Automotive's

> Board of Directors and the Audit Committee of the Company's Board of Directors have reviewed and discussed the terms of the Series D-1 Financing Capital Call . . . and have determined that the terms of the Series D-1 Financing Capital Call . . . are in the best interests of the Company and its stockholders.

(D.I. 53, ex. F at 1) A letter from Fisker (the "December 2011 Fisker Letter) explained:

> We have had several delays to the Karma program due to component part shortages, obtaining emissions and regulatory clearances and fine tuning the Karma to get it ready for customers. Consequently, we did not realize revenue as expected in 2011. We now believe that raising equity is a prudent course of action. Improving our cash position will allow us to continue to build momentum behind the Karma production and sales launch and maintain the 2013 launch timing of the Nina sedan.
>
> Management and the Board of Directors have determined that it is in the best interest of Fisker Automotive to raise equity through the D-1 Financing Capital Call that is described in detail in the attached Information Statement. . . . I encourage you to carefully review the Information Statement and consider a further investment in Fisker Automotive. Importantly, three of our major venture capital investors, Kleiner Perkins, NEA and Pacific Century, support this action and have already made, or committed to make, their capital calls, together totaling more than $57 million.

(*Id.* at ¶ 83) The Executive Summary accompanying the December 2011 Fisker Letter described the "Board Approval Process" as using an Audit Committee and discussing

10

the Capital Call in "working group calls and meetings." After considering "a number of factors,"

> [t]he Board of Directors then instructed its officers to solicit the approval of the requisite vote of the stockholders of the Company, mail this Information Statement, and obtain indications of interest from interested stockholders. The Company received the requisite vote of the stockholders to approve the Series D-1 Financing Capital Call on December 14, 2011.

(D.I. 53, ex. J at 55-56)

On a conference call with investors December 15, 2011, Fisker Automotive (represented by McDonnell, Fisker, Koehler, and DaMour) discussed the ATVM Loan status. The complaint states that "[o]n that call, . . . DaMour discussed the ATVM [l]oan, stating that '[Fisker Automotive is] currently not drawing [on the ATVM loan] and that was a mutual agreement between [Fisker Automotive] and the government as [Fisker Automotive] work[s] to finalize the revised covenants and milestones, but as you see, [Fisker Automotive] ha[s] $340 million remaining to be drawn and that will be drawn through the 2012 and first half 2013 timeframe.'" (Id. at ¶ 86) "[I]n response to investor questions about the ATVM Loan, . . . Fisker reiterated that 'there is not a risk that [the DOE] will not continue to fund because they have already given us a commitment by letter that they are committed to Fisker Automotive.'" (Id. at ¶ 87) Moreover, plaintiffs allege:

> DaMour . . . stated "with the money we raised in this round, [Fisker Automotive] can continue with the [Karma] indefinitely," even if Fisker Automotive received no further funds from the DOE or other outside capital. And, in response to specific questions regarding Fisker Automotive's business plan and whether the funding from this $300 million Series D round would be sufficient to fund Fisker Automotive's business plan without another capital call or some other additional funding, Defendant DaMour stated "this is the last . . . private raise, and surely the last capital call .... The $300 [million] is enough to fund the complete plan

11

> as we have explained . . . . We are at the point now that the . . . [Karma] is fully funded."

(*Id.* at ¶ 89) Plaintiffs allege that "Fisker 'responded to a question about concerns of battery fires in light of the Chevrolet Volt's reported battery fire problems by stating that it 'is not a risk for us, we have a different chemistry [a] liquid cooled battery.'" (*Id.* at ¶ 88)

On December 21, 2011, the National Highway Traffic Safety Commission ("NHTSC") acknowledged (through a "non-public letter" to Fisker Automotive) a "report of a 'safety recall campaign which [would] be conducted under Federal law' of 239 Fisker Karmas due [to] a battery problem that could cause a fire" ("Karma recall notice"). (*Id.* at ¶ 90) On December 29, 2011, the day after the first deadline to invest in the December 2011 Capital Call, Fisker Automotive publicly announced its recall of 239 Fisker Karmas due to the battery fire issue. (*Id.* at ¶¶ 90-92) On December 30, 2011, an article[10] reported that "Fisker spokesman Roger Ormisher [("Ormisher")] said customers were alerted of the faulty batteries last week . . . ." (*Id.* at ¶ 92) The article also explained that the source of the problem is "misaligned hose clamps that could cause coolant leaks, and potentially a dangerous electrical short circuit." According to the article, the NHTSC notice stated, "[i]f coolant enters the battery compartment, an electrical short could occur, possibly resulting in a fire." (D.I. 34, ex. A)

A January 4, 2012 non-public report prepared by the DOE Loans Program Office discussed Fisker Automotive's missed launch dates and potential alternatives. (D.I. 24 at ¶¶ 93-94) Specifically, the report stated that Fisker Automotive had $200 million in

---

[10] Jonathan Starkey, *Fisker issues Karma recalls*, The News Journal (Wilmington, Delaware), December 30, 2011.

payables as of November 30, 2011, of which $120 million were overdue – with only $20 million in cash on hand and could be out of money as early as December 15, 2011. (*Id.* at ¶ 93) On February 7, 2012, an article[11] reported layoffs of workers refurbishing the manufacturing plant in Wilmington, Delaware and of workers at Fisker Automotive's California headquarters. According to the article, "Fisker officials characterized the layoffs as part of the complicated process of getting a billion-dollar car company off the ground." (*Id.* at ¶ 95) The article further reported:

> A Fisker spokesman said Monday that negotiations are under way with the Energy Department to modify the loan achievement goals to allow some cash to be drawn down. "To date we have received $193 million of the $529 million Department of Energy loan, mostly for the Karma program, and received our last reimbursement in May 2011," Fisker spokesman Roger Ormisher said in a statement Monday. "We are renegotiating some terms of the DOE agreement for the $336 million balance of the loan related to the Project Nina program." Ormisher said the exact terms of the loan conditions are confidential. "The DOE can sometimes take a little bit of time," Ormisher said. "We can't keep going and going and going without that money."

(*Id.*) On February 22, 2012, Fisker Automotive (represented by McDonnell, Fisker, Koehler, and DaMour) held a conference call to update investors regarding its status and a change in the Series D-1 round of financing whereby Fisker Automotive wanted to raise an additional $100 million by the end of March. The complaint states that "Fisker acknowledged recent negative press regarding the ATVM Loan, and characterized Fisker's problems as 'essentially driven by more political views around whether the government should be lending money or not. And unfortunately, we have become somewhat a political football . . . .'" (D.I. 24 at ¶ 97) Further, "Fisker Automotive's

---

[11] *Fisker slows work at former GM site, lays off 26*, The News Journal (Wilmington, Delaware), February 7, 2012.

Board of Directors had made a decision that it was in Fisker Automotive's 'better interests ... in the future to pay back the [DOE] and basically get alternative financing,'" in order to be "self-sustaining as a company" with just the Karma. But Fisker "also stated that they would continue negotiating with the DOE to obtain the remaining funds under the ATVM Loan." (*Id.* at ¶¶ 98-99) On February 28, 2012, Fisker Automotive announced Fisker's resignation as Fisker Automotive's CEO to be replaced by Tom LaSorda ("LaSorda"). The confidential ATVM Loan contained a "Key Personnel" covenant requiring Fisker to be "responsible for the management of the borrower." (*Id.* at ¶ 100)

In March 2012, Fisker Automotive notified its investors of another "pay to play" capital call (the "March 2012 Capital Call"), which raised $392 million. (*Id.* at ¶¶ 101-103) On April 19, 2012, an article[12] reported more layoffs in Delaware. (*Id.* at ¶ 104) A Fisker Automotive spokesman stated "[w]e have always had a flexible business model. The plant is now ready for the next phase of installing new production equipment." (*Id.*) On June 26, 2012, an article[13] detailed Fisker Automotive's continued attempt to raise more equity, having sold 1,700 Karma vehicles. (*Id.* at ¶ 105) The article quoted Lane as stating: "I'm looking at about $400 million in revenue this year. That would make [Fisker Automotive] the fastest growing start-up ever." The article also stated that "[t]he situation with the DOE, said Lane, 'caused [Fisker Automotive] to accelerate capital raising.'" (*Id.*) On July 6, 2012, an article[14] "reported that Jim Yost, a former executive

---

[12] The Detroit Free Press, April 19, 2012.
[13] *Fisker Pursues $87M Capital Raise, Debt Deal, Amid DOE Loan Suspension*, The Wall Street Journal Venture Capital Dispatch Blog, June 26, 2012.
[14] In 4WheelsNews.

at Ford Motor Co. and Dana Holdings Corporation, had replaced Defendant DaMour as Fisker Automotive's CFO and that DaMour would 'stay on as a special advisor to [Fisker Automotive].'" (Id. at ¶ 106) A confidential DOE presentation dated August 2, 2012 stated that the DOE had spoken to Lane regarding the financial status of Fisker Automotive and was told that Fisker Automotive "was down to $12 million in cash and . . . expected to run out of cash 'within a month.'" (Id. at ¶ 107)

On August 14, 2012, LaSorda was replaced as CEO by the former head of the Chevy Volt hybrid program, Tony Posowatz. (Id. at ¶ 108) The complaint alleges that:

> On August 16, 2012, Reuters published an interview of Ray Lane in which he stated [Fisker Automotive] was seeking to raise an additional $150 million to increase cash on Fisker Automotive's balance sheet and to fund development of Fisker Automotive's next model car. Lane held out the prospect of an upcoming IPO, which would save Fisker Automotive's investors, stating that "[o]nce Fisker [Automotive] breaks even, [it] could pursue an initial public offering or a sale to a strategic investor, which could come in late 2013."

