**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| IN RE FISKER AUTOMOTIVE HOLDINGS, INC. SHAREHOLDER LITIGATION | ) ) ) ) ) ) ) ) ) |

Civ. No. 13-2100-SLR

**CONSOLIDATED AMENDED
COMPLAINT FOR VIOLATION OF
THE FEDERAL SECURITIES LAWS**

<u>DEMAND FOR JURY TRIAL</u>

Plaintiffs Atlas Allocation Fund, L.P. ("Atlas Fund") and Atlas Capital Management,

L.P. ("Atlas Management"),  its general partner and investment advisor, CK Investments LLC,

David W. Raisbeck, Hunse Investments, L.P., Southwell Partners, L.P., Sandor Master Capital

Fund, John S. Lemak, Pinnacle Family Office Investments, L.P., Dane Andreeff, SAML

Partners, Kenneth & Kimberly Roebbelen Revocable Trust of 2001, Brian Smith, PEAK6

Opportunities Fund L.L.C., 8888 Investments GmbH, MCP Fisker L.L.C., 12BF Global

Investments, Ltd., and ASC Fisker L.L.C. (hereinafter "Plaintiffs"), by their undersigned

attorneys, allege upon personal knowledge as to themselves and  their agents, and upon

information and belief as to all other matters, based upon, *inter alia,* the investigation made by

and through their attorneys, which investigation included:  a review of press releases, media

reports, and other public documents concerning Fisker Automotive Holdings, Inc. ("Fisker

Automotive" or the "Company"); certain Company documents, investor presentations, and

conference calls  associated with the offerings of securities the Company made which are the

subject of this action; confidential government documents obtained by third parties relating to

the Company; the testimony and documents made public in the hearing held by the

Subcommittee On Economic Growth, Job Creation and Regulatory Affairs of the Committee On

Oversight And Government Reform U.S. House of Representatives on April 24, 2013 to

investigate Fisker Automotive's travails; and documents obtained in discovery, as follows:

### NATURE OF THE ACTION

1.      In this action, Plaintiffs assert claims of common law fraud and violations of the

Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the

"Exchange Act"), in connection with purchases of (i) Fisker Automotive preferred stock by

Plaintiffs PEAK6 Opportunities Fund L.L.C., 8888 Investments GmbH, MCP Fisker L.L.C.,

12BF Global Investments, Ltd., and ASC Fisker L.L.C. ("Fisker Automotive Plaintiffs"); and (ii)

Fisker Automotive preferred stock through Middlebury Group LLC, Middlebury Ventures II/III,

LLC,  and/or Ridgemakers SPV II/III, LLC (together or separately, "Middlebury") by Plaintiffs

Atlas Fund and Atlas Management, CK Investments LLC, David W. Raisbeck, Hunse

Investments, L.P., Southwell Partners, Sandor Master Capital Fund, John S. Lemak, Pinnacle

Family Office Investments, L.P., Dane Andreeff, SAML Partners, Kenneth & Kimberly

Roebbelen Revocable Trust of 2001, and Brian Smith ("Middlebury Plaintiffs").  All securities

are collectively referred to hereinafter as "Fisker Automotive Securities."

2.      Plaintiffs seek to pursue remedies under common law, the Securities Act and the

Exchange Act as described below.

3.      This Amended Complaint sets forth non-fraud claims under Section 12(a)(2) of

the Securities Act (against all Defendants) and non-fraud claims under Section 15 of the

Securities Act (against the "Section 15 Defendants" (defined below)).  Plaintiffs' Securities Act

claims are not based on any knowing or reckless misconduct – *i.e.*, they do not allege fraud, do

not sound in fraud and expressly disavow any fraud-related allegations.  Rather, they are

premised on the fact that there were material omissions in the disclosures related to the offerings

of Fisker Automotive Securities.

- 2 -

4.      This Amended Complaint also separately sets forth: (i) common law fraud claims; and (ii) certain claims under Section 10(b) of the Exchange Act (against all Defendants) and under Section 20(a) of the Exchange Act (against the "Section 20 Defendants" (defined below)) who were knowing or deliberately reckless participants in defrauding investors in connection with their material omissions.

## JURISDICTION AND VENUE

5.      Plaintiffs assert claims that arise under and pursuant to (a) Sections 12 and 15 of the Securities Act (15 U.S.C. §§ 77l, 77l(a)(2) and 77o);  (b) Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5); and (c) the common law.

6.      This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v) and Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.  This Court has supplemental jurisdiction over Plaintiffs' common law claim pursuant to 28 U.S.C. § 1367.

7.      Venue is proper in this District pursuant to Section 22 of the Securities Act and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b) and (c).  In addition, a Fisker manufacturing plant, located at 801 Boxwood Road, Wilmington, Delaware, was purchased in October 2009 with approximately $21.5 million in Delaware state subsidies.

8.      In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications, and the Internet.

## PARTIES AND RELEVANT NON-PARTIES

9.     Plaintiff PEAK6 Opportunities Fund L.L.C. ("PEAK6") is an Illinois-based entity. PEAK6 invested in Fisker Automotive Securities as follows: (i) $3 million on or about April 27, 2011; (ii) $1.2 million on December 23, 2011; and (iii) $360,000 on or about September 15, 2012, for a total investment of approximately $4.6 million.

10.     Plaintiff 8888 Investments GmbH ("8888 Investments") is a Swiss-based entity. 8888 Investments invested in Fisker Automotive Securities as follows: (i) $2,999,993 between April 27-29, 2011; (ii) $819,973 on December 23, 2011; (iii) $199,973 between March 15-30, 2012; and (iv) $592,895 between August 20, 2012 and September 18, 2012, for a total investment of approximately $4,612,834.

11.     Plaintiff MCP Fisker ("MCP") is an Illinois-based entity.  MCP invested in Fisker Automotive Securities as follows: (i) $1,150,000 on April 27, 2011; (ii) $1,360,000 on December 28, 2011; (iii) $100,000 on January 30, 2012; (iv) $70,000 on March 30, 2012; and (iv) $387,000 on September 21, 2012, for a total investment of approximately $3,067,000.

12.     Plaintiff 12BF Global Investments, Ltd. ("12BF") is a company organized under the laws of the Cayman Islands with limited liability. 12BF invested in Fisker Automotive securities as follows: (i) $3,160,000 on December 23, 2011; (ii) $6,065,000 on March 31, 2012; and (iii) $2,767,500 between September 5-24, 2012, for a total investment of approximately $11,992,500.

13.     Plaintiff ASC Fisker L.L.C. ("ASC") is a Florida-based entity.  ASC invested in Fisker Automotive Securities as follows: (i) $654,817.97 between April 19-27, 2011; (ii) $1,818,486 between August 12, 2011 and October 31, 2011; (iii) $233,901 on December 17,

2011; (iv) $8,172 on January 18, 2012; (v) $841,548.13 between March 27-30, 2012; and (v) $969,080.31 between September 4-21, 2012, for a total investment of approximately $4,526,005.

14.     Plaintiff CK Investments LLC ("CK Investments") is a Maryland-based entity. CK Investments invested in Fisker Automotive Securities as follows: (i) $1.5 million on April 13-20, 2011; and (ii) $559,701 on December 21, 2011, for a total investment of approximately $2,059,701.

15.     Plaintiff Atlas Management  is the general partner and investment advisor to Plaintiff Atlas Fund (collectively, "Atlas"); both of which are based in Texas.  Atlas invested in Fisker Automotive Securities as follows: (i) $1,005,000 on April 20, 2011; (ii) $374,986 on December 27, 2011; (iii) $275,991.87 on March 29, 2012; and (iv) $352,351.79 on September 25, 2012, for a total investment of approximately $2,008,330.

16.     Plaintiff David W. Raisbeck ("Raisbeck") is a resident of Florida.  Mr. Raisbeck invested in Fisker Automotive Securities as follows: (i) $2,720,442.04 on or about April 14, 2011; (ii) $1,119,361.17 on December 27, 2011; and (iii) $335.923.32 between September 12-18, 2012, for a total investment of approximately $4,175,726.

17.     Plaintiff Hunse Investments, L.P. ("Hunse Investments") is a Texas-based entity. Hunse Investments invested in Fisker Automotive Securities as follows: (i) $250,000 on or about April 19, 2011; (ii) $93,280 on December 27, 2011; (iii) $56,720.41 on or about March 28, 2012; and (iv) $45,015.72 September 18, 2012, for a total investment of $445,015.

18.     Plaintiff Southwell Partners, L.P. ("Southwell") is a Texas-based entity. Southwell invested in Fisker Automotive Securities as follows: (i) $750,000 between April 13-19, 2011; (ii) $279,840 on or about January 18, 2012; (iii) $150,000 on or about March 30, 2012;

and (iv) $128,996.21 or about September 20, 2012, for a total investment of approximately $1,308,836.

19.     Plaintiff Sandor Master Capital Fund ("Sandor") is a Texas-based entity.  Sandor invested in Fisker Automotive Securities as follows: (i) $702,160 between April 7-21, 2011; (ii) $261,990 on December 27, 2011; (iii) $200,111.80 on or about March 27, 2012; and (iv) $138,678.29 between September 4-18, 2012, for a total investment of approximately $1,302,943.

20.     Plaintiff John S. Lemak ("Lemak") is a resident of Texas.  Lemak invested in Fisker Automotive Securities through his personal individual retirement account ("IRA" and personally as follows: (i) $201,000/$100,500 between April 11-21, 2011; (ii) $74,997/$37,399 between December 27-28, 2011; (iii) $49,651.80/$28,857.50 on March 27, 2012; and (iv) $2,772.39/$5,237.09 and $32,170.71/$29,804.96 between September 4-19, 2012, for a total investment of approximately $562,390.

21.     Plaintiff Pinnacle Family Office Investments, L.P. ("Pinnacle") is a Texas-based entity. Pinnacle invested in Fisker Automotive Securities as follows: (i) $4,000,001.84 on or about April 15, 2011; (ii) $1,448,239 on December 27, 2011; (iii) $1,551,760.25 on or about March 29, 2012; and (iv) $927,662.47 on or about September 17, 2012, for a total investment of approximately $8 million.

22.     Plaintiff Dane Andreeff ("Andreeff") is a resident of Florida. Andreeff invested in Fisker Automotive Securities as follows: (i) $500,000 on April 20, 2011; (ii) $86,560 on December 28, 2011; and (iii) $50,000 on March 27, 2012, for a total investment of approximately $636,560.

23.     Plaintiff SAML Partners ("SAML Partners") is a California-based entity. SAML Partners invested in Fisker Automotive Securities as follows: (i) $250,000 on April 11, 2011; (ii)

$93,280 on December 23, 2011; and (iii) $27,993.80 between September 4 and September 19, 2012, for a total investment of approximately $371,993.

24.     Plaintiff Kenneth & Kimberly Roebbelen Revocable Trust of 2001 ("KKRR Trust") is a California-based entity.  The KKRR Trust invested in Fisker Automotive Securities as follows: (i) $500,000 on April 7, 2011; (ii) $186,560 on December 20, 2011; and (iii) $100,000 on March 28, 2012, for a total investment of $786,560.

25.     Plaintiff Brian Smith ("Smith") is a resident of Utah.  Smith invested in Fisker Automotive Securities as follows: (i) $250,000 on April 11, 2011; (ii) $93,800 on December 21, 2011; and (iii) $24,074.67 on March 28, 2011, for a total investment of $367,874.

26.     Non-Party Fisker Automotive is a Delaware corporation which had its principal place of business located at 5515 E. La Palma Ave, Anaheim, CA 92807.  On November 22, 2013, Fisker Automotive filed for bankruptcy protection in the United States Bankruptcy Court for the District of Delaware, Case No. 13-13087-KG.  Accordingly, Fisker Automotive is not named as a defendant herein.

27.     Defendant Henrik Fisker was a co-founder and director of Fisker Automotive.  He was also Fisker Automotive's Chief Executive Officer from its inception through February 2012.

28.     Defendant Bernhard Koehler was a co-founder of Fisker Automotive's predecessor entity, Fisker Coachbuild, LLC, and was Fisker Automotive's Chief Operating Officer at all relevant times.

29.     Defendant Joe DaMour was Fisker Automotive's Chief Financial Officer at all relevant times through July 2012, after which he acted as a "special adviser" to the Company.

30.     Defendant Kleiner Perkins Caufield & Byers ("Kleiner Perkins") is a venture capital firm with its headquarters in Menlo Park, CA, and is a controlling shareholder of Fisker

Automotive. The  profile of Kleiner Perkins partner Trae Vassalo on CrunchBase, a database about technology companies, people and investors, states that since joining Kleiner Perkins in 2002, Vassalo has "work[ed] closely with the management teams of [among others] Fisker Automotive." Thirty-two Delaware business entities include "Kleiner Perkins" or "KPCB" in their name.

31.     Defendant Ray Lane was a Managing Partner of Kleiner Perkins and was Fisker Automotive's Chairman of the Board of Directors at all relevant times. Defendant Lane spoke on behalf of Fisker Automotive on numerous occasions and in numerous press reports and was actively involved in negotiating Fisker Automotive's loan agreement with the U.S. Department of Energy ("DOE") under its Advanced Technology Vehicles Manufacturing Loan Program ("ATVM").  The loan agreement is hereinafter referred to as the ATVM Loan.

