## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------------

IN RE: FISKER AUTOMOTIVE HOLDINGS, INC.     :     No. 13-cv-2100-
SHAREHOLDER LITIGATION               :     DBS-SRF

---------------------------------------------------------------------

## MEMORANDUM OPINION

SMITH, *Chief Circuit Judge*.

Before the Court is a motion by Richard Li Tzar Kai (Li) and Ace Strength Ltd. (Ace) to dismiss for lack of personal jurisdiction the Consolidated Second Amended Complaint (SAC) under Federal Rule of Civil Procedure 12(b)(2). *See* dkt. 427. For the reasons set forth below, I will deny the motion as to Li but grant the motion as to Ace.

## I. Facts and Procedural History

### A. Procedural History

Plaintiffs, who are various investors, filed three securities actions at the end of December 2013. Those actions named as defendants some of the officers and directors of Fisker Automotive (FA), a Delaware Corporation,[1] as well as other

---

[1] It appears that FA became Fisker Holdings, Inc. at some point after its initial incorporation. Despite the name change, this opinion refers to the business entity as FA to distinguish it from its cofounder Henrik Fisker. FA is not a named party, having filed for protection under the Bankruptcy Code in November 2013.

individuals and entities, and were consolidated. Among the various defendants were Li and Ace. Li was a member of FA's Board of Directors from January 2010 until he resigned effective July 15, 2011. He is also the owner of Ace, an "investment holding company incorporated in the British Virgin Islands," which invested in FA and is allegedly a controlling shareholder. Dkt. 40, ¶ 2.

Li and Ace moved to dismiss the consolidated action for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2). That motion was stayed pending jurisdictional discovery. Dkt. 81 at 49. In granting jurisdictional discovery, District Judge Robinson[2] expressed her belief that the plaintiffs had failed to plead sufficient facts "showing that Li or Ace exercised control over the challenged disclosures or engaged in substantial acts purposefully directed at the United States and sufficient to establish minimum contacts." Dkt. 81 at 47–48 (internal quotation marks and citations omitted).

Plaintiffs responded by filing the Consolidated Amended Complaint (hereafter referred to as the Second Amended Complaint or SAC). Dkt. 145. The first count alleged that Li and other defendants, but not Ace, "were sellers and offerors and/or solicitors of purchasers" of FA Securities and that "Plaintiffs purchased these securities as a result of . . . material omissions." SAC ¶ 128. After

---

[2] Judge Robinson retired from the bench on July 14, 2017. This case was then transferred to the undersigned judge.

setting out the various omissions, the plaintiffs alleged that the identified defendants violated Section 12(a)(2) of the Securities Act.

Count two named Li, Ace and others as defendants. It alleged that these defendants were "each a controlling person of [FA]" and that they "had the power and influence and exercised the same to cause [FA] to disseminate offering documents that omitted material information" in violation of Section 15 of the Securities Act. SAC ¶ 143. Count three alleged that Li and other defendants, but not Ace, violated section 10(b) and Rule 10b-5 of the Exchange Act by "knowingly or with deliberate recklessness disseminated or approved materially false and misleading statements [which] failed to disclose material facts necessary . . . to make the statements made . . . not misleading." SAC ¶ 147. The fourth claim alleged that Li, Ace and others violated section 20(a) of the Exchange Act as they "acted as controlling persons" of FA that "had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of [FA], including the contents and dissemination of the various statements which Plaintiffs contend omit material." SAC ¶¶ 162, 163. A common law claim of fraud against all defendants was the fifth and final claim for relief.

The SAC specifically stated that it "sets forth non-fraud claims under Sections 12(a)(2) of the Securities Act . . . . and non-fraud claims under Section 15 of the Securities Act." SAC ¶ 3. It "expressly disavow[ed]" any fraud-related allegations

pursuant to the Securities Act, instead premising these claims "on the fact that there were material omissions in the disclosures related to the offerings of [FA]." *Id.* Li and Ace again moved to dismiss for lack of personal jurisdiction. Dkt. 427.

## A. SAC's Factual Allegations

FA was launched in August 2007 as "a new venture to produce premium plug-in hybrid automobiles," SAC ¶ 38, with the objective of manufacturing and delivering a four-door sports sedan by December 2009. *Id.* ¶ 39. FA initiated efforts to raise a substantial amount of capital to "complete future phases of development, testing and tooling for the new vehicle platform." *Id.* ¶ 39. In 2008, it completed a $20 million Series B round of financing. *Id.* ¶ 41. A published report on FA indicated that Henrik Fisker, a cofounder and the chief executive officer of the company, stated that FA had "all the capital we need to move forward according to the plan." *Id.* ¶ 42. The report also noted that Fisker indicated the design of the car had been finalized, and the safety concerns arising because of lithium-ion batteries had "been resolved." *Id.* On December 31, 2008, FA applied for a loan from the U.S. Department of Energy (DOE) under its Advanced Technology Vehicles Manufacturing Loan Program. (ATVM). *Id.* ¶ 44.

In March of 2009, FA offered a $68.5 million Series C round of financing. SAC ¶ 45. In August of the same year, Bernard Koehler, another cofounder and chief operating officer, urged DOE to approve FA's loan application as bankruptcy

loomed over the horizon.  *Id.* ¶ 46.  Within a month, DOE conditionally committed millions of dollars to FA, allocating $169 million for the Fisker Karma luxury vehicle, and $359 million for a low cost hybrid named Nina.  *Id.* ¶ 47.  The DOE loan, which was not a public document, provided that an "'Event of Default' would include Fisker's 'fail[ure] to achieve any Milestone by the relevant Milestone Completion Date.'"  *Id.*  One milestone required the commencement of commercial production of the Karma by February 2011.  *Id.* ¶ 51.  To that end, during 2010, FA acquired a previously closed manufacturing plant in Delaware and entered into supply agreements with several entities.  Additional private equity was raised in a financing offer designated as Series A-1.  SAC ¶ 52.