(Id. at ¶ 109) In late August 2012, Fisker Automotive issued offering documents in connection with a Series E round of financing/preferred stock ("2012 Series E offering documents"), seeking to raise at least $30 million in bridge loan financing which would convert into Series E Preferred stock if the full amount was actually raised. The DOE agreed to waive Fisker Automotive's covenant violations and not declare the ATVM Loan in default if Fisker Automotive raised that amount. Fisker Automotive raised $50 million by early September. (Id. at ¶ 110) On or around September 19, 2012, Osborn sent plaintiffs and other investors a pay to play capital call (the "September 2012 Capital Call") for Series E preferred stock, raising approximately $104 million. (Id. at ¶¶ 111-12)

On or about October 16, 2012, A123 filed for bankruptcy protection. Shortly thereafter, Fisker Automotive stopped production of the Karma, laid off another 40

employees, and retained an investment banking advisory firm to find a "strategic partner" to save itself. On March 13, 2013, Fisker resigned from the Board of Directors. Fisker Automotive then hired the law firm of Kirkland & Ellis, PC to advise it on a possible bankruptcy filing. In April 2013, Fisker Automotive laid off another 160 employees (75% of its remaining workforce). (*Id.* at ¶¶ 113-115)

On April 17, 2013, PrivCO, a private research firm, made available a detailed report ("the PrivCo Report") based on documents obtained through Freedom of Information Act requests detailing Fisker Automotive's decline. On April 21, 2013, the U.S. Government reported that it had seized $21 million in cash from Fisker Automotive to fulfill the first loan payment. On April 24, 2013, a U.S. House of Representatives Subcommittee On Economic Growth, Job Creation And Regulatory Affairs Of The Committee On Oversight And Government Reform held a hearing to investigate Fisker Automotive (the "House Fisker Hearing"). (*Id.* at ¶¶ 116-122) Lane resigned from Fisker Automotive's Board of Directors in May 2013. (*Id.* at ¶ 123) On September 17, 2013, the DOE put the remaining $168 million owed on the ATVM Loan out to bid in a public auction. (*Id.* at ¶ 124) On November 22, 2013, Fisker Automotive filed for bankruptcy protection. (*Id.* at ¶ 125)[15]

### C. Claims

The complaint alleges violations of § 12(a)(2) of the Securities Act against all defendants except Kleiner Perkins and Ace Strength; violations of § 15 of the Securities Act against defendants Kleiner Perkins, Lane, Fisker, Koehler, DaMour, Daubenspeck,

---

[15] From the record at bar, at least $1.4 billion was invested in Fisker Automotive prior to its bankruptcy filing.

Li and Ace Strength; violations of § 10(b) of the Exchange Act and Rule 10b-5 against all defendants except Kleiner Perkins and Ace Strength; and violations of § 20(a) of the Exchange Act against defendants Kleiner Perkins, Lane, Fisker, DaMour, Koehler, Daubenspeck, Li and Ace Strength. (D.I. 24 at ¶¶ 126-165)

## III. MOTION TO DISMISS

### A. Standard

A motion filed under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a complaint's factual allegations. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 545 (internal quotation marks omitted) (interpreting Fed. R. Civ. P. 8(a)). Consistent with the Supreme Court's rulings in *Twombly* and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Third Circuit requires a two-part analysis when reviewing a Rule 12(b)(6) motion. *Edwards v. A.H. Cornell & Son, Inc.*, 610 F.3d 217, 219 (3d Cir. 2010); *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). First, a court should separate the factual and legal elements of a claim, accepting the facts and disregarding the legal conclusions. *Fowler*, 578 F.3d. at 210-11. Second, a court should determine whether the remaining well-pled facts sufficiently show that the plaintiff "has a 'plausible claim for relief.'" *Id.* at 211 (quoting *Iqbal*, 556 U.S. at 679). As part of the analysis, a court must accept all well-pleaded factual allegations in the complaint as true, and view them in the light most favorable to the plaintiff. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Christopher v. Harbury*, 536

U.S. 403, 406 (2002); *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008). In this regard, a court may consider the pleadings, public record, orders, exhibits attached to the complaint, and documents incorporated into the complaint by reference. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384-85 n.2 (3d Cir. 1994).

The court's determination is not whether the non-moving party "will ultimately prevail" but whether that party is "entitled to offer evidence to support the claims." *United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 302 (3d Cir. 2011). This "does not impose a probability requirement at the pleading stage," but instead "simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of [the necessary element]." *Phillips*, 515 F.3d at 234 (quoting *Twombly*, 550 U.S. at 556). The court's analysis is a context-specific task requiring the court "to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 663-64.

## B. Discussion

### 1. Omissions and misstatements

Plaintiffs assert "the following material omissions which [d]efendants had a duty to disclose in connection with [d]efendants' efforts to solicit [p]laintiffs and other investors to purchase Fisker Automotive Securities in violation of [§] 12(a)(2) and Rule 10b-5" (D.I. 52 at 20): (1) the failure to disclose that Fisker Automotive did not meet the February 2011 Karma production milestone, the representation to the DOE that Fisker Automotive did meet such milestone in the March 2011 presentation, and the failure to disclose the DOE's drawstop decision in May 2011 (D.I. 24 at ¶¶ 53, 64, 149-51); (2) the failure to disclose the Karma recall notice, acknowledged by NHTSA on December 21,

2011 during the December 2011 Capital Call, one week before the December 2011

Capital Call closed (*id.* at ¶¶ 90-91, 152); (3) the failure to disclose during the December

2011 Capital Call Fisker Automotive's precarious cash position, i.e., that Fisker

Automotive had $200 million in payables as of no later than November 30, 2011, of

which $120 million were overdue – with only $20 million in cash on hand and could be

out of money as early as December 15, 2011 (*id.* at ¶¶ 93, 153); and (4) the failure to

disclose in connection with the March 2012 Capital Call and September 2012 Capital

Call offerings that Fisker's resignation from the day-to-day management of Fisker

Automotive as CEO in February 2012 caused Fisker Automotive to be in default of the

ATVM Loan "Key Personnel" covenant requiring him to be "responsible for the

management of the borrower" (*id.* at ¶¶ 100, 154).

## 2. Section 12(a)(2) claims[16]

To state a claim under § 12(a)(2),[17] plaintiffs must allege that they purchased

securities pursuant to a materially false or misleading prospectus or oral

communication. *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 273-74 (3d Cir. 2004)

---

[16] Against all defendants except Kleiner Perkins and Ace Strength. (D.I. 24 at ¶¶ 126-139)

[17] Section 12(a)(2) provides that any defendant who

> offers or sells a security ... by means of a prospectus or oral
> communication, which includes an untrue statement of a material fact or
> omits to state a material fact necessary in order to make the statements,
> in the light of the circumstances under which they were made, not
> misleading (the purchaser not knowing of such untruth or omission), and
> who shall not sustain the burden of proof that he did not know, and in the
> exercise of reasonable care could not have known, of such untruth or
> omission, shall be liable ... to the person purchasing such security from
> him.

15 U.S.C. § 77l.

19

(internal citations and quotations omitted). Where a plaintiff's § 12(a)(2) claims are not grounded in allegations of fraud, scienter is not required to be pled and "the liberal notice pleading requirements of Rule 8 apply." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 270 (3d Cir. 2006) (citing *In re Adams Golf*, 381 F.3d at 273 n.5).