32.     Defendant Ace Strength Ltd ("Ace") is an investment vehicle through which Richard Li Tzar Kai invested in Fisker Automotive.  Ace was a controlling shareholder of Fisker Automotive.

33.     Defendant Richard Li Tzar Kai was a member of Fisker Automotive's Board of Directors at all relevant times until his resignation as a director of Fisker Automotive effective July 15, 2011 and thereafter continued to attend and/or participate in various Fisker Automotive Board of Director meetings at all other relevant times.

34.     Defendant Keith Daubenspeck was a Director of Fisker Automotive and Co-founder of Advanced Equities, Inc. ("Advanced Equities"), which was one of several investment banks or vehicles that Fisker Automotive used to raise capital.  The SEC censured Advanced Equities in September 2012 as part of a Cease and Desist Order arising out of its fraudulent practices in connection with raising capital for an unnamed company other than Fisker

Automotive.  Advanced Equities ceased operations shortly thereafter and is now defunct.

Accordingly, Advanced Equities is not named as a defendant herein. Daubenspeck was

suspended from the securities industry for twelve months in connection with the SEC's Order

against Advanced Equities, and also paid a $50,000 fine.

35.     Defendant Peter McDonnell was the senior managing director in the investment

banking group at Advanced Equities and was responsible for, *inter alia*, marketing Fisker

Automotive's Series D-1 offering.  As detailed below, Defendant McDonnell spoke on numerous

conference calls with Fisker Automotive investors.

36.     Non-party Middlebury and its affiliates are Delaware limited liability companies,

which were also used by Fisker Automotive to raise capital.

## FACTUAL ALLEGATIONS

### I.     Fisker Automotive's Beginnings

37.     Fisker Coachbuild LLC, the predecessor to Fisker Automotive, was founded in

early 2003 by Defendants Henrik Fisker and Bernhard Koehler with a focus on creating new

exterior car designs while utilizing existing luxury car engineering.

38.     On August 7, 2007, Quantum Fuel Systems Technologies Worldwide, Inc.

("Quantum Fuel Systems") (NASDAQ: QTWW) and Fisker Coachbild, LLC, launched Fisker

Automotive as a new venture to produce premium plug-in hybrid automobiles.

39.     Quantum Fuel Systems stated in Form 10-Q for the quarter ended October 31,

2007 that:

> Initial deliveries of a four-door sports sedan are anticipated to commence in
> December 2009. Upon formation, [Quantum Fuel Systems] owned 62% of the
> issued and outstanding capital stock of Fisker Automotive. On November 21,
> 2007, Fisker Automotive sold $5.5 million of convertible preferred stock in a
> Series A financing, which reduced [Quantum Fuel Systems'] ownership
> percentage to 47.5%. The preferred shareholders have voting rights that are

similar to the common shareholders. [Quantum Fuel Systems] has the right to appoint two of Fisker Automotive's five members of the Board of Directors. Fisker Automotive will need to raise a substantial amount of additional capital in order to complete future phases of development, testing and tooling for the new vehicle platform, which will further reduce the Company's ownership percentage in Fisker Automotive.

40.     In November 2007, in conjunction with its investment in Fisker Automotive, Quantum Fuel Systems also began providing preliminary concept development services to Fisker Automotive for a production intent hybrid-electric vehicle under a $1.0 million arrangement. Quantum Fuel Systems stated in the Form 10-Q referenced above that "[w]e anticipate expanding our services beyond this initial arrangement to develop the powertrain and software control systems for the new vehicle platform over the next twelve months."

41.     In January 2008, Fisker Automotive completed a $20 million Series B round of financing including investments from Palo Alto Investors, Gentry Venture Partners, and Defendant Kleiner Perkins.

42.     On January 14, 2008, the Wall Street Journal published a report on Fisker Automotive based on two interviews of Defendants Lane and Henrik Fisker, stating in part:

> The precise size of the investment in Fisker wasn't disclosed, but Mr. Lane said it was more than $10 million and 'one of our bigger investments.' Mr. Lane, the former No. 2 executive at software company Oracle Corp., will join Fisker's board.  Thanks to Kleiner's investment, 'we have all the capital we need to move forward according to the plan,' said Henrik Fisker, a Danish-born former BMW AG and Aston Martin designer and now chief executive of the company he helped set up last year. Palo Alto Investors, a venture-capital concern, invested in Fisker in an earlier round of fund raising. 'We're still going to raise money later in the year, but we don't see that as a big issue,' Mr. Fisker said.
>
> * * *
>
> Mr. Fisker believes his company is a couple of years ahead of bigger rivals because the design of the car has been finalized. 'The car we're showing in Detroit is not your usual show car; it's actually a preview of the production car you can buy,' Mr. Fisker said.

The Karma, Mr. Fisker said, will use lithium-ion batteries, the most-promising next-generation energy-storage technology for automotive use so far. Some of those batteries, however, have been found to overheat. In 2006 and 2007, reports surfaced that lithium-ion batteries for laptops and cellphones were catching fire, leading to several recalls.  Mr. Fisker wouldn't say what kind of lithium-ion battery the Karma will use, but he said safety concerns have all been 'resolved.'

43.     On or about February 14, 2008, Fisker Automotive awarded Quantum Fuel a $13.5 million contract to develop further the powertrain and software control systems for the Fisker Karma, for which Fisker Automotive expected to begin initial production and deliveries in the fourth quarter of 2009.

## II.     Additional Private Equity is Raised, and the U.S. Department of Energy Becomes a Critical Backer of Fisker Automotive

44.     On or about December 31, 2008, Fisker Automotive applied for the ATVM Loan.

45.     Shortly thereafter, on or about March 2, 2009, Fisker Automotive raised approximately $68.5 million in Series C financing, including an investment from Defendant Kleiner Perkins. Defendant Ray Lane, Kleiner Perkins' Managing Partner, was appointed to Fisker Automotive's Board of Directors in conjunction with Kleiner Perkins' investment in this financing round.

46.     At midnight on August 23, 2009, Defendant Koehler, Fisker Automotive's Chief Operating Officer, wrote a panicked email to the DOE stating that Fisker Automotive would be forced into bankruptcy if the DOE did not approve Fisker Automotive's term loan application. Defendant Koehler stated further that "[t]he latest information to delay the conditional commitment for the Karma program until we receive the approval for the Kx program is pushing our supplier base and investment group beyond the limit. . . . *We are oversubscribed in this equity round with DOE support – and nowhere without it*." (Emphasis added.)

47.     Less than a month later, on September 18, 2009, the DOE issued a $528.7 million Conditional Commitment Letter which allocated $169.3 million for Fisker Automotive to complete its first vehicle, the Fisker Karma, and $359 million to complete a low cost plug-in hybrid tentatively called the Fisker Nina. The ATVM Loan document, which was not made public, specifically stated that an "Event of Default" would include Fisker's "fail[ure] to achieve any Milestone by the relevant Milestone Completion Date."

48.     In October 2009, Fisker Automotive bought from General Motors a closed manufacturing plant located at 801 Boxwood Road, Wilmington, DE, with $21.5 million in Delaware state subsidies. The Wilmington Delaware News Journal reported on October 28, 2009 that Governor Jack Markell was instrumental in bringing Fisker Automotive to Delaware by, *inter alia*, "contact[ing] a close friend, Aileen Lee, who work[ed] at Kleiner Perkins Caufield & Byers, a California venture capital firm investing in Fisker."

49.     On or about January 13, 2010, Fisker Automotive and A123 Systems, Inc. ("A123") entered into a supply agreement, pursuant to which A123 agreed to supply batteries for Fisker Automotive's Karma plug-in hybrid electric vehicle program.  At the same time, A123 also agreed to invest approximately $20.5 million into its new customer, Fisker Automotive.

50.     On January 20, 2010, the Wall Street Journal published an article entitled "Car Maker Taps Funding Karma" based primarily on interviews with Defendants Henrik Fisker and Lane.  The article stated in full:

> Fisker Automotive Inc. said it raised $115.3 million in a round of equity financing that could reach $150 million in coming weeks.
>
> 'The business plan has always called for $150 million in equity,' said Ray Lane, a managing partner at venture-capital firm Kleiner Perkins Caufield & Byers, which has been a major investor in electric car maker Fisker since the company's founding in 2007.

In an interview, Mr. Lane said Fisker will grab the investing momentum surrounding the company to complete the $150 million funding round in 'the next month or two.'

The start-up company, based in Irvine, Calif., decided to announce it had raised $115.3 million to close on a $529 million low-cost loan with the U.S. Department of Energy, which required Fisker to raise $113 million in equity, said Mr. Lane.

Besides Kleiner Perkins, other investors in the round so far are lithium-ion battery technology developer A123Systems Inc. and Ace Investments, a Hong Kong investment firm associated with Richard Li, chairman and executive director of Hong Kong-based telecommunications company PCCW Ltd.

The combined DOE and private-equity funding bring the luxury plug-in hybrid electric Karma program to a fully funded status, which Mr. Lane said is 'phenomenal' for a start-up vehicle technology developer and manufacturer.

Fisker's long-term business plan also calls for an annual $50 million equity funding, with the company reaching profitability in 2011, the first full year of production of the Karma, said Mr. Lane.

The business plan covers not only the Karma but also its sports version, the Karma Sunset, as well as a lower-price family car under development.

With this fund-raising target met, Fisker expects to close on the DOE loan in coming months, following an extensive period of negotiations, said Henrik Fisker, the company's chief executive and founder, in an interview.

'We've worked with the DOE for the last nine months,' said Mr. Fisker. 'It's been a very long due-diligence process. They've hired outside consultants . . . for technical due diligence, financial stress tests . . . definitely there's no other investor that has made as much due diligence as the DOE.'

Fisker was selected in September to receive nearly $529 million in low-cost loans under the DOE's Advanced Technology Vehicles Manufacturing Loan Program, or ATVM.

The funding will help Fisker finalize the development of the Karma and support the engineering and manufacturing of the family car, a plug-in hybrid slated for 2012 with a retail price of less than $48,000, before consumer-tax incentives.

The ATVM loans can cover as much as 80% of a project cost in a traditional 80% debt-20% equity financing structure. To secure the loan, the borrower is required to show the DOE it has its equity share in place. The funding tops off a series of announcements for Fisker.

- 13 -

Last week, A123 Systems disclosed it had made a $23 million investment in the company and that it would be the supplier of battery management systems for the Karma.

For A123, becoming a strategic investor in an electric vehicle developer allows it to get in on the engineering of the vehicle 'from scratch,' which will help on cost-cutting strategies, said David Vieau, president and chief executive of A123 Systems.

A123 Systems will invest $13 million in cash from its balance sheet, and the remainder will be in stock. Including the latest round, Fisker has raised around $190 million since its founding. Other key investors in the company include investment firm Palo Alto Investments LLC, the Qatar Investment Authority and Quantum Fuel Systems Technologies Worldwide Inc., a maker of power trains.

51.     On or about April 22, 2010, Fisker Automotive and the DOE executed the non-public final term loan and credit facility, discussed in the Conditional Commitment Letter referenced above, for the ATVM Loan. Defendant DaMour signed the ATVM Loan agreement on behalf of Fisker Automotive. One of the "Karma Milestones" in the ATVM Loan documents required "Commencement of commercial production of the Karma vehicle" by February 2011.

52.     On or about May 5, 2010, Fisker Automotive raised an additional $145 million in Series A-1 venture capital from Kleiner Perkins, Palo Alto Investors and Advanced Equities (which raised approximately $27 million from 347 private investors).

53.     In March 2011, Fisker Automotive delivered a non-public presentation to DOE officials in which it inaccurately reported that the February 2011 Karma commercial production milestone under the ATVM Loan had been met.  Fisker Automotive's failure to meet this milestone was an "Event of Default" under the ATVM Loan.

54.     On or about March 23, 2011, Fisker Automotive reportedly raised an additional $190 million in private equity including investments from Kleiner Perkins, Palo Alto Investors, and Advanced Equities.

55.     On April 6, 2011, AutoblogGreen published an article entitled "Electric vehicle newcomers still in front after first round, but for how long?"  The portion of the article discussing Fisker Automotive quoted Defendants Lane and Henrik Fisker, and stated in relevant part:

> One of the advocates of the newer entrants is Ray Lane, Managing Partner at Kleiner Perkins Caufield & Byers who is one of the main shareholders at Fisker. He told me:
>
>> It's all about focus. Typically start-ups have to have one person that is 'the best' at something and that drives the whole culture. OEM's have lost that. They are monoliths playing out what they think the industry wants rather than trying to change the game. When you take Henrik [Fisker] out of the bureaucracy or have an entrepreneur like Elon, who isn't encumbered by "what the industry thinks", then magic happens. When the OEM's catch up, these companies need to retain what made them special.
>
> So I asked Henrik Fisker what it was that made Fisker so special that he was going to be able to compete and win against the world's leading luxury car makers, and he said:
>
>> Fisker Automotive's brand sends a clear message of 'caring' about our environment and our dependence of oil, combining this with extreme style and power, to evoke the emotional side, that made us fall in love with the automobile in the first place. This is a clear message that the driver will project by owning one of our cars: Responsible luxury.

**III.     Fund Raising and the Status of the ATVM Loan**

56.     In or around April 2011, Fisker Automotive solicited qualified investors in connection with a  $100 million offering of Series C-1 Preferred Stock and made related offering documents, including a Confidential Private Placement Memorandum dated March 31, 2011, available to Plaintiffs and other investors (the "April 2011 Offering").