Although commercial production of the "Karma" vehicle was to begin in February 2011, that milestone was passed without production commencing.  The following month, FA represented to the DOE that "the February 2011 Karma production milestone under the AVTM loan had been met."  SAC ¶ 53.  This representation that FA had satisfied the February 2011 milestone "avoided a default on the ATVM Loan" and enabled FA to draw further advances on the Karma portion of the loan.  *Id.* ¶ 64.  In April 2011, FA completed a Series C-1 Preferred Stock round of financing (the April 2011 Offering).  SAC ¶ 56.  The following month, after FA had drawn down all of the portion of the AVTM loan allocated to the Karma vehicle, DOE issued a "non-public 'Drawstop Notice'" on the loan "to prevent [FA]

from making any further draws on the [FA] Nina phase of the AVTM loan." *Id.* ¶ 61. Then, in June 2011, FA made another private presentation to the DOE during which it contradicted its earlier representation that it had met the February 2011 milestone of commencing production. *Id.* ¶ 64.

In the meantime, FA continued to raise capital, including through a Series D-1 offering in July 2011. *Id.* ¶ 66. Late that same month, Joe DaMour, FA's chief financial officer, represented that FA had raised more than $600 million and had the ability to draw on its loan with the DOE. In DaMour's view, FA was "very well capitalized." *Id.* ¶ 67.

Yet FA sought to raise more capital. "Starting on September 15, 2011 and ending on December 2, 2011, FA closed on twelve rounds of sales of Series D1 stock, raising a total of approximately $86 million." *Id.* ¶ 69. "Investors expressed concerns about the AVTM Loan" in the wake of the bankruptcy filing of another DOE loan recipient. SAC ¶ 71. In addition, A123 Systems, Inc, the battery supplier, lowered its 2011 revenue projections based on a reduction in the battery orders it received from FA. *Id.* ¶¶ 72–73. In the meantime, a FA investor advised DOE that FA's ability to raise additional equity was hampered by the prospect of FA defaulting on the DOE loan on December 31 unless DOE agreed to move certain "milestones back by one year." SAC ¶ 77. On December 5, 2011, DOE acceded to

FA's request to push certain milestones back by one year in order to remove the barrier to raising capital. *Id.*

On December 8, 2011,

> [t]hrough an obscure provision in the [Series C-1 Preferred Stock, i.e.,] April 2011 Offering documents called a "pay to play" capital call provision . . . [FA's] Board of Directors unanimously approved a 40% "pay to play" capital call imposed on all Fisker Automotive investors (the "December Capital Call"). The December Capital Call required funding beginning within as soon as three weeks. Investors, including plaintiffs, faced the severe penalty[,] if they did not participate[,] of having each share of preferred stock they had an interest in converted to one-half share of common stock, as well as the severe dilution of their existing interests in [FA].

SAC ¶ 79. Fisker characterized the December Capital Call as a "prudent business decision." *Id.* ¶ 83.

A safety recall of the Karma's battery was issued on December 21, 2011 by the National Highway Traffic Safety Commission. Yet FA failed to disclose that recall until Thursday December 29, 2011, "the day after the first deadline to invest in the December Capital Call had passed." *Id.* ¶ 91.

In February 2012, Henrik Fisker, FA's CEO, resigned, and was replaced by Tom LaSorda. SAC ¶ 100. The AVTM loan designated Fisker as "Key Personnel." Another capital call was issued by FA in March 2012, SAC ¶¶ 101-02, and again in September 2012, SAC ¶ 111. By March 2013, FA was seeking advice on filing for bankruptcy. *Id.* ¶ 114. In November 2013, FA filed a petition seeking bankruptcy protection. *Id.* ¶ 125.

## B. Jurisdictional Discovery as to Li

Jurisdictional discovery established that Li resides in Hong Kong. Dkt. 429, tab 1, at 4.[3] As explained below, Ace, whose successor is Pacific Century Group Investments (PCGI), was "a single purpose vehicle for the investment into [FA]" for Li. 442/A/11.

Li became a member of FA's Board of Directors on January 14, 2010. 442/B. He personally attended a Board meeting in Irvine, California in March 2010. Although Li was not physically present for a Board meeting in Livornia, Michigan on September 9, 2010, he attended telephonically. 442/A/6.