### a. Timeliness of plaintiffs' § 12(a)(2) claim

Section 13 of the Securities Act provides that "[n]o action shall be maintained to enforce any liability created under [§ 12(a)(2)] of this title unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 77m. A discovery standard governs § 13 of the Securities Act, that is, a claim "accrues '(1) when the plaintiff did in fact discover, or (2) when a reasonably diligent plaintiff would have discovered, 'the facts constituting the violation'—whichever comes first.'" *Pension Trust Fund for Operating Engineers v. Mortgage Asset Securitization Transactions, Inc.*, 730 F.3d 263, 273 (3d Cir. 2013) (quoting *Merck & Co. v. Reynolds*, 559 U.S. 633, 637 (2010)). Therefore, "a fact is not deemed 'discovered' until a reasonably diligent plaintiff would have sufficient information about that fact to adequately plead it in a complaint ... with sufficient detail and particularity to survive a 12(b)(6) motion to dismiss." *Pension Trust Fund*, 730 F.3d at 275 (citing *City of Pontiac General Employees' Retirement System v. MBIA, Inc.*, 637 F.3d 169, 175 (2d Cir. 2011)).

> In determining the time at which "discovery" of those "facts" occurred,
> terms such as "inquiry notice" and "storm warnings" may be useful to the
> extent that they identify a time when the facts would have prompted a
> reasonably diligent plaintiff to begin investigating. But the limitations period
> does not begin to run until the plaintiff thereafter discovers or a reasonably
> diligent plaintiff would have discovered "the facts constituting the
> violation," including scienter—irrespective of whether the actual plaintiff
> undertook a reasonably diligent investigation

*Merck*, 559 U.S. at 653.

Snippets of Fisker Automotive's financial struggles were presented in various news articles and confidential memoranda published in 2011 and 2012, including references to the ATVM loan status. (D.I. 24 at ¶¶ 57, 90-91, 100, 105; D.I. 53, ex. E at 44) However, the PrivCo Report (published on April 17, 2013) and the House Fisker Hearing (held on April 24, 2013) disclosed previously unknown material, including the DOE's termination of funding in June 2011, Fisker Automotive's $200 million in past due bills, the NHTSA Recall Notice, and the Key Personnel Milestone in the ATVM loan. (D.I. 24 at ¶¶ 116, 118; D.I. 52 at 37) While defendants argue that each of these issues was discoverable through news articles and the private offering documents, the PrivCo Report and hearing testimony contained unpublished documents and brought to light non-public information regarding the ATVM loan. (D.I. 24 at ¶¶ 116-122) The court concludes that the claims are not time-barred.

### b. Statutory sellers under § 12(a)(2)

In *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628 (3d Cir. 1989), the Third Circuit adopted the Supreme Court's analysis in *Pinter v. Dahl*, 486 U.S. 622 (1988), holding that "liability under § 12(2) extends not only to those who pass title to the purchaser, but also to those who successfully solicit the purchase, motivated by their own or the securities owner's financial interests." *Id.* at 636. In evaluating whether participation falls within such scope, the language of § 12 "focuses the inquiry on the relationship between the purchaser and the participant, rather than on the latter's degree of involvement in the transaction." *Id.* (citing *Pinter*, 486 U.S. at 651-52). More specifically, liability should not be imposed "on persons whose actions were merely a

'substantial factor' in causing the purchase," instead "[t]he purchaser must demonstrate direct and active participation in the solicitation of the immediate sale to hold the issuer liable as a § 12(2) seller." *Id.* (citations omitted).

> Plaintiffs alleged in *Craftmatic* that:

> Each of the defendants . . . solicited plaintiffs . . . to buy Craftmatic common stock ... and in so acting were motivated by a desire to serve their own financial interests or the financial interests of the owner(s) of Craftmatic securities, and they . . . conspired with and aided and abetted one another in connection with the preparation of the false and misleading Prospectus and Registration Statement used in conjunction with the sale of Craftmatic securities.

*Id.* at 637. Such allegation was "sufficient to survive a Rule 12(b)(6) motion to dismiss[, as i]t cannot be said at this juncture that plaintiffs can prove no set of facts that would entitle them to relief." *Id.* Similarly, in *In re Westinghouse*, the Third Circuit held that while the complaint was "not clearly drafted, . . . [t]aken in the light most favorable to plaintiffs, however, the complaint does allege that the Westinghouse defendants 'solicited plaintiffs' to purchase Westinghouse securities and that in so doing they were motivated by a desire to serve their own financial interests." *In re Westinghouse Securities Litigation*, 90 F.3d 696, 717 (3rd Cir. 1996). The Third Circuit reversed the district court's dismissal of the claims even though "[p]laintiffs d[id] not, for example, make clear which defendants are alleged to be direct sellers as opposed to solicitor sellers . . . or allege how the Westinghouse defendants, assuming they are alleged to be solicitor sellers, directly and actively participated in the solicitation of the immediate sales." *Id.*

> The complaint at bar states that:

> Defendants, with the exceptions of Kleiner Perkins and Ace Strength which are named as control persons in Count II below, were sellers and

> offerors and/or solicitors of purchasers of the Fisker Automotive Securities
> offered, including to [p]laintiffs. Plaintiffs purchased these securities as a
> result of the material omissions . . . .

(D.I. 24 at ¶ 128) The complaint identifies Daubenspeck as a Director of Fisker Automotive and cofounder of Advanced Equities, Inc. ("Advanced Equities"),[18] which was one of several investment banks or vehicles that Fisker Automotive used to raise capital. (*Id.* at ¶ 34) With respect to the December 2011 Capital Call, Osborn wrote an email on December 11, 2011, purportedly based on his conversations with Fisker Automotive representatives, to the Middlebury Plaintiffs and others stating that "Daubenspeck, a Fisker Board member and Chairman of Advanced Equities [will] join our call" the next day. (*Id.* at ¶ 81) The complaint also references the private memorandum dated March 31, 2011 used to solicit investors, which describes related party transactions and states that "Daubenspeck, AEFC and its affiliates, including [Advanced Equities], have an economic interest in Fisker's success as well as the success of the Offering." (*Id.* at ¶ 56; D.I. 53, ex. E at 42)

The complaint identifies Koehler as a participant and Fisker and DaMour as speakers in several conference calls with analysts and/or investors. The purpose of the conference calls was to solicit investors in Fisker Automotive securities. Certain calls were recorded for future distribution to potential investors. (D.I. 24 at ¶¶ 69, 66, 71, 86, 96) The December 2011 Fisker Letter encouraged investing.[19] (*Id.* at ¶ 83) The

---

[18] The SEC censured Advanced Equities for fraudulent practices and Advanced Equities then ceased operations and is now defunct. (D.I. 24 at ¶ 34)

[19] Stating in part:

> I encourage you to carefully review the Information Statement and
> consider a further investment in Fisker Automotive. Importantly, three of
> our major venture capital investors, Kleiner Perkins, NEA and Pacific

Executive Summary described the "Board Approval Process" as using an Audit Committee and discussing the Capital Call in "working group calls and meetings." After considering "a number of factors,"

> [t]he Board of Directors then instructed its officers to solicit the approval of the requisite vote of the stockholders of the Company, mail this Information Statement, and obtain indications of interest from interested stockholders. The Company received the requisite vote of the stockholders to approve the Series D-1 Financing Capital Call on December 14, 2011.

(D.I. 53, ex. J at 55-56) Lane was a Managing Partner of Kleiner Perkins and was Fisker Automotive's Chairman of the Board of Directors. (D.I. 24 at ¶ 31) Li was a controlling shareholder through Ace Strength (*Id.* at ¶ 32) and was on the Board of Directors, which approved the December 2011 "pay-to-play" capital call. (*Id.* at ¶ 81)

Taking the allegations in the complaint in the light most favorable to plaintiffs, the court concludes that as to defendants Daubenspeck, Fisker, Koehler and DaMour, plaintiffs have alleged sufficient facts regarding solicitation. As to Lane, the offering documents point to decisions regarding solicitation made by the Board, of which Lane is chairman. This, together with Lane's position as Managing Partner of Kleiner Perkins (a major investor in Fisker Automotive) is sufficient to allege solicitation at the motion to dismiss stage.[20] While plaintiffs have not used the precise language "motivated by their own or the securities owner's financial interests," plaintiffs' factual allegations are sufficient to support such motivation as the defendants stood to gain from Fisker

---

Century, support this action and have already made, or committed to make, their capital calls, together totaling more than $57 million.

(D.I. 24 at ¶ 83)
[20] The court does not base its decision on the news articles containing general statements regarding raising capital and going public.

Automotive's success though their positions as Directors of Fisker Automotive.[21]  The

court concludes that plaintiffs have sufficiently pled that defendants were § 12(2) sellers.