57.     During the same timeframe, on behalf of Fisker Automotive, Middlebury circulated a Confidential Private Placement Memorandum (the "April 2011 CPPM") to the

- 15 -

Middlebury Plaintiffs soliciting qualified investors to purchase as much as $25 million in "membership units" in Middlebury's affiliated special purpose vehicles ("SPV"), priced at $1.34 per unit (the "April 2011 Offering"). The membership units would be based exclusively on Middlebury's purchase of "Fisker [Automotive] Series C-1 Shares pursuant to the Fisker [Automotive] Series C-1 transaction documents" which could be viewed only by potential investors "by following the instructions set forth on Exhibit D" to the April 2011 CPPM (i.e. the Fisker Automotive documents could not be viewed without having the password included in the April 2011 CPPM).

58.     On or around April 19, 2011, on behalf of Fisker Automotive, Middlebury circulated an email to the Middlebury Plaintiffs in connection with the April 2011 Offering attaching an LLC Membership Agreement between investors in the Middlebury special purpose vehicle (i.e. Middlebury Ventures II, LLC) and Fisker Automotive stating in part:

> The attached Middlebury SPV Member Acknowledgment Form must be completed before we can accept your completed investment in Fisker Automotive. We received this document today (Wednesday April 19th) and apologies for having not been able to send it out before now. **Fisker wants to ensure that each investor is an Accredited Investor as defined by the Securities Act and as such will not accept anyone [sic] investment without having the attached form executed**. (Bold added).

59.     As of May 2011, Defendant Kleiner Perkins reportedly owned a 12.61% and Defendant Ace owned a 10.15%, equity stake in Fisker, respectively.

60.     On May 13, 2011, VentureBeat published an article headlined "Luxury hybrid electric car maker Fisker Automotive raises an extra $100M" stating in part:

> [Defendant] Lane, a managing partner at storied venture capital firm Kleiner Perkins Caufield & Byers, said Fisker Automotive also plans to go public in the future in an interview with the Wall Street Journal. The company is backed by Kleiner Perkins, as well as New Enterprise Associates and A123 Systems Inc. (NASDAQ:AONE). Fisker Automotive raised $190 million just two months ago to help fund the production of its electric cars.

61.     In May 2011, with Fisker Automotive having completely drawn down on the Fisker Karma portion of the ATVM Loan, the DOE issued a non-public "Drawstop Notice" to the Federal Financing Bank which would prevent Fisker from making any further draws on the Fisker Nina phase of the ATVM Loan pending approval of revisions to Fisker Automotive's business plan.

62.     On or about June 6, 2011, Fisker Automotive raised another $115 million in venture capital, including investments from Advanced Equities, Kleiner Perkins and a new investor, New Enterprise Associates.

63.     On June 13, 2011, Automotive News published an article entitled "Electrifying 100," profiling Fisker Automotive and Ray Lane, stating in full:

RAY LANE

Managing partner, Kleiner Perkins Caufield & Byers Chairman, Fisker Automotive

Chosen because: Kleiner Perkins Caufield & Byers had invested in other green tech plays such as solar power and biofuels but hadn't found any appealing transportation companies, said Lane, 64. Until he saw the Fisker Karma luxury plug-in hybrid, that is. It was an electric vehicle that would appeal to more than just green buyers, he figured. Kleiner Perkins Caufield & Byers invested what Lane calls 'a lot by our standards' in Fisker Automotive in 2008. Lane chairs the company's board.

Kleiner Perkins Caufield & Byers made a smaller investment in Think, a Norwegian producer of small city electric vehicles. That stake has since been sold back to Think. Lane says he isn't looking for more electric car companies to invest in - for now. But he is eagerly awaiting his Fisker Karma. Several thousand of the pricey EVs will be in consumer hands by the end of 2011, Lane says. He will receive Serial No. 2.

Quote: 'Reduce demand for oil by 5 to 10 percent, and you start to control pricing.'

64.     In June 2011, Fisker Automotive made a non-public presentation to the DOE that contradicted its March 2011 representation to the DOE that Fisker Automotive had met the February 2011 Karma commercial production commencement milestone under the ATVM Loan. Importantly, Fisker's March 2011 representation to the DOE of its satisfaction of that milestone had avoided a default on the ATVM Loan as of February 2011, even as Fisker continued to draw approximately $29 million from February through May 2011.

65.     Following the June 2011 presentation, the DOE kept the non-public Drawstop Notice in place and refused to allow Fisker to draw any further funds under the ATVM Loan.

66.     In July 2011, Fisker Automotive also began preparations for a new round of private equity financing to raise approximately $150 million by issuing Series D-1 shares of Fisker Automotive. To that end, Fisker prepared a PowerPoint presentation for distribution to potential investors and also held a conference call with analysts and/or investors on July 27, 2011, which was recorded for future distribution to potential investors.  On the conference call for Fisker Automotive were Peter McDonnell, Senior Managing Director Investment Banking at Advanced Equities, and Defendants Henrik Fisker, Bernhard Koehler and Joe DaMour. Fisker Automotive made a replay of the conference call and the PowerPoint presentation available to Plaintiffs as well as other investors.

67.     On that call, Defendant DaMour discussed the  ATVM Loan and Fisker Automotive's cash position, stating in part:

> We've already raised over $600 million worth of equity and <u>when you combine that with the Department of Energy loans, which we secured, which are $530 million – that's $1.1 billion of total capital already secured for the business</u>.
>
> It's important to emphasize the Department of Energy loans are low interest rate loans that we're drawing them down on approximately 2% interest rate. They are long term in nature.  The loans are anywhere from 7 years with the Karma to 16 years  for the Nina, 3 years interest only and then they amortize off for the

remaining period.  And in my experience, it's a quasi-equity structure. Again, it gives you an extremely [inaudible] capital base.  There aren't any significant drop-offs or roll-offs in debt that would need to be refinanced at a critical point in the company's development phase.

In this round and you can see if you go down to the equity funding, what we're targeting and we've laid into the 11 financials, we're targeting a raise of $150 million. To be conservative, we've assumed that we would raise $100 million in 2011 and then we would come back to market in the first half of 2012 to raise $150 million additional.  What that does, if you look at the very bottom of the page, is it allows us to keep our cash position very strong anywhere between $100 to $200 million minimum cash which we think is prudent and  appropriate to run the business given the way we are scaling it up.  But importantly, a significant cash cushion which provides significant security and comfort to our suppliers and our dealers and all the other major partners we have that run the business with us. So in sum, we know we are very well capitalized today.

68.     On August 21, 2011, the News Journal (Wilmington, Delaware) published the

following article regarding Fisker Automotive's latest round of fundraising, including the "hype"

that a Fisker IPO was just around the corner:

Fisker Automotive is using a flurry of hype surrounding its first car -- the $98,000 Karma hybrid -- to ask for another $200 million from investors, according to a web report from Fortune magazine.  Fortune's report said the funding round is being characterized as a 'pre-IPO' round, suggesting that Fisker would not ask investors for more money before it offered its stock publicly.

John Gartner, an electric cars analyst at Pike Research, said 'it's a little unusual to put it that bluntly' but said the money Fisker is looking to raise is 'within reason' given that the company is hoping to produce and market thousands of high-end luxury hybrids.

Fisker insiders have been looking forward to an initial public offering for some time. Ray Lane, Fisker's chairman and managing partner at the venture capital firm Kleiner Perkins Caufield & Byers, told The News Journal last summer that the company would sell shares publicly once the Karma was on the road.

Contacted by email earlier this month, Lane said he could not 'speculate on IPO probability or timing.' Either way, Fisker appears to be capitalizing on some positive attention -- and even some star power on its side. Actor Leonardo DiCaprio was spotted in his silver version of the 2012 Fisker Karma, a $98,000 plug-in hybrid and the company's first car. DiCaprio was one of the first of around 3,000 Karma deposit-holders to get his car. Lane also took early delivery of a silver Karma.

- 19 -

Delaware, which has $21.5 million invested in Fisker, also should get a closer
look at the car soon.  Union Park Automotive in Wilmington, the state's only
Fisker dealer, is scheduled to receive its first Karma next month, says Fisker
spokesman Roger Ormisher. Delaware, ultimately, is to be a second home for
Anaheim, Calif.-based Fisker, which plans to produce its second line of hybrids at
a Newport-area plant formerly owned by General Motors. Production there is
scheduled to begin late next year, and the company is already hiring electrical and
mechanical engineers to retrofit equipment left in the facility.

Fisker would not appear to be short of cash, having raised north of $1 billion
publicly and privately. The company has raised $290 million privately just in the
last several months, which Gartner says likely gives the company confidence
about completing another large funding round.

69.     Starting on September 15, 2011 and ending on December 2, 2011, Fisker

Automotive closed on twelve rounds of sales of Series D1 stock, raising a total of approximately

$86 million based on offering documents distributed in or around the month before.  The

Amended and Restated Series D-1 Preferred Stock Purchase Agreement states that "The

Knowledge of the Company shall mean the Knowledge of Henrik Fisker, Bernhard Koehler, and

Joseph DaMour."

70.     On October 20, 2011, the DOE put out a press release on its website

http://energy.gov entitled  "Fisker, Tesla, and American Auto Innovation", stating in part:

Two years ago, critics said we shouldn't be investing in American auto
manufacturing because the industry wouldn't survive. They were wrong then and
they're wrong today. From well-established names like Ford to innovative
startups like Tesla and Fisker, America's auto industry is being reinvented, and
the Department's loan program is helping play an important role.

* * *

About the Fisker Loan:

With the help of a $529 million loan, Fisker is producing high performance
vehicles with an advanced hybrid electric powertrain that could significantly
improve performance and fuel economy.

Fisker's loan has two parts. In the first part, Fisker used $169 million to support
the engineers who developed the tools, equipment and manufacturing processes

- 20 -

for Fisker's first vehicle, the Fisker Karma. That work was done Fisker's U.S. facilities, including its headquarters in Irvine, California which has 700 employees and plans to continue hiring. While the vehicles themselves are being assembled in Fisker's existing overseas facility, the Department's funding was only used for the U.S. operations. The money could not be, and was not, spent on overseas operations. The Karma also relies on an extensive network of hundreds of suppliers in more than a dozen U.S. states.

The larger portion of the loan -- $359 million – is supporting the production of Fisker's Nina vehicles. Fisker is using this funding to bring a shuttered General Motors plant in Delaware back to life and employing more than 2,500 workers. Fisker was attracted to this site in part by the opportunity to rehire some of the trained, dedicated workers who lost their jobs when that plant closed.

Fisker's production schedule was delayed by regulatory issues that were outside of its control, but the company has successfully raised more than $650 million in private sector  investment to support its ongoing operations since closing its DOE loan.

71.    On October 26, 2011, Fisker held a conference call with investors.  Defendants McDonnell, Henrik Fisker, Koehler, and DaMour participated on that call on behalf of the Company.  Among other things, investors expressed concerns about the ATVM Loan in light of the recent bankruptcy filing of DOE loan guarantee recipient, Solyndra.  Defendant Henrik Fisker stated that there was no risk of losing the DOE loan.

72.    On November 1, 2011, Fisker Automotive confidentially informed the DOE that it would run out of cash within three days without additional government loan money or an injection of private equity.

73.    On November 4, 2011, A123 Systems, Inc. the supplier of the Karma's battery and an investor in Fisker Automotive, announced that it was lowering its 2011 revenue guidance based on a "temporary" reduction in battery orders from Fisker for the fourth quarter, as Fisker Automotive "rebalanced" its inventory levels. Specifically, A123's press release stated that A123:

revised revenue guidance range for the full year 2011 due to unanticipated developments that will impact fourth quarter revenue. . . . The reduction in full-year revenue guidance will be reflected principally in the fourth quarter.

'While we continued to increase our production ramp in the third quarter, we are adjusting our 2011 revenue expectations due to an unexpected reduction in orders for battery packs from Fisker Automotive for the fourth quarter as it balances inventory levels from all suppliers,' said David Vieau, CEO of A123 Systems. 'Our relationship with Fisker remains strong, and we expect that this reduction in volume is temporary as we understand the Karma plug-in hybrid electric vehicle has received EPA certification as well as an all-electric range rating of 51.6 miles from the European regulatory body Technischer Ueberwachungs Verein (TUV), clearing the way for vehicles sales. We are executing a plan that we believe will manage costs in the near term while allowing us to maintain the manufacturing and operational capabilities required to quickly ramp up production.'

74.    On November 18, 2011, the Calgary Herald (Alberta) published an article, based on an interview of Defendant Lane, entitled "Fisker on track to make electric sports cars, despite delays."  The article stated in full:

Fisker Automotive is on track to meet production goals for its electric sports cars in 2012 despite production delays that have sharply reduced the startup carmaker's projected deliveries this year.

Production of Fisker's first vehicle, the plug-in hybrid Karma, was held up by faulty electrical harnesses and head-lights, topped off by a flood that damaged the leather for its interior, according to chairman Ray Lane. 'In production of a first vehicle, everything doesn't go the way you plan,' Lane said in a recent interview. 'Next year, we'll do exactly what we plan.'

Fisker has long said it plans to sell 15,000 Karmas next year. But a spokesman later clarified the target was now 10,000 to 12,000. Some in the industry have questioned whether the vehicle's price tag - which starts at $96,000 - will make that goal unattainable in a weak economy.  Fisker's fortunes have come under increased scrutiny in the two months since U.S. solar panel maker Solyndra filed for bankruptcy after securing a $535-million federal loan guarantee. Fisker itself received $529 million in loans from the U.S. Department of Energy under a program similar to the one that funded Solyndra's factory.