In October 2010, FA was working to complete a Series B-1 financing offer. In furtherance of that transaction, the voting agreement was to be amended so that FA would have 9 rather than 10 Directors, and that a majority would be independent directors. To effect this change, Fisker suggested to FA's Board Chairman, Ray Lane, that Li's status could change from director to observer. 429/8/2. Lane was also a managing partner of Kleiner Perkins, a venture capital firm. In an email to Fisker, Lane expressed doubt that Li would accept this proposal. 429/8/2. He also noted that Li had "played a crucial role when the company was at the brink," but that

---

[3] Because the citations to the documentary evidence submitted by the parties on this motion are frequent and lengthy, I will simply reference the number of the docket entry, the tab, the exhibit in that tab, and the page number if available by forward slashes. For example, dkt. 429, tab 1, at 4 would be 429/1/4.

he did "not show up for meetings." *Id.* From the email chain, it appears that Lane

approached Li about the proposal. Lane explained to Li that having a representative

from Ace, which Li owned, observe the Board meetings "did not constitute holding

a board seat[.]" 429/8/1; *see also* 429/1/6/20. Usually the representative from Ace

was David Manion, a member of Ace's management team. Lane informed Li that

Manion's presence was not a problem but noted that Manion did not contribute. The

email chain further indicates that after communicating with Li, Lane informed Fisker

that Li would try to increase his involvement and that Li "definitely wants to keep

the board seat," "but [Lane had] started the discussion about making the seat more

useful." *Id.*

In November 2010, a Series B-1 Preferred Stock Purchase Agreement was

issued. 442/I. It contained a "Consent to Jurisdiction" clause, which provided:

> The Company, and each of the purchasers hereby irrevocably submit to
> the jurisdiction of the state or federal courts located in Delaware[,]
> County New Castle in connection with any suit, action or other
> proceeding arising out of or relating to this agreement and the
> transactions contemplated hereby, and hereby agree not to assert, by
> way of motion, as a defense [a lack of jurisdiction.]

*Id.* This very same provision had been in the D-X Series issued in September

2009. 442/J.

Li personally attended the December 3, 2010 Board meeting in Newport

Beach, California, which afforded the directors an opportunity to test drive the

Karma. 429/6. The "overall opinion was that [the] vehicle performed very well."

429/6.   On December 8 and 12, 2010, Li participated telephonically in a FA compensation committee meeting. 442/A/3.  Shortly thereafter, on December 17, 2010, Li participated telephonically in another meeting of the compensation committee.  442A/5.

Meanwhile, on December 14, 2010, FA enacted an Amended and Restated Certificate of Incorporation (Amended Certificate).   442/A/1.   The Amended Certificate called for establishing Common Stock and Preferred Stock consisting of D-X Preferred, Series A-1, and Series B-1.  442/A/exh 1. Section 6 of the Amended Certificate set out the Protective Covenants and provided that the preferred stock would not be increased or decreased without a majority of the preferred stockholders voting to do so.  442/A/exh. 1/15.  In other words, the company could not dilute the value of the preferred stock without the approval of a majority of the preferred stockholders.

As the milestone for commencing production of the Karma passed, Li personally attended a Board meeting on February 28, 2011, which was held in Finland.  As part of the meeting, the Board was led "on a tour of the Valmet facility, including Karma body assembly, paint shop, final assembly and testing." 442/1/exh. 10/1.  After the tour, the Board discussed "Karma production readiness," and "an update on progress at the Delaware facility."  *Id.*  An updated business plan and

financials in connection with the Series B-1 financing were also discussed. 442/1/exh. 10/3.

In March 2011, FA addressed the issuance of the Series C-1 financing, i.e., the April 2011 Offering, which included the pay to play provision. Documents pertaining to the Series C-1 offering were sent to Li and others on March 22. The Board held several telephonic meetings on March 23, 24, and 29. 442/A/exh. 16. Li did not participate in those Board calls, and Ace was not permitted to participate as an observer. 442/A/15. Lane explained to Li in an e-mail prior to the meetings that the subject of the meetings was both sensitive and urgent from a temporal perspective, and that only Board members were being included. 429/9. By limiting those in attendance to Board members, Fisker believed it was clear that the April 2011 Offering "was a board decision." 429/9.

During the March meetings, the Series C-1 financing option, i.e., the April 2011 offering, was discussed and approved by resolution. 442/A/exh. 16. The Series C-1 Preferred Stock Purchase Agreement (the April 2011 offering) also included a "Consent to Jurisdiction" clause. *Id.* On March 27, Li indicated to Fisker that he had received an update from Lane at Kleiner Perkins about the Series C-1 financing. 442/A/15. Li advised Fisker that his view was consistent with Lane's view. *Id.* On April 15, 2011, Ace conveyed its consent to the Series C-1 round of financing in the April 2011 offering. 442/A/exh. 17; 429/27. That same day, FA's

secretary certified that the Board of Directors had adopted the resolution authorizing the Series C-1 Preferred Stock offering. 442/E/C.

A telephonic Board meeting was scheduled for June 22, 2011, with the materials for the meeting sent the day before. 442/A/exh. 20. The materials sent to the Directors for the Board call—a call in which Li participated—specifically set out the objectives of the call. They were: 1) "Review and Gain Agreement on Revised Business Plan"; 2) "Revised Business Plan to be Used for DOE, Research Analysts, and IPO"; and 3) "Plan Intended to be Conservative As It Will Be Used To Provide Guidance To Street." 442/A/exh. 20/2. Two bullet points in the Executive Summary stated: "Financials Extended Out Through 2021 And Made Decidedly More Conservative Anticipating IPO and DOE Covenant Renegotiation," and "Purpose of Review Is To Gain Agreement on Directions/Approach As We Move Ahead with DOE and IPO." *Id.* at 3. Additional materials specifically addressed the DOE loan, the need to revise the covenants and milestones, and the need to renegotiate its terms. *Id.* at 14. In the page labeled "Conclusion/Next Steps," the first step was the "Need to Agree on Which Version of Financials to Use," setting out the options as the recommended DOE Plan or a more conservative plan. *Id.* at 19. The final bullet point in the "Conclusion/Next Steps" stated that the "Top Priority Will Be DOE Negotiations to Assure Timing Achieved." *Id.*

Li participated in the Board call on June 22, 2011. 429/31. An hour and twenty minutes of the meeting was devoted to a DOE Update and Review of Business Plan. 442/A/exh. 19–20. A July 7, 2011 Board call pertained to the approval of the D-1 Financing, 442/A/exh. 21. Li received the materials for that Board call via e-mail but did not participate in the call.