### c. Public offerings

Section 12(a)(2) provides liability for misstatements made "by means of a

prospectus or oral communication." *Gustafson v. Alloyd Co.*, 513 U.S. 561, 567 (1995);

*see also, In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 273 (3d Cir. 2004). "[T]he

word 'prospectus' is a term of art referring to a document that describes a public offering

of securities by an issuer or controlling shareholder" and "must include the 'information

contained in a registration statement.'" *Gustafson*, 513 U.S. at 584, 569.

An offering is considered private only if limited to investors who have no
need for the protection provided by registration.  To determine if an
offering is sufficiently limited courts focus on such factors as: (1) the
number of offerees; (2) the sophistication of the offerees, including their
access to the type of information that would be contained in a registration
statement; and (3) the manner of the offering.

*See, e.g., United States v. Arutunoff*, 1 F.3d 1112, 1118 (10th Cir. 1993).

The complaint alleges that the "offering materials including Prospectuses/Private

Placement Memoranda and other offering documents made available to purchasers of

Fisker Automotive Securities" omitted material information.  (D.I. 24 at ¶ 129)  The

following offering materials are identified in the complaint:  The March 2011 CPPM (*id.*

at ¶ 56); the April 2011 Middlebury CPPM (*id.* at ¶ 57); the December 2011 stock

purchase agreement (*id.* at ¶ 69); Information Statement dated December 14, 2011 (*id.*

at ¶¶ 82-85); the March 2012 D-1 offering documents (*id.* at ¶¶ 101-102); and the 2012

Series E offering documents (*id.* at ¶ 110).  The March 2011 CPPM and April 2011

---

[21] The court addresses Li *infra*.

Middleburry CPPM are "Confidential Private Placement Memorand[a]." (*Id.* at ¶¶ 56-57) The April 2011 Middlebury CPPM makes clear that the shares "have not been registered under the Securities Act." (D.I. 53, ex. E) The December 2011 information statement is marked "Strictly Confidential & Proprietary." (*Id.* at ex. F) The March 2012 Capital Call D-1 offering documents are labeled "Confidential & Proprietary." (D.I. 24 at ¶ 102) Certain offering materials required a password. (*Id.* at ¶¶ 56-57)

Fisker Automotive solicited only "qualified investors." (*Id.* at ¶¶ 56-58) For example, the AEI investor acknowledgement states that the "investor is an 'accredited investor' within the meaning of Rule 501(A) of Regulation D under the [S]ecurities Act of 1933 . . . ."[22] (D.I. 53, ex. L; *see also*, ex. G at 17; ex. H at 21; ex. K at 2-3) While the news articles mentioned the possibility of an upcoming IPO, no such offering was made to the public. Plaintiffs aver that the number of investors is in the hundreds – "Fisker Automotive raised an additional $145 million in Series A-1 venture capital from Kleiner Perkins, Palo Alto Investors and Advanced Equities (which raised approximately $27 million from 347 private investors);" however, the investment information was provided to the venture capital firms, not to the private investors. (*Id.* at ¶ 52)

The court concludes that the offerings were made via private placement memoranda to sophisticated investors and were not public offerings. The motion to dismiss is granted as to the § 12(a)(2) claims.[23] *See e.g., Vannest v. Sage, Rutty &*

---

[22] Rule 501(a) defines "accredited investor," which are more sophisticated investors, such as banks, companies and high net worth individuals. 17 C.F.R. § 230.501(a).
[23] Section 15 of the Securities Act provides for joint and several liability on the part of one who controls a violator of § 12. Accordingly, a violation of § 15 only applies when a primary violation of § 12 has been found. *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 284 (3d Cir. 2006). As plaintiffs have failed to set forth a primary violation of § 12(a)(2), plaintiffs' controlling person claims under § 15 must also be dismissed.

*Co.*, 960 F. Supp. 651, 654-55 (W.D.N.Y. 1997) (concluding that there was no public offering where the private placement memorandum expressly (and repeatedly) stated that the offering was not subject to registration requirements and that the securities are intended to be sold only to purchasers qualified by the Rule 506 regulations.); *In re J W.P. Inc. Securities Litigation*, 928 F. Supp. 1239, 1259 (S.D.N.Y.1996) ("Courts in this district have held that under *Gustafson*, private placement memoranda like those at issue are not 'prospectuses' for the purposes of a claim under § 12(2)"); *Walish v. Leverage Grp., Inc.*, Civ. No. 97-CV-5908, 1998 WL 314644, at *5 (E.D. Pa. June 15, 1998) ("The complaint does not allege that the sale was a public offering of securities and the 'defacto prospectus,' on which the [p]laintiffs rely, shows that this was a private transaction involving six investors.").

### 3. Section 10(b) and Rule 10b-5[24]

According to § 10(b) of the Exchange Act, it is unlawful:

> To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement (as defined in section 206B of the Gramm–Leach–Bliley Act), any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b-5, promulgated by the Securities and Exchange Commission to implement § 10(b), makes it unlawful:

> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

---

[24] Against all defendants except Kleiner Perkins and Ace Strength. (D.I. 24 at ¶¶ 145-159)

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

In order to state a claim for securities fraud under § 10(b) and Rule 10b-5, a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant [i.e., falsity]; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 630–31 (3d Cir. 2011). A statement or omission is material if there is "a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act]." *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 283 (3d Cir. 2010) (citing *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). "A material misrepresentation or omission is actionable if it significantly altered the total mix of information made available." *Id.* (citations and quotations omitted). Material misstatements are contrasted with subjective analyses and general or vague statements of intention or optimism which constitute no more than mere corporate puffery. *In re Aetna*, 617 F.3d at 283; *City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*, 713 F. Supp. 2d 378, 390 (D. Del. 2010). "Scienter is a mental state embracing intent to deceive, manipulate, or defraud, and requires a knowing or reckless state of mind." *Inst. Investors Group v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009) (citations and quotations omitted).

Shareholders filing a securities fraud lawsuit under the Exchange Act are subject to the heightened pleading standard codified by the Private Securities Litigation Reform

Act ("PSLRA"). *Avaya, Inc.*, 564 F.3d at 253; *City of Roseville Employees' Ret. Sys. v. Horizon Lines*, 686 F. Supp. 2d 404, 414 (D. Del. 2009) ("The PSLRA imposes a dramatically higher standard on a plaintiff drafting a complaint than that of traditional notice pleading."); *Brashears v. 1717 Capital Mgmt, Nationwide Mut. Ins. Co.*, 2004 WL 1196896, at *4 (D. Del. 2004) ("[B]y enacting the current version of the [PSLRA], Congress expressly intended to substantially heighten the existing pleading requirements.")[25] (internal quotations omitted). "The PSLRA provides two distinct pleading requirements, both of which must be met in order for a complaint to survive a motion to dismiss." *Avaya, Inc.*, 564 F.3d at 252. First, the complaint must "specify each allegedly misleading statement, the reason or reasons why the statement is misleading, and, if an allegation is made on information and belief, all facts supporting that belief with particularity." *Id.* at 259 (citing 15 U.S.C. § 78u–4(b)(1)). This is the falsity requirement. Second, "with respect to each act or omission alleged to violate [§ 10(b)]," a plaintiff is required to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* (citing 15 U.S.C. § 78u–4(b)(2)). This is the scienter requirement.

Both of these provisions require that facts be pled "with particularity." With respect to the falsity requirement,

---

[25]     The PSLRA's heightened pleading requirements were constructed in order to restrict abuses in securities class-action litigation, including: (1) the practice of filing lawsuits against issuers of securities in response to any significant change in stock price, regardless of defendants' culpability; (2) the targeting of 'deep pocket' defendants; (3) the abuse of the discovery process to coerce settlement; and (4) manipulation of clients by class action attorneys.

*Horizon Lines*, 686 F. Supp. 2d at 414.

the particularity standard echoes Rule 9(b) of the Federal Rule[s] of Civil Procedure, which is comparable to and effectively subsumed by the requirements of ... the PSLRA. Like Rule 9(b), the PSLRA requires plaintiffs to plead the who, what, when, where and how: the first paragraph of any newspaper story. Additionally, if an allegation regarding [a] statement or omission is made on information and belief, a plaintiff must state with particularity all facts on which that belief is formed.

*Horizon Lines*, 686 F. Supp. 2d at 414 (citing *Avaya, Inc.*, 564 F.3d at 253) (internal quotations and citations omitted). The scienter requirement, on the other hand, "marks a sharp break from Rule 9(b)." *Avaya*, 564 F.3d at 253. "Unlike Rule 9(b), under which a [plaintiff] could plead scienter generally, § 78u–4(b)(2) requires any private securities complaint alleging that the defendant made a false or misleading statement ... [to] state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Horizon Lines*, 686 F. Supp. 2d at 414 (citations and quotations omitted).