Lane's comments come more than a week after Fisker battery supplier A123 Systems Inc. cut its 2011 revenue out-look 20 per cent, blaming a sharp cut in fourth-quarter orders from Fisker. A123 would not say by how much orders were cut back, and Fisker had no comment on the delays at the time.

Lane, however, said Fisker would deliver 1,500 cars this year, a lot fewer than the 7,000 vehicles the company said it would sell this year when it began production of the Karma in Finland in March. The company is building about 150 vehicles a week, Lane said.

The major delays, according to Lane, stemmed from faulty electrical harnesses and headlights. The final straw, however, came when leather for the vehicle's interior was damaged in a flood. 'The leather was useless. We had 250 cars parked and waiting for leather,' Lane said.

75.     On November 26, 2011, AutoblogGreen published an article about Fisker

Automotive entitled "Fisker says Karma will meet 15,000 production target for 2012."  The

article stated further that:

A raft of production delays slowed the arrival of the first Fisker Karma. Though the initial round of vehicles were finally delivered, the delays mean that Fisker will only ship 1,500 of the four door plug-in hybrids in 2011, well short of the original target of 7,000.  There has been an effort to turn Fisker into a scandal and these lower production numbers are enough to fan the flames. Fisker has received loans totaling $529 million from the Department of Energy, a number that puts the company within $6 million of the assistance lent to failed solar-panel maker Solyndra. Fisker's partners at A123 Systems have been forced to chop their earnings estimates for 2011, since fewer Karmas out the door means fewer A123 batteries sold. To some, it all has the look of failure.

However, Fisker Chairman Ray Lane says that the issues in 2011 were a combination of difficulties faced by any start up - such as problems with the electrical system that didn't appear until production was underway - and some one-off disasters. For example, a flood soaked the initial shipment of leather delivered for the car's interior, leaving Fisker with 250 vehicles that were ready to go, except for seats, dashboards, steering wheels and every other surface that needed to be covered in cowhide.

With the Freshman year drawing to a close, Lane is convinced that Fisker will hit its mark in 2012.  According to Lane, Fisker still plans to meet projections of 15,000 Karmas delivered in 2012. A123 is taking a more cautious approach, projecting around 7,000 vehicles. Either number would actually be very good for a car that has a base price of $96,000. Even the 7,000-unit sales number would exceed the annual sales of such well-known $100k sedans as the Maserati Quattroporte or Audi R8. Those cars don't have any green chic, though, and that might make all the difference.

76.     On November 30, 2011, Fisker Automotive confidentially informed the DOE that a modest investment increase of $37 million at mid-month had nudged its available cash up to a still-thin $20 million.

77.     According to a confidential Quarterly Credit Report prepared by the DOE dated December 12, 2011 [though not then publicly available]:

Background and Update:

There have been delays in the launch of the Karma from the timing specified in the business plan provided when the ATVM loan documents and FFB loan documents were executed (April 2010).

The February 2011 launch date was included as a required milestone in the Loan Arrangement and Reimbursement Program . . . . In a presentation delivered by Fisker to the DOE in March 2011, Fisker claimed that the launch milestone was met.  In a subsequent presentation, Fisker presented new information calling into question whether the launch milestone had actually been met. After receiving the June 2011 presentation, DOE halted further funding of the loan.

Throughout November [2011] [a] Fisker investor told DOE that Fisker could not raise additional equity cash unless DOE agreed to move financial covenants and milestones that Fisker would begin to breach on December 31, 2011. During a series of internal discussions in November, DOE concluded it was in the government's best interest to move the milestones back by one year in order to remove the barrier to equity which in turn would provide sufficient liquidity and time for DOE to assess the situation and formulate an action plan and amended LARA financial covenants and milestones. On December 5, DOE sent a letter to Fisker stating that it would move the covenants in order to enable commencement of an equity investment plan described in a December 5 letter to DOE from Fisker Chairman Ray Lane.

78.     The Quarterly Credit Report also stated that:

Fisker is raising this additional equity to fund long capital requirements, additional cost resulting from delays and last minute engineering changes associated with the Karma's project launch, and additional liquidity needed to fund cash short falls caused by the build-up of excessive inventory levels of Karma components and delays in assembly, shipping from Finland to the United States and being able to wholesale Karmas to dealers. Fisker's Board of Directors reacted to launch delays and problems with supply chain management including excessive inventories of some components and shortages of critical parts needed to complete the assembly of vehicles by appointing new executive (made public

- 24 -

December 15) Tom LaSorda as Vice Chairman of Fisker and Richard Beattie as Fisker's Chief Commercial Officer.  Fisker will prepare an updated business plan with the Assistance (sic) of these new executives.

## IV.    Fisker Automotive Issues a Capital Call

79.    Through an obscure provision in the April 2011 Offering documents called a "pay to play" capital call provision, on December 8, 2011, Fisker Automotive's Board of Directors unanimously approved a 40% "pay to play" capital call imposed on all Fisker Automotive investors (the "December Capital Call").  The December Capital Call required funding beginning within as soon as three weeks. Investors, including Plaintiffs, faced the severe penalty if they did not participate of having each share of preferred stock they had an interest in converted to one-half share of common stock, as well as the severe dilution of their existing interests in Fisker Automotive.

80.    On Sunday, December 11, 2011, Greg Osborn of Middlebury sent a detailed email, purportedly based on his conversations with Fisker Automotive representatives, to the Middlebury Plaintiffs and others describing the "pay to pay" plan for the December Capital Call and stating that Fisker Automotive would hold an emergency conference call the next day to explain the situation.

81.    Osborn attempted to mollify shocked investors by describing in detail how well things were going for Fisker Automotive and describing this forced investment as a prudent step towards an initial public offering.  Specifically, Osborn stated:

All,

Happy Holidays. As you know, we have a call tomorrow regarding Fisker and it is IMPORTANT that you attend or follow up during the week with your representative. I personally apologize that I have not been able to respond one on one to all of the calls the last fews (sic) days, but I have been traveling the last 10 days for various business issues and needed to be with my family this weekend.

- 25 -

We have been trying to get as many of the facts as possible reference recent events at Fisker in preparation of tomorrow's call.

The good news is the company;

1. Has completed approximately $100 mill in a series D funding.

2. Is operating at approximately 35 cars a day or near 10,000 a year. (full production based on 6 days a week)

3. Has received written confirmation of the DOE's plans to proceed

4. Has commitments for an additional $150 mill from current investors.

For your review enclosed is the recent DOE letter and the Cap Table pre the Series D round. At the bottom of the email we cut and paste the 'waiver' that enabled the majority shareholders to perfect this offering and process (in orange) and a UNCONFIRMED general outline of how the deal alters your effective investment.(in purple)

With that said, we wanted to inform you in advance of the importance and purpose of tomorrows call. This last minute email will most likely create more questions then (sic) answers, but it does bring to the forefront the current situation and what action is required by you by December 24th, 2011. Our experience is, after understanding the facts surrounding this and the benefits, the original reaction wears off a bit and the logic and the positives of the financial upside sets in. We will attempt to explain in detail the current environment the best we can and we will have Keith Daubenspeck, a Fisker Board member and Chairman of Advanced Equities join our call towards the end. We will also accept questions at the end via email. Please email Chris@middsec.com for questions during the call tomorrow of which we will try to reply.

* * *

The fact is that that there is now a 40% 'pay to play' requirement by all to be funded by Christmas for all Fisker investors. This was approved unanimously by the Fisker Board of Directors last Thursday. We share this with you now, because at first take it is very frustrating, no one likes a forced hand. What we don't want is for tomorrows call details to be overwhelmed by your initial response, hence this email may help manage that. The fact is... This offering increases the security of your investment while enhancing the total return and the potential timing of return of your investment.

We hope that after you have had the time to hear the call and understand the 'why's' and what a investor gets in return, that you will see it as quite attractive. Net net there are benefits and challenges investing with large institutions in late

- 26 -

stage private equity. We were fortunate to have access to participate alongside these people Kleiner, NEA, Richard Lee [sic], Quatar Holdings [sic] as they have the deep pockets and can continue to fund and preserve a company.

For the record: All large investors have voted for this and are participating. We hadn't a choice as we are a minority shareholder.

Again the dirt is in the details, and tomorrow we will explain in detail the situation the best we can. Although no one likes having there (sic) hand forced, it is compelling and provides us with great leveraged upside and we encourage participation.

Reminder...WE DO NOT YET HAVE THE OFFICIAL TERM SHEET, but this is what we understand the Board has approved.
However, even without the term sheet, all funds above $10 mill have agreed to participate.

In summary, there is a 40% capital call, if you will.

1. If you participate for 40% of your original investment by Christmas, you will get 30% PENNY warrants on your new money and your original investment.

2. If you participate for 40% of your original investment by Jan 10th or so, you will get 15% PENNY warrant coverage on your new money and your original investment.

3. If you don't participate, you are converted to a 1/2 share of common. Or have a fixed cost of approximately $2.78 … a common share.

* * *

Based on preliminary analysis, if you participate prior to Christmas your break even is approximately $2.2 billion dollars post funding and you stay in a leveraged preferred situation and your cost drops to $1.07 a share. If you elect to pass, your break even is approximately $5.5Bill.

* * *

The public offering is still anticipated to be a Feb thru April goal. Markets permitting, pricing discussions suggest a $4 to $5 bill offering price.

THERE ARE NO GUARANTEES of such a offering. THERE IS MARKET AND OPERATIONAL RISK AND YOU COULD LOSE ALL OF YOUR INVESTMENT FOR MANY DIFFERENT REASONS. SEE DISCLAIMERS IN OFFERING DOCUMENTS.

- 27 -

But that is the plan and hopeful goal. So, if everything continues on track, we will hit our near first quarter goal and a very positive return. I provide a detailed example below reference this.

There are many reasons why the Company is doing this now and we hope tomorrow's call will assist in explaining it and see the many positives.

The bottom line, it was imperative that the Company and the Board be PROACTIVE vs. REACTIVE in managing the companies (sic) financial well being.

Allow me to explain. As per the last business plan, the company had suggested $150 mill in 2011 revenues and confirmed it needed to raise a total of $250mill in the 4th quarter of 2011 and the 1rst quarter of 2012 to assure the DOE funding. With some of the operational delays and the Solyndra situation, felt even more compelled to reduce market risk and secure its future. They felt with the angst surrounding Solyndra and the D.O.E coupled with manufacturing stalls with the EPA sticker, flooded leather etc, it was best to secure the DOE and the company quickly without depending on the public markets in Q1 2012 and/or future financings. This wait and see approach is perceived as too risky considering the never ending Euro Crisis. Hence they felt they should take control of their own destiny and secure their $650 mill in investments to date and the DOE funds now.

The terms they have proposed seem to do both. This funding secures our investment further and the companies [sic] prospects. In response to this offering the company.

1. Has a fully funded company

2. Secures the DOE loan follow thru without reliance on the public markets and to overcome 4th quarter production delays.

3. Enables the company to fully pursue the 2012 and 2013 business plans and launch of the NINA

4. Brings in a new tier one President and Vice Chair, who hales [sic] from a top 3 worldwide auto firm. Depending confirmation tomorrow, he will join the company to compliment the team post the funding.

5. Securing the above will allow for the S1 to filed post close accelerating the potential public offering described and disclaimed above.

In summary:

The company HAS successfully raised $98 Mill to date in the series D. All new funds in the Series D will get the additional warrant coverage on their new

investment as well. The new terms have already secured an additional $150 mill on top of the$98 mill as committed by all the lead investors for a total of the $250 mill required for the DOE loan. We expect in excess e$300 mill secures a new Executive to the team.

Richard Lee [sic], Quatar [sic], Kleiner, Perkins [sic], AEI, and NEA are all participating. They all have board seats and they all voted for the offering. Other new investors in this round include, Eric Schmidt the Google CEO, John Chambers the Cisco CEO, the founder and Chairman of Salesforce.com. Participating investors include Ray Lane the Chairman of Hewlett Packard and Fisker, John Doers Family trust, John is the Chairman of Kleiner and on the Google and Amazon Boards, and myself.

In summary, the NEA (just took Groupon public) and the Kleiner team said of Fisker post this offering[:]

'With the Karma winning the Luxury Car of the Year award, the EPA and Solyndra issues behind it, a new industry President, fully funded and operational, we would expect Fisker to be one of the hottest offerings in early 2012.'

We look forward to speaking tomorrow. We remain encouraged that barring any unforeseen circumstances in the market or at the company, we will all have a very positive return on investment.

Our first reaction and probably yours….

How were they able to do this? We thought we had "full ratchet anti dilute" etc.

The board is also the majority shareholders in each class and used the below waiver to make the changes described herein.