The June 22 Board call was the last meeting Li participated in as a Director. Li resigned effective July 15, 2011, 429/4/1. He explained during his deposition that one of the reasons he resigned was that Lane ran the Board as an executive chairman and he "talk[ed] a lot on the board, and he [didn't] exactly let any other directors put in too many comments." 442/A/52. Li reasoned that there was no point to be on the Board and that he "might as well become an observer." *Id.* at 53.

The same date that his resignation became effective, Fisker Holdings, Fisker Automotive, PCGI (Ace's successor), and Li executed an Agreement. 429/4. The Agreement noted Li's written resignation, and acknowledged that under an April 27, 2011 Amended and Restated Voting Agreement, PCGI had the "right to designate (and remove) one of the Series D-X Directors." 429/4. The Agreement further provided that notwithstanding that right, Fisker Holdings and Fisker Automotive, PCGI and Li "confirm and agree that at the election and sole discretion of PCGI, Mr. Li (or another designee of PCGI) shall be immediately reinstated as a D-X Director and, if applicable, the Series D-X Director nominated by the Board of Directors . . .

shall be immediately removed, if [FA] has not consummated a firm commitment underwritten public offering . . . on or before July 31, 2012." 429/4. A further provision in the July 15, 2011 Agreement stated that "[s]o long as PCGI continues to hold at least Twenty Million (20,000,000) shares of Series D-X Preferred Stock . . . the Company shall permit a representative of PCGI (whether Mr. Li or any other designee . . . ) (the Observer) to attend all meetings of the Board . . . in a nonvoting observer capacity." 429/4/2. Although the observer could not vote, he was "entitled to participate in the discussion of the issues considered in such meetings." *Id.* These reinstatement and observer rights were to terminate upon either the consummation of a qualified IPO or a liquidation event, whichever occurred first. *Id.*

Li claimed not to have read the resolutions and related documents that authorized the various financing initiatives. 442/A/54–55. He explained that he had not read the materials because that is for "the management team and the CFO to do." *Id.*

Following his resignation as a Director, Li exercised his observer rights, personally attending Board meetings held in Newport Beach, California on July 22, 2011, and November 8, 2012. 429/2/6. He also observed telephonically the February 14, 2012 Board meeting, which discussed the "need for additional equity financing" and the terms of the extended Series D-1 Preferred stock financing. 442/L.

In December 2011, when the Board contemplated bringing on LaSorda as a new CEO, Li expressed his agreement with the effort in an email to FA's officers and directors. .  442/A/38.

The Series D-1 financing also required a decision by PCGI as to whether it would make an additional investment.  In February 2012, Ray Lane, who was still Chairman of FA, emailed Li inquiring as to his willingness to commit.  Li responded that he was "uncomfortable with the financial projections" and unlikely to forward the cash.  442/A/39.  The D-1 Series's Preferred Stock Purchase Agreement also contained a "Consent to Jurisdiction" clause.  442/C/26, § 6.18.

Li does not own, rent or lease any real estate in the United States.  He acknowledged that he indirectly is a "100% beneficial owner of an apartment in New York for investment purposes."  429/2/10.  Nor does Li maintain an office in the United States.  429/2/12.  In response to an interrogatory concerning the occasions he was present in the United States on FA business, Li stated that "he was present . . . for a number of short trips on a sporadic basis during the Relevant Time Period and he spent no more than 40 days per year in the United States during" that period. 429 /2/13.  And, he specified that "only a very small portion of the time he spent in the United States was spent on [FA] business."  *Id.*

**C. Jurisdictional Discovery as to Ace, Li's Investment Vehicle into FA**

Li directed the creation of Ace, which is a corporation formed in the British Virgin Islands as a "single purpose vehicle for [his] investment into Fisker." 429/1/10–11. Li is the "100 percent indirect beneficial owner of Ace." 429/1/12; 429/3/6. The company ceased being known as Ace. At one point during Li's involvement at FA, Ace became Pacific Century Cyberworks, and thereafter was known as Pacific Century Growth, 442/A/12–13, or Pacific Century Group Investments Limited (PCGI), 429/4. David Manion, a resident of the United Kingdom, worked for Ace, serving as an observer and monitor of FA's Board meetings by personally attending or participating in Board calls. 442/A/exh. 20– 22, 43. Ace has one director, Guenter Kring. David Wong also worked for Li at Ace and was in charge of Li's investments. 429/1/25. Li noted that Wong was involved in Ace's investments for the Series C and D financing offerings. 442/A/8/26–27. Li directed Wong to ensure that any dilution of his investment in FA was not excessive. *Id.* at 27.

Ace was an early investor in FA. As a result, Ace had certain rights, including "the right to approve subsequent financing that could dilute" Ace's investment. 442/A/46. As noted above, the July 15, 2011 Agreement between Fisker Holdings, FA, PCGI, and Li provided PCGI, Ace's successor, the "right to designate (and remove) one of the Series D-X Directors." 429/4. Manion observed FA's Board meetings on Ace's behalf on March 30, 2010, September 9, 2010 in Livonia,

Michigan, and on December 3, 2010 in Newport Beach, California. 429/5, 6, 29; 442/A/exh. 6–7. Manion also attended, on behalf of Ace, the Board meeting held in Finland on February 28, 2011. 442/A/exh. 10.