Aside from these two requirements, the PSLRA imposes additional burdens with respect to allegations involving forward-looking statements. The PSLRA's Safe Harbor provision, 15 U.S.C. § 78u–5(c), "immunizes from liability any forward-looking statement, provided that: the statement is identified as such and accompanied by meaningful cautionary language; or is immaterial; or the plaintiff fails to show the statement was made with actual knowledge of its falsehood." *Avaya*, 564 F.3d at 254.

### a. Duty to disclose

"[N]on-disclosure of material information will not give rise to liability under Rule 10b-5 unless the defendant had an affirmative duty to disclose that information. 'Silence, absent a duty to disclose, is not misleading under Rule 10b-5.'" *See Oran v. Stafford*, 226 F.3d 275, 78-86 (3d Cir. 2000). There is no affirmative duty to disclose

information unless 1) there is insider trading, 2) a statute requires disclosure, or 3) a previous disclosure becomes inaccurate, incomplete, or misleading. *Id.* In the context of insider trading, liability for securities nondisclosure "is premised upon a duty to disclose arising from a relationship of trust and confidence between parties to a transaction." *See Chiarella v. United States*, 445 U.S. 222, 235 (1980). As the Supreme Court acknowledged in *Chiarella*, corporate insiders, particularly officers, directors, or controlling stockholders, assume an affirmative duty of disclosure when trading in shares of their own corporation. *Id.* at 226-27 (citing *In re Cady, Roberts & Co.*, 40 S.E.C. 907, 1961 WL 3743 (1961)). "[I]nsiders must disclose material facts which are known to them by virtue of their position but which are not known to persons with whom they deal and which, if known, would affect their investment judgment." *In re Cady*, 1961 WL at * 3. This duty extends not only to existing shareholders but also to nonshareholders when sales of securities are made to them. *See id.* at * 5. Such a duty ensures that corporate insiders "will not benefit personally through fraudulent use of material, nonpublic information." *Chiarella*, 445 U.S. at 230.

Plaintiffs allege "a duty to disclose the material omitted facts as insiders engaging in sales and purchases or otherwise benefiting from those transactions while in a position of 'trust and confidence' and/or in a fiduciary relationship with [p]laintiffs." (D.I. 52 at 43) While defendants argue that they did not engage in "trading," to the extent defendants made statements regarding Fisker Automotive in an effort to entice plaintiffs into becoming shareholders, defendants had a duty to disclose material information.[26]

---

[26] The court does not reach plaintiffs' duty to disclose argument based on the third prong, prior misleading statements.

See *Tse v. Ventana Med. Sys., Inc.*, Civ. No. 97-37-SLR, 1998 WL 743668, at *8 (D. Del. Sept. 23, 1998) (finding a duty to disclose when "defendants were asking plaintiffs to become equity shareholders in the acquiring corporation, defendant [Ventana]. Accordingly, as 'insiders,' defendants assumed an affirmative duty to disclose material information.").

### b. Falsity

Plaintiffs allege material omissions in certain statements and documents made by "defendants." (D.I. 24 at ¶¶ 147-48) In *Winer Family Trust v. Queen*, 503 F.3d 319 (3d Cir. 2007), the Third Circuit made clear that "the group pleading doctrine is no longer viable in private securities actions after the enactment of the PSLRA." *Id.* at 337. More recently, the Supreme Court in *Janus Capital Group, Inc. v. First Derivative Traders*, —— U.S. ——, 131 S.Ct. 2296 (2011), explained that:

> For purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it. Without control, a person or entity can merely suggest what to say, not "make" a statement in its own right. One who prepares or publishes a statement on behalf of another is not its maker. And in the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed.

*Id.* at 2302. The Supreme Court specifically declined to equate "create" with "make," stating that "in *Stoneridge*, we rejected a private Rule 10b-5 suit against companies involved in deceptive transactions, even when information about those transactions was later incorporated into false public statements." *Id.* at 2303-04 (citing *Stoneridge Investment Partners, LLC v. Scientific–Atlanta, Inc.*, 552 U.S. 148, 161 (2008)).

### i. Offering documents[27]

Plaintiffs allege that the offering documents expressly state that Fisker Automotive's Board of Directors had control and authority over the offering documents, by reference to statements in the April 2011 Middlebury CPPM and December 2011 stock purchase agreement regarding the "exculpation among purchasers" clause (D.I. 53, ex. G and H); the statement on the cover page of the March 2011 CPPM – "Preliminary Draft – Terms may Change Subject to Board and Shareholder Approval" (*id.*, ex. E); and the statements in the December 2011 Capital Call documents and Executive Summary (that the Board of Directors and the Audit Committee reviewed and discussed the terms of the Series D-1 Financing Capital Call). (*Id.*, ex. F at 1) The documents associated with the solicitation of investments and various Capital Calls[28] are not signed. Fisker signed the Series C-1 preferred Stock Purchase Agreement dated April 27, 2011 on behalf of Fisker Holdings, Inc. (*Id.*, ex. G) In the case at bar, the court is not called upon to determine whether a director signing certain documents had "authority over the content of the statement and whether and how to communicate it," sufficient to be deemed to have "made" the statement. *See e.g., WM High Yield Fund v. O'Hanlon*, 964 F. Supp. 2d 368, 390 (E.D. Pa. 2013). Instead, the court is presented with documents containing statements indicating that the Board was likely involved in their creation and dissemination.[29] As discussed below, certain Board members participated in conference calls on behalf of Fisker Automotive discussing

---

[27] Plaintiffs allege that all defendants except McDonnell had a duty to disclose related to the offering documents.

[28] Provided by plaintiffs as exhibits.

[29] Without discovery, the court struggles to envision how plaintiffs could ascertain which individuals were responsible for the creation of these types of documents.

these documents and the associated solicitations. The court concludes that this is

sufficient to pass muster at the motion to dismiss stage. *See e.g., In re Merck & Co.,*

*Inc. Securities, Derivative, & ERISA Litigation,* Civ. Nos. 05–1151(SRC), 05–367(SRC),

2011 WL 3444199 at *25 (D. NJ Aug. 8, 2011) (citing *Suez Equity Investors, L.P. v.*

*Toronto–Dominion Bank,* 250 F.3d 87, 101 (2d Cir. 2001)) (denying motion to dismiss

where officer "signed SEC forms and was quoted in articles and reports in his [official]

capacity . . . . pursuant to his responsibility and authority to act as an agent of Merck").

### ii. Conference calls[30]

The Third Circuit has explained that

> the plain language of § 10(b) and corresponding Rule 10b-5 do not
> contemplate the general failure to rectify misstatements of others.
> Moreover, in *Central Bank,* the Supreme Court determined that the scope
> of § 10(b) does not encompass aiding and abetting liability because the
> statute "prohibits only the making of a material misstatement (or omission)
> or the commission of a manipulative act." Consequently, incorporating
> into the statute an obligation to rectify others' misstatements (though
> lacking even the aiding and abetting mens rea requirement of the initial
> statement made) would be illogical in light of the Supreme Court's holding.

*U.S. v. Schiff,* 602 F.3d 152, 167 (3d Cir. 2010) (citing *Central Bank of Denver, N.A. v.*

*First Interstate Bank of Denver, N.A.,* 511 U.S. 164 (1994)) (internal citations omitted).

This analysis is also consistent with the Supreme Court's decision in *Janus,* discussed

above. The court concludes that participation in a conference call, without speaking,

cannot confer liability under Rule 10b-5 for the misstatements or omissions of the

speaker. As plaintiffs do not allege that Koehler and McDonnell spoke on the

conference calls, no liability for misstatements made by others may attach.

---

[30] Plaintiffs allege that McDonnell, Fisker, Koehler, and DaMour had a duty to disclose
in connection with the conference calls.