         (j) Waiver of Adjustment of Conversion Price.  Notwithstanding anything herein to the contrary, any downward adjustment of the Conversion Price of Series D-X Preferred Stock may be waived, either prospectively or retroactively and either generally or in a particular instance, by the consent of vote of the holders of the majority of the outstanding shares of the Series D-X Preferred Stock.  Notwithstanding anything herein to the contrary, any downward adjustment of the Conversion Price of Series A-1 Preferred Stock may be waived, either prospectively or retroactively and either generally or in a particular instance, by the consent or vote of holders of at least seventy-five percent (75%) of the outstanding shares of the Series A-1 Preferred Stock. Notwithstanding anything herein to the contrary, any downward adjustment of the Conversion Price of Series B-1 Preferred Stock may be waived, either prospectively or retroactively and either generally or in a particular instance, by the consent or vote of the holders of the majority of the outstanding shares of the Series B-1 Preferred Stock.  Notwithstanding anything herein to the contrary, any

- 29 -

downward adjustment of the Conversion Price of Series C-1 Preferred Stock may be waived, either prospectively or retroactively and either generally or in a particular instance, by the consent or vote of the holders of the majority of the outstanding shares of the Series C-1 Preferred Stock.  Notwithstanding anything herein to the contrary, any downward adjustment of the Conversion Price of Series D-1 Preferred Stock may be waived, either prospectively or retroactively and either generally or in a particular instance, by the consent or vote of the holders of the majority of the outstanding shares of the Series D-1 Preferred Stock.  Any such waiver shall bind all future holders of shares of such series of Preferred Stock.

\* \* \*

We hoped this helped, enjoy the DALLAS. New York GAME!

Regards,

The team.

82.     On December 15, 2011, Fisker made available to Plaintiffs and other investors the associated offering documents in connection with the December Capital Call, including the Amended and Restated Series D1 Preferred Stock Purchase Agreement.  That same day, Osborn sent another email to the Middlebury Plaintiffs attaching a cover letter from Defendant Henrik Fisker, Fisker Automotive Holdings, Inc. Information Statement dated December 14, 2011 detailing the "pay to play" December Capital Call, and the Amended and Restated Series D1 Preferred Stock Purchase Agreement.  Osborn stated further that "[o]ur counsel is currently altering the SPV documents so we can get them to you as soon as possible. We will have the proper SPV paperwork and wire instructions to you this afternoon." A conference call was also scheduled later that day.

83.     The cover letter from Defendant Henrik Fisker, which was made available to all investors, extolled Fisker Automotive's progress and repeated the theme that the "pay to play" capital call was merely a prudent business decision:

Fisker Automotive continues to make tremendous progress. We are currently at a stable production rate of 25 Karma sedans per day and have been generating revenue of almost $2 million per day.  I have personally engaged with many of our retailers and first Karma customers.  The enthusiasm surrounding the Karma launch and the positive reception of the Karma by our retailers and customers is overwhelming.  The Karma has also received amazing worldwide media recognition and accolades.  Some recent examples include:

- Top Gear "Luxury Car of the Year"

- Automobile Magazine "Design of the Year"

- Time Magazine "50 Best Inventions of the Year

That said, I realize that it has been a long, and sometimes difficult, road to get to where we are today.  We have had several delays to the Karma program due to component part shortages, obtaining emissions and regulatory clearances and fine tuning the Karma to get it ready for customers.   Consequently, we did not realize revenue as expected in 2011.  We now believe that raising equity is a prudent course of action.  Improving our cash position will allow us to continue to build momentum behind the Karma production and sales launch and maintain the 2013 launch timing of the Nina sedan.

Management and the Board of Directors have determined that it is in the best interest of Fisker Automotive to raise equity through the D-1 Financing Capital Call that is described in detail in the attached Information Statement.  We have also received the approval of a requisite vote of the stockholders to proceed with the Series D-1 Financing Capital Call. I encourage you to carefully review the Information Statement and consider a further investment in Fisker Automotive. Importantly, three of our major venture capital investors, Kleiner Perkins, NEA and Pacific Century, support this action and have already made, or committed to make, their capital calls, together totaling more than $57 million.

The entire Fisker team and I are grateful for the continued support of all of our investors.  As we move forward, we are working extremely hard to reward this support by maximizing shareholder value.

84.     The Information Statement, which was made available to all investors, had a

boxed and bold face warning to investors on its first page stating:

**NOTE THAT THIS INFORMATION STATEMENT CONTAINS TIME-SENSITIVE MATERIAL. IF YOU ACT BY WEDNESDAY, DECEMBER 28, 2011, YOU WILL RECEIVE ADDITIONAL EQUITY IN THE COMPANY, AND IF YOU DO NOT ACT BY JANUARY 20, 2012, YOU MAY LOSE 50% OF YOUR INVESTMENT IN THE COMPANY.**

85.     The Information Statement also stated that "[a]lthough the DOE has indicated their support of the Company and our equity investment plan, and has furthermore agreed to delay the effective dates of the financial covenants in the DOE loan facility for approximately [one] year, we have elected not to submit any advanced requests for additional funding under the DOE loan facility until our discussions with the DOE are completed." (emphasis added).  The Information Statement also stated that Fisker Automotive "anticipates that the first closing of the Series D-1 Financing Capital Call will happen on or about Thursday, December 15, 2011. An additional closing is expected to be held on Wednesday, December 28, 2011."

86.     On December 15, 2011, Fisker Automotive held a conference call with investors, a replay of which was made available for future listening, to explain the impact of the "pay to play" December Capital Call on current investors, as well as the status of the Company. Defendants McDonnell, Henrik Fisker, Koehler, and DaMour participated on that call on behalf of Fisker Automotive.  On that call, Defendant Damour discussed the ATVM Loan, stating that "[w]e're currently not drawing and that was a mutual agreement between us and the government as we work to finalize the revised covenants and milestones, but as you see, we have $340 million remaining to be drawn and that will be drawn through the 2012 and first half 2013 timeframe."

87.     In addition, in response to investor questions about the ATVM Loan, Defendant Henrik Fisker reiterated that "there is not a risk that they will not continue to fund because they have already given us a commitment by letter that they are committed to Fisker Automotive."

88.     Defendant Henrik Fisker also responded to a question about concerns of battery fires in light of the Chevrolet Volt's reported battery fire problems by stating that it "is not a risk for us, we have a different chemistry [a] liquid cooled battery."

89.     DaMour further stated "with the money we raised in this round, [Fisker Automotive] can continue with the [Karma] indefinitely," even if Fisker Automotive received no further funds from the DOE or other outside capital. And, in response to specific questions regarding Fisker Automotive's business plan and whether the funding from this $300 million Series D round would be sufficient to fund Fisker Automotive's business plan without another capital call or some other additional funding, Defendant DaMour stated "this is the last . . . private raise, and surely the last capital call. . . . The $300 [million] is enough to fund the complete plan as we have explained. . . . . We are at the point now that the . . . [Karma] is fully funded."

90.     On December 21, 2011, the National Highway Traffic Safety Commission sent a non-public letter to Fisker "acknowledging" a Fisker Automotive report of a "safety recall campaign which [would] be conducted under Federal law" of 239 Fisker Karmas due a battery problem that could cause a fire.

91.     On Thursday, December 29, 2011, **one day after** the first deadline to invest in the mandatory pay to play capital call, Fisker Automotive publicly announced its recall of 239 Fisker Karmas due to the battery fire issue.

92.     According to a report in the News Journal (Wilmington, Delaware) dated December 30, 2011, "Fisker spokesman Roger Ormisher said <u>customers were alerted of the faulty batteries last week</u>  -- and insists that the company is on top of the issue."  The article also noted the seriousness of this issue, quoting John Gartner, an electric cars analyst at market research firm Pike Research, as saying customers likely expected more from Fisker's Karma, given its lofty price tag, and "[i]t's certainly not good for their company in their initial outing of

the vehicle to have something come up so quickly . . . . It's a little surprising that it's happening now and it wasn't caught before the vehicle was released."

93.     A January 4, 2012 non-public PowerPoint report prepared by the DOE Loans Program Office entitled "Risk Management Committee Briefing" stated in part:

**Reminder – Events Leading Up to December Briefing**

**In 1H11, faulty components led to launch delays and business plans revisions**

- February 2011 - to date – Fisker repeatedly missed launch dates and downwardly revised sales and production

    - Main problems were faulty inverter and wiring, but there were numerous engineering changes occurring into late September.

    - These changes led to suppliers missing deadlines, in turn led to parts shortages, further delaying launch.

    - 2011 production plan: Feb 2011 = 10k, June2011 = 4.5k, Sep = 3-3.5k, Oct 2011 = 2k, Nov 2011 = 1.25k

- May 2011 -- DOE stopped funding loan pending approval revisions to business plan.

**By October 2011, mismanagement of the launch and supply chain (inventory) created a cash crisis:**

    - Oct 13 – Fisker said it will make 2k, sell 1.7k cars during 2011

    - Oct 28 – Fisker said it will make 1.2k, sell 542 cars during 2011, will be out of cash Dec 1.

        - Fisker over-ordered batteries, engines and other components – leading to $30m plus of excess inventory.

        - Poor oversight of complex supply chain – Fisker had significant accounting and payables management lapses.

    - Nov 1 – Fisker said its cash would run out [around] Nov 4 without DOE loan and equity injection

    - Nov 15 – Equity injected $37m, Fisker said cash will now run out [around] Dec 15.

- Nov 30 – <u>Fisker says $20m cash on hand, with [around] $200m in payables, [around] $120m of which were overdue</u>.

94.     In that PowerPoint presentation, the DOE discussed four "Potential Alternative Solutions." One of those solutions was for Fisker Automotive to "Forego Nina," Fisker Automotive's more affordable hybrid electric car scheduled for later release.  That alterative was explained as follows: "DOE refuses to resume advances until [around] September time frame or later.  <u>Fisker and Kleiner Perkins</u> say they would forego the Nina, repay the $23m already advanced for Nina, and pursue sale or move the company to China or Russia (either of which would require first repaying DOE loan)." (emphasis added)

**V.     Fisker Automotive Continues Raising Cash As It Implodes**

95.     On February 7, 2012, the New Journal (Wilmington, Delaware) published an article entitled "Fisker slows work at former GM site, lays off 26." The article stated that:

> A cash crunch has forced Fisker Automotive to lay off 26 of about 100 workers refurbishing the former General Motors plant near Newport as a U.S. manufacturing base for the startup company. The layoffs, which affected both regular employees and subcontractors, come as Fisker trims expenses while it waits to qualify to draw down more cash from the Department of Energy, which conditionally promised to lend the automaker $529 million to help build its first two models and get its Delaware operations running.
>
> The company, which also laid off 40 to 45 workers at its California headquarters, must meet specific fundraising, production and sales goals to qualify for successive disbursements from the loan. Fisker is behind schedule for producing and selling its first model, the $108,000 Karma sedan. 'Until that happens, they're trying to preserve the cash that they have,' said Alan Levin, Delaware's director of economic development. 'And unfortunately, until they meet the milestone that DOE continues to set ... they're not able to access the additional capital that they need.'
>
> In recent weeks, the company has scaled back 2012 sales projections for the Karma luxury sports car, blaming mileage and emissions certification that took longer than expected. It also needed to recall sold models to fix a coolant hose problem and, later, to issue a software upgrade to tame a balky console computer. Fisker has said it would begin assembling the company's second plug-in hybrid

model -- still with just the project name 'Nina' -- at the Boxwood Road plant in mid-2013. Prototypes were to begin rolling out of the factory this fall.

A Fisker spokesman said Monday that negotiations are under way with the Energy Department to modify the loan achievement goals to allow some cash to be drawn down. 'To date we have received $193 million of the $529 million Department of Energy loan, mostly for the Karma program, and received our last reimbursement in May 2011,' Fisker spokesman Roger Ormisher said in a statement Monday. 'We are renegotiating some terms of the DOE agreement for the $336 million balance of the loan related to the Project Nina program.' Ormisher said the exact terms of the loan conditions are confidential. 'The DOE can sometimes take a little bit of time,' Ormisher said. 'We can't keep going and going and going without that money.'

With design work on the Karma largely complete, 40 to 45 workers also have been let go recently at Fisker's head-quarters in Anaheim, Calif., where about 350 to 400 are employed. Subcontractors at the Delaware plant were told earlier this year that work would be unavailable through January. Now it looks like their return this month will be delayed, Levin said.

Glitches and delays

Fisker officials characterized the layoffs as part of the complicated process of getting a billion-dollar car company off the ground. 'A flex model of expanding and contracting staffing for development of new cars is routine in the automotive industry,' Ormisher wrote. 'Project Nina is already well-advanced. Much of the engineering, design and development is near complete, and we expect to ramp up operations again quickly.'

96.     On February 22, 2012, Fisker Automotive held a conference call to, *inter alia*,

update investors about the Company's status, revisions to its business plan, and a change in the

Series D-1 round of financing whereby the Company wanted to raise an additional $100 million

by the end of March.  On the call for Fisker Automotive were Defendants McDonnell, Hernrik

Fisker, Koehler, and DaMour.

97.     Among other things, Defendant Henrik Fisker acknowledged recent negative

press regarding the ATVM Loan, and characterized Fisker's problems as "essentially driven by

more political views around whether the government should be lending money or not. And

unfortunately, we have become somewhat a political football . . . ."

- 36 -

98.     As a consequence of the "election year" politics surrounding this program, Defendant Henrik Fisker stated that Fisker Automotive's Board of Directors had made a decision that it was in Fisker Automotive's "better interests . . . in the future to pay back the [DOE] and basically get alternative financing."  In furtherance of that decision, Henrik Fisker stated that Fisker Automotive's Board of Directors had engaged the Royal Bank of Canada to raise debt for Fisker Automotive.  He also stated that they would continue negotiating with the DOE to obtain the remaining funds under the ATVM Loan.