Like Li, Manion observed telephonic Board meetings. Board minutes indicate Manion participated telephonically on December 17, 2010, June 22, 2011, July 7, 2011, and December 1, 5, and 6 in 2011. 442/A/exh. 5, 19, 32, 34; 442/F.

At one point in March 2011, FA's CFO DaMour received in association with a financing offer for FA a $10 million wire from Norwood Associates, instead of from Ace. 442/A/exh. 12. DaMour emailed Li to make sure FA could process the payment. Li explained that Norwood was another private company he owned and that FA could proceed even though the money had not come from Ace. *Id.* In gearing up for the Series C-1 Financing, i.e., the April 2011 Offering, FA required Ace's consent as an A-1 preferred shareholder. Ace's consent arrived April 16, 2011. 442/A/exh. 17

The Series D-1 Financing required, inter alia, Ace/PCGI's consent to proceed. 442/G.

## II.    Applicable Standard

When a defendant challenges a court's exercise of personal jurisdiction, "a district court has considerable leeway" in resolving the motion. *Marine Midland Bank v. Miller*, 664 F.2d 899, 904 (3d Cir. 1981). It "may determine the motion on

the basis of affidavits alone; or it may permit discovery in aid of the motion; or it may conduct an evidentiary hearing on the merits of the motion." *Id.* If the court does not conduct an evidentiary hearing, "the plaintiff need make only a prima facie showing of jurisdiction through its own affidavits and supporting materials." *Id.* "Where the plaintiff has made this required threshold showing," plaintiffs usually have the "right to conduct discovery before the district court dismisses for lack of personal jurisdiction." *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 456 (3d Cir. 2003). But "until [an evidentiary] hearing [or trial] is held, a prima facie showing suffices, notwithstanding any controverting presentation by the moving party, to defeat the motion." *Id.*

The Third Circuit has yet to explain what is required for a prima facie showing. For its part, the First Circuit has instructed that a prima facie showing is the least rigorous of the three standards that can be applied to a 12(b)(2) challenge. *Foster-Miller, Inc. v. Babcock & Wilcox Canada*, 46 F.3d 138, 145 (1st Cir. 1995) (citing likelihood and preponderance as the other two standards). There, the Court stated that a prima facie showing usually consists of evidence adduced by the plaintiff, "that if credited is enough to support findings of all facts essential to personal jurisdiction." *Id.* It further explained that a court resolving the motion acts "as a data collector . . . in a manner reminiscent of its role when a motion for summary judgment is on the table[,]" accepting as true the proffered evidence "for

18

the purpose of determining the adequacy of the prima facie showing." *Id.* The Second Circuit has explained that "[w]here plaintiff has engaged in jurisdictional discovery, but no evidentiary hearing was conducted, 'the plaintiff's prima facie showing, necessary to defeat a jurisdiction testing motion, must include an averment of facts that, if credited . . . would suffice to establish jurisdiction over the defendant.'" *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir. 2003) (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)). Although the Fifth Circuit has not fully set out the parameters of a prima facie showing, it has noted that uncontroverted allegations are taken as true and any factual conflicts are resolved in the plaintiff's favor. *Stripling v. Jordan Production Co.*, 234 F.3d 863, 869 (5th Cir. 2000). In *Conn v. Zakharov*, 667 F.3d 705, 711 (6th Cir. 2012), the Sixth Circuit observed that in deciding if a plaintiff adduced a prima facie case, the district court does not weigh disputed facts, but considers them in the light most favorable to the plaintiff. *Id.* The Eighth Circuit has acknowledged that a prima facie showing is minimal. *K-V Pharm. Co. v. J. Uriach & CIA, S.A.*, 648 F.3d 588, 591 (8th Cir. 2011).

Because I did not conduct an evidentiary hearing on the motion before me, my focus here is on whether the plaintiffs have adduced a prima facie showing of jurisdiction. *Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 330 (3d Cir. 2009).

### III.    Personal Jurisdiction

"Due process requirements are satisfied when in personam jurisdiction is asserted over a nonresident corporate defendant that has certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Helicopteros Nacionales De Colombia v. Hall*, 466 U.S. 408, 414 (1984) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)) (internal quotation marks omitted). In *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 369 (3d Cir. 2002), Chief Judge Becker explained that, when a plaintiff's claim is based on a federal statute authorizing nationwide service of process, such as the Securities laws, a "federal court's personal jurisdiction may be assessed on the basis of the defendant's national contacts." Like *Pinker*, this action is based on the Securities Act. Accordingly, we may consider the national contacts of Li and Ace.

In addressing personal jurisdiction, the Supreme Court has "differentiated between general or all-purpose jurisdiction, and specific or case-linked jurisdiction."[4] *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2851 (2011). General jurisdiction allows a court to assert jurisdiction over a foreign corporation "when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." *Id.* (quoting *Int'l Shoe*,

---

[4] "[T]he principle[s] announced in diversity cases such as *International Shoe* . . . and its progeny [are] also applicable to nondiversity cases." *DeJames v. Magnificence Carriers, Inc.*, 654 F.2d 280, 283 (3d Cir. 1981).

326 U.S. at 317). "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home." *Id.* at 2853-54. With regard to a corporation's home for general jurisdiction purposes, *Goodyear* specifically mentions the place of incorporation or the principal place of business. *Id.* at 2854 (omitting citation).