34

Plaintiffs identify certain statements made by DaMour and Fisker (such statements are presented in the complaint in the context of the larger transcripts).[31] The salient facts are presented in detail above. (D.I. 24 at ¶¶ 67, 70-71, 86-87, 89, 93-94, 97-99, 110) The Third Circuit has "explained that for 'misrepresentations in an opinion' or belief to be actionable, plaintiffs must show that the statement was 'issued without a genuine belief or reasonable basis'. . . ." *In re Merck & Co., Inc. Sec., Derivative & ""ERISA" Litig.*, 543 F.3d 150, 166 (3d Cir. 2008) (citations omitted). DaMour and Fisker's positive statements regarding the ATVM loan, while reflecting the fact that Fisker Automotive was working with the DOE to negotiate terms, contradict the actual frozen status of the loan. That the DOE's press release reported positively on Fisker Automotive's progress does not validate DaMour and Fisker's statements. DaMour and Fisker's statements regarding Fisker Automotive's cash position (presenting Fisker Automotive as well capitalized, without mentioning payables and continuing without the DOE loan) conflict with the actual state of affairs, that Fisker Automotive had payables, some of which were overdue. As to the battery fires, Fisker disputes the falsity of his response based on the cause of the fires. However, the timing of the recall belies Fisker's conclusion that there were no "concerns of battery fires." The court concludes that plaintiffs have sufficiently alleged that Fisker and DaMour's statements were misleading.

---

[31] Defendants argue that plaintiffs have not identified in the complaint with specificity which statements from the conference calls are misleading and may not now do so through the briefing. *Com. of Pa. ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) ("[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss."). However, in the interests of efficiency (because an amendment would be granted) and as defendants have substantively responded to the arguments, the court reviews the identified statements.

### iii. The December 2011 Fisker Letter

Plaintiffs also allege that Fisker's statement in the December 2011 Fisker Letter explaining the reasons for the December 2011 Capital Call omitted any reference to the $200 million in outstanding bills, i.e., Fisker Automotive's true cash position, rendering such statement misleading. The complaint quotes a portion of such letter and describes it as "repeat[ing] the theme that the 'pay to play' capital call was merely a prudent business decision." (D.I. 24 at ¶ 83) However, the letter explicitly refers investors to the "Information Statement" and plaintiffs have alleged that the defendants distributed December 2011 Capital Call documents together with the December 2011 Fisker Letter and the Information Statement. As the December 2011 Fisker Letter is not a stand-alone document, the court declines to analyze it in a vacuum.

### iv. Statements in news articles

In the briefing, plaintiffs allege that two particular statements by Lane in news articles were misleading.

> However, Fisker Chairman Ray Lane says that **the issues in 2011 were a combination of difficulties faced by any start up** - such as problems with the electrical system that didn't appear until production was underway - and some one-off disasters. For example, a flood soaked the initial shipment of leather delivered for the car's interior, leaving Fisker with 250 vehicles that were ready to go, except for seats, dashboards, steering wheels and every other surface that needed to be covered in cowhide.

(D.I. 24 at ¶ 75) (emphasis added) This statement[32] cannot be reconciled with the standard articulated in *Janus*, i.e., that statements attributable to an individual are those which the individual has "ultimate authority over . . . , including its content and whether

---

[32] *Fisker says Karma will meet 15,000 production target for 2012*, AutoblogGreen, November 26, 2011.

and how to communicate it." The above paraphrased or summarized statement is not wholly attributable to Lane. Indeed, the author of the article had control over which portions of the interview to use and how to present any information received from Lane. The same analysis applies to plaintiffs' second citation[33] as no portion is directly attributable to Lane.

The complaint generally alleges that "Lane's, Fisker's, DaMour's, Koehler's and/or McDonnell's statements described at ¶¶ 56, 60, 63, 66-67, 71, 74-75, 86-89, 96-99 and 105" failed to disclose certain facts. (*Id.* at ¶ 149) The following material (from the cited paragraphs) is directly attributable to Lane and related to plaintiffs' arguments.[34, 35] An article[36] discussing the production of the Karma states: "'In

_____

[33] *Fisker Pursues $87M Capital Raise, Debt Deal, Amid DOE Loan Suspension*, The Wall Street Journal Venture Capital Dispatch Blog, June 26, 2012.

> **For a while, Irvine, Calif.-based Fisker was operating under the assumption that it has $529 million in federal loans, but last year the Department of Energy, which handles the loans, suspended issuing new checks because the car company missed some milestones. Fisker delayed the release of Karma and sold fewer Karmas than it promised under the DOE loan agreement.** As a result of the loan suspension, Fisker stopped additional work on a plant in Delaware where it was planning to build the cars and laid off some employees.

(*Id.* at ¶ 105) (emphasis added)

[34] Again, rather than entertain an amended complaint.

[35] Paragraphs 56, 66-67, 71, 86-89, 96-99 relate to offering documents and conference calls. The articles cited in ¶¶ 60 and 75 do not contain direct quotations. The article in ¶ 63 states, "[q]uote: 'Reduce demand for oil by 5 to 10 percent, and you start to control pricing.'" This statement is unrelated to the issues at bar.

[36] *Fisker on track to make electric sports cars, despite delays*, Calgary Herald (Alberta), November 18, 2011. The article also states: "'The leather was useless. We had 250 cars parked and waiting for leather,' Lane said." Such statement is unrelated to the issues at bar.

production of a first vehicle, everything doesn't go the way you plan,' Lane said in a recent interview. 'Next year, we'll do exactly what we plan.'" (*Id.* at ¶ 74)

The article cited by plaintiffs above[37] also stated:

In the first quarter, the company said it drew in $100 million in revenue. 'I'm looking at about $400 million in revenue this year. That would make it the fastest growing start-up ever,' Lane said.
These projections, he added, don't include sales in China and Middle East, where the company is building relation-ships with dealerships.
Fisker Automotive, however, is not profitable, said Lane.

Discussing investments, the article stated "[w]e've added warrants as a sweetener,' said Lane." The article continued:

The situation with the DOE, said Lane, "caused us to accelerate capital raising." That is leading to certain compromises. Advanced Equities has recently been served a Wells Notice from the Securities & Exchange Commission, which indicates the SEC may enforce action against it.

Asked why Kleiner Perkins is continuing to use Advanced Equities' services in light of the SEC investigation, Lane said: "They are good at what they do."

---

[37] *Fisker Pursues $87M Capital Raise, Debt Deal, Amid DOE Loan Suspension*, The Wall Street Journal Venture Capital Dispatch Blog, June 26, 2012. Other quotations do not relate to the issues at bar. "'We have 1,700 cars sold now,' said Ray Lane . . . ." Discussing financing operations and its next car model, Atlantic, the article stated

"You don't make money until volumes are up," said Lane. The company needs to build the Atlantic, which would increase its volumes, and amortize its fixed costs across more units, as well as allow Fisker to negotiate better deals with suppliers. "We can't move forward without the debt,' said Lane, referring to the Atlantic program."

. . .

The company has been using equity, the most expensive capital, to pay for the development of Atlantic to date. "We spent $130 million on the Atlantic," Lane said. "No one wants to spend"[sic] more equity," he said. That is the reason Fisker is in discussions with a syndicate of private lenders, led by the Royal Bank of Canada, he added.

(*Id.* at ¶105)

(*Id*. at ¶ 105) Lane's statement regarding revenue is followed by the admission that Fisker Automotive is not profitable. The quoted statements do not conflict with the alleged facts, therefore, the court concludes that such statements are not actionable.

### c. Reliance

In *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), the Supreme Court examined reliance in the context of cases seeking to predicate Rule 10b-5 liability upon omissions and concluded that in cases "involving primarily a failure to disclose [material facts], positive proof of reliance is not a prerequisite to recovery." *Id*. at 153-54. "[R]eliance will be presumed from the materiality of the information not disclosed. Conversely, no presumption arises in cases of alleged misrepresentations." *Johnston v. HBO Film Management, Inc.*, 265 F.3d 178, 192 (3d Cir. 2001); *Sharp v. Coopers & Lybrand*, 649 F.2d 175, 187 (3d Cir. 1981) (overruled on other grounds by *McCarter v. Mitcham*, 883 F.2d 196, 202 (3d Cir. 1989)). The proper approach to reliance in cases involving both omissions and misrepresentations "is to analyze the plaintiff's allegations, in light of the likely proof at trial, and determine the most reasonable placement of the burden of proof of reliance." *Sharp*, 649 F.2d at 188.

Applying *Affiliated Ute*, the Court of Appeals for the Tenth Circuit explained:

Any fraudulent scheme requires some degree of concealment, both of the truth and of the scheme itself. We cannot allow the mere fact of this concealment to transform the alleged malfeasance into an omission rather than an affirmative act. To do otherwise would permit the *Affiliated Ute* presumption to swallow the reliance requirement almost completely.

*Joseph v. Wiles*, 223 F.3d 1155, 1163 (10th Cir. 2000) (citations omitted). In *Wiles*, the plaintiff alleged that defendant "continually reported in its public statements that it had achieved, and would continue to achieve, substantial growth in revenue and profits.