99.     Critically, as stated earlier on the December 15, 2011 conference call, Defendant Henrik Fisker stated that with the completed Series D-1 financing, Fisker Automotive had a "Karma plan" whereby Fisker Automotive would be "self-sustaining as a company" with just the Fisker Karma, even without any other financing or the ATVM Loan.  According to Defendant Henrik Fisker, any of the funds from those latter two sources were necessary only to allow Fisker Automotive to bring its more affordable follow-on vehicle the Nina to market.

100.    On February 28, 2012, Fisker Automotive announced that Defendant Henrik Fisker would resign as Fisker Automotive's CEO to be replaced by Tom  LaSorda, who had joined Fisker Automotive two and half months earlier as its Vice Chairman. Notably, the confidential ATVM Loan contains a "Key Personnel" covenant requiring Henrik  Fisker to be "responsible for the management of the borrower." The New York Times Blogs (Wheels) reported that day on the Company's conference call  as well as a post-conference call interview with Fisker Automotive spokesman Ormisher, stating that:

> 'The D.O.E. funding has been played a lot in the media,' Mr. LaSorda said during Tuesday's call, before claiming that the company could be profitable as early as 2013 without the federal money, and with the Karma sedan as the company's primary revenue generator. The Nina launch date was uncertain, he said, but development was continuing, despite the halt in federal financing.

Roger Ormisher, a Fisker spokesman, said in a telephone interview after the conference call that talks were continuing with the Energy Department on 'agreeable milestones and deadlines.' He added, however, that the company was 'exploring other revenue sources" in the event the loan was not renewed. 'But we still have confidence that we can reach an agreement with the D.O.E.,' he said.

101.    In early March 2012, Fisker Automotive extended the D-1 Series financing round whereby the investors would again face severe dilution of their investment if they did not purchase yet more Fisker Automotive Securities, and made new offering documents available to Plaintiffs and other investors.

102.    On or about March 22, 2012, Greg Osborn sent another email to the Middlebury Plaintiffs and other Fisker Automotive investors notifying them of this "pay to play" capital call. Osborn's email directed the Middlebury Plaintiffs to Fisker Automotive's offering documents online, stating:

Dear Fisker SPV Investors,

We are pleased to enclose for your review the current Middlebury Ventures 2 SPV documents for the Extended D-1 Round with a link to EXHIBIT D. Due to the magnitude of the offering documents including Exhibit D, we have separated the Middlebury SPV Ventures 2 and Middlebury Ventures 3 offering documents in two separate emails and have provided a link to EXHIBIT D, the 'CONFIDENTIAL & PROPRIETARY DISCLOSURE AND NOTICE STATEMENT DATED AS OF MARCH 5, 2012, INCLUDING, WITHOUT LIMITATION, COPIES OF ALL FISKER SERIES D-1 TRANSACTION DOCUMENTS'. This is to assist those of you with sensitive servers that block emails containing large amount of data. For your added convenience, we have provided the signature pages as a separate attachment. Please make sure you are filling out the proper SPV 2 or SPV 3 documents and wiring to the appropriate titled account.

In typical Fisker fashion this offering is time sensitive and rather rushed. Our apologies. Please note this is not our doing. It has been quite a task and we are pleased to have completed these documents along with Wollmuth Maher & Deutsch in such a timely fashion. Many of you have requested from us that we provide an exact percentage of your current investment needed to maintain your current position.

Since this is a moving number and the final amount of the D-1 Round will not be known until post closing, we are suggesting a 15% participation in the Series D-1 extension based on an ~ $110 million closing. (If you do not participate, there is a approximate 22% dilution based on a ~$100 million offering. Should the round grow to $150 million or more, these numbers would increase. Although the official closing date is Friday March 30th, 2012, The Middlebury SPV Funds need your funds in house Thursday March 29th so we can transfer the SPV funds direct to Fisker on the final closing date, Friday March 29th, 2012.

\* \* \*

To access the Fisker Documents, (EXHIBIT D) please visit https://themiddleburygroup.securevdr.com/ and login. Then proceed to the Fisker D-1 Round Subscription Documents subfolder.
If you experience any difficulties during the login process, please contact Max Levine via telephone at (802) 377-5161 or via e-mail at Maxlevine@middsec.com.

103.    On April 2, 2012, Fisker Automotive filed a Form D/A stating that it had raised

$392 million in this latest offering.

104.    On April 19, 2012, the Detroit Free Press reported that "Fisker Automotive has

laid off another dozen workers at the former General Motors plant in Delaware that it has been

refitting with federal and state money to build a new sedan."  The article stated further that

 '[t]he layoffs, which occurred quietly Friday, come as California-based Fisker continues talks with the U.S. Energy Department to unfreeze loan money that could determine whether it ever builds a car at the plant. Meanwhile, the state continues to pay utility bills for the factory in hopes that Fisker will still provide jobs there.

For now, Fisker employs only a small maintenance team at the site 'protecting plant assets and maintaining the facility,' said Fisker spokesman Russell Datz. 'We have always had a flexible business model. The plant is now ready for the next phase of installing new production equipment.'

105.    On June 26, 2012, the Wall Street Journal Venture Capital Dispatch Blog

published an article entitled "Fisker Pursues $87M Capital Raise, Debt Deal, Amid DOE Loan

Suspension" and extensively quoted Defendant Lane, writing:

Even as it's trying to raise $87 million in new equity marketed to investors by brokerage firm Advanced Equities, along with the debt deal, the company is continuing to sell its first car, the luxury plug-in Karma. 'We have 1,700 cars sold now,' said Ray Lane, managing partner at Kleiner Perkins Caufield & Byers and director on Fisker's board.

In the first quarter, the company said it drew in $100 million in revenue. 'I'm looking at about $400 million in revenue this year. That would make it the fastest growing start-up ever,' Lane said.

These projections, he added, don't include sales in China and Middle East, where the company is building relation-ships with dealerships. Fisker Automotive, however, is not profitable, said Lane. The Irvine, Calif.-based company still needs new capital to finance operations and to start ordering parts and production tools to build its next car model, Atlantic, which is central to the viability of the business longer-term. 'You don't make money until volumes are up,' said Lane. The company needs to build the Atlantic, which would increase its volumes, and amortize its fixed costs across more units, as well as allow Fisker to negotiate better deals with suppliers. 'We can't move forward without the debt,' said Lane, referring to the Atlantic program.'

For a while, Irvine, Calif.-based Fisker was operating under the assumption that it has $529 million in federal loans, but last year the Department of Energy, which handles the loans, suspended issuing new checks because the car company missed some milestones. Fisker delayed the release of Karma and sold fewer Karmas than it promised under the DOE loan agreement. As a result of the loan suspension, Fisker stopped additional work on a plant in Delaware where it was planning to build the cars and laid off some employees.

The company has been using equity, the most expensive capital, to pay for the development of Atlantic to date. 'We spent $130 million on the Atlantic,' Lane said. 'No one wants to spend' more equity,' he said. That is the reason Fisker is in discussions with a syndicate of private lenders, led by the Royal Bank of Canada, he added.

A spokesman for the Royal Bank of Canada didn't respond to a request for comment. Roger Ormisher, spokesman for Fisker, declined to comment on any involvement of the bank. 'We've opened every door,' said Ormisher, adding that the company is evaluating different options.  Negotiations with the DOE are ongoing, said Ormisher. He declined to discuss Fisker's cash-burn.

Should the deal with the DOE fall through and the company has to turn to private lenders, it will have to pay more than it would have in interest, said Lane. The attractiveness of the federal loan lay in its low interest rate. Under the private deal that's being negotiated now, the DOE may be partially or fully repaid the amount that it already loaned to Fisker, said Lane. In the meantime, Fisker is using the

- 40 -

services of Advanced Equities, a Chicago-based broker, to raise a new tranche of its Series D-1 financing.

Advanced Equities, which started marketing the new tranche for Fisker in the past few days, is aiming to raise $87 million toward a $500 million target with several closings to be complete by July 16, according to a person familiar with the situation. As of early April, Fisker raised $392 million in that round.
The Series D-1 preferred shares are being sold for $1.46 each. Investors can pay an extra cent to get a warrant to buy another preferred D-1 share, and another cent to buy two shares of common stock, according to two people familiar with the offering.

'We've added warrants as a sweetener,' said Lane. Ormisher declined to comment on details of the funding. Advanced Equities' spokesman didn't respond to a request for comment. The structure of the deal essentially allows an investor to buy two preferred shares for the price of one. At the same time, the company's previous investors are not diluted until new investors exercise the warrant, and so for the time being, the valuation of the company remains higher than it would be if investors were sold two preferred shares for half the price.

The situation with the DOE, said Lane, 'caused us to accelerate capital raising.' That is leading to certain compromises. Advanced Equities has recently been served a Wells Notice from the Securities & Exchange Commission, which indicates the SEC may enforce action against it.

Asked why Kleiner Perkins is continuing to use Advanced Equities' services in light of the SEC investigation, Lane said: 'They are good at what they do.'

106.    On July 6, 2012, 4WheelsNews reported that Jim Yost, a former executive at Ford

Motor Co. and Dana Holdings Corporation, had replaced Defendant DaMour as Fisker

Automotive's CFO and that DaMour would "stay on as a special advisor to the [C]ompany."

107.    A confidential DOE "Risk Management Committee Briefing" PowerPoint

presentation dated August 2, 2012 states that the DOE had "spoke[n] to Fisker board member

and Kleiner Perkins Caufield & Byers managing partner Ray Lane, who confirmed that a waiver

of existing financial covenants and milestones would facilitate an equity raise of at least $100

million.  That presentation also reflected that Fisker Automotive had told the DOE that it was

down to $12 million in cash and that the Company expected to run out of cash "within a month."

Critically, the DOE was also told that "[w]eekly wholesale Karma sales had slowed significantly . . . [and] that Fisker had lowered its 2012 wholesale target from 4,000 to 2,250."

108.    On August 14, 2012, LaSorda was replaced as CEO by the former head of the Chevy Volt hybrid program, Tony Posowatz.

109.    On August 16, 2012, Reuters published an interview of Ray Lane in which he stated the Company was seeking to raise an additional $150 million to increase cash on Fisker Automotive's balance sheet and to fund development of Fisker Automotive's next model car. Lane held out the prospect of an upcoming IPO, which would save Fisker Automotive's investors, stating that "[o]nce Fisker breaks even, the company could pursue an initial public offering or a sale to a strategic investor, which could come in late 2013."

110.    In late August 2012, Fisker Automotive issued offering documents in connection with a Series E round of financing/preferred stock, seeking to raise at least $30 million in bridge loan financing which would convert into Series E Preferred stock if the full amount was actually raised.  In addition, by Fisker Automotive raising that amount, the DOE agreed to waive Fisker Automotive's covenant violations and not declare the Company in default of the ATVM Loan. Fisker Automotive was able to raise $50 million by early September, satisfying the DOE's waiver.

111.    On or around September 19, 2012, Greg Osborn sent the Middlebury Plaintiffs and others another "pay to play" capital call to invest in Series E Fisker Automotive preferred stock through a renamed entity Ridgemakers SPV.  Again, the prior investors' failure to participate would result is severe dilution of their current holdings.  As with the previous offerings, investors were directed to view Fisker Automotive documents which were available only by "electronic… access."

112.    Combined with the $50 million raised in the convertible bridge loan financing, Fisker Automotive raised approximately $104 million through this Series E private placement offering by October 1, 2012.

113.    On or about October 16, 2012, Fisker Automotive's battery supplier, A123, filed for bankruptcy protection. Shortly thereafter, Fisker Automotive stopped production of the Karma, laid off another 40 employees, and retained an investment banking advisory firm to find a "strategic partner" to save the Company.

114.    On March 13, 2013, Defendant Henrik Fisker resigned from Fisker Automotive's Board of Directors.  Shortly thereafter, it was announced that Fisker Automotive had hired the law firm of Kirkland & Ellis, PC to advise it on a possible bankruptcy filing.

115.    In April 2013, Fisker Automotive laid off another 160 employees (75% of its remaining workforce).

116.    On April 17, 2013, PrivCO, a private research firm, made available a detailed report ("the PrivCo Report") entitled "FISKER AUTOMOTIVE'S ROAD TO RUIN: How a 'Billion-Dollar Startup Became a Billion-Dollar Disaster'" which was "supported by over 11,000 pages of original never-before published documents obtained through multiple Freedom Of Information Act requests." (emphasis added)

117.    On April 21, 2013, the U.S. Government reported that it had seized $21 million in cash from Fisker Automotive to fulfill the first loan payment.

118.    On April 24, 2013, the U.S. House of Representatives Subcommittee On Economic Growth, Job Creation And Regulatory Affairs Of The Committee On Oversight And Government Reform held a hearing to investigate Fisker Automotive's travails (the "House Fisker Hearing").

119.    Nicholas Whitcombe, the Supervisory Senior Investment Officer at the Department of Energy's Loan Program Office, testified that, regarding the ATVM Loan, the DOE "had all discussions … with Fisker senior executives and the board of directors."

120.    However, according to information brought to light in that hearing, on May 14th, 15th, and 24th 2011 -- around the time that the DOE filed the Drawstop Notice with the Federal Financing Bank --  John Doerr and/or Ray Lane, of Kleiner Perkins, had  meetings with Jonathan Silver, who was the director of this ATVM program at the time, and others at the Loan Program Office.  The House Fisker Hearing record also reflects that Mr. Doerr had meetings with Jonathan Silver on March 24, 2010, April 16, 2010, and October 4, 2010.