Applying *Goodyear*'s standard, plaintiffs cannot establish a basis for exercising general jurisdiction over either Li or Ace. Li is a resident of Hong Kong. 429/1/4. Ace was incorporated in the British Virgin Islands. Thus, neither Li nor Ace is "at home" in the United States for purposes of general jurisdiction.

Specific jurisdiction "focuses on the relationship among the defendant, the forum, and the litigation. . . . For a [court] to exercise jurisdiction consistent with due process, the defendant's suit related conduct must create a substantial connection with the forum[.]" *Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014) (omitting citations and internal quotation marks). "Specific or case-linked jurisdiction depends on an affiliation between the forum and the underlying controversy (i.e., an activity or an occurrence that takes place in the forum . . . and is therefore subject to . . . regulation)." *Goodyear Dunlop*, 131 S. Ct. at 2851.

In *D'Jamoos v. Pilatus Aircraft Ltd.*, 566 F.3d 94 (3d Cir. 2009), the Third

Circuit discussed the "three-part inquiry" that is to be undertaken in determining if

specific jurisdiction exists.

> First, the defendant must have "purposefully directed [its] activities" at the
> forum. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (internal
> quotation marks omitted). Second, the litigation must "arise out of or relate
> to" at least one of those activities. *Helicopteros*, 466 U.S. at 414; *O'Connor*,
> 496 F.3d at 317. And third, if the first two requirements have been met, a court
> may consider whether the exercise of jurisdiction otherwise "comport[s] with
> 'fair play and substantial justice.'" *Burger King*, 471 U.S. at 476 (quoting *Int'l
> Shoe*, 326 U.S. at 320).
>
> The first two parts of the test determine whether a defendant has the
> requisite minimum contacts with the forum. The threshold requirement is that
> the defendant must have "purposefully avail[ed] itself of the privilege of
> conducting activities within the forum State." *Hanson v. Denckla*, 357 U.S.
> 235, 253 (1958). To meet this requirement, the defendant's physical entrance
> into the forum is not necessary. *See Burger King*, 471 U.S. at 476; *Grand
> Entm't Group, Ltd. v. Star Media Sales, Inc.*, 988 F.2d 476, 482 (3d Cir.1993).
> A defendant's contacts, however, must amount to "a deliberate targeting of
> the forum." *O'Connor*, 496 F.3d at 317. The "unilateral activity of those who
> claim some relationship with a nonresident defendant" is insufficient. *Hanson*,
> 357 U.S. at 253.

*Id.* at 102–03.

*Burger King Corporation v. Rudzewicz*, 471 U.S. 462 (1985), is instructive.

Burger King, a Florida corporation, sued Rudzewicz, a Michigan citizen, in the

Southern District of Florida, asserting that Rudzewicz breached a franchise

agreement and tortiously infringed Burger King's trademarks. *Id.* at 468.

Rudzewicz argued that the Florida Court lacked personal jurisdiction over him. The

Supreme Court began its analysis by stating that "[w]here a forum seeks to assert

specific jurisdiction over an out-of-state defendant who has not consented to suit there, this 'fair warning' requirement is satisfied if the defendant has 'purposefully directed' his activities at residents of the forum[.]" *Id.* at 472 (quoting *Keeton v. Hustler Magazine, Inc.* 465 U.S. 770, 774 (1984)). It considered the interstate contractual nature of the dispute and noted that it had "emphasized that parties who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to regulation and sanctions in the other State for the consequences of their activities." *Id.* at 473 (omitting citation). The Court declared that "[j]urisdiction is proper . . . where the contacts proximately result from actions by the defendant *himself* that create a 'substantial connection' with the forum State. . . . or has created 'continuing obligations' between himself and residents of the forum[.]" *Id.* at 475 (omitting citation). Focusing on the business nature of the dispute, the Court instructed that jurisdiction

> may not be avoided merely because the defendant did not *physically* enter the forum State. Although territorial presence frequently will enhance a potential defendant's affiliation with a State and reinforce the reasonable foreseeability of suit there, it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted. So long as a commercial actor's efforts are "purposefully directed" towards residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction.

*Id.* at 475.

As (now former) District Judge Sean McLaughlin observed just over twenty years ago in *Zippo Manufacturing Co. v. Zippo Dot Com, Inc.*, "[t]he Internet makes it possible to conduct business throughout the world entirely from a desktop." 952 F. Supp. 1119, 1123 (W.D. Pa. 1997). The amount of business conducted through the internet has only grown since then. I now turn to examining whether Li's and Ace's business dealings have triggered personal jurisdiction in the United States.

## IV. Discussion

Li and Ace both contend that there are insufficient contacts for this court to exercise personal jurisdiction. Li asserts that "[d]iscovery demonstrates that [he] did not participate in the drafting or review of *any* Fisker statements to investors at *any* time." Dkt. 428, at 1. He highlights that he "was an outside director at Fisker for only one of the four offerings at issue in the SAC, and he had no involvement in the statements made to investors during that offering." *Id.* At the time of the other Fisker offerings, Li points out that he "was merely a board observer" as he had resigned as a director of the Board, and had "no power to vote or otherwise direct any action by Fisker." *Id.* at 2. Li further points out that Judge Robinson, to whom this case was originally assigned, recognized that the position of director is by itself insufficient to find specific jurisdiction. *See* dkt. 81 at 47.

As to Ace, it contends it was merely a minority shareholder and had no involvement or control over Fisker statements that Plaintiffs challenge. It also asserts that it does not have an alter-ego or agency relationship with any U.S. entity.