39

These statements . . . were materially false and misleading in that they failed to disclose the existence of the fraudulent scheme . . ." *Id.* at 1163. The Tenth Circuit held that "[s]tatements such as these, while struggling valiantly to bring the alleged conduct within the definition of 'omission,' indicate that what [plaintiff] really protests are the affirmative misrepresentations allegedly made by defendants." *Id.*

The allegations at bar present a mix of both omissions (e.g., not disclosing the status of the ATVM loan) and misrepresentations (e.g., statements regarding working with the DOE to resolve issues with the ATVM loan). Considering all of plaintiffs' allegations, the court concludes that plaintiffs are principally complaining of the misrepresentations, i.e., presenting Fisker Automotive's status as stable and funded, when it was failing. The *Affiliated Ute* presumption of reliance does not apply.

The burden of reliance "requires a plaintiff to demonstrate that defendants' conduct caused him 'to engage in the transaction in question.'" *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 174 (3d Cir. 2001), as amended (Oct. 16, 2001) (citations omitted). In this regard, the complaint at bar identifies the offering documents and alleges that such documents were false and misleading. In the briefing, plaintiffs point out that the "prospectuses/offering memoranda alleged in the Complaint . . . required investors to sign a Subscription Agreement, warranting that they had read the agreement and were 'not relying on any representation other than that contained [t]herein.'" (D.I. 52 at 77) Defendants argue that plaintiffs continued to invest after several of the misstatements at issue were presented in news articles. The various disclosures – the snippets available in news articles, the information from the conference calls, and the information contained in the offering documents – are

intertwined. The court concludes that plaintiffs have sufficiently pled reliance. *C.f.,*

*Gallup v. Clarion Sintered Metals, Inc.*, 489 F. App'x 553, 557 (3d Cir. 2012) (citing

*Rochez Bros., Inc. v. Rhoades*, 491 F.2d 402, 410 (3d Cir. 1974)) (Finding no evidence

of reliance at the summary judgment stage, when plaintiffs did not read the financial

statements and reports, which omitted information, therefore, plaintiffs decisions "were

entirely unaffected by the contents of [defendant's] financial statements.").

### d. Scienter[38]

Scienter is a "mental state embracing intent to deceive, manipulate, or defraud,"

and requires a knowing or reckless state of mind. *Avaya*, 564 F.3d at 252 (internal

citations omitted). "A reckless statement is one involving ... an extreme departure from

the standards of ordinary care, and which presents a danger of misleading buyers or

sellers that is either known to the defendant or is so obvious that the actor must have

been aware of it." *Id.* at 267 n.42. The court must be mindful of the heightened

pleading standards prescribed by the PSLRA throughout its analysis of defendants'

state of mind. *See Tellabs*, 551 U.S. at 324 (defining PSLRA's characterization of

"strong" inference as one that is "powerful or cogent"). The court must look to the

totality of the allegations in order to determine whether defendants acted with the

required level of intent. *See Avaya*, 564 F.3d at 272-73. Although the pleadings need

not present an irrefutable inference of scienter, plaintiffs' allegations as to defendants'

intent must remain "strong in light of other explanations." *Tellabs*, 551 U.S. at 324.

Accordingly, the court must examine plaintiffs' complaint to determine whether it has

---

[38] As the court previously found that only Fisker and DaMour "made" statements, the scienter analysis is limited to these defendants.

adequately pled that the misrepresentations and omissions attributed to defendants give rise to an inference of scienter that is at least as compelling as any nonculpable explanations presented by the defendants. *See id.*

The Third Circuit has held that a securities fraud plaintiff may not merely allege "motive and opportunity" as the requisite scienter necessary to survive a motion to dismiss. *Avaya*, 564 F.3d at 277. Although motive may be a factor in analyzing defendant's state of mind, plaintiff's complaint must also include some element of volition on the part of the defendant. *See id.*

As discussed above, Fisker and DaMour made positive statements regarding the ATVM loan after it had been frozen, and conflicting statements regarding Fisker Automotive's cash position. Fisker additionally made statements downplaying the potential for battery fires. Plaintiffs relied on the representations in the offering documents, which allegedly contained misstatements and omissions. The totality of the circumstances, which can be succinctly described as ardently soliciting investors in order to launch and sustain Fisker Automotive, with defendants standing to gain from Fisker Automotive's success through their positions as Directors, leads to a strong inference that defendants acted with an intent to manipulate investors. For these reasons, defendants' motions to dismiss the § 10(b) claims are denied.

### 4. Section 20(a)[39]

Section 20(a) of the Exchange Act imposes joint and several liability on any person who "directly or indirectly controls any person liable" under any provision of the

---

[39] Against Kleiner Perkins, Lane, Fisker, DaMour, Koehler, Daubenspeck, Li and Ace Strength.

Act, "unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a); *In re Suprema*, 438 F.3d at 284 (citing 15 U.S.C. § 78t(a)). Plaintiffs "must prove that one person controlled another person or entity and that the controlled person or entity committed a primary violation of the securities laws." *In re Suprema*, 438 F.3d at 284 (citation omitted). Accordingly, liability under § 20(a) is derivative of an underlying violation of those sections by the controlled person.

The court has found that plaintiffs have adequately alleged a primary violation of § 10(b) by the various defendants.[40] As to the control element, Daubenspeck, DaMour and Li were members of Fisker Automotive's Board of Directors and plaintiffs have alleged that the Board was responsible for the creation and dissemination of various confidential memoranda regarding the offerings and Capital Calls. DaMour participated in conference calls regarding Fisker Automotive. Daubenspeck cofounded Advanced Equities, an investment bank used by Fisker Automotive to raise capital. As to Ace Strength, plaintiffs have alleged that Li invested in Fisker Automotive through Ace Strength, such that Ace Strength was a controlling shareholder of Fisker Automotive. The court concludes that plaintiffs have adequately pled "actual control" as to these defendants.

## IV. PERSONAL JURISDICTION

### A. Standard

---

[40] Kleiner Perkins, Lane, Fisker and Koehler only challenged the § 20(a) claim as failing to allege a primary violation. (D.I. 58; D.I. 62)

Rule 12(b)(2) directs the court to dismiss a case when it lacks personal jurisdiction over the defendants. Fed.R.Civ.P. 12(b)(2). When reviewing a motion to dismiss pursuant to Rule 12(b)(2), a court must accept as true all allegations of jurisdictional fact made by the plaintiffs and resolve all factual disputes in the plaintiffs' favor. *Traynor v. Liu*, 495 F. Supp. 2d 444, 448 (D. Del. 2007). Once a jurisdictional defense has been raised, the plaintiffs bear the burden of establishing, with reasonable particularity, that sufficient minimum contacts have occurred between the defendants and the forum to support jurisdiction. *See Provident Nat'l Bank v. Cal. Fed. Sav. & Loan Ass'n*, 819 F.2d 434, 437 (3d Cir. 1987). To meet this burden, the plaintiffs must produce "sworn affidavits or other competent evidence," since a Rule 12(b)(2) motion "requires resolution of factual issues outside the pleadings." *Time Share Vacation Club v. Atlantic Resorts, Ltd.*, 735 F.2d 61, 67 n. 9 (3d Cir. 1984).

In determining whether a court may exercise personal jurisdiction, a court must examine the relationship among the defendants, the forum, and the litigation. *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 368 (3d Cir. 2002). Where the plaintiffs' cause of action is related to or arises out of the defendants' contacts with the forum, the court is said to exercise "specific jurisdiction." *IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 259 (3d Cir. 1998) (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984)). In federal court, the exercise of specific jurisdiction must satisfy the requirements of the Due Process Clause of the Fifth Amendment. *See In re Real Estate Title & Settlement Servs. Antitrust Litig.*, 869 F.2d 760, 766 n. 6 (3d Cir. 1989). In assessing the sufficiency of defendants' contacts with the forum as required by the Due Process Clause, "a court should look at the extent to which the defendants 'availed

[themselves] of the privileges of American law and the extent to which [they] could reasonably anticipate being involved in litigation in the United States.'" *Pinker,* 292 F.3d at 370 (quoting *Max Daetwyler Corp. v. Meyer,* 762 F.2d 290, 293 (3d Cir. 1985)); *see also Hanson v. Denckla,* 357 U.S. 235, 253 (1958). The final phase of assessing whether to exercise personal jurisdiction over defendants involves an analysis of whether jurisdiction comports with "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

Jurisdiction over alleged violations of the Exchange Act is governed by § 27 of the Act. *See* 15 U.S.C. § 78aa. Section 78aa provides in pertinent part:

> The District Courts of the United States ... shall have exclusive jurisdiction of this title or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this title or the rules and regulations thereunder. Any suit or action to enforce any liability or duty created by this title or rules and regulations thereunder, or to enjoin any violation of such title or rules and regulations, may be brought in [the district wherein any act or transaction constituting the violation occurred] or in the district wherein the defendant is found or is an inhabitant or transacts business, and process in such cases may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found.