121.    The evidence in the House Fisker Hearing record reflects that the DOE waived earlier violations of certain required milestones and/or financial covenants under the ATVM Loan in 2010. Despite that fact, Mr. Whitcombe testified that when the DOE saw the information presented in the June 2011 meeting which conflicted with Defendants' prior representation that Fisker Automotive had met the February 2011 Karma production milestone, "[w]e [the DOE] believe[d] it did not happen and, therefore, we took <u>decisive action</u>" to terminate further funding. (emphasis added).

122.    In addition, Mr. Whitcombe was asked at the hearing: "<u>So after the DOE froze Fisker's loan in June of 2011, why did the DOE not make this public? If the taxpayer was in fact on the hook, don't you think that they had a right to know that the loan was not going smoothly?</u>" Whitcombe responded stating "Fisker is responsible for raising its own capital and notifying investors of its situation. Having said that, as to why no press releases or no public notification were provided by the Department of Energy . . . . <u>I don't have an answer, sir.</u>" (Emphasis added.)

123.    Defendant Lane resigned from Fisker Automotive's Board of Directors in May 2013.

124.    On September 17, 2013, the DOE put the remaining $168 million Fisker Automotive owed on the ATVM Loan out to bid in a public auction.

125.     On November 22, 2013, Fisker Automotive filed for bankruptcy protection.


**FIRST CLAIM FOR RELIEF**

**For Violations of Section 12(a)(2) of the Securities Act Against All Defendants Except Kleiner Perkins and Ace Strength**

126.    Plaintiffs incorporate by reference and reallege each of the foregoing paragraphs.

127.    Plaintiffs do not claim for purposes of this Count that Defendants committed intentional or reckless misconduct or acted with scienter or fraudulent intent.

128.    Fisker Automotive is the issuer of the Fisker Automotive Securities the Fisker Automotive Plaintiffs purchased, and from which the Fisker Automotive Securities the Middlebury Plaintiffs  purchased are derived.  Defendant=s, with the exceptions of Kleiner Perkins and Ace Strength which are named as control persons in Count II below, were sellers and offerors and/or solicitors of purchasers of the Fisker Automotive Securities offered, including to Plaintiffs.  Plaintiffs purchased these securities as a result of the material omissions set forth below.

129.    Specifically, as to Fisker Automotive's operations described herein, all of the offering materials including Prospectuses/Private Placement Memoranda and other offering documents made available to purchasers of Fisker Automotive Securities, as described at ¶¶ 56-57, 69, 82-85, 101-102 and 110-111 above, and public statements by  Defendants Lane, Henrik Fisker, DaMour, Koehler and/or McDonnell described at ¶¶ 55, 60, 63, 66-67, 71, 74-75, 86-89,

96-99, and 105 above, omitted material information because they failed to disclose the facts that:
(i) Fisker Automotive had in fact not met the February 2011 Fisker Karma commercial
production milestone under the ATVM Loan covenants, as represented to the DOE in March
2011; (ii) Defendants falsely told the DOE in March 2011 that this milestone had been met; (iii)
in June of 2011, Defendants gave a presentation to the DOE that contradicted the earlier
representation to the DOE that Fisker Automotive had complied with the February 2011 Karma
commercial production milestone; and (iv) as a result, the DOE enforced its Drawstop Notice,
thereby halting any further advancements under the ATVM Loan in June 2011.

130.    As Mr. Whitcombe testified, the DOE "took decisive action" to cut off further
funding as soon as this contradictory information was presented to them in June 2011. In
addition, the confidential Quarterly Credit Report prepared by the DOE dated December 12,
2011 (described at ¶ 77), which was made public in the PrivCo Report dated April 17, 2013, also
confirms the omitted material facts described above, stating that in June 2011, "Fisker presented
new information calling into question whether the [February 2011] launch milestone had been
met. After receiving the June 2011 presentation, DOE halted further funding of the loan." In
addition, another confidential DOE document made available in the PrivCO Report states that
after DOE enforced the Drawstop Notice in June 2011, "in follow-up meetings with [Defendants
Fisker, Koehler, and Damour] . . . Fisker gave varied and incomplete explanations" as to whether
the milestone had been met and thus, "loan draws were not resumed."

131.    In addition, in connection with the December 2011 "pay to play" capital call
described at ¶¶79-89, Defendants omitted the material fact  that Fisker Automotive had notified
NHTSA on December 21, 2011 that it would recall 239 Fisker Karmas necessitated by battery
fires.  Fisker Automotive publicly announced that recall on December 29, 2011 -- exactly one

day after this financing round closed. This NHTSA document first became public as part of the PrivCo Report.

132.    Another confidential DOE document described at ¶ 93, also revealed in the PrivCo Report, demonstrates that Defendants  failed to disclose material facts to Plaintiffs in the offering documents described at ¶¶ 82-85 associated with the December 2011 "pay to play" round.  Specifically, Defendants omitted the material fact that Fisker Automotive owed $200 million in payables as of no later than November 30, 2011, of which $120 million were overdue – while, at the same time, Fisker Automotive had only had $20 million in cash "on hand" and was burning cash so fast that it would be out money by around December 15th. In this connection, Defendant DaMour's statement on the December 15, 2011 conference call, discussed at ¶ 89 that, *inter alia*, "this is the last . . . private raise, and surely the last capital call. . . . The $300 [million] is enough to fund the complete plan as we have explained. . . . We are at the point now that the . . . [Karma] is fully funded," also omitted the material fact that the vast majority of the funds raised in the capital call would simply go to pay down existing obligations rather than fund Fisker Automotive's business plan going forward. The same is true with similar statements made on the February 22, 2012 conference call described at ¶¶ 96-99 whereby Henrik Fisker repeated the assertion that Fisker Automotive could be "self-sustaining as a company" without additional funds.

133.    The offering documents in connection with the March 2012 and September 2012 offerings, described in ¶¶ 101-102 and 110-111 above, were also materially false and misleading because they did not disclose that Defendant Henrik Fisker's stepping down from the day to day management of Fisker Automotive as its CEO in February 2012 caused Fisker Automotive to be

in default of the ATVM Loan "Key Personnel" covenant requiring him to be "responsible for the management of the borrower."

134.   These Defendants were obligated to make a reasonable and diligent investigation of the statements made in various offering documents to ensure such statements were true and that there was no omission of material fact required to be stated in order to make the statements contained therein not misleading.  None of these Defendants made a reasonable investigation or possessed reasonable grounds for the belief that their statements were accurate and complete in all material respects.  Had they done so, these Defendants would have known of the material omissions alleged herein.

135.   At the time they purchased Fisker Automotive Securities, Plaintiffs did not know, and by the reasonable exercise of care could not have known, of the material omitted facts alleged herein.

136.   In connection with the sale of Fisker Automotive Securities, these Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce and the United States Mails.

137.   This action is brought within one year after the discovery of the material omissions.

138.   By reason of the foregoing, these Defendants have violated Section 12(a)(2) of the Securities Act and are liable to Plaintiffs, which have been damaged by reason of such violations.

139.   Accordingly, Plaintiffs have the right to rescind and recover the consideration paid for their Fisker Automotive Securities and hereby elect to rescind and tender their Fisker Automotive Securities to the Defendants named herein.

## SECOND CLAIM FOR RELIEF

### For Violations of Section 15 of the Securities Act
### Against Defendants Kleiner Perkins, Ray Lane, Henrik Fisker,
### Bernhard Koehler, Joe DaMour, Keith Daubenspeck,
### Richard Li Tzar Kai and Ace Strength

140.    Plaintiffs repeat and reallege each and every allegation contained above.

141.    This count is asserted against Kleiner Perkins, Ray Lane, Henrik Fisker, Bernhard Koehler, Joe DaMour, Keith Daubenspeck, Richard Li Tzar Kai, and Ace Strength (the "Section 15 Defendants"), and is based upon Section 15 of the Securities Act.

142.    Plaintiffs do not claim, for purposes of this Count, that the Section 15 Defendants committed intentional or reckless misconduct or acted with scienter or fraudulent intent.

143.    The Section 15 Defendants, by virtue of their senior management positions, stock ownership, directorships and specific acts were, at the time of the wrongs alleged herein and as set forth herein, each a controlling person of Fisker Automotive.  The Section 15 Defendants had the power and influence and exercised the same to cause Fisker Automotive to disseminate offering documents that omitted material information.

144.    Based on each Section 15 Defendant's having been a signatory to the offering documents and/or having otherwise participated in the process which allowed the offerings to be completed, and the Section 15 Defendants' conduct alleged herein, the Section 15 Defendants are jointly and severally liable for Fisker Automotive's violations of Section 12(a)(2) of the Securities Act.

## THIRD CLAIM FOR RELIEF

### For Violation of Section 10(b) of the Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants Except Kleiner Perkins and Ace Strength

145.     Plaintiffs repeat and reallege each and every allegation contained above, excepting ¶¶ 126-144.

146.     This Count is asserted against all defendants except Kleiner Perkins and Ace Strength for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

147.     Defendants knowingly or with deliberate recklessness disseminated or approved materially false and misleading statements specified herein in that they failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

148.     Defendants, with the exception of Kleiner Perkins and Ace Strength, which are named as control persons in Count IV below, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse information about the business, operations and future prospects of the Company as specified herein.

149.     These Defendants had actual knowledge of the material omission of facts set forth herein, or acted with deliberate reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them.  Defendants' material omissions in  offering documents described at ¶¶ 56-57, 69, 82-85, 101-102 and 109-110 above and Defendants Lane's, Fisker's, DaMour's, Koehler's and/or McDonnell's statements described at ¶¶ 56, 60, 63, 66-67, 71, 74-75, 86-89, 96-99  and 105 were made knowingly or recklessly and for the purpose and effect of concealing material information from Plaintiffs because they failed to disclose the facts that: (i) Fisker Automotive had not met the February 2011 Fisker Karma commercial production milestone under the ATVM Loan covenants; (ii) Defendants had

knowingly, or recklessly, falsely told the DOE in March 2011 that Fisker Automotive had

complied with that milestone; (iii) in June of 2011, Defendants gave a presentation to the DOE

that contradicted the earlier representation to the DOE that Fisker Automotive had complied with

the February 2011 Karma commercial production milestone under the ATVM Loan covenants;

and (iv) as a result, the DOE issued a Drawstop Notice halting any further advancements under

the ATVM Loan in June 2011 because DOE officials believed they had been misled by

Defendants in the March 2011 presentation.

150.    Defendants' knowing or reckless disregard of the aforementioned facts is also

strongly supported by detailed confidential DOE documents and the testimony of Mr.

Whitcombe.  As demonstrated at ¶¶ 119-120, Mr. Whitcombe testified that DOE officials

worked closely with Fisker Automotive's executives, Board of Directors, Ray Lane and non-

defendant John Doerr (also of Kleiner Perkins) regarding the ATVM Loan.  A confidential

Quarterly Credit Report prepared by the DOE dated December 12, 2011(described at ¶ 77) ,

which was first made public in the PrivCo Report, also confirms the omitted facts described

above, stating that in June 2011, "Fisker presented new information calling into question whether

the [February 2011] launch milestone had been met. After receiving the June 2011 presentation,

DOE halted further funding of the loan."

151.    As Mr. Whitcombe testified at the House Fisker Hearing, so clear was the fact

that Fisker Automotive had <u>not</u> met the February 2011 Fisker Karma commercial production

milestone as Defendants falsely told the DOE in March 2011, that the DOE "took decisive

action" to cut off further funding when this contradictory information was presented to them in

June 2011. The DOE refused to waive this milestone despite that fact that DOE had earlier

waived other financial covenants and/or milestones under the ATVM Loan, further evidencing

an inference that the DOE believed Defendants had misled the DOE in March 2011 as to the fulfillment of that milestone.  Indeed, Defendants' scienter is further supported in another confidential DOE document revealed in the PrivCo Report, stating that after June 2011, "in follow-up meetings with [Defendants Fisker, Koehler, and Damour] . . . Fisker gave varied and incomplete explanations" as to their failure to meet the February 2011 milestone and thus, "loan draws were not resumed."

152.    In addition, in connection with the December 2011 "pay to play" capital call described at ¶¶ 79-89, Defendants omitted the material fact  that Fisker Automotive had notified NHTSA on December 21, 2011 that it would recall 239 Fisker Karmas necessitated by battery fires.  Fisker Automotive publicly announced that recall on December 29, 2011 -- exactly one day after this financing round closed. This NHTSA document first became public as part of the PrivCo Report.

153.    In addition, another confidential DOE document described at ¶ 93, also revealed in the PrivCo Report, demonstrates that Defendants omitted material facts in the offering documents described at ¶¶ 82-85 associated with the December 2011 "pay to play" round. Specifically, Defendants knowingly or recklessly concealed the material fact that Fisker Automotive had $200 million in payables as of no later than November 30, 2011, of which $120 million were overdue – while, at the same time, Fisker Automotive had only had $20 million in cash "on hand" and was burning cash so fast that it would be out of money by around December 15th.  In this connection, among other things, Defendant DaMour's statement on the December 15, 2011 conference call, at ¶ 89, that, "this is the last . . . private raise, and surely the last capital call. . . . The $300 [million] is enough to fund the complete plan as we have explained. . . . We are at the point now that the . . . [Karma] is fully funded," was also knowingly or recklessly

- 52 -

materially false and misleading because the vast majority of the funds raised in the capital call would simply go to pay down existing obligations rather than fund Fisker Automotive's business plan going forward as Damour stated. The same is true with similar statements made on the February 22, 2012 conference call described at ¶¶ 96-99 whereby Henrik Fisker repeated the assertion that Fisker Automotive could be a "self-sustaining as a company" without additional funds.