## A. Personal Jurisdiction Over Li

I recognize that Judge Robinson noted that "a position of director is by itself insufficient to find specific jurisdiction," dkt 81 at 47, and that as support, she cited *Tracinda Corp. v. Daimlerchrysler AG*, 197 F. Supp. 2d 86, 99 (D. Del. 2002). Yet this pincite concerns general jurisdiction, and the district court there concluded that the foreign defendant's service as a director of an American corporation is "insufficient to meet the markedly higher burden of establishing systematic and continuous contacts with the United States sufficient to warrant the exercise of general jurisdiction." *Id.* at 98-99. Indeed, I have already concluded that this court cannot exercise general jurisdiction over Li, who is a foreign national residing in Hong Kong. Accordingly, I turn to whether there is specific jurisdiction.

The question of whether Li, a foreign national and resident of Hong Kong, is subject to specific jurisdiction by this court hinges to a great extent on his service as a director of FA. FA is a Delaware corporation. Under Delaware law, "[t]he business and affairs of every corporation . . . shall be managed by or under the direction of a board of directors." 8 Del. C. § 141(a). As the United States Supreme Court noted in *Daimler AG v. Bauman*, a corporation is a fictitious entity that "can

25

act only through its agents."  134 S. Ct. 746, 759 n.13 (2014) (omitting internal quotation marks and citation).  Thus, as with every corporation, FA's directors transacted business on behalf of FA at the various Board meetings.

Although residing abroad, Li accepted the offer to serve on the Board of FA, a Delaware corporation.  After joining the Board in January 2010, he personally attended two Board meetings held in California that same year, and participated telephonically in a Board meeting held in Michigan.  In addition, Li personally attended a Board meeting in Finland that concerned a facility used in the production of the Karma vehicle.  He also participated in a telephonic Board call in June of 2011.  And Li's participation in FA's business was not limited to Board meetings. As a member of FA's compensation committee, he participated telephonically in three meetings held in December 2010.

At Board meetings in December 2010, February 2011, and June 2011, the Board discussed FA's financial status and its business plans.  The status of the DOE loan was specifically discussed at the June 2011 meeting with the objective of determining the revised business plan to be submitted to the DOE.  The next steps for the Board included negotiating the DOE milestones.  Yet information material to missing the February 2011 production milestone for the DOE loan, the DOE presentations in March and June, and the DOE's Drawstop Notice are what the SAC alleges was omitted from the various offering documents and public statements.

While Li emphasizes that he did not make any public statements, he did attend the meetings that specifically discussed the DOE loan and the need to negotiate new milestone dates. Thus, there is a factual basis to support that Li knew of the true status of the DOE loan and that information had been omitted from the stock offerings. Moreover, FA's Board of Directors approved the Series C-1 Preferred Stock offering with the pay to play provision on April 15, 2011 while Li was a member. 442/E/C.

*Burger King* instructs that "[j]urisdiction is proper . . . where the contacts proximately result from action by the defendant himself that create a 'substantial connection' with the forum[.]" 471 U.S. at 475. The facts set forth above demonstrate purposeful efforts by Li to maintain his connection to FA, a Delaware corporation, and its Board of Directors by participating in its Board meetings. Li either physically attended Board meetings, or participated by telephone. In the latter part of 2010, Li did not want to relinquish his seat as a Board member and promised to be more involved in the work of the Board. Because technology enabled him to make the connection from afar, Li's physical absence did not prevent him from fulfilling his commitments as a Director. Plainly, Li could have simply invested in FA without becoming a director. He chose, instead, to invest via Ace and to accept a seat on the Board of an American company that sought his input.

In other words, Li's participation in these Board meetings was not "solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, . . . or of the unilateral activity of another party or third person." *Burger King*, 471 U.S. at 475. Li himself created the connection with FA and its Board, and as a Director he was provided with material information about FA's financial status and its indebtedness under the DOE loan. This securities action relates to the alleged failure to disclose material information about the DOE loan. I conclude that plaintiffs have adduced a prima facie case that Li "purposefully avail[ed] [him]self of the privilege of conducting activities within the forum [of the United States], thus invoking the benefits and protections of its laws," and that this litigation relates to Li's activities. *Burger King*, 471 U.S. at 475 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)).

I find persuasive the District Court's analysis in *In re Cinar Corp. Securities Litigation*, 186 F. Supp. 2d 279, 305–06 (E.D.N.Y. 2002). There, the company's general counsel, a foreign citizen, signed the allegedly fraudulent registration statement in Canada. In her view, that was the only fact on which to establish personal jurisdiction and it was an insufficient basis for subjecting her to suit in the United States. The Court disagreed. It found:

> that it is perfectly reasonable to exercise jurisdiction over Corbeil based solely on her signing the 1999 Registration Statement. As General Counsel, Corbeil must have known that the Statement was released in connection with a secondary stock offering designed to attract American investment. There is no clearer example of purposeful availment of the privilege of doing business in the United States than

this. In like manner, as General Counsel, Corbeil must have known that the Statement was made to comply with the laws governing securities offerings in American markets and, as such, it would be used and relied upon by American investors. Corbeil could have reasonably foreseen that, were there to be litigation concerning the Statement, she would be haled into court in the United States.