15 U.S.C. § 78aa.[41] As stated above, § 78aa provides for nationwide service of process. The Third Circuit has held that a "national contacts analysis" is appropriate "when appraising personal jurisdiction in a case arising under a federal statute that contains a nationwide service of process provision." *Pinker,* 292 F.3d at 369 (quoting *AlliedSignal, Inc. v. Blue Cross of Calif.,* 924 F. Supp. 34, 36 (D.N.J.1996)).

---

[41] Jurisdiction over alleged violations of the Securities Act is governed by § 22 of the Act. Section 77v, like § 78aa of the Exchange Act, provides for nationwide service of process. *See* 15 U.S.C. § 77v.

## B. Discussion

Plaintiffs allege that both Li and Ace Strength possess minimum contacts with the United States. Specifically, plaintiffs allege that Li, a Hong Kong resident and member of the Fisker Automotive Board of Directors, held a "controlling interest" in Fisker Automotive through Ace Strength, a British Virgin Islands corporation which owned 10.15% of Fisker's shares. (D.I. 24 at ¶¶ 32-33, 59) Plaintiffs aver that Li voted for and/or approved the December 2011 Capital Call. (Id. at ¶¶ 79, 81) Plaintiffs also allege that the solicitations were directed at the United States and that "substantial acts" related to the disclosure allegations took place in the United States. Li was identified as a Director and used Fisker Automotive's address in a Notice of Exempt Offering of Securities. (D.I. 52 at 84; D.I. 53, ex. I)[42]

So long as defendants have minimum contacts with the United States as a whole, § 78aa and § 77v confer personal jurisdiction over the defendant in any federal court. The due process requirement that

> a defendant have "minimum contacts" with a particular district or state . . . is not a limitation imposed on the federal courts under Section 27 in a federal case. Due process concerns under the Fifth Amendment are satisfied if a federal statute provides for nationwide service of process in federal court for federal question cases.

---

[42] Defendants did not oppose plaintiffs' motion to take judicial notice of certain documents. (D.I. 54) Such documents are cited in the complaint (D.I. 53, ex. B-H and J-N); a matter of public record (id., ex. A); and filed with the SEC (id., ex. I). The court takes judicial notice of such documents as needed for the present motions. *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.,* 998 F.2d 1192, 1196 (3d Cir. 2006) ("[A] court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document."); *Oshiver v. Levin, Fishbein, Sedran & Berman,* 38 F.3d 1380, 1385 (3d Cir. 1994) ("We may also consider matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case."); *Oran v. Stafford,* 226 F.3d 275, 289 (3d Cir. 2000) (taking "judicial notice of properly-authenticated public disclosure documents filed with the SEC").

*FS Photo, Inc. v. PictureVision, Inc.*, 48 F. Supp. 2d 442, 445 (D. Del. 1999).

Specific jurisdiction cannot be solely based upon shares in a United States corporation. *Balden Techs., Inc. v. LS Corp.* 626 F. Supp. 2d 448, 457 (D. Del. 2009) ("[m]ere ownership of a [Delaware] corporation is not sufficient to confer personal jurisdiction over a non-resident defendant"). A position of director is by itself insufficient to find specific jurisdiction. *Tracinda Corp. v. Daimlerchrysler AG*, 197 F. Supp. 2d 86, 99 (D. Del. 2002). Moreover, plaintiffs must "adequately specif[y defendants'] alleged role" to establish specific jurisdiction. *See id.* at 96 (declining "to exercise jurisdiction over [d]efendant Kopper based solely on Tracinda's controlling person claims").

Plaintiffs assert that Li's position on Fisker's Board of Directors, identification in the Notice of Exempt Offering of Securities with Fisker Automotive's California address, along with his "active participation" and vote on the December 2011 Capital Call, mandates specific jurisdiction. While these statements demonstrate that Li had some contact with the United States, plaintiffs do not allege that the cause of action – misrepresentations and omission in the disclosures – arises out of or is related to said contact. *See IMO Indus., Inc.*, 155 F.3d at 259. Plaintiffs have not pled facts showing that Li or Ace Strength exercised control over the challenged disclosures or engaged in "substantial acts" "purposefully directed" at the United States and sufficient to establish

minimum contacts.[43, 44] *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985); *Helicopteros*, 466 U.S. at 414.

While plaintiffs shoulder the burden of demonstrating sufficient jurisdictional facts, "courts are to assist the plaintiff by allowing jurisdictional discovery unless the plaintiff's claim is 'clearly frivolous.'" *Toys "R" Us, Inc. v. Step Two, S.A.,* 318 F.3d 446, 456 (3d Cir. 2003) (quoting *Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n,* 107 F.3d 1026, 1042 (3d Cir. 1997)). "If a plaintiff presents factual allegations that suggest 'with reasonable particularity' the possible existence of the requisite 'contacts between [the parties] and the forum state,' the plaintiff's right to conduct jurisdictional discovery should be sustained." *Id.* at 456 (*quoting Mellon Bank (East) PSFS, Nat'l Ass'n v. Farino,* 960 F.2d 1217, 1223 (3d Cir. 1992)). A court must determine whether certain discovery avenues, "if explored, might provide the 'something more' needed" to establish personal jurisdiction. *Toys "R" Us,* 318 F.3d at 456. To receive jurisdictional discovery, plaintiffs must claim that their factual allegations establish with reasonable particularity the possible existence of requisite contacts. If they do not, to allow jurisdictional discovery would "allow plaintiff to undertake a fishing expedition based

---

[43] Plaintiffs' citation to *TCS Capital Management, LLC v. Apax Partners, L.P.*, 2008 U.S. Dist. LEXIS 19854 (S.D.N.Y. Mar. 7, 2008) is inapposite. Though it was indeed "foreseeable" that defendants' actions would have an "effect" in the United States, the jurisdictional issue in the case turned on the fact that the "director defendants were all primary violators by virtue of their having prepared and approved the allegedly false and/or misleading Explanatory Report." *Id.* at \*29-33.

[44] Therefore, the court does not consider whether the exercise of specific jurisdiction "would comport with 'fair play and substantial justice.'" *D'Jamoos ex rel. Estate of Weingeroff v. Pilatus Aircraft Ltd.,* 566 F.3d 94, 106 (3d Cir. 2009) (citing *Burger King*, 471 U.S. at 476).

only upon bare allegations." *Inno360 v. Zakta, LLC*, 50 F. Supp. 2d 587, 597 (2014). Notably, in addition, "the United States Supreme Court has held that courts should 'exercise special vigilance to protect foreign litigants from the danger that unnecessary, or unduly burdensome, discovery may place [on] them.'" *Telecordia Tech, Inc. v. Alcatel S.A.*, Civ. No. 04-874 GMS, 2005 WL 1268061, at *8 (D. Del. May 27, 2015).

In support of the request for jurisdictional discovery, plaintiffs suggest that Ace Strength might have an alter-ego or agency relationship with a company for which this court has general jurisdiction and that Li might own property in the United States.[45] (D.I. 52 at 86-87) Plaintiffs also contend that Li may have "traveled to the United States in connection with Fisker Automotive or the offerings, particularly the pay-to-play offerings," and that such information might provide further relevant information pertaining to specific jurisdiction. (D.I. 52 at 87) These contentions, along with Li's status as a Director of Fisker Automotive,[46] raise a colorable showing of personal jurisdiction sufficient to allow jurisdictional discovery.

## V. CONCLUSION

For the foregoing reasons, the court grants in part and denies in part defendants Daubenspeck, Fisker and Koehler, DaMour, and Kleiner and Lane's motions to dismiss the consolidated complaint (D.I. 29; D.I. 33; D.I. 36; D.I. 43); stays Ace Strength and Li's

---

[45] Plaintiffs also assert that jurisdictional discovery is supported by the fact that Ace Strength is not a public company and that a great deal of information is solely in their hands. *See Rocke v. Pebble Beach Co.*, 541 F. App'x 208, 212-13 (3d Cir. 2013) (finding that a district court abused its discretion by failing to allow jurisdictional discovery where the necessary information was solely in defendants' hands resulting in an "imbalance in access to information" between the parties).

[46] Who may have participated in the preparation of offering documents, discussed above.

motion to dismiss (D.I. 38) pending the completion of jurisdictional discovery; grants
McDonnell's motion to dismiss (D.I. 31); and grants plaintiffs' motion for judicial notice of
certain documents (D.I. 54). An appropriate order shall issue.