154.    In addition, the offering documents in connection with the March 2012 and September 2012 offerings described in ¶¶ 101-102, 110-111, above were materially false and misleading because Defendants knowingly or recklessly concealed the material fact that Defendant Henrik Fisker's stepping down from the day to day management of Fisker Automotive as its CEO in February 2012 caused Fisker Automotive to be in default of the ATVM Loan "Key Personnel" covenant requiring him to be "responsible for the management of the borrower."

155.    As demonstrated by statements at all relevant times, if Defendants did not have actual knowledge of the omissions alleged, they were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

156.    Had Plaintiffs known the truth regarding the material facts not revealed to them – including Fisker Automotive's failure to meet the February 2011 Fisker Karma commercial production milestone and Defendants' misleading of the DOE in their March 2011 presentation as to Fisker Automotive's fulfillment of that milestone, the DOE's issuance of the Drawstop Notice in June 2011, the December 2011 recall due to battery fires and/or that Defendants had concealed the Company's notification to NHTSA on December 21, 2011 of the recall, the fact

that the funds raised in the December 2011 capital call would largely go to pay down $200 million in payables rather than funding the Company's business plan to make it a self-sustaining company as Defendants represented, and/or  Fisker's default of the DOE confidential "Key Personnel" loan covenant -- Plaintiffs would not have purchased or otherwise acquired their Fisker Automotive Securities, or, if Plaintiffs had purchased such securities,  they would not have done so at the artificially inflated prices which they paid.

157.      Defendants were motivated to conceal the aforementioned material information and otherwise mislead Plaintiffs and other investors in order to protect Defendants' own investments in and executive/control positions with Fisker Automotive. Specifically, Defendants concealed this material information from Plaintiffs and other investors because they needed huge sums of additional cash to fund Fisker Automotive to position the Company for a sale or an initial public offering ("IPO").   Defendants stood to make huge profits in either transaction. But, without Plaintiffs' and other investors' money, Fisker Automotive was not a viable company -- a fact that would render Defendants' investments in Fisker Automotive worthless and threaten their executive/control positions.  The fact that Kleiner Perkins, through its two top partners, non-Defendant John Doerr and Defendant Lane, took an active role in dealing with the DOE on behalf of Fisker Automotive, as described above, not only is strong evidence of Lane's and Kleiner Perkins' actual knowledge and concealment of the material facts that were concealed from Plaintiffs and other investors, but also supports a strong inference of motive, as described above.

158.      By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

159.    As a direct and proximate result of the Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchases of Fisker Automotive Securities.

## FOURTH CLAIM FOR RELIEF

### For Violation of Section 20(a) of the Exchange Act Against Defendants
### Kleiner Perkins, Ray Lane, Henrik Fisker, Joe DaMour,
### Bernhard Koehler, Keith Daubenspeck, Richard Li Tzar Kai and Ace Strength

160.    Plaintiffs repeat and reallege each and every allegation contained above, excepting ¶¶ 126-144.

161.    This Count is asserted against Kleiner Perkins, Ray Lane, Henrik Fisker, Joe DaMour, Bernhard Koehler, Keith Daubenspeck, Richard Li Tzar Kai, and Ace Strength (the "Section 20 Defendants"), for violations of Section 20(a) of the Exchange Act.

162.    The Section 20 Defendants acted as controlling persons of Fisker Automotive within the meaning of Section 20(a) of the Exchange Act.

163.    By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the material omissions withheld from the investing public, the Section 20 Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Fisker Automotive, including the contents and dissemination of the various statements which Plaintiffs contend omit material information.

164.    The Section 20 Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged to have omitted material information prior to these statements being issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

165.    As set forth above, each Defendant, as well as Fisker Automotive, violated

Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue

of their positions as controlling persons, the Section 20 Defendants are liable pursuant to Section

20(a) of the Exchange Act.  As a direct and proximate cause result of the Section 20 Defendants'

wrongful conduct, Plaintiffs suffered damages in connection with their purchases of Fisker

Automotive Securities.

## FIFTH CLAIM FOR RELIEF

### For Fraud Against All Defendants

166.    Plaintiffs repeat and reallege each and every allegation contained above.

167.    This Count is asserted against all defendants for fraud.

168.    The purchase agreements through which Defendants issued Fisker Automotive

stock in the Offerings at issue here each contained a paragraph stating:

> Governing Law. This Agreement and all acts and transactions pursuant hereto and
> the rights and obligations of the parties hereto shall be governed, construed, and
> interpreted in accordance with the laws of the State of Delaware, without giving
> effect to principles of conflicts of law.

169.    Defendants knowingly, intentionally, or with reckless indifference to the truth

approved, made, disseminated or caused to be disseminated materially false and misleading

statements specified herein while concealing material facts in order to induce Plaintiffs to invest

in Fisker Automotive.

170.    Defendants, individually and in concert, directly and indirectly, engaged and

participated in a continuous course of conduct to misrepresent and conceal adverse information

about the business, operations and future prospects of Fisker Automotive, as described herein.

171.    These Defendants had actual knowledge of the material omission of facts set forth

herein, or acted with deliberate reckless disregard for the truth in that they failed to ascertain and

disclose such facts, even though such facts were available to them. Defendants' material omissions in offering documents described at ¶¶ 56-57, 69, 82-85, 101-102 and 109-110 above and Defendants'' statements described at ¶¶ 56, 60, 63, 66-67, 71, 74-75, 86-89, 96-99 and 105, were made knowingly or recklessly and for the purpose and effect of concealing material information from Plaintiffs because they failed to disclose the facts that: (i) Fisker Automotive had not met the February 2011 Fisker Karma commercial production milestone under the ATVM Loan covenants; (ii) Defendants had knowingly, or recklessly, falsely told the DOE in March 2011 that Fisker Automotive had complied with that milestone; (iii) in June of 2011, Defendants gave a presentation to the DOE that contradicted the earlier representation to the DOE that Fisker Automotive had complied with the February 2011 Karma commercial production milestone under the ATVM Loan covenants; and (iv) as a result, the DOE issued a Drawstop Notice and halted any further advancements under the ATVM Loan in June 2011 because DOE officials believed they had been misled by Defendants in the March 2011 presentation.

172.    Defendants' knowing, intentional or reckless disregard of the aforementioned facts is also strongly supported by detailed confidential DOE documents and the testimony of Mr. Whitcombe. As demonstrated at ¶¶ 119-120, Mr. Whitcombe testified that DOE officials worked closely with Fisker Automotive's executives, Board of Directors, Ray Lane and non-defendant John Doerr (also of Kleiner Perkins) regarding the ATVM Loan. A confidential Quarterly Credit Report prepared by the DOE dated December 12, 2011(described at ¶ 77) , which was first made public in the PrivCo Report, also confirms the omitted facts described above, stating that in June 2011, "Fisker presented new information calling into question whether the [February 2011] launch milestone had been met. After receiving the June 2011 presentation, DOE halted further funding of the loan."

173.     As Mr. Whitcombe testified at the House Fisker Hearing, so clear was the fact that Fisker Automotive had <u>not</u> met the February 2011 Fisker Karma commercial production milestone as Defendants falsely told the DOE in March 2011, that the DOE "took decisive action" to cut off further funding when this contradictory information was presented to them in June 2011. The DOE refused to waive this milestone despite that fact that DOE had earlier waived other financial covenants and/or milestones under the ATVM Loan, further evidencing an inference that the DOE believed Defendants had misled the DOE in March 2011 as to the fulfillment of that milestone.  Indeed, Defendants' scienter is further supported in another confidential DOE document revealed in the PrivCo Report, stating that after June 2011, "in follow-up meetings with [Defendants Fisker, Koehler, and Damour] . . . Fisker gave varied and incomplete explanations" as to their failure to meet the February 2011 milestone and thus, "loan draws were not resumed."

174.     In addition, in connection with the December 2011 "pay to play" capital call described at ¶¶ 79-89, Defendants were aware, but failed to disclose the material fact  that Fisker Automotive had notified NHTSA on December 21, 2011 that it would recall 239 Fisker Karmas necessitated by battery fires.  Fisker Automotive publicly announced that recall on December 29, 2011 -- exactly one day after this financing round closed.  This NHTSA document first became public as part of the PrivCo Report.

175.     In addition, another confidential DOE document described at ¶ 93, also revealed in the PrivCo Report, demonstrates that Defendants concealed material facts by omitting them from the offering documents described at ¶¶ 82-85 associated with the December 2011 "pay to play" round.  Specifically, Defendants knowingly or recklessly concealed the material fact that Fisker Automotive had $200 million in payables as of no later than November 30, 2011, of

which $120 million were overdue – while, at the same time, Fisker Automotive had <u>only had $20</u> <u>million in cash "on hand"</u> and was burning cash so fast that it would be out of money by around December 15th.  In this connection, among other things, Defendant DaMour's statement on the December 15, 2011 conference call, at ¶ 89, that, "this is the last . . . private raise, and surely the last capital call. . . . The $300 [million] is enough to fund the complete plan as we have explained. . . . We are at the point now that the . . . [Karma] is fully funded," was also knowingly or recklessly materially false and misleading because the vast majority of the funds raised in the capital call would simply go to pay down existing obligations rather than fund Fisker Automotive's business plan going forward as Damour stated. The same is true with similar statements made on the February 22, 2012 conference call described at ¶¶ 96-99 whereby Henrik Fisker repeated the assertion that Fisker Automotive could be a "self-sustaining as a company" without additional funds.

176.    In addition, the offering documents in connection with the March 2012 and September 2012 offerings described in ¶¶ 101-102, 110-111, above were materially false and misleading because Defendants knowingly or recklessly concealed the material fact that Defendant Henrik Fisker's stepping down from the day to day management of Fisker Automotive as its CEO in February 2012 caused Fisker Automotive to be in default of the ATVM Loan "Key Personnel" covenant requiring him to be "responsible for the management of the borrower."

177.    As demonstrated above, at all relevant times, Defendants had actual knowledge or recklessly disregarded that their statements regarding Fisker Automotive were false and misleading; Defendants intentionally omitted critical facts that they were aware of concerning the Company in order to induce Plaintiffs and other investors to invest in Fisker Automotive.

178.    Had Plaintiffs known the truth regarding the material facts not revealed to them –
including Fisker Automotive's failure to meet the February 2011 Fisker Karma commercial
production milestone and Defendants' <u>misleading of the DOE</u> in their March 2011 presentation
as to Fisker Automotive's fulfillment of that milestone, the DOE's issuance of the Drawstop
Notice and halting any further funding of Fisker Automotive in June 2011, the December 2011
recall due to battery fires and/or that Defendants had concealed the Company's notification to
NHTSA on December 21, 2011 of the recall, the fact that the funds raised in the December 2011
capital call would largely go to pay down $200 million in payables rather than funding the
Company's business plan to make it a self-sustaining company as Defendants represented, and/or
Fisker's default of the DOE confidential "Key Personnel" loan covenant -- Plaintiffs would not
have purchased or otherwise acquired their Fisker Automotive Securities.

179.     Defendants made such false and misleading statements and concealed critical
information necessary to make the statements made, in light of the circumstances under which
they were made, not misleading, with the intent that Plaintiffs rely on such statements.

180.    Plaintiff reasonably believed and relied on Defendants' false and misleading
statements about Fisker Automotive and were unaware that Defendants were concealing critical
information about the Company necessary to make the statements made, in light of the
circumstances under which they were made, not misleading.  As a result, Plaintiffs were induced
to invest millions of dollars in Fisker Automotive.

181.    As a direct and proximate result of Defendants' actions, Plaintiffs suffered
damages in connection with their purchases of Fisker Automotive Securities.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

- 60 -

A.      Awarding Plaintiffs compensatory damages  against all Defendants, jointly and severally, for all  losses Plaintiffs  sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

B.      With respect to Counts I, II and V, Ordering rescission of Plaintiffs' purchases of Fisker Automotive Securities and that Defendants reimburse Plaintiffs' funds used to purchase Fisker Automotive Securities;

C.      With respect to Count V, awarding punitive damages;

D.      Awarding Plaintiffs their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E.      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury.

Dated:  April 15, 2016                    ROSENTHAL, MONHAIT & GODDESS, P.A.

                                          */s/ P. Bradford deLeeuw*
                                          Norman M. Monhait (#1040)
                                          P. Bradford deLeeuw (#3569)
                                          919 Market Street, Suite 1401
                                          Wilmington, Delaware  19801
                                          (302) 656-4433
                                          nmonhait@rmgglaw.com
                                          bdeleeuw@rmgglaw.com
                                          *Attorneys for Plaintiffs*

OF COUNSEL:

KLAFTER OLSEN & LESSER LLP
Kurt B. Olsen
1250 Connecticut Ave., N.W., Suite 200
Washington, D.C. 20036
(202) 261-3553
ko@klafterolsen.com

BERGER & MONTAGUE, P.C.

- 61 -

Todd S. Collins
Barbara A. Podell
1622 Locust Street
Philadelphia, PA 19103
(215) 875-3000
tcollins@bm.net
bpodell@bm.net