*Id.* Similarly, Li purposefully availed himself of the privilege of conducting business for FA as one of its directors and participated in the decisions about FA's business plan, the DOE loan and its stock offering. That is the sort of information that a reasonable investor would deem material. *See Itoba Ltd. v. LEP Group, PLC*, 930 F. Supp. 36, 40–41 (D. Conn. 1996) (concluding foreign citizen's approval of certain SEC filings in England made a prima facie case of personal jurisdiction as SEC filings generally are the types of documents on which a reasonable investor would rely in purchasing securities); *In re Royal Dutch/Shell Transport Secur. Litig.*, 380 F. Supp. 2d 509, 551 (D.N.J. 2005) (concluding foreign citizen, who was an officer of the foreign corporation, was subject to suit in federal district court as he attended and presented at U.S. conferences and assisted in the dissemination of the material misrepresentations).[5]

_____

[5] I acknowledge that in *In re AstraZeneca Securities Litigation*, 559 F.Supp. 2d 453, 467 (S.D.N.Y. 2008), the Court stated that "[a] person's status as a board member is not alone sufficient to establish jurisdiction." There, the Court noted that the complaint did not allege that the defendants' travel to the United States for AstraZeneca business pertained to the medication at the heart of the class action and personal jurisdiction had not been adequately alleged in the complaint. *AstraZeneca* is, therefore, factually distinguishable. Here, in addition to the allegations of the SAC, jurisdictional discovery established that Li attended Board meetings that

In *Remick v. Manfredy*, 238 F.3d 248, 255 (3d Cir. 2001), we observed that simply because there is personal jurisdiction over a defendant "as to a particular claim . . . does not necessarily mean that [the court] has personal jurisdiction over that same defendant as to [the] other claims." Thus, personal jurisdiction must be considered as to each specific claim. Yet each count in the SAC is based to some extent on the omissions regarding the DOE loan. For that reason, I conclude that this court has personal jurisdiction over Li as to counts one through five.

Because plaintiffs have satisfied the first two parts of the "three-part inquiry" we must undertake, I conclude that minimum contacts exist. *D'Jamoos*, 566 F.3d at 102. The "existence of minimum contacts makes jurisdiction presumptively constitutional and the defendant 'must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 324 (3d Cir. 2007) (quoting *Burger King*, 471 U.S. at 477).

Li has not presented the compelling case needed to defeat personal jurisdiction. I conclude that exercising personal jurisdiction over Li "comport[s] with 'fair play and substantial justice.'" *D'Jamoos*, 566 F.3d at 102 (quoting *Int'l Shoe*, 326 U.S. at 320). As *Burger King* pointed out, modern commercial life enables

_____

concerned financial and business matters that are at the heart of this litigation. Thus, there is a link between Li, the federal forum, and the litigation. *See Walden*, 134 S. Ct. at 1121.

"a substantial amount of business [to be] transacted solely by mail and wire communications . . . thus obviating the need for physical presence" to prepare Li's defense in this matter.  471 U.S. at 476.  As a consequence, it is not unfair to subject Li "to the burdens of litigating in" the United States.  *Id.* at 474.  The Delaware District Court has a strong interest in adjudicating a federal securities action involving a Delaware corporation.  Moreover, when Li accepted the position of director on FA's Board, he had fair notice that he might be subject to suit in the United States for matters arising out of or related to his service in that position.

In sum, plaintiffs have established a prima facie case of personal jurisdiction over Li and I will deny the motion to dismiss as to him.

### B.    Personal Jurisdiction as to Ace

Personal jurisdiction over Ace, however, has not been established.  Ace is a foreign corporation which does not transact business in the United States and does not own, rent, or lease any property in the United States.  While Manion may have represented Ace when he observed FA's Board meetings, Manion is not a defendant.  Though affiliated with Ace, Manion's status with that corporation is not apparent from the record before us.  There is no evidence showing he is an officer of the corporation.  Ace has only one director, Guenter Kring.  Thus, Manion's physical presence is not enough to establish the specific jurisdiction needed to keep Ace in this litigation.

That leaves Ace's status as a shareholder as the sole basis for establishing specific jurisdiction. Plaintiffs allege that Ace is the controlling shareholder. Yet they fail to cite specific evidence to establish as much. Ace admittedly has a substantial investment in FA, but the evidence does not establish the percentage of that holding or show that Ace influenced FA.

Because Ace's mere status as a shareholder preceded the underlying controversy and because being a shareholder is not linked to the omissions that give rise to this litigation, I conclude that this court lacks personal jurisdiction over Ace. As the Supreme Court declared in *Shaffer v. Heitner*, "[i]t strains reason . . . to suggest that anyone buying securities in a corporation formed in Delaware 'impliedly consents' to subject himself to Delaware's . . . jurisdiction on any cause of action.'" 433 U.S. 186, 216 (1977) (omitting quotation marks and citation).

Plaintiffs contend that Ace is an alter ego of Li and therefore subject to personal jurisdiction. Whether Ace is or is not Li's alter ego, the record before me falls short of providing a basis for piercing the corporate veil. *See, e.g. Clientron Corp. v. Devon IT, Ic.*, 894 F.3d 568, 576 (3d Cir. 2018) (discussing piercing the corporate veil and concluding that plaintiff failed to establish corporation was a sham that would allow imposing liability upon the shareholders).

Finally, I reject the assertion that the jurisdictional consent clause in the Series D-X, B-1, and D-1 offerings establishes a waiver by Ace of the defense that personal

jurisdiction is lacking.  While Ace might be bound as a purchaser to that provision of the agreement, the clause indicates that the consent is for any suit or action "arising out of or relating to [that] agreement."  It is not clear that this dispute is about these specific offerings.  Nor is the suit against Ace as a purchaser of stock. Without more, I am not persuaded that the clause applies in this situation.

An appropriate order will follow.