**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| IN RE FISKER AUTOMOTIVE HOLDINGS, INC. SHAREHOLDER LITIGATION | ) ) ) ) ) ) ) |

Civ. No. 13-2100-CFC-SRF

**PUBLIC VERSION**
**FILED NOVEMBER 16, 2018**

## DEFENDANT KEITH DAUBENSPECK'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFFS' CONSOLIDATED THIRD AMENDED COMPLAINT

Defendant Keith Daubenspeck hereby answers the allegations in Plaintiffs' Consolidated Third Amended Complaint (the "TAC"). Because the Court's Memorandum Opinion and Order entered on September 9, 2015 ("Order") dismissed certain portions of the Complaint as against Daubenspeck, no answer is required for those portions. Daubenspeck refers to and incorporates his Answer and Affirmative Defenses to Plaintiffs' First Amended Complaint (D.I. 86) and his Answer and Affirmative Defenses to Plaintiffs' Second Amended Complaint, as if fully set forth herein.

Daubenspeck filed a Motion to Dismiss Counts III and IV of Plaintiffs' Third Consolidated Amended Complaint ("TAC") on November 9, 2018, to the extent that those claims are based upon allegations relating to the Series A-1 and Series B-1 financing rounds. This Answer is filed pursuant to Federal Rule of Civil Procedure 15(a)(3). The filing of this Answer should not be construed to waive any of the arguments set forth or the relief sought in Daubenspeck's Motion to Dismiss. If the Court grants any part of that motion, Daubenspeck requests that the Court grant them permission to file an Amended Answer to the TAC.

Daubenspeck responds to the numbered paragraphs of the TAC as follows:

1.      In this action, Plaintiffs assert claims for violations of the Securities Act of 1933 (the "Securities Act"), the Securities Exchange Act of 1934 (the "Exchange Act") and

under common law, in connection with purchases of (i) Fisker Automotive preferred stock by Plaintiffs PEAK6 Opportunities Fund L.L.C., 8888 Investments GmbH, MCP Fisker L.L.C., I2BF Global Investments, Ltd., and ASC Fisker L.L.C. ("Fisker Automotive Plaintiffs"); and (ii) Fisker Automotive preferred stock through Middlebury Group LLC, Middlebury Ventures II/III, LLC, and/or Ridgemakers SPV II/III, LLC (together or separately, "Middlebury") by Plaintiffs Atlas Fund and Atlas Management, CK Investments LLC, David W. Raisbeck, Hunse Investments, L.P., Southwell Partners, Sandor Master Capital Fund, John S. Lemak, Pinnacle Family Office Investments, L.P., Dane Andreeff, SAML Partners, Kenneth & Kimberly Roebbelen Revocable Trust of 2001, and Brian Smith ("Middlebury Plaintiffs"). All securities are collectively referred to hereinafter as "Fisker Automotive Securities."

**ANSWER**: Paragraph 1 sets forth conclusions of law to which no response is required. Paragraph 1 contains allegations that do not require a response by Daubenspeck in light of the Court's Order. To the extent an answer is required, Daubenspeck admits only that Plaintiffs seek to assert claims of common law fraud and violations of the Exchange Act and that the second sentence of paragraph 1 purports to define "Fisker Automotive Securities." Daubenspeck is without knowledge or information sufficient to admit or deny the allegation that Plaintiffs purchased Fisker Automotive preferred stock, and denies the remaining allegations in paragraph 1.

2. This Amended Complaint sets forth non-fraud claims under Section 12(a)(2) of the Securities Act (against certain Defendants identified below) and non-fraud claims under Section 15 of the Securities Act (against the "Section 15 Defendants" (defined below)). Plaintiffs' Securities Act claims are not based on any knowing or reckless misconduct – *i.e.*, they do not allege fraud, do not sound in fraud and expressly disavow any fraud-related allegations. Rather, they are premised on the fact that there were material omissions in the disclosures related to the offerings of Fisker Automotive Securities.

**ANSWER**: Paragraph 2 contains allegations that do not require a response by Daubenspeck in light of the Court's Order. Daubenspeck admits that Plaintiffs purport to seek remedies under common law and the Exchange Act, but denies the remaining allegations in paragraph 2, including that suggestion that Plaintiffs are entitled to any such relief.

3. This Amended Complaint also separately sets forth: (i) common law claims for fraud, and aiding and abetting fraud; and (ii) certain claims under Section 10(b) of the Exchange Act (against all Defendants) and under Section 20(a) of the Exchange Act (against the

"Section 20 Defendants" (defined below)) who were knowing or deliberately reckless participants in defrauding investors in connection with their material omissions.

**ANSWER**: Paragraph 3 contains allegations that do not require a response by Daubenspeck in light of the Court's Order. Daubenspeck admits that Plaintiffs purport to seek remedies under common law and the Exchange Act, but denies the remaining allegations in paragraph 3, including that suggestion that Plaintiffs are entitled to any such relief.

## JURISDICTION AND VENUE

4.      Plaintiffs assert claims that arise under and pursuant to (a) Sections 12 and 15 of the Securities Act (15 U.S.C. §§ 77l, 77l(a)(2) and 77o); (b) Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5); and (c) the common law.

**ANSWER**: Paragraph 4 contains allegations that do not require a response by Daubenspeck in light of the Court's Order. Paragraph 4 also sets forth conclusions of law to which no response is required. To the extent an answer is required, Daubenspeck admits that Plaintiffs purport to assert claims under common law and the Exchange Act, but denies the remaining allegations in paragraph 4, including that suggestion that Plaintiffs are entitled to any such relief.

5.      This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v) and Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331. This Court has supplemental jurisdiction over Plaintiffs' common law claim pursuant to 28 U.S.C. § 1367.

**ANSWER**: Paragraph 5 contains allegations that do not require a response by Daubenspeck in light of the Court's Order. Paragraph 5 also sets forth conclusions of law to which no response is required.

6.      Venue is proper in this District pursuant to Section 22 of the Securities Act and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b) and (c). In addition, a Fisker manufacturing plant, located at 801 Boxwood Road, Wilmington, Delaware, was purchased in October 2009 with approximately $21.5 million in Delaware state subsidies.

**ANSWER**:  Paragraph 6 contains allegations that do not require a response by Daubenspeck in light of the Court's Order.  Paragraph 6 also sets forth conclusions of law to which no response is required.  To the extent an answer is required, Daubenspeck is without knowledge or information sufficient to admit or deny the allegations in paragraph 6, except that a Fisker Automotive manufacturing plant was located in Wilmington, Delaware.

7.     In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications, and the Internet.

**ANSWER**:  To the extent that paragraph 7 contains allegations regarding control, those allegations are legal conclusions to which no response is required.  To the extent an answer is required, Daubenspeck is without knowledge or information sufficient to admit or deny the allegations in paragraph 7, except Daubenspeck denies that he used the mail system, telephone, or the Internet to communicate anything about Fisker Automotive that was materially false or materially incomplete.

## PARTIES AND RELEVANT NON-PARTIES

8.     Plaintiff PEAK6 Opportunities Fund L.L.C. ("PEAK6") is an Illinois-based entity. PEAK6 invested in Fisker Automotive Securities as follows: (i) $3 million on or about April 27, 2011; (ii) $1.2 million on December 23, 2011; and (iii) $360,000 on or about September 15, 2012, for a total investment of approximately $4.6 million.

**ANSWER**:  Daubenspeck is without knowledge or information sufficient to admit or deny the allegations in paragraph 8.

9.     Plaintiff 8888 Investments GmbH ("8888 Investments") is a Swiss-based entity. 8888 Investments invested in Fisker Automotive Securities as follows: (i) $2,999,993 between April 27-29, 2011; (ii) $819,973 on December 23, 2011; (iii) $199,973 between March 15-30, 2012; and (iv) $592,895 between August 20, 2012 and September 18, 2012, for a total investment of approximately $4,612,834.

**ANSWER**:  Daubenspeck is without knowledge or information sufficient to admit or deny the allegations in paragraph 9.

10.     Plaintiff MCP Fisker ("MCP") is an Illinois-based entity. MCP invested in Fisker Automotive Securities as follows: (i) $1,000,001.96 between January and May 2010 (ii) $1,250,001.82 between November 2010 and March 2011 (iii) $1,150,000 on April 27, 2011; (iv) $1,360,000 on December 28, 2011; (v) $100,000 on January 30, 2012; (vi) $70,000 on March 30, 2012; and (vii) $387,000 on September 21, 2012, for a total investment of approximately $5,317,003.

**ANSWER**:  Daubenspeck is without knowledge or information sufficient to

admit or deny the allegations in paragraph 10.

11.     Plaintiff I2BF Global Investments, Ltd. ("I2BF") is a company organized under the laws of the Cayman Islands with limited liability. 12BF invested in Fisker Automotive securities as follows: (i) $7,900,000 on December 14, 2010; (ii) $3,160,000 on December 23, 2011; (iii) $6,065,000 on March 31, 2012; and (iv) $2,767,500 between September 5-24, 2012, for a total investment of approximately $19,892,500.

**ANSWER**:  Daubenspeck is without knowledge or information sufficient to

admit or deny the allegations in paragraph 11.

12.     Plaintiff ASC Fisker L.L.C. ("ASC") is a Florida-based entity. ASC invested in Fisker Automotive Securities as follows: (i) $2,683,000.49 between January and March 2010 (ii) $1,313,952.06 between November 2010 and March 2011 (iii) $654,817.97 between April 19-27, 2011; (iv) $1,818,486 between August 12, 2011 and October 31, 2011; (v) $233,901 on December 17, 2011; (vi) $8,172 on January 18, 2012; (vii) $841,548.13 between March 27-30, 2012; and (viii) $969,080.31 between September 4-21, 2012, for a total investment of approximately $8,522,957.

**ANSWER**:  Daubenspeck is without knowledge or information sufficient to

admit or deny the allegations in paragraph 12.

13.     Plaintiff CK Investments LLC ("CK Investments") is a Maryland-based entity. CK Investments invested in Fisker Automotive Securities as follows: (i) $1.5 million on April 13-20, 2011; (ii) $559,701 on December 21, 2011; (iii) approximately $400,000 on or about March 27, 2012; (iv) 108,008.93 on or about September 9, 2012; and (v) $188,000 on or about October 10, 2012, for a total investment of approximately $2,755,710.

**ANSWER**:  Daubenspeck is without knowledge or information sufficient to

admit or deny the allegations in paragraph 13.

14.     Plaintiff Atlas Management is the general partner and investment advisor to Plaintiff Atlas Fund (collectively, "Atlas"); both of which are based in Texas. Atlas invested in Fisker Automotive Securities as follows: (i) $1,005,000 on April 20, 2011; (ii) $374,986 on

December 27, 2011; (iii) $275,991.87 on March 29, 2012; and (iv) $352,351.79 on September 25, 2012, for a total investment of approximately $2,008,330.

      **ANSWER**:  Daubenspeck is without knowledge or information sufficient to admit or deny the allegations in paragraph 14.

      15.     Plaintiff David W. Raisbeck ("Raisbeck") is a resident of Florida. Mr. Raisbeck invested in Fisker Automotive Securities as follows: (i) $2,720,442.04 on or about April 14, 2011; (ii) $1,119,361.17 on December 27, 2011; and (iii) $335.923.32 between September 12-18, 2012, for a total investment of approximately $4,175,726.

      **ANSWER**:  Daubenspeck is without knowledge or information sufficient to admit or deny the allegations in paragraph 15.

      16.     Plaintiff Hunse Investments, L.P. ("Hunse Investments") is a Texas-based entity. Hunse Investments invested in Fisker Automotive Securities as follows: (i) $250,000 on or about April 19, 2011; (ii) $93,280 on December 27, 2011; (iii) $56,720.41 on or about March 28, 2012; and (iv) $45,015.72 September 18, 2012, for a total investment of $445,015.

      **ANSWER**:  Daubenspeck is without knowledge or information sufficient to admit or deny the allegations in paragraph 16.

      17.     Plaintiff Southwell Partners, L.P. ("Southwell") is a Texas-based entity. Southwell invested in Fisker Automotive Securities as follows: (i) $750,000 between April 13-19, 2011; (ii) $279,840 on or about January 18, 2012; (iii) $150,000 on or about March 30, 2012; and (iv) $128,996.21 or about September 20, 2012, for a total investment of approximately $1,308,836.

      **ANSWER**:  Daubenspeck is without knowledge or information sufficient to admit or deny the allegations in paragraph 17.

      18.     Plaintiff Sandor Master Capital Fund ("Sandor") is a Texas-based entity. Sandor invested in Fisker Automotive Securities as follows: (i) $702,160 between April 7-21, 2011; (ii) $261,990 on December 27, 2011; (iii) $200,111.80 on or about March 27, 2012; and (iv) $138,678.29 between September 4-18, 2012, for a total investment of approximately $1,302,943.

      **ANSWER**:  Daubenspeck is without knowledge or information sufficient to admit or deny the allegations in paragraph 18.

      19.     Plaintiff John S. Lemak ("Lemak") is a resident of Texas. Lemak invested in Fisker Automotive Securities through his personal individual retirement account ("IRA" and

personally as follows: (i) $201,000/$100,500 between April 11-21, 2011; (ii) $74,997/$37,399 between December 27-28, 2011; (iii) $49,651.80/$28,857.50 on March 27, 2012; and (iv) $2,772.39/$5,237.09 and $32,170.71/$29,804.96 between September 4-19, 2012, for a total investment of approximately $562,390.

**ANSWER**:  Daubenspeck is without knowledge or information sufficient to

admit or deny the allegations in paragraph 19.

20.     Plaintiff Pinnacle Family Office Investments, L.P. ("Pinnacle") is a Texas-based entity. Pinnacle invested in Fisker Automotive Securities as follows: (i) $4,000,001.84 on or about April 15, 2011; (ii) $1,448,239 on December 27, 2011; (iii) $1,551,760.25 on or about March 29, 2012; and (iv) $927,662.47 on or about September 17, 2012, for a total investment of approximately $8 million.

**ANSWER**:  Daubenspeck is without knowledge or information sufficient to

admit or deny the allegations in paragraph 20.

21.     Plaintiff Dane Andreeff ("Andreeff") is a resident of Florida. Andreeff invested in Fisker Automotive Securities as follows: (i) $500,000 on April 20, 2011; (ii) $86,560 on December 28, 2011; and (iii) $50,000 on March 27, 2012, for a total investment of approximately $636,560.

**ANSWER**:  Daubenspeck is without knowledge or information sufficient to

admit or deny the allegations in paragraph 21.

22.     Plaintiff SAML Partners ("SAML Partners") is a California-based entity. SAML Partners invested in Fisker Automotive Securities as follows: (i) $250,000 on April 11, 2011; (ii) $93,280 on December 23, 2011; and (iii) $27,993.80 between September 4 and September 19, 2012, for a total investment of approximately $371,993.

**ANSWER**:  Daubenspeck is without knowledge or information sufficient to

admit or deny the allegations in paragraph 22.

23.     Plaintiff Kenneth & Kimberly Roebbelen Revocable Trust of 2001 ("KKRR Trust") is a California-based entity. The KKRR Trust invested in Fisker Automotive Securities as follows: (i) $500,000 on April 7, 2011; (ii) $186,560 on December 20, 2011; and (iii) $100,000 on March 28, 2012, for a total investment of $786,560.

**ANSWER**:  Daubenspeck is without knowledge or information sufficient to

admit or deny the allegations in paragraph 23.

24.    Plaintiff Brian Smith ("Smith") is a resident of Utah. Smith invested in Fisker Automotive Securities as follows: (i) $250,000 on April 11, 2011; (ii) $93,800 on December 21, 2011; and (iii) $24,074.67 on March 28, 2011, for a total investment of $367,874.

**ANSWER**:  Daubenspeck is without knowledge or information sufficient to admit or deny the allegations in paragraph 24.

25.    Non-Party Fisker Automotive is a Delaware corporation which had its principal place of business located at 5515 E. La Palma Ave, Anaheim, CA 92807, and also engaged in business activities in this District.  Fisker was engaged in the design and development of plug in hybrid cars, which it named the Karma and the Nina, with the intention to build and sell the vehicles commercially.  On November 22, 2013, Fisker Automotive filed for bankruptcy protection in the United States Bankruptcy Court for the District of Delaware, Case No. 13-13087-KG. Accordingly, Fisker Automotive is not named as a defendant herein.

**ANSWER**:  Daubenspeck admits the allegations in the first sentence of paragraph 25.  With respect to the second sentence of paragraph 25, Daubenspeck admits that Fisker Automotive was engaged in the business of developing hybrid electric cars, but is without knowledge or information sufficient to admit or deny the remaining allegations in the second sentence of paragraph 25.  With respect to the third sentence of paragraph 25, Daubenspeck admits that Fisker Automotive filed for bankruptcy, but is without knowledge or information sufficient to admit or deny the remaining allegations in paragraph 25.  With respect to the last sentence of paragraph 25, Daubenspeck admits that Fisker Automotive is not named as a defendant in this action.  Daubenspeck is without knowledge or information sufficient to admit or deny the remaining allegations of paragraph 25.

26.    Defendant Henrik Fisker ("Fisker") was a co-founder and director of Fisker Automotive. He was also Fisker Automotive's Chief Executive Officer from its inception through February 2012.

**ANSWER**:  Daubenspeck admits the allegations in paragraph 26.

27.    Defendant Bernhard Koehler ("Koehler") was a co-founder of Fisker Automotive's predecessor entity, Fisker Coachbuild, LLC, and was Fisker Automotive's Chief Operating Officer at all relevant times.

**ANSWER**:  Daubenspeck admits that defendant Bernhard Koehler was Fisker

Automotive's Chief Operating Officer.  Daubenspeck is without knowledge or information

sufficient to admit or deny the remaining allegations contained in Paragraph 27.

28.     Defendant Joe DaMour ("DaMour") was Fisker Automotive's Chief
Financial Officer from approximately January 2010 through July 2012, after which he acted as a
"special adviser" to the Company. DaMour is named as a defendant in connection with
materially false and/or misleading statements made to Plaintiffs as alleged herein during the time
of his employment with Fisker Automotive.

**ANSWER**:  Daubenspeck admits that defendant Joe DaMour was Fisker

Automotive's Chief Financial Officer.  Daubenspeck is without knowledge or information

sufficient to admit or deny the remaining allegations contained in Paragraph 28.

29.     Defendant Kleiner Perkins Caufield & Byers, LLC ("KPCB LLC") is a the
venture capital firm with its headquarters in Menlo Park, CA, and was a controlling shareholder
of Fisker Automotive at all relevant times. The profile of Kleiner Perkins partner Trae Vassallo
on CrunchBase, a database about technology companies, people and investors, states that since
joining Kleiner Perkins in 2002, Vassallo has "work[ed] closely with the management teams of
[among others] Fisker Automotive." Kleiner Perkins was a control person of Fisker Automotive
not just because of its ownership of a controlling block of Fisker Automotive stock, but also
because, through Keith Daubenspeck, discussed below, KPCB LLC controlled the actions of
Advanced Equities, Inc. ("Advanced Equities" or "AEI"), also discussed below, in connection
with Fisker Automotive. AEI had the highest percentage voting power of Fisker Automotive
preferred stock of any investor – owning over 25% of Fisker Automotive's preferred stock
between January 2010 and September 2012 as of December 2011.

**ANSWER**:  To the extent that paragraph 29 contains allegations regarding

control, those allegations are legal conclusions to which no response is required.  To the extent

an answer to such allegations is required, Daubenspeck denies them.  Daubenspeck denies the

remaining allegations in paragraph 29, except Daubenspeck admits that Defendant Kleiner

Perkins Caufield & Byers, LLC is a venture capital firm with its headquarters in Menlo Park,

California.

30.     Kleiner Perkins is the umbrella entity through which the various LLCs
described below were managed and operated, including conduct such as paying rent, salaries,
and other expenses associated with the overall operations of these various LLCs.

**ANSWER**:  Daubenspeck is without knowledge or information sufficient to admit or deny the allegations contained in Paragraph 30.

31.     Defendant Kleiner Perkins Caufield & Byers XII, LLC ("KPCB XII") is a fund that accepted capital from, *inter alia*, institutional investors and university endowments and others who are limited partners in that fund. Between December 2008 and October 2012, KPCB XII invested approximately $61.5 million in Fisker Automotive through stock purchases and bridge loans.

**ANSWER**:  Daubenspeck is without knowledge or information sufficient to admit or deny the allegations contained in Paragraph 31.

32.     Defendant Kleiner Perkins Caufield & Byers XIII, LLC ("KPCB XIII") is a fund that accepted capital from, *inter alia*, institutional investors and university endowments and others who are limited partners in that fund. Between December 2008 and October 2012, KPCB XII invested approximately $44.5 million in Fisker Automotive through stock purchases and bridge loans.

**ANSWER**:  Daubenspeck is without knowledge or information sufficient to admit or deny the allegations contained in Paragraph 32.

33.     Defendant Kleiner Perkins Caufield & Byers Associates XII, LLC ("KPCB Associates XII") is an entity that, *inter alia*, managed the investments of KPCB XII. Kleiner Perkins partners Defendant Ray Lane, John Doerr, Theodore Schlein, Brook Byers, and Joseph Lacob (collectively referred to as the "KPCB Managing Members") made the actual investment decisions.

**ANSWER**:  Daubenspeck is without knowledge or information sufficient to admit or deny the allegations contained in Paragraph 33.

34.     Defendant Kleiner Perkins Caufield & Byers Associates XIII, LLC ("KPCB Associates XIII") is an entity that, *inter alia*, managed the investments of KPCB XIII with the same KPCB Managing Members making the actual investment decisions.

**ANSWER**:  Daubenspeck is without knowledge or information sufficient to admit or deny the allegations contained in Paragraph 34.

35.     Defendants KPCB, LLC, KPCB XII, KPCB Associates XII, KPCB XIII, and KPCB Associates XIII are collectively referred to as "Kleiner Perkins."  In addition to the KPCB Managing Members, Kleiner Perkins created a group of partners sometimes called the Fisker Working Group ("KPCB FWG"), comprised of primarily Defendant Lane, Kleiner Perkins' Chief Operating Officer Erick Keller ("Keller"), and Kleiner Perkins partners Trae

Vassallo ("Vassallo"), and Ryan Popple ("Popple") who, *inter alia*, maintained constant contact with Fisker Automotive, directed capital funding issues, participating in meetings of Fisker Automotive's Board of Directors, and advised, directed, and/or controlled the Company's operations as described herein. Throughout the relevant time period, Kleiner Perkins would bring in additional Kleiner Perkins partners, such as John Denniston, to assist in certain matters such as the negotiations concerning Fisker Automotive's $528 million loan agreement with the U.S. Department of Energy ("DOE") under its Advanced Technology Vehicles Manufacturing Loan Program (the "ATVM Loan").

**ANSWER**: Daubenspeck admits that the first sentence of paragraph 35 purports to define Defendants KPCB, LLC, KPCB XII, KPCB Associates XII, KPCB XIII, and KPCB Associates XIII collectively as "Kleiner Perkins." Daubenspeck is without knowledge or information sufficient to admit or deny the remaining allegations contained in Paragraph 35.

36.     In addition to his role as a KPCB Managing Member of KPCB Associates XII and XIII, Defendant Ray Lane was a Managing Partner of Kleiner Perkins and also was designated by Kleiner Perkins to be their representative director on Fisker Automotive's Board of Directors. Defendant Lane was Fisker Automotive's Chairman of the Board of Directors at all relevant times. Lane spoke on behalf of Fisker Automotive on numerous occasions and in numerous press reports and was actively involved in negotiating the ATVM Loan with DOE along with Denniston as described above, and Doerr who was appointed to the President's Economic Recovery Advisory Board in February 2009. Lane was a control person of Fisker Automotive not just because of his board position, but also because he controlled Kleiner Perkins and, through Kleiner Perkins, also controlled Fisker Automotive through Advanced Equities, as described below. As Chairman of Fisker Automotive's board of directors, Lane drafted and/or approved the offering materials and documents made available to Plaintiffs in connection with the offerings of Fisker Automotive Securities, including, but not limited to, the relevant: Confidential Private Placement Memoranda ("CPPM"); Disclosure and Notice Statements ("DNS"); Preferred Stock Purchase Agreements (the "Purchase Agreement"); and Schedules of Exceptions to the Preferred Stock Purchase Agreements ("SOE").

**ANSWER**:  To the extent that paragraph 36 contains allegations regarding control, those allegations are legal conclusions to which no response is required.  Daubenspeck is without knowledge or information sufficient to admit or deny the remaining allegations contained in Paragraph 36, except Daubenspeck admits that defendant Ray Lane was Fisker Automotive's Chairman of the Board of Directors.

37.     In addition, Kleiner Perkins' control over the Company is demonstrated by its control over all material aspects of Fisker Automotive's operations including: mandating cash preservation requirements on the Company's payroll and supplier bills; mandating design and

engineering changes to the Karma when Kleiner Perkins determined that Karma's costs were too high for the Karma to be profitable; and negotiating agreements with the Company's suppliers. As a controlling shareholder, Kleiner Perkins also drafted, participated in the drafting of, and/or approved the Purchase Agreements, CPPMs, DNSs, and SOEs were updated and issued in connection with each offering.

ANSWER: To the extent that paragraph 37 contains allegations regarding

control, those allegations are legal conclusions to which no response is required.  To the extent

an answer is required, Daubenspeck is without knowledge or information sufficient to admit or

deny the allegations contained in Paragraph 37.

38.    Defendant Richard Li Tzar Kai ("Li"), a controlling shareholder of Fisker Automotive, invested in Fisker Automotive through an investment vehicle he 100% owned named Ace Strength Ltd ("Ace"). Li was also a member of Fisker Automotive's Board of Directors at all relevant times until his resignation as a director of Fisker Automotive effective July 15, 2011, and thereafter continued to attend and/or participate, both in person and by proxy, in various Fisker Automotive Board of Director meetings at all other relevant times. As a controlling shareholder, Li also drafted, participated in the drafting of, and/or approved the Purchase Agreements, CPPMs, DNSs, and SOEs that were updated and issued in connection with each offering.

ANSWER: To the extent that paragraph 37 contains allegations regarding

control, those allegations are legal conclusions to which no response is required.  To the extent

an answer is required, Daubenspeck is without knowledge or information sufficient to admit or

deny the allegations contained in Paragraph 38, except Daubenspeck admits that Richard Li Tzar

Kai was a member of Fisker Automotive's Board of Directors.

39.    Defendant Keith Daubenspeck ("Daubenspeck") was a member of Fisker Automotive's Board of Directors and Co-founder of AEI, Fisker Automotive's private placement agent for each of the offerings of Fisker Automotive preferred stock -- from which it earned in excess of $60 million in fees. In addition to acting as the placement agent for Fisker Automotive's offerings, Daubenspeck directed AEI's formation of its own investment entities called special purpose vehicles (the "AEI SPVs") formed for the express purpose of attracting large numbers of smaller investors who purchased "membership units" in the SPVs to provide capital to Fisker Automotive. These SPVs gave Daubenspeck and AEI a controlling stake in Fisker Automotive because AEI, through Daubenspeck as the managing member of the AEI SPVs, was entitled to vote the shares held by the AEI SPVs upon which the membership units were based. AEI was Fisker Automotive's primary source for raising capital from outside investors, raising approximately $800 million for Fisker Automotive from outside investors like

Plaintiffs – including approximately $250 million from the approximately 1,300 investors who purchased membership units in the AEI SPVs.

**ANSWER**:  Daubenspeck denies the allegations in paragraph 39, except

Daubenspeck admits only that he was a member of Fisker Automotive's Board of Directors from

January 2010 to early May 2011; that he was one of the founders of AEI; that AEI was registered

as a broker-dealer and an investment adviser with the SEC; that Fisker Automotive retained the

services of AEI in connection with the sale of securities issued by Fisker Automotive; and that

AEI formed SPVs for the purposes of facilitating investments in Fisker Automotive.

Daubenspeck is without knowledge or information sufficient to admit or deny the allegations in

the last sentence of paragraph 39, except Daubenspeck admits that AEI was Fisker Automotive's

primary placement agent for its preferred stock offerings.

40.      AEI shuttered its operations in November 2012, after the SEC charged it and its co-founders, Defendant Daubenspeck and Dwight Badger, with misleading investors in connection with two private placement offerings in 2009 and 2010 for Bloom Energy, another green energy company controlled by Kleiner Perkins. The SEC censured Advanced Equities in September 2012 as part of a Cease and Desist Order ("AEI CDO") and fined it $1 million; fined Badger $100,000 and barred him from the securities industry; and fined Daubenspeck $50,000 and suspended him from the securities industry for one year based on Daubenspeck's direct and knowing participation in Badger's unlawful actions. Advanced Equities ceased operations shortly thereafter and is now defunct. Accordingly, Advanced Equities is not named as a defendant herein. According to the AEI CDO, Daubenspeck "had final approval for all management decisions within Advanced Equities. . . . [and] directly supervised Advanced Equities' investment bankers."

**ANSWER**:  Daubenspeck admits the AEI closed its operations in or around

November 2012.  Daubenspeck admits that AEI settled an administrative action filed by the

SEC, *In the Matter of Advanced Equities, Inc., et al.*, Admin. Proceeding No. 3-15031 (Sept. 18,

2012) ("Administrative Action").   The terms of that settlement are described in the Order

Instituting Proceedings ("OIP") that was filed in the Administrative Action.  Daubenspeck refers

to the OIP for the true and correct terms of the OIP and denies any inaccurate characterization or

interpretation of the settlement terms when the OIP is read in context and in its entirety.

Daubenspeck admits that as part of the settlement of the Administrative Action, he agreed to a suspension of twelve months and to a $50,000 fine.  Daubenspeck denies the remaining allegations in paragraph 40.

41.     At all relevant times, Daubenspeck: (i) was a director of Fisker Automotive or an observer at its Board meetings; and (ii) directed AEI's controlling voting stake in Fisker Automotive's preferred stock. According to a February 16, 2012 e-mail produced by DOE in this action, he stated to DOE that his role at Fisker was "completely *passive. . . . [and that] AEI follows Kleiner's lead with regard to investing in Fisker*." (Emphasis added.). As a result of these positions, Daubenspeck was privy to material inside information about Fisker Automotive, including material adverse information that was not disclosed to Fisker Automotive's outside investors.

**ANSWER**:  To the extent that paragraph 41 refers to a February 16, 2012 email from Daubenspeck to representatives of the DOE, Daubenspeck refers to that email for its true and correct contents and denies any inaccurate characterization or interpretation of that email when read in context and in its entirety.  Daubenspeck admits that he was a member of Fisker Automotive's Board of Directors from January 2010 to early May 2011, and was a Board observer for a period of time thereafter.  Daubenspeck denies the remaining allegations in paragraph 41.

42.     [1] As a Fisker Automotive Board member and AEI principal controlling AEI's voting stake in Fisker Automotive, Daubenspeck drafted and/or approved the Purchase Agreements, CPPMs, DNSs, and SOEs which were updated and issued in connection with each offering. [2] The Purchase Agreements, CPPMs, DNSs, and SOEs were updated and issued in connection with each offering. [3] As described below, these documents contained materially false and misleading information and omitted material information. [4] Among other things, AEI used its proprietary web-based portal, the Venture Gateway, to make all offering materials for Fisker Automotive Securities available to outside investors like Plaintiffs. [5] According to AEI, the Venture Gateway "provide[d] an innovative way to connect institutional and other high-net-worth investors with late-stage private equity opportunities, by providing a level of transparency not previously found in the venture capital industry." [6] In sum, Daubenspeck was an insider and control person of Fisker Automotive due to his role as a director of Fisker Automotive and through his control of the Fisker Automotive preferred stock held by the AEI SPVs.

**ANSWER**:  The first sentence of paragraph 42 sets forth conclusions of law to which no response is required.  To the extent an answer to those allegations is required, the

allegations are denied.  Daubenspeck admits the second sentence of paragraph 42.  The third

sentence of paragraph 42 sets forth conclusions of law to which no response is required.  To the

extent an answer to those allegations is required, the allegations are denied.  Daubenspeck admits

the fourth sentence of paragraph 42.  The fifth sentence of paragraph 42 quotes from an

unidentified document to which Daubenspeck refers for its true and correct contents and denies

any inaccurate characterization or interpretation of that document when read in context and in its

entirety.  The sixth sentence of paragraph 42 sets forth a conclusion of law to which no response

is required.  To the extent an answer to those allegations is required, the allegations are denied.

Daubenspeck denies any remaining allegations in paragraph 42.

      43.    Defendant Peter McDonnell was the senior managing director in the
investment banking group at Advanced Equities and was responsible for, *inter alia*, marketing
Fisker Automotive's Securities. As detailed below, Defendant McDonnell spoke on numerous
conference calls with Fisker Automotive investors. By Order of the Court dated September 9,
2015 (D.I. 70; the "Order"), the Court dismissed McDonnell as a defendant. McDonnell is
named herein solely to preserve Plaintiffs' rights in connection with any appeal of the Order.

      **ANSWER**:  Paragraph 43 contains allegations that do not require a response by

Daubenspeck in light of the Court's Order.  To the extent an answer is required, Daubenspeck

admits that Peter McDonnell held the title of Senior Managing Director of Investment Banking at

Advanced Equities.  Daubenspeck also admits that by Order of the Court dated September 9,

2015, the Court dismissed McDonnell as a defendant.  Daubenspeck is without knowledge or

information sufficient to admit or deny the remaining allegations in paragraph 43.

      44.    Non-party Orrick, Herrington & Sutcliffe LLP ("Orrick") is an
international law firm with its headquarters in San Francisco, California. An Orrick partner,
Mitchell Zuklie ("Zuklie"), was at relevant times Secretary and/or Assistant Secretary of the
Company's Board of Directors. Orrick represented Defendant Kleiner Perkins in connection with
Kleiner Perkins' first investment in Fisker Automotive in January 2008 under an open ended
general engagement agreement. In or around early 2009, Orrick became Fisker Automotive's
outside counsel.

**ANSWER**:  Daubenspeck admits that Orrick is an international law firm with its headquarters in San Francisco, California.  Daubenspeck is without knowledge or information sufficient to admit or deny the remaining allegations in paragraph 44.

45.     Non-party Middlebury and its affiliates are Delaware limited liability companies, which entered into sub-placement agreements with AEI and were also used by AEI and/or Fisker Automotive to raise capital.

**ANSWER**: Daubenspeck admits that Fisker Automotive retained the services of Middlebury Group Securities LLC and Middlebury Ventures II LLC (together, hereinafter "Middlebury") in connection with the sale of securities issued by Fisker Automotive. Daubenspeck is without knowledge or information sufficient to admit or deny the remaining allegations in paragraph 45.

46.     Unless otherwise defined, Defendants means all defendants except KPCB XII, KPCB Associates XII, KPCB XIII, KPCB Associates XIII and McDonnell.

**ANSWER**: Daubenspeck admits that paragraph 46 purports to define Defendants as all defendants except KPCB XII, KPCB Associates XII, KPCB XIII, KPCB Associates XIII and McDonnell.  Daubenspeck denies the remaining allegations in paragraph 46.

## FACTUAL ALLEGATIONS

**Summary of Plaintiffs' Claims**

47.     The claims at issue in this case concern six Fisker Automotive Securities offerings: (i) the Series A-1 round of convertible preferred stock, opened on or around August 19, 2009 and with a final close on or around May 5, 2010 (the Series A-1 Round"); (ii) the Series B-1 round of convertible preferred stock, opened on or around November 1, 2010 and closed on or around March 16, 2011 (the "Series B-1 Round"); (iii) the Series C-1 Round of convertible preferred stock, opened on or around April 1, 2011 and closed on or about May 4, 2011 (the "Series C-1 Round"); (iv) the Series D-1 Round of convertible preferred stock, opened on or around September 15, 2011 and closed on December 2, 2011 (the "Series D-1 Round"), and the subsequent mandatory capital call announced in mid-December 2011 and closed on January 20, 2012 (the "December Capital Call"); (v) the Series D-1 Extension Round of convertible preferred stock, opened on or around March 5, 2012 and closed on or about March 31, 2012 (the "Series D-1 Extension"); and (vi) the Series E-1 Round of unsecured subordinated convertible promissory notes and preferred stock, opened on or around August 24, 2012 and closed on or around September 26, 2012 (the "Series E-1 Round").

**ANSWER**:  Paragraph 47 purports to be a summary of the claims that Plaintiffs seeks to bring in this action, to which no response is required.  To the extent an answer is required, Daubenspeck admits that Plaintiffs seek to bring claims arising out of the referenced financings, but denies that Plaintiffs are entitled to any such relief.

48.     Defendants made, approved, caused to be made, and/or assisted in making, numerous materially false and/or misleading statements of present, material fact and risks in the CPPMs, DNSs, and SOEs issued in connection with these offerings about: (i) the status of the ATVM Loan and Fisker Automotive's compliance with the terms of the ATVM Loan; and (ii) Fisker Automotive's operating results, financial results, financial condition, and controls.

**ANSWER**: Paragraph 48 sets forth conclusions of law to which no response is required.  To the extent an answer to the allegations in paragraph 48 is required, Daubenspeck denies those allegations.

49.     Defendants and the Company also stated, approved, and/or caused to be stated in the purchase agreement for the Fisker Automotive preferred stock in each offering (the "Purchase Agreements") that: "None of the Transaction Agreements nor any other documents delivered in connection with the transactions contemplated by the Transaction Agreements contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements herein and therein not misleading."

**ANSWER**:  To the extent that paragraph 49 refers to certain provisions of the Purchase Agreements, Daubenspeck refers to the Purchase Agreements for their true and correct contents and denies any inaccurate characterization or interpretation of the Purchase Agreements when read in context and in their entirety.  Daubenspeck denies the remaining allegations in paragraph 49.

50.     The Purchase Agreements also expressly stated that "The Knowledge of the Company shall mean the Knowledge of" Defendants Henrik Fisker, Bernhard Koehler, and Joseph DaMour, except for the Series A-1 Round Purchase Agreement and the Series E-1 Round Purchase Agreement, which did not include Defendant DaMour in the definition of Knowledge.

**ANSWER**: To the extent that the allegations in paragraph 50 refer to a particular provision of the Purchase Agreements, Daubenspeck refers to the Purchase Agreements for their true and correct contents and denies any inaccurate characterization or interpretation of the

Purchase Agreements when read in context and in its entirety.  Daubenspeck is without

knowledge or information sufficient to admit or deny the remaining allegations in paragraph 50.

51.     Defendants required that investors certify that they were relying on the
final offering documents (including any exhibits to those offering documents), which were
accessible through and maintained on AEI's Venture Gateway. As stated in the CPPMs and
DNSs issued in connection with the offerings, if revised versions of the offering documents were
circulated prior to the closing of any offering, potential investors were permitted to "rescind any
previously executed signature pages evidencing offers to purchase [Fisker Automotive
Securities] . . . prior to the stated time and date of the applicable Closing."

**ANSWER**:  To the extent that Paragraph 51 refers to particular provisions of the

CPPMs and DNSs, Daubenspeck refers to the CPPMs and DNSs for their true and correct

contents and denies any inaccurate characterization or interpretation of the CPPMs and DNSs

when read in context and in their entirety.  Daubenspeck is without knowledge or information

sufficient to admit or deny the remaining allegations in paragraph 51, except Daubenspeck

admits that the final offering documents for each stock offering were accessible through its

Venture Gateway.

52.     Defendants made statements and disclosures regarding Fisker
Automotive's compliance with, and the status of, the ATVM Loan in Fisker Automotive's
CPPMs, DNSs, and SOEs, and on investor conference calls (all of which were maintained on
AEI's Venture Gateway), that were materially false and misleading because Defendants failed to
disclose the following material facts:

       a.   Defendants misled DOE with respect to the Business Plan they
submitted to DOE in August 2009 in connection with Fisker
Automotive's application for a conditional commitment letter from
DOE (the "CCL") for the ATVM Loan. The Business Plan falsely and
without basis projected the Company as selling 6,000 Karmas in 2010.
The August 20, 2009 Series A-1 Round CPPM reflected the same
figure. In fact, on or about July 27, 2009, the manufacturing facility
contracted by Fisker Automotive to build the Karma, Valmet
Automotive, Inc. ("Valmet"), expressly told Defendant Koehler that
the 6,000 Karma volume projection in the Business Plan "was not
feasible" because of the delays caused by, *inter alia*, the Company's
lack of payment to Valmet (an issue with other suppliers as well) and
the fact that the design of the Karma had not been finalized.

    b.   On December 19, 2009, Thomas Fritz, Fisker Automotive's Director
of Engineering, and John Kwapis, Director of Purchasing, delivered a
report to the Company demonstrating that the Supplier Engineering
Design & Development ("ED&D") costs for the Karma and the Nina
in the Business Plan given to the DOE in connection with the ATVM
Loan application were materially understated by well over $100
million, and as a result, the Company had violated the ATVM Loan
terms by not disclosing this material error to the DOE.

    c.   After the DOE issued the CCL in September 2009, the Karma project
remained halted and delayed due to the Company's failure to pay
suppliers and designers. Defendants misled DOE, and investors, as to
the readiness of the Karma project, concealing from them that it was
impossible for the Company to achieve *any* of the Karma project
milestones in, *inter alia*, the April 15, 2010 Business Plan incorporated
required under the terms of the ATVM Loan. Defendants further
violated the terms of the ATVM Loan by failing to disclose the fact
that the Company failed to meet any of the required pre-production
Karma project milestones as well as the milestone under the ATVM
Loan requiring commencement of commercial production of the Fisker
Karma by February 28, 2011 (the "Karma Production Milestone");

    d.   Fisker Automotive executives falsely told the DOE in a March 2011
presentation that Fisker Automotive had met that Karma Production
Milestone; and

    e.   When the DOE discovered in June 2011 that the Karma Production
Milestone had in fact not been met, DOE immediately took "decisive
action" and "halted further funding of" the ATVM Loan.

    (The above five items, a.-e., are referred to collectively as the "ATVM
Loan Omissions").

**ANSWER**: Paragraph 52 sets forth conclusions of law to which no response is

required.  To the extent an answer is required, Daubenspeck denies the allegations in paragraph

52

    53.    Defendants also made statements and disclosures regarding Fisker
Automotive's operating results, financial results, financial condition, and controls in, *inter alia*,
Fisker Automotive's CPPMs, DNSs, and SOEs and on investor conference calls (maintained on
AEI's Venture Gateway) that were materially false and misleading because Defendants failed to
disclose the following material facts:

    a.    As of October 31, 2011, DOE had discovered that Fisker Automotive's
lack of accounting controls and inability to track its contractual

obligations with suppliers had caused Fisker Automotive to order tens of millions of dollars in excess and unusable inventory as of October 2011 – including, for example, $30 million of batteries and other parts already received. This control failure led to an undisclosed $120 million in past due accounts payable as of November 2011, causing a liquidity crisis and bringing Fisker Automotive to the brink of insolvency;

    b.    Fisker Automotive's controls were so structurally deficient that Fisker Automotive had ordered (or was contractually obligated to purchase) several hundred million dollars in unusable inventory while at the same time the Company was unable to ascertain or fully account for its payment obligations – which Fisker Automotive nonetheless had to pay lest Fisker Automotive's outside manufacturer ("Valmet") and suppliers stop production of the Karma;

    c.    The Company maintained an undisclosed "suspense account", discovered by the DOE in November 2011, through which the Company materially understated its accounts payable on its financial statements by approximately $40 million; and

    d.    In or around early January 2012, DOE refused to resume funding Fisker Automotive – not because of "politics" as Fisker Automotive executives stated on conference calls with investors – but rather because of Fisker Automotive's inability to remedy these structural control deficiencies

    (The above four items, a.-d., are referred to collectively as the "Cash Burn Omissions").

    **ANSWER**: Paragraph 53 sets forth conclusions of law to which no response is

required. To the extent an answer is required, Daubenspeck denies the allegations in paragraph

53.

    54.    Until the close of any offering, Fisker Automotive and Defendants issued, or caused to be issued, updated offering documents including, but not limited to, revised SOEs reflecting any new material information or material changes to prior disclosures. In particular, the Company and Defendants used the SOEs as a vehicle to clarify or expand upon material statements or omissions made by Fisker Automotive's directors or officers to investors and/or the public. For example, the SOEs contain disclosures clarifying or expanding upon the numerous public statements by Defendant Lane concerning the prospects for the Company's initial public offering, the Company's future valuation, and sales projections for the Karma. As such, Defendants undertook the responsibility and duty, *inter alia*, to correct the aforementioned materially false and misleading statements made on the investor conference calls related to the ATVM Loan Omissions and Cash Burn Omissions, as well as the statements contained in the

offering documents made materially false and misleading by the ATVM Loan Omissions and Cash Burn Omissions.

      **ANSWER**: The allegations in paragraph 54 set forth legal conclusions to which no response is required.  To the extent that paragraph 54 refers to or describes the purported purpose of the offering documents, Daubenspeck refers to the offering documents for their true and correct contents and denies any inaccurate characterization or interpretation of the offering documents when read in context and in their entirety.  Daubenspeck denies the allegations in paragraph 54, except Daubenspeck admits that until the close of any offering, Fisker Automotive issued updated offering documents reflecting any new material information or material changes to prior disclosures.

## I. Fisker Automotive's Beginnings

      55.    Fisker Coachbuild LLC, ("Fisker Coachbuild") the predecessor to Fisker Automotive, was founded in early 2003 by Defendants Henrik Fisker and Bernhard Koehler with a focus on creating new exterior car designs while utilizing existing luxury car engineering.

      **ANSWER**:  Daubenspeck is without knowledge or information sufficient to admit or deny the allegations in paragraph 55.

      56.    On August 7, 2007, Quantum Fuel Systems Technologies Worldwide, Inc. ("Quantum Fuel Systems") (NASDAQ: QTWW) and Fisker Coachbuild, launched Fisker Automotive as a new venture to produce premium plug-in hybrid automobiles with Henrik Fisker as the CEO and Koehler as the Chief Operating Officer ("COO"). Fisker Coachbuild remained a separate entity that would also provide design services for Fisker Automotive to develop the Company's vehicles, including the Karma.

      **ANSWER**:  Daubenspeck is without knowledge or information sufficient to admit or deny the allegations in paragraph 56.

      57.    Quantum Fuel Systems stated in Form 10-Q for the quarter ended October 31, 2007 that:

> Initial deliveries of a four-door sports sedan are anticipated to commence in December 2009. Upon formation, [Quantum Fuel Systems] owned 62% of the issued and outstanding capital stock of Fisker Automotive. On November 21, 2007, Fisker Automotive sold $5.5 million of convertible preferred stock in a

Series A financing, which reduced [Quantum Fuel Systems'] ownership percentage to 47.5%. The preferred shareholders have voting rights that are similar to the common shareholders. [Quantum Fuel Systems] has the right to appoint two of Fisker Automotive's five members of the Board of Directors. Fisker Automotive will need to raise a substantial amount of additional capital in order to complete future phases of development, testing and tooling for the new vehicle platform, which will further reduce the Company's ownership percentage in Fisker Automotive.

**ANSWER**: To the extent the allegations in Paragraph 57 refer to statements in the Form 10-Q of Quantum Fuel Systems for the quarter ended October 31, 2007, Daubenspeck refers to that document for its true and correct contents and denies any inaccurate characterization or interpretation of that document when read in context and in its entirety. Daubenspeck is without knowledge or information sufficient to admit or deny the remaining allegations in paragraph 57.

58.     In November 2007, in conjunction with its investment in Fisker Automotive, Quantum Fuel Systems also began providing preliminary concept development services to Fisker Automotive for a production intent hybrid-electric vehicle under a $1.0 million arrangement. Quantum Fuel Systems stated in the Form 10-Q referenced above that "[w]e anticipate expanding our services beyond this initial arrangement to develop the powertrain and software control systems for the new vehicle platform over the next twelve months."

**ANSWER**:  To the extent the allegations in Paragraph 58 refer to statements in the Form 10-Q of Quantum Fuel Systems for the quarter ended October 31, 2007, Daubenspeck refers to that document for its true and correct contents and denies any inaccurate characterization or interpretation of that document when read in context and in its entirety. Daubenspeck is without knowledge or information sufficient to admit or deny the remaining allegations in paragraph 58.

59.     In January 2008, Fisker Automotive completed a $20 million Series B round of financing, including investments from Palo Alto Investors, Gentry Venture Partners, and Defendant Kleiner Perkins. Assisting Kleiner Perkins with its investment were Harold Yu ("Yu") and Zuklie, who were partners at Orrick. Kleiner Perkins had an open ended general engagement agreement with Orrick for investment matters like Fisker Automotive. During that financing round, Kleiner Perkins made its first investment of more than $10 million in Fisker Automotive. Shortly thereafter, Lane was appointed to Fisker Automotive's Board of Directors.

**ANSWER**:  Daubenspeck is without knowledge or information sufficient to admit or deny the allegations in paragraph 59.

60.    That same month, Fisker Automotive unveiled the Fisker Karma at the North American International Auto Show in Detroit, Michigan to rave reviews. In addition, as stated in the January 2008 edition of Car and Driver Magazine, "[t]he good news is the Karma is more than a design concept—the car on display in Detroit is a signed-off design—essentially a pre-production car that will change very little before it goes on sale."

**ANSWER**:  To the extent the allegations in Paragraph 60 refer to statements in the January 2008 edition of Car and Driver Magazine, Daubenspeck refers to that article for its true and correct contents and denies any inaccurate characterization or interpretation of that article when read in context and in its entirety.  Daubenspeck is without knowledge or information sufficient to admit or deny the remaining allegations in paragraph 60.

61.    As Car and Driver wrote in its December 2008 edition:

When Fisker first showed us the sexy, low-slung Karma plug-in hybrid concept at the 2008 Detroit auto show, we immediately put it into the 'we'll believe it when we see it' file. After all, as talented as Henrik Fisker is at design (he penned the Aston Martin V-8 Vantage and BMW Z8, among others), we weren't sure of his ability to get something as technically challenging as a plug-in hybrid luxury sports sedan to market. We were especially skeptical in light of claims of 50 miles on battery-only range, a 250-hp engine capable of extending the range and perking up performance, and an $80,000 asking price.

But Fisker has been busy at work turning his way-cool concept into an absolutely fabulous reality, and he returns to the Detroit show in early 2009 with the production version of the sporty Karma. (Emphasis added.)

**ANSWER**:  To the extent the allegations in Paragraph 61 refer to statements in the December 2008 edition of Car and Driver Magazine, Daubenspeck refers to that article for its true and correct contents and denies any inaccurate characterization or interpretation of that article when read in context and in its entirety.  Daubenspeck is without knowledge or information sufficient to admit or deny the remaining allegations in paragraph 61.

62.    The article also quoted Henrik Fisker, stating further that: "'In the year since we debuted the Karma, the reception we've received has been tremendous,' says Fisker.

'I'm proud to announce at this time that we are already sold out on the car until mid-2010.'
Customers have already preordered 1300 of the cars, and Fisker Automotive itself hopes to sell
as many as 15,000 annually." (Emphasis added.)

      **ANSWER**:  To the extent the allegations in Paragraph 62 refer to statements in

the December 2008 edition of Car and Driver Magazine, Daubenspeck refers to that document

for its true and correct contents and denies any inaccurate characterization or interpretation of

that document when read in context and in its entirety.  Daubenspeck is without knowledge or

information sufficient to admit or deny the remaining allegations in paragraph 62.

      63.     On January 14, 2008, the Wall Street Journal published a report on Fisker
Automotive based on interviews of Defendants Lane and Henrik Fisker, stating in part:

> The precise size of the investment in Fisker wasn't disclosed, but Mr. Lane said it
> was more than $10 million and 'one of our bigger investments.' Mr. Lane, the
> former No. 2 executive at software company Oracle Corp., will join Fisker's
> board. Thanks to Kleiner's investment, 'we have all the capital we need to move
> forward according to the plan,' said Henrik Fisker, a Danish-born former BMW
> AG and Aston Martin designer and now chief executive of the company he helped
> set up last year. Palo Alto Investors, a venture-capital concern, invested in Fisker
> in an earlier round of fund raising. 'We're still going to raise money later in the
> year, but we don't see that as a big issue,' Mr. Fisker said.

* * *

> Mr. Fisker believes his company is a couple of years ahead of bigger rivals
> because the design of the car has been finalized. 'The car we're showing in Detroit
> is not your usual show car; it's actually a preview of the production car you can
> buy,' Mr. Fisker said.

> The Karma, Mr. Fisker said, will use lithium-ion batteries, the most-promising
> next-generation energy-storage technology for automotive use so far. Some of
> those batteries, however, have been found to overheat. In 2006 and 2007, reports
> surfaced that lithium-ion batteries for laptops and cellphones were catching fire,
> leading to several recalls. Mr. Fisker wouldn't say what kind of lithium-ion
> battery the Karma will use, but he said safety concerns have all been 'resolved.'

      **ANSWER**:  To the extent the allegations in Paragraph 63 refer to statements in a

January 14, 2008 Wall Street Journal article, Daubenspeck refers to that article for its true and

correct contents and denies any inaccurate characterization or interpretation of that article when

read in context and in its entirety.  Daubenspeck is without knowledge or information sufficient

to admit or deny the remaining allegations in paragraph 63.

   64. On or about February 14, 2008, Fisker Automotive awarded Quantum Fuel a $13.5 million contract to develop further the powertrain and software control systems for the Fisker Karma, for which Fisker Automotive expected to begin initial production and deliveries in the fourth quarter of 2009.

   **ANSWER**:  Daubenspeck is without knowledge or information sufficient to

admit or deny the allegations in paragraph 64.

## II. Additional Private Equity is Raised, Defendants Launch the Series A-1 Round, and the U.S. Department of Energy Becomes a Critical Backer of Fisker Automotive

   65. On or about December 31, 2008, Fisker Automotive applied for the

ATVM Loan.

   **ANSWER**:  Daubenspeck is without knowledge or information sufficient to

admit or deny the allegations in paragraph 65, except that he admits that at some point before he

became a Director of Fisker Automotive, the Company applied for a loan from the DOE.

   66. Shortly thereafter, on or about March 2, 2009, Fisker Automotive raised approximately $68.5 million in Series C financing, including an investment from Defendant Kleiner Perkins. Defendant Ray Lane, Kleiner Perkins' Managing Partner, was appointed to Fisker Automotive's Board of Directors in conjunction with Kleiner Perkins' investment in this financing round. Around this time, at Kleiner Perkins' behest, the Company retained Orrick to act as its outside counsel.

   **ANSWER**:  Daubenspeck is without knowledge or information sufficient to

admit or deny the allegations in paragraph 66, except Daubenspeck admits that at some point

before he became a Director of Fisker Automotive, Ray Lane was appointed to Fisker

Automotive's Board of Directors.

   67. Despite this injection of capital, Fisker Automotive's expenses were ballooning well beyond the budget in its business plan. As a result, according to a qui tam complaint filed against Fisker Automotive by its former Chief Financial Officer and VP of Finance, Eric Weidner ("Weidner"), "Kleiner Perkins began to provide cash to Fisker [Automotive] on a weekly basis in order to keep Fisker [Automotive's] operations going. . . . [as] Fisker had $30 million in accounts payable and no way to make payments [and] was deeply

insolvent."[1]  A Fisker Automotive bankruptcy would have resulted in Kleiner Perkins suffering the total loss of its investment totaling tens of millions of dollars, as well as causing huge embarrassment since it and Lane were such high-profile financial backers.

      **ANSWER**:  To the extent the allegations in Paragraph 67 refer to a qui tam

complaint filed against Fisker Automotive, Daubenspeck refers to that complaint for its true and

correct contents and denies any inaccurate characterization or interpretation of that complaint

when read in context and in its entirety.  Daubenspeck is without knowledge or information

sufficient to admit or deny the remaining allegations in paragraph 67, including those allegations

in the footnote.

      68.     During this time period, Kleiner Perkins determined that the Company's capital needs were far higher than it had planned, and that Kleiner Perkins needed to reduce the growth of its already huge financial exposure. On February 20, 2009, Lane forwarded an email to Fisker, Weidner and Vasallo regarding another green car company Kleiner Perkins was backing, V-Vehicle Co. ("VVC") – which was also in search of a DOE loan – stating that DOE wanted companies like VVC and Fisker Automotive to have a sufficiently high amount of committed equity to show "financial viability" before DOE would consider an ATVM loan application "complete." As an example, DOE wanted VVC to have approximately a $90 million commitment. Lane stated to Defendant Henrik Fisker that he would "investigate whether the [Kleiner Perkins] partnership is willing to put something in writing based on 'getting ATVM funding'" on Fisker Automotive's behalf. The next day, Fisker asked Lane if Kleiner Perkins would provide DOE a "Letter of Intent from KPCB" whereby Kleiner Perkins itself would guarantee an $83 million "capital injection" – even if the capital could not be raised from non-Kleiner Perkins sources. Fisker also stated that "with the DOE loan in place this will attract a lot of other investors."

      **ANSWER**:  To the extent the allegations in paragraph 68 refer to email

communications between Lane, Fisker, Weidner, and Vassalo, Daubenspeck refers to those

email communications for their true and correct contents and denies any inaccurate

characterization or interpretation of those email communications when read in context and in

---

[1] The qui tam complaint was unsealed on September 17, 2013, shortly before Fisker Automotive sought bankruptcy protection, and was voluntarily dismissed without prejudice after the Company filed for bankruptcy. Weidner was terminated on January 18, 2010 by Henrik Fisker and Koehler after Weidner detailed their improper activities in a letter to Ray Lane, as Chairman of Fisker Automotive's Board of Directors. Weidner's qui tam complaint states that "Kleiner Perkins conducted a 2-day sham 'investigation' into the issues [he] raised."

their entirety.  Daubenspeck is without knowledge or information sufficient to admit or deny the

remaining allegations in paragraph 68.

69. 

**ANSWER**:  To the extent the allegations in paragraph 69 refer to email

communications between Lane, Fisker, Weidner, and Vassalo, Daubenspeck refers to those

email communications for their true and correct contents and denies any inaccurate

characterization or interpretation of those email communications when read in context and in

their entirety.  Daubenspeck is without knowledge or information sufficient to admit or deny the

remaining allegations in paragraph 69.

70.     Denniston followed up immediately, sending an email dated February 25, 2009 to the KPCB Managing Members and other Kleiner Perkins partners on the subject of "Fisker, DOE ATVM Loan Program-Phase II diligence." He stated that he "spoke with David Frantz, the head of the DOE loan guarantee program. . . . [and was] separately reaching out to Lachlan Seward, who runs the ATVM program." Dennison noted that Frantz had told him, *inter alia*, that Fisker Automotive's loan application would "go to the top of the stack" if it came with a "firm equity commitment."

**ANSWER**:  To the extent the allegations in paragraph 70 refer to email

communications between Lane, Fisker, Weidner, and Vassalo, Daubenspeck refers to those

email communications for their true and correct contents and denies any inaccurate

characterization or interpretation of those email communications when read in context and in

their entirety.  Daubenspeck is without knowledge or information sufficient to admit or deny the

remaining allegations in paragraph 70.

71.     In addition, according to a $10 million arbitration claim against, *inter alia*, Defendant Lane by Fisker Automotive's distributor in Italy, GP Supercars (whose owner Gianfranco Pizzuto had invested $2 million in the Company in 2007), made public in February 2015, in the summer of 2009, "Lane was considering an investment of approximately $100 million into Fisker Automotive. . . . However, before making an investment, Lane and KPCB required that Pizzuto waive his anti-dilution rights." The arbitration claim further states that Pizzuto:

> traveled to meet with Lane at his massive retreat in Medford, Oregon. At the meetings, first Fisker and Koehler and then Lane requested that Pizzuto waive his anti-dilution rights, and that he do so for the benefit of Fisker Automotive. First, Fisker and Koehler, and then Lane, represented to Pizzuto that with the investment of approximately $100 million or more of capital, Fisker Automotive would have sufficient capital to manufacture and produce 10,000 or more of the Karmas, as well as plan for additional automobile lines.
>
> Fisker and Koehler represented that Fisker Automotive had already reached agreements with manufacturers that were in place, so that they would produce 10,000 Karmas in 2011. Lane concurred that Fisker Automotive was ready to begin large scale production and simply needed his investment to start. As a result, they each represented that Pizzuto would be closer to having a dealership stocked with Karmas to sell in 2011, if he waived his anti-dilution for Lane and KCPB to invest, which he agreed to do.
>
> (Emphasis added.)

**ANSWER**: To the extent the allegations in paragraph 71 refer to an arbitration

claim filed by GP Supercars, Daubenspeck refers to that arbitration claim for its true and correct

contents and denies any inaccurate characterization or interpretation of that arbitration claim

when read in context and in its entirety.  Daubenspeck is without knowledge or information

sufficient to admit or deny the remaining allegations in paragraph 71.

72.     Fisker Automotive's cash preservation plan, which involved delaying supplier payments, did not sit well with the Company's suppliers, several of whom, as a consequence, had stopped work on the Karma project and were threatening legal action. In March 2009, the Company and Kleiner Perkins thought they had found a savior in an obscure investment firm, Eco Drive Capital Partners LLC ("Eco Drive"). Eco Drive purportedly controlled an investment account from "REPSOL, Spain's largest oil company" and was willing to invest in Fisker Automotive and give it the capital it needed to pay its suppliers. On April 2,

2009, Eco Drive executed a stock purchase agreement with the Company and KPCB Holdings, Inc. to purchase $75 million in Fisker Automotive Series D Preferred Stock with the first tranche of funds due no later than May 5, 2009, so that the Company could pay the tens of millions of dollars in past due bills it owed its major suppliers – including Valmet and the principal engineering design firm for the Karma hired by the Company, EDAG, Inc. ("EDAG").

        **ANSWER**:  Daubenspeck is without knowledge or information sufficient to

admit or deny the allegations in paragraph 72.

        73.     Eco Drive kept coming up with excuses for not being able to transfer funds pursuant to the purchase agreement, and Fisker Automotive's suppliers were threatening to sue the Company. At Lane's and the Company's request, on May 25, 2009, Eco Drive sent a detailed letter to the Company, addressed to the Company's suppliers, with the subject line "Series D Financing Update For Fisker Automotive Suppliers." The letter apologized for the delay in transferring the funds and promised, *inter alia*, that the first funding tranche of $15 million would be transferred that week and that $25 million would be transferred "on or before June 2, 2009."

        **ANSWER**: To the extent the allegations in paragraph 73 refer to a May 25, 2009

letter from Eco Drive to Fisker Automotive, Daubenspeck refers to that letter for its true and

correct contents and denies any inaccurate characterization or interpretation of that letter when

read in context and in its entirety.  Daubenspeck is without knowledge or information sufficient

to admit or deny the remaining allegations in paragraph 73.

        74.     By June 3, 2009, Eco Drive had not actually transferred any funds in connection with its purchase agreement, and, as reflected in an email string dated that day between Eco Drive and Defendants Lane, Fisker, Koehler and others, the Company was in a "really critical situation" with its suppliers. For example, on June 4, 2009, EDAG emailed Defendants Fisker and Koehler and others about "how to handle the latest break of Fisker's commitment of paying the [approximately $5 million in] open invoices". EDAG refused to do any more work until it received payment, thereby preventing Fisker Automotive from finalizing the design of the Karma (the "Production Release", as referred to in EDAG's June 4 email), a necessary prerequisite for suppliers to begin preparing production parts, and for Valmet to begin assembly of pre-production Karmas for development and testing.

        **ANSWER**:  To the extent the allegations in paragraph 74 refer to email

communications between EDAG and Defendants Fisker and Koehler, Daubenspeck refers to

those email communications for their true and correct contents and denies any inaccurate

characterization or interpretation of those email communications when read in context and in

their entirety.  Daubenspeck is without knowledge or information sufficient to admit or deny the

remaining allegations in paragraph 74.

      75.     Fisker Automotive's dire financial situation left Kleiner Perkins two choices: (i) either lose the $31 million it had already invested in Fisker Automotive through KPCB XII; or (ii) invest more capital from KPCB XII than it had planned.



**ANSWER**:  To the extent the allegations in paragraph 75 refer to letter

communications from KPCB Managing Members to KPCB XII's and KPCB XIII's limited

partners, Daubenspeck refers to those letter communications for their true and correct contents

and denies any inaccurate characterization or interpretation of those letter communications when

read in context and in their entirety.  Daubenspeck is without knowledge or information

sufficient to admit or deny the remaining allegations in paragraph 75.

76.     In the meantime, the DOE still had not approved Fisker Automotive's application for the ATVM Loan. To address the DOE's concerns regarding Fisker Automotive's financial viability, on or about July 17, 2009, Fisker Automotive's Chief Financial Officer, James Thorburn, (cc'ing Zuklie and others) forwarded to DOE two commitment letters regarding the Company's financial backing. One was from ECO Drive, stating, *inter alia*, that EcoDrive was a party to a stock purchase agreement "by and among Fisker, KPCB Holdings, Inc. as nominee and Eco-Drive dated April 2, 2009 . . . pursuant to which Eco-Drive has committed to purchase . . . $85,000,000 of Fisker's Series D Preferred Stock." EcoDrive also acknowledged in the letter that it knew "that DOE will be relying on the representations set forth in [the] letter to enter into a conditional commitment to provide financing to Fisker under the ATVM Program"– though Eco Drive still had not provided any funding despite its repeated excuses and promises.

**ANSWER**:  To the extent the allegations in paragraph 76 refer to letter

communications from KPCB Managing Members to KPCB XII's and KPCB XIII's limited

partners, Daubenspeck refers to those letter communications for their true and correct contents

and denies any inaccurate characterization or interpretation of those letter communications when

read in context and in their entirety.  Daubenspeck is without knowledge or information

sufficient to admit or deny the remaining allegations in paragraph 76.

77.     Kleiner Perkins provided the other commitment letter. Also dated July 16, 2009, and signed by Defendant Lane as Senior Vice President of KPCB Holdings, Inc., this letter discussed Eco Drive and the same stock purchase agreement as in the Eco Drive letter and stated, *inter alia*, that Kleiner Perkins was committed to investing an additional $10 million in Fisker Automotive. Though Eco Drive and Kleiner Perkins both acknowledged in their respective commitment letters that they knew that DOE would be relying on the representations in these letters, none of the Company, Zucklie, Eco Drive, or Kleiner Perkins disclosed to the DOE that Eco Drive had repeatedly failed to meet its obligations to purchase Fisker Automotive stock. In fact, as Defendants Lane, Fisker, and Koehler then suspected -- and soon confirmed -- the entire Eco Drive commitment was nothing more than a con game. Lane noted the con game could be figured out by running a Google search on the name of the person Eco Drive stated "managed the cash positions of REPSOL" – "Prospere Baleng." Specifically, that name shows up, *inter alia*, in the website www.scam.com as a well-known con artist.

**ANSWER**:  To the extent the allegations in paragraph 77 refer to a July 16, 2009

letter from Kleiner Perkins, Daubenspeck refers to that letter for its true and correct contents and

denies any inaccurate characterization or interpretation of that letter when read in context and in

its entirety.  Daubenspeck is without knowledge or information sufficient to admit or deny the

remaining allegations in paragraph 77.

78.     On or about July 27, 2009, Valmet expressly told Defendant Koehler that the 6,000 Karma volume figure in Fisker Automotive's Business Plan submitted to DOE in connection with negotiations for the ATVM Loan (a figure also reflected in the Company's investor presentation used at the time) "was not feasible" because of the delays caused by, *inter alia*, the Company's lack of payment to Valmet and the fact that the design of the Karma had not been finalized.

**ANSWER**: To the extent the allegations in paragraph 78 refer to certain written

communications between Valmet and Defendant Koehler, Daubenspeck refers to those

communications for their true and correct contents and denies any inaccurate characterization or

interpretation of those communications when read in context and in their entirety.  Daubenspeck

is without knowledge or information sufficient to admit or deny the remaining allegations in

paragraph 78.

79.     On July 27, 2009, Lane sent an email to Fisker Automotive's other inside investors, as well as Palo Alto Investors, stating that Fisker Automotive "may be closing its doors, and our investments . . . written to zero" unless the Company came up with $24 million within four days to meet "the last DOE qualification criteria."

**ANSWER**:  To the extent the allegations in paragraph 79 refer to certain written

communications between Lane and Fisker Automotive investors, Daubenspeck refers to those

communications for their true and correct contents and denies any inaccurate characterization or

interpretation of those communications when read in context and in their entirety.  Daubenspeck

is without knowledge or information sufficient to admit or deny the remaining allegations in

paragraph 79.

80.     During this time period, Kleiner Perkins continued to totally control Fisker Automotive, as the Company was dependent on bridge loans from Kleiner Perkins to meet payroll. For example, a July 31, 2009 email from Kleiner Perkins' partner, Eric Keller, to Zuklie and others, subject "Fisker payroll", states "[a]s we just discussed, KP agrees to release $375K from the escrow account to Fisker provided this amount will be treated as senior secured debt by Fisker until such time the DOE approves the ATVM facility."

**ANSWER**:  To the extent that paragraph 80 contains allegations regarding

control, those allegations are legal conclusions to which no response is required.  To the extent

the allegations in paragraph 80 refer to a July 31, 2009 email from Eric Keller to Zuklie and

others, Daubenspeck refers to that email for its true and correct contents and denies any

inaccurate characterization or interpretation of that email when read in context and in its entirety.

Daubenspeck is without knowledge or information sufficient to admit or deny the remaining

allegations in paragraph 80.

      81.    By August 13, 2009, Fisker Automotive was on the brink of bankruptcy.
That day, Defendant Fisker sent an email to the Company's non-Kleiner Perkins inside investors
(cc'ing Yu and Zuklie), pleading for more money and proposing a financing structure supported
by another investment by Kleiner Perkins until the DOE agreed to issue the CCL. Yu then
forwarded that email to Kleiner Perkins partner Eric Keller. In the email, Fisker stated in part:

      Dear Investor,

      We are at a critical inflection point in the life of Fisker Automotive, Inc. (the
      "Company"). Put simply, we must raise funds immediately, or wind down
      operations.

      We owe suppliers approximately $42 million, and, to date, we have been unable
      to raise outside financing. The cash we have on hand is much less than our current
      liabilities.

**ANSWER**:  To the extent the allegations in paragraph 81 refer to an August 13,

2009 email from Defendant Fisker, Daubenspeck refers to that email for its true and correct

contents and denies any inaccurate characterization or interpretation of that email when read in

context and in its entirety.  Daubenspeck is without knowledge or information sufficient to admit

or deny the remaining allegations in paragraph 81.

      82.    Without disclosing any of the facts described in the two paragraphs
immediately above, on August 19, 2009, AEI, as Fisker Automotive's placement agent, issued a
CPPM to investors for the Series A-1 Round, offering $100 million of Series A-1 Convertible
Preferred Stock with an overallotment right to increase the offering to $150 million. The section
of the CPPM entitled Summary of the Offering stated, *inter alia*, that the "initial closing shall be
conditioned upon receipt of a conditional commitment letter from the United States Department
of Energy. . . . to provide not less than $165 million of ATVM loans to the Company for

production of the Fisker Karma." In addition, the CPPM stated that, *inter alia*, upon initial closing of the Series A-1 Round, Daubenspeck would be added to Fisker Automotive's Board of Directors, and further that "AEI shall at all times be entitled to Board observation rights, including the right to attend all executive and committee sessions. . . ."

      **ANSWER**: To the extent the allegations in paragraph 82 refer to a CPPM for the

Series A-1 Round, Daubenspeck refers to that document for its true and correct contents and

denies any inaccurate characterization or interpretation of that document when read in context

and in its entirety. Daubenspeck is without knowledge or information sufficient to admit or deny

the remaining allegations in paragraph 82, except Daubenspeck denies that AEI ever "issued"

any CPPM or any other offering documents to investors and denies that Daubenspeck had any

responsibility or authority over the offering documents or the contents thereof.

      83.     In addition, the CPPM stated, *inter alia*, that "Henrik Fisker and Ray Lane will travel on a 'roadshow' for one week, including Chicago . . . for meetings (at dates to be determined by AEI, the Company, and Mr. Lane) to present the Company and its business to AEI Group investors", defined as the investors identified by AEI and investors in AEI's SPVs. AEI also required the Company to:

> prepare, with review and comment by AEI, a private placement memorandum in AEI's customary format, for circulation to AEI Group investors. Before the PPM is disseminated, the Company shall provide AEI the due diligence materials to be reasonably requested by AEI for uploading into AEI's secure data room for review by the prospective AEI Group investors or their counsel who in either case shall be subject to appropriate confidentiality restrictions.

      **ANSWER**: To the extent the allegations in paragraph 83 refer to a CPPM for the

Series A-1 Round, Daubenspeck refers to that document for its true and correct contents and

denies any inaccurate characterization or interpretation of that document when read in context

and in its entirety. Daubenspeck is without knowledge or information sufficient to admit or deny

the remaining allegations in paragraph 83.

      84.     The CPPM also stated at the end that "[a]ll communications or inquiries relating to these materials or to a possible transaction involving the Company should be directed" to AEI's Lead Investment Banker, Peter McDonnell at AEI's headquarters in Chicago, Illinois.

**ANSWER**:  To the extent the allegations in paragraph 84 refer to a CPPM for the

Series A-1 Round, Daubenspeck refers to that document for its true and correct contents and

denies any inaccurate characterization or interpretation of that document when read in context

and in its entirety.  Daubenspeck is without knowledge or information sufficient to admit or deny

the remaining allegations in paragraph 84.

85.     At midnight on August 23, 2009, Defendant Koehler, Fisker Automotive's Chief Operating Officer, wrote a panicked email to the DOE stating that Fisker Automotive would be forced into bankruptcy if the DOE did not approve Fisker Automotive's term loan application. Defendant Koehler stated further that "[t]he latest information to delay the conditional commitment for the Karma program until we receive the approval for the Kx program is pushing our supplier base and investment group beyond the limit. . . . *We are oversubscribed in this equity round with DOE support – and nowhere without it*." (Emphasis added.)

**ANSWER**:  To the extent the allegations in paragraph 85 refer to email

communications between Defendant Koehler and the DOE, Daubenspeck refers to those

communications for their true and correct contents and denies any inaccurate characterization or

interpretation of those communications when read in context and in their entirety.  Daubenspeck

is without knowledge or information sufficient to admit or deny the remaining allegations in

paragraph 85.

86.     Less than a month later, on September 18, 2009, the DOE issued a $528.7 million Conditional Commitment Letter (the "CCL"), which allocated $169.3 million for Fisker Automotive to complete its first vehicle, the Fisker Karma, and $359 million to complete a low cost plug-in hybrid tentatively called the Fisker Nina. The ATVM Loan document, which was not made public, specifically stated that an "Event of Default" would include Fisker's "fail[ure] to achieve any Milestone by the relevant Milestone Completion Date." The CCL also: (i) required Fisker Automotive to submit monthly reports describing any changes in the Budget line items for each project, including cost overruns; and (ii) required the DOE's prior written consent" for "any material modifications of the Business Plan or the Budget.

**ANSWER**: To the extent the allegations in paragraph 86 refer to statements in the

September 18, 2009 letter referenced therein, Daubenspeck refers to that document for its true

and correct contents and denies any inaccurate characterization or interpretation of that document

when read in context and in its entirety.  Daubenspeck is without knowledge or information

sufficient to admit or deny the remaining allegations in paragraph 86, except Daubenspeck

admits that at some point before he became a Director of Fisker Automotive, the Company

obtained a loan from the DOE.

87.     In addition, in the CCL, DOE conditioned the execution of the ATVM
Loan upon an additional equity raise. Thus, Kleiner Perkins and two other inside investors, Palo
Alto Partners and Ace Strength, Ltd, invested another $45 million in Fisker Automotive through
the purchase of Series D-X Preferred Stock. However, according to Weidner's qui tam
complaint, "Kleiner Perkins[had] continued to provide weekly cash and additional bridge loans
to Fisker at a very high cost to the company prior to the completion of the" Series D-X Round.

**ANSWER**:  To the extent the allegations in paragraph 87 refer to the CCL and

Weidner's qui tam complaint, Daubenspeck refers to those documents for their true and correct

contents and denies any inaccurate characterization or interpretation of those documents when

read in context and in their entirety.  Daubenspeck is without knowledge or information

sufficient to admit or deny the remaining allegations in paragraph 87.

88.     On or around October 1, 2009, Fisker Automotive and AEI opened the
Series A-1 Round to outside investors in connection with the CPPM issued on August 19, 2009,
in anticipation of a final loan agreement with the DOE.

**ANSWER**:  Daubenspeck denies the allegations in paragraph 88, except that he

admits that Fisker Automotive opened the Series A-1 Round to outside investors with assistance

from AEI.

89.     In October 2009, Fisker Automotive bought from General Motors a closed
manufacturing plant located at 801 Boxwood Road, Wilmington, DE, with $21.5 million in
Delaware state subsidies. The Wilmington Delaware News Journal reported on October 28, 2009
that Governor Jack Markell was instrumental in bringing Fisker Automotive to Delaware by,
*inter alia*, "contact[ing] a close friend, Aileen Lee, who work[ed] at Kleiner Perkins Caufield &
Byers, a California venture capital firm investing in Fisker."

**ANSWER**:  To the extent the allegations in paragraph 89 refer to statements in

the October 28, 2009 *News Journal* article referenced therein, Daubenspeck refers to that article

for its true and correct contents and denies any inaccurate characterization or interpretation of

that article when read in context and in its entirety.  Daubenspeck is without knowledge or information sufficient to admit or deny the remaining allegations contained in the first sentence of paragraph 89, except that a Fisker Automotive manufacturing plant was located in Wilmington, Delaware.

90.     According to the GP Supercars arbitration claim discussed above:

In October 2009, Fisker Automotive and the U.S. Department of Energy ("DOE") were in serious discussions over the grant of a $529 million government loan. Pizzuto and the other initial investors traveled to Wilmington, Delaware, for an on-site announcement that the second generation of Fisker cars (not the first line of Karmas) would be built at a former General Motors plant starting in 2012/2013. This announcement was attended by Vice President Joe Biden and Delaware Governor Markell and other politicians, as well as Lane and other directors.

In discussions they had at this event, Lane represented to Pizzuto that Fisker Automotive was close to completing the Karma model and testing, and that he expected large-scale production to begin by the end of the year. He also represented that this $529 million loan and the government's backing gave Fisker Automotive a huge boost, and that they hoped to accelerate the launch of additional car lines.

(Emphasis added.)

**ANSWER**:  To the extent the allegations in paragraph 90 refer to the GP Supercars arbitration claim, Daubenspeck refers to that document for its true and correct contents and denies any inaccurate characterization or interpretation of that document when read in context and in its entirety.  Daubenspeck is without knowledge or information sufficient to admit or deny the remaining allegations in paragraph 90.

91.     According to Weidner, in late 2009, as the Company's negotiations with the DOE over the final terms of the ATVM Loan continued, he learned that the Karma program cost projections made in the ATVM Loan application given to the DOE were not accurate. According to Weidner, this information was contained in a "report, dated December 19, 2009 and marked 'CONFIDENTIAL,' . . . prepared by Thomas Fritz, Director of Engineering, and John Kwapis, Director of Purchasing, with input from several other Fisker Engineering Staff" (the "Fritz Report"). The report concluded that the Supplier Engineering Design & Development ("ED&D") and tooling costs given to DOE for the Karma "derivative products" (i.e., a convertible called K2 and a sports wagon called K3) had been "under-budgeted by

approximately $105,000,000" – i.e., the $43,000,000 budget figure given to the DOE was materially incorrect; it should have been $148,100,000. Weidner also stated in his complaint that because the ED&D costs for the Nina were based on the same flawed assumptions as the K2 and K3, the budgeted cost amounts for the Nina given to the DOE were materially understated "in the precisely the same way" as well.

**ANSWER**:  To the extent the allegations in paragraph 91 refer to the Weidner

quit tam complaint and the December 19, 2009 report referenced therein, Daubenspeck refers to

those documents for their true and correct contents and denies any inaccurate characterization or

interpretation of those documents when read in context and in their entirety.  Daubenspeck is

without knowledge or information sufficient to admit or deny the remaining allegations in

paragraph 91.

92.    Under the terms of the CCL, Fisker Automotive was required to disclose to the DOE the fact and the amount of the materially understated costs with Karma and Nina programs. Fisker Automotive never did so.

**ANSWER**: The allegations of paragraph 92 set forth conclusions of law to which

no response is required.  To the extent an answer is required, the allegations in paragraph 91

refer to the terms of the CCL, and Daubenspeck refers to the CCL for its true and correct

contents and denies any inaccurate characterization or interpretation of the CCL when read in

context and in its entirety.  Daubenspeck is without knowledge or information sufficient to admit

or deny the remaining allegations in paragraph 92.

93.    However, despite the injection of $45 million in capital in the Series D-X Round discussed above, the situation at Fisker Automotive remained dire. The Company was unable to pay the overdue bills it owed to its suppliers (including Valmet), who in turn refused to resume work on the Karma project, thereby continuing the delay in the Karma's development. As discussed in a presentation at a meeting of Fisker Automotive's Board of Directors held on or about November 20, 2009, which was attended by all Defendants, among other things: (i) Fisker Automotive had over $45 million in accounts payable, of which $30 million was overdue by over 120 days; (ii) work on the Karma program had stopped; and (iii) suppliers were told that they would get no further payments until the close of the Series A-1 Round. Also discussed was the fact that Fisker Automotive's Business Plan given to the DOE prior to the DOE's issuance of the CCL – which, as discussed above, falsely stated that the Company would commence commercial production of the Karma in mid-2010 and sell 6,000 Karmas that year – would now have to be "updated" to reflect the fact that Karma commercial production would be delayed until 2011.

**ANSWER**: To the extent the allegations in paragraph 93 refer to a November 20, 2009 presentation at a meeting of Fisker Automotive's Board of Directors, Daubenspeck refers to that presentation for its true and correct contents and denies any inaccurate characterization or interpretation of that presentation when read in context and in its entirety.  Daubenspeck is without knowledge or information sufficient to admit or deny the remaining allegations in paragraph 93.

94.     On December 15, 2009, Defendant Koehler sent an update to a representative of the Fisker Coachbuild investors, who also held an equity interest in Fisker Automotive, and cc'ing Defendant Fisker, noting that Karma "production start" would now purportedly occur in December 2010, describing the Series A-1 Round financing, and offering the Fisker Coachbuild investors an opportunity to invest in that offering.

**ANSWER**:  To the extent the allegations in paragraph 94 refer to a December 15, 2009 update sent from Defendant Koehler to a representative of Fisker Coachbuild, Daubenspeck refers to that document for it true and correct contents and denies any inaccurate characterization or interpretation of that document when read in context and in its entirety. Daubenspeck is without knowledge or information sufficient to admit or deny the remaining allegations in paragraph 94.

95.     The Fisker Coachbuild representative responded to Koehler and Fisker by blasting them for providing misleading information, stating that Fisker Automotive's financial woes had created "a 12 month (or longer delay) in the production of the Karma [including the] planned design work" by Fisker Coachbuild and, as a consequence, Fisker Coachbuild was forced to liquidate "all [of its] marketable physical assets." The representative concluded stating, *inter alia*, "[i]n summary, I am very concerned that the facts relating to the major issues that have occurred in the last 12 months have been kept from [Fisker Coachbuild] investors and [that Koehler's update] . . . seeks to gloss over serious matters, rather than expose the full truth . . . . I am not comfortable with anything but full disclosure". Koehler, in turn forwarded this response to Zuklie.

**ANSWER**:  To the extent the allegations in paragraph 95 refer to communications between Defendant Koehler and a representative of Fisker Coachbuild, Daubenspeck refers to those communications for their true and correct contents and denies any

inaccurate characterization or interpretation of those communications when read in context and

in their entirety.  Daubenspeck is without knowledge or information sufficient to admit or deny

the remaining allegations in paragraph 95.

96.     In December 2010, Defendants also realized that if the Company did not
pay all of its key suppliers the tens of millions of dollars it owed in overdue bills, the suppliers
would not resume work on the Karma project in time for the Company to achieve the Karma
production release and tooling release necessary to meet the new February 2011 Karma start of
production date that Defendants had communicated to DOE.



**ANSWER**:  To the extent the allegations in paragraph 96 refer to various email

communications, Daubenspeck refers to those communications for their true and correct contents

and denies any inaccurate characterization or interpretation of those communications when read

in context and in their entirety.  Daubenspeck is without knowledge or information sufficient to

admit or deny the remaining allegations in paragraph 96, except Daubenspeck denies the first

sentence of paragraph 96.

97.



**ANSWER**:  To the extent the allegations in paragraph 97 refer to the email

communications referenced in paragraph 96, Daubenspeck refers to those communications for

their true and correct contents and denies any inaccurate characterization or interpretation of

those communications when read in context and in their entirety.  Daubenspeck is without

knowledge or information sufficient to admit or deny the remaining allegations in paragraph 97.

### III.   AEI Begins Closing the Series A-1 Round, and DOE Executes the ATVM Loan Unaware that Fisker Automotive Materially Understated the Costs of the Karma and Nina Programs

        98.     On or about January 12, 2010, all Defendants attended a Board of Directors meeting at which the Board approved two alternative plans regarding the use of proceeds from the Series A-1 Round expected to close on January 15, 2010, with $115.3 million in proceeds. Intended to address the Company's continuing cash crisis, the two plans were: (i) the "Minimal Investment Plan", which principally paid past due bills and left "[o]nly $3.0 million for [Karma] development"; or ███████████████████████████████ ████████████████████████████████████████████████ ████████████████

        **ANSWER**:  Daubenspeck is without knowledge or information sufficient to

admit or deny the allegations in paragraph 98.

        99.     Just prior to the first closing of the Series A-1 Round to be conducted on January 15, 2010, the Company and Advanced Equities issued a Series A-1 Preferred Stock Purchase Agreement that Defendants had each drafted and/or approved. In addition, the Company and/or AEI issued the CPPM and SOE that, along with the CPPM as updated by Advanced Equities in December 2009, *inter alia*, discussed the ATVM Loan at length, including its importance to the Company's ability to operate and the risks associated with the Company's failure to comply with the ATVM Loan terms.

        **ANSWER**:  To the extent the allegations in paragraph 99 refer to various Series

A-1 offering documents, Daubenspeck refers to those documents for their true and correct

contents and denies any inaccurate characterization or interpretation of those documents when

read in context and in their entirety.  Daubenspeck is without knowledge or information

sufficient to admit or deny the remaining allegations in paragraph 99, except Daubenspeck:

admits that Fisker Automotive conducted a Series A-1 Round preferred stock offering.

Daubenspeck denies that AEI ever "issued" any Series A-1 Preferred Stock Purchase Agreement,

CPPM, SOE, or any other offering documents to investors; and Daubenspeck denies that he had

any responsibility or authority over the offering documents, including the drafting, approval, and

contents thereof.

100.   Nowhere in the CPPM or SOE (or anywhere else) did Defendants disclose that they had misled the DOE in connection with the CCL by submitting a Business Plan to the DOE in August 2009 that falsely reflected Fisker Automotive commencing production of the Karma in mid-2010 with sales of 6,000 Karmas in that year, as discussed above. Nor did Defendants disclose the Karma and Nina cost overruns in the budget and Business Plan given to the DOE, as determined by the Fritz Report, or that the Company's failure to disclose these material cost overruns had violated the terms of the CCL. The Purchase Agreement also falsely and/or misleadingly stated at ¶2.11:

> Disclosure. The Company has provided each Purchaser with all the information reasonably available to the Company that such Purchaser has requested for the purposes of determining whether to purchase the Shares. None of the Transaction Agreements nor any other documents delivered in connection with the transactions contemplated by the Transaction Agreements contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements herein and therein not misleading. To the Knowledge of the Company, there is no fact that has not been disclosed herein or otherwise by the Company to the Purchasers that would reasonably be likely to have a Material Adverse Effect on the Company.

> (Emphasis added.)

**ANSWER**:  To the extent the allegations in paragraph 100 refer to various Series

A-1 offering documents, Daubenspeck refers to those documents for their true and correct

contents and denies any inaccurate characterization or interpretation of those documents when

read in context and in their entirety.  Daubenspeck is without knowledge or information

sufficient to admit or deny the remaining allegations in paragraph 100.

101.   On January 20, 2010, the Wall Street Journal published an article entitled "Car Maker Taps Funding Karma" based primarily on interviews with Defendants Henrik Fisker and Lane. The article stated in full:

> Fisker Automotive Inc. said it raised $115.3 million in a round of equity financing that could reach $150 million in coming weeks.

> 'The business plan has always called for $150 million in equity,' said Ray Lane, a managing partner at venture-capital firm Kleiner Perkins Caufield & Byers, which has been a major investor in electric car maker Fisker since the company's founding in 2007.

In an interview, Mr. Lane said Fisker will grab the investing momentum surrounding the company to complete the $150 million funding round in 'the next month or two.'

The start-up company, based in Irvine, Calif., decided to announce it had raised $115.3 million to close on a $529 million low-cost loan with the U.S. Department of Energy, which required Fisker to raise $113 million in equity, said Mr. Lane.

Besides Kleiner Perkins, other investors in the round so far are lithium-ion battery technology developer A123Systems Inc. and Ace Investments, a Hong Kong investment firm associated with Richard Li, chairman and executive director of Hong Kong-based telecommunications company PCCW Ltd.

The combined DOE and private-equity funding bring the luxury plug-in hybrid electric Karma program to a fully funded status, which Mr. Lane said is 'phenomenal' for a start-up vehicle technology developer and manufacturer.

Fisker's long-term business plan also calls for an annual $50 million equity funding, with the company reaching profitability in 2011, the first full year of production of the Karma, said Mr. Lane.

The business plan covers not only the Karma but also its sports version, the Karma Sunset, as well as a lower-price family car under development.

With this fund-raising target met, Fisker expects to close on the DOE loan in coming months, following an extensive period of negotiations, said Henrik Fisker, the company's chief executive and founder, in an interview.

'We've worked with the DOE for the last nine months,' said Mr. Fisker. 'It's been a very long due-diligence process. They've hired outside consultants . . . for technical due diligence, financial stress tests . . . definitely there's no other investor that has made as much due diligence as the DOE.'

Fisker was selected in September to receive nearly $529 million in low-cost loans under the DOE's Advanced Technology Vehicles Manufacturing Loan Program, or ATVM.

The funding will help Fisker finalize the development of the Karma and support the engineering and manufacturing of the family car, a plug-in hybrid slated for 2012 with a retail price of less than $48,000, before consumer-tax incentives.

The ATVM loans can cover as much as 80% of a project cost in a traditional 80% debt-20% equity financing structure. To secure the loan, the borrower is required to show the DOE it has its equity share in place. The funding tops off a series of announcements for Fisker.

Last week, A123 Systems disclosed it had made a $23 million investment in the company and that it would be the supplier of battery management systems for the Karma.

For A123, becoming a strategic investor in an electric vehicle developer allows it to get in on the engineering of the vehicle 'from scratch,' which will help on cost-cutting strategies, said David Vieau, president and chief executive of A123 Systems.

A123 Systems will invest $13 million in cash from its balance sheet, and the remainder will be in stock. Including the latest round, Fisker has raised around $190 million since its founding. Other key investors in the company include investment firm Palo Alto Investments LLC, the Qatar Investment Authority and Quantum Fuel Systems Technologies Worldwide Inc., a maker of power trains.

**ANSWER**:  To the extent the allegations in paragraph 101 refer to statements in the January 20, 2010 *Wall Street Journal* article entitled "Car Maker Taps Funding Karma," Daubenspeck refers to that article for its true and correct contents and denies any inaccurate characterization or interpretation of that article when read in context and in its entirety. Daubenspeck is without knowledge or information sufficient to admit or deny the remaining allegations in paragraph 101.

102.    On or about January 29, 2010, all Defendants and Zuklie participated in a Board of Directors meeting. A presentation prepared for that Board meeting stated that the Incremental Funding Plan, approved by the Board on January 12, 2010, "has not happened." As a consequence, "[t]he lack of incremental funds places the Karma development on hold." The failure to restart development of the Karma made it impossible for the Company to achieve a "production release" of the Karma in April 2010 (as set forth in the presentation) necessary to support the Company's new plan to the DOE to start production of the Karma in February 2011.

**ANSWER**:  To the extent the allegations in paragraph 102 refer to a presentation prepared in connection with a January 29, 2010 Board meeting, Daubenspeck refers to that presentation for its true and correct contents and denies any inaccurate characterization or interpretation of that presentation when read in context and in its entirety.  Daubenspeck is without knowledge or information sufficient to admit or deny the remaining allegations in

paragraph 101, except that Daubenspeck admits that he attended a Fisker Automotive Board

meeting on or about January 28, 2010.

103.    On February 4, 2010, Zuklie and Defendants Fisker, Koehler, and DaMour met with DOE officials in Orrick's Washington D.C. office to review the DOE loan status, finalize the DOE loan agreement, and attempt to resolve, *inter alia*, the outstanding issues regarding the milestones/terms by which the Company purportedly would produce a commercially saleable Karma by February 2011. An email from Defendant Fisker, which included Lane, Zuklie and Koehler as recipients, summarizing the meeting with DOE, stated that they had told DOE that suppliers were now being paid to keep the Karma "launch on track" but that they needed the DOE to close on the loan by March 15, 2010.

**ANSWER**:  To the extent the allegations in paragraph 103 refer to an email from

Defendant Fisker to Defendant Lane, Zuklie, and Defendant Koehler, Daubenspeck refers to that

email for its true and correct contents and denies any inaccurate characterization or interpretation

of that email when read in context and in its entirety.  Daubenspeck is without knowledge or

information sufficient to admit or deny the remaining allegations in paragraph 103.

104.    A Board of Directors presentation dated February 6, 2010 discussed meeting with DOE, stating, *inter alia*, that the presentation by Defendants Fisker and Koehler was "well received by the DOE." The presentation reflected the Company's "Updated Business Plan" and "Operating Assumptions", including completing the engineering release of the Karma by April 19, 2010 and start of production in February 2011. However, contrary to what DOE was told at the February 4, 2010 meeting, the presentation again stated that the Incremental Funding Plan, approved by the Board on January 12, 2010, "has not happened" and, as a consequence, that "[t]he lack of incremental funds places the Karma development on hold."

**ANSWER**:  To the extent the allegations in paragraph 104 refer to a Board of

Directors presentation dated February 6, 2010, Daubenspeck refers to that presentation for its

true and correct contents and denies any inaccurate characterization or interpretation of that

presentation when read in context and in its entirety.  Daubenspeck is without knowledge or

information sufficient to admit or deny the remaining allegations in paragraph 104.

105.    In addition, an email to Defendant Koehler dated February 19, 2010, reflected that Magna, Inc., a key supplier on the Karma project, had not been paid and had not restarted its work on the Karma project.

**ANSWER**:  To the extent the allegations in paragraph 105 refer to an email to

Defendant Koehler dated February 19, 2010, Daubenspeck refers to that email for its true and

correct contents and denies any inaccurate characterization or interpretation of that email when

read in context and in its entirety.  Daubenspeck is without knowledge or information sufficient

to admit or deny the remaining allegations in paragraph 105.

106.     Afterwards, through April 2010, the Company continued to negotiate the
terms of the DOE loan with DOE. For example, on March 29, 2010, Yu sent an email to
DaMour, cc'ing Zuklie, attaching a presentation to be used at a meeting of Fisker's Board of
Directors that same day that, *inter alia*, described the terms of the DOE loan and the remaining
issues necessary to close on that loan. Among other things, the presentation expressly stated that
the "DOE requires monthly reporting of . . . any material change from [Fisker Automotive's]
submitted business plan." And, the presentation noted that the assembly agreement with Valmet
needed to finalized.

**ANSWER**:  To the extent the allegations in paragraph 106 refer to a March 29,

2010 email and a March 29, 2010 Board of Directors presentation, Daubenspeck refers to those

documents for their true and correct contents and denies any inaccurate characterization or

interpretation of those documents when read in context and in their entirety.  Daubenspeck is

without knowledge or information sufficient to admit or deny the remaining allegations in

paragraph 106.

107.     With respect to Valmet, Defendants Fisker, Koehler, DaMour and Zuklie
and the DOE worked closely on the terms of an amendment to the Company's assembly
agreement with Valmet by which, *inter alia*, Valmet would be contractually bound to begin
producing a commercially saleable Karma in February 2011.

**ANSWER**:  The allegations of paragraph 107 set forth conclusions of law to

which no response is required.  Daubenspeck is without knowledge or information sufficient to

admit or deny the remaining allegations in paragraph 107.

108.     On April 12, 2010, with the DOE's concurrence, Fisker Automotive
executed an amendment to the Valmet Assembly Agreement governing the production of the
Karma. The "Attachments" to the Assembly Agreement included the following "Project
timetable" defining the timing of pre-production milestones to ensure the "Start of production
(SOP)" of the Karma by February 21, 2011. The first of many milestones required the

Production and Tooling Release by April 19, 2010, except that the tooling release would be at "latest by 21st of May 2010 for all parts." "Start of production (SOP)" was defined in this chart as beginning production of a Karma that was "Ok to sell" on this date – defined as the Karma having received EPA Certification and passing Federal Motor Vehicle Safety Standards (FMVSS) in 45 states (referring to states that followed federal standards instead of their own).



CONFIDENTIAL

KA0449849

**ANSWER**:  The allegations of paragraph 108 set forth conclusions of law to which no response is required.  To the extent the allegations in paragraph 108 refer to the Valmet Assembly Agreement or any amendments or attachments thereto, Daubenspeck refers to those documents for their true and correct contents and denies any inaccurate characterization or interpretation of those documents when read in context and in their entirety.  Daubenspeck is without knowledge or information sufficient to admit or deny the remaining allegations in paragraph 108.

109.    Paragraph 2.2 of the Valmet Assembly Agreement governed Valmet's rights should Fisker "fail[] to meet the milestones as specified in Schedule 6 [the Project timetable]." In that event, the Company would be "liable to VALMET for direct, indirect and consequential damages suffered by VALMET as a result of any such failure. In addition, VALMET shall have the right to extend the respective date noted above for the Start of Production at a minimum for a period of time equal in length to the period of time during which FISKER failed to meet the milestones."

**ANSWER**:  The allegations of paragraph 109 set forth conclusions of law to which no response is required.  To the extent the allegations in paragraph 109 refer to the Valmet Assembly Agreement or any amendments or attachments thereto, Daubenspeck refers to those documents for their true and correct contents and denies any inaccurate characterization or interpretation of those documents when read in context and in their entirety.  Daubenspeck is without knowledge or information sufficient to admit or deny the remaining allegations in paragraph 109.

110.    On April 15, 2010, the Company sent the DOE Fisker Automotive's Business Plan (the "April 2010 Business Plan") which DOE and the Company had previously agreed upon. That Business Plan included, inter *alia*, the following chart entitled "Karma Milestones", which milestones were premised on the Karma Project timetable in the Valmet Assembly Agreement:

## Milestones

| Karma Milestones | | Expenses $M | Cap. Ex. $M | Funding $M |
|---|---|---|---|---|
| Completion of the Karma Engineering Work for Tooling Release | May-2010 | 19.2 | | |
| Completion of all other initial engineering integration work required for the Karma Project - Tooling Kick-off | Jul-2010 | 44.9 | 50.4 | |
| A schedule for completion of all vehicle certification requirements in the United States and the European Union related to vehicle safety and environmental matters; | Apr-2010 | N/A | | |
| Testing & Certification Process; Full Engineering Sign off for Restraint, Crash, Regen Brakes, Emissions and High Volume Manufacturing | Oct-2010 | 80.5 | 29.3 | |
| Commencement of commercial production of the Karma vehicle | Feb-2011 | 13.1 | 29.8 | |
| Achieving Karma vehicle sales of 11,000 units by February 29, 2012 at an average price of not less than $87,900, and | Feb-2012 | N/A | | |
| Creation of a satisfactory dealer network for sales of Karma vehicles, | US Oct-2009 | N/A | | |
| | Europe Jan-2010 | N/A | | |

| NINA Milestones | | Expenses $M | Cap. Ex. $M | Funding $M |
|---|---|---|---|---|
| Purchase of the site required for the NINA Facility | May-2010 | 2.3 | 26.0 | |
| Completion of construction and/or re-equipping of the manufacturing facility for the Fisker NINA vehicle and all related tooling work required for assembly thereof, | Apr-2012 | N/A | 277.9 | |
| Completion of all engineering integration work required for tooling related to NINA vehicle assembly; | Apr-2011 | 37.6 | | |
| A schedule for completion of all vehicle certification requirements related to safety and environmental matters for retail sales of the NINA vehicle in the United States and European Union | Apr-2011 | N/A | | |
| Commencement of commercial production of the NINA vehicle at the NINA Facility in quantities to be mutually agreed | Jun-2012 | 186.3 | | |
| Creation of a satisfactory dealer network for sales of NINA vehicles | US Apr-2011 | N/A | | |
| | Europe Apr-2011 | N/A | | |

| Funding Milestones | | | | Funding $M |
|---|---|---|---|---|
| Equity | Jun-2010 | | | 25.0 |
| Equity | Jul-2010 | | | 6.0 |
| Equity | Oct-2010 | | | 50.0 |

CONFIDENTIAL   KP00000127

**ANSWER**:  To the extent the allegations in paragraph 110 refer to a April 2010 Business Plan, Daubenspeck refers to that document for its true and correct contents and denies any inaccurate characterization or interpretation of that document when read in context and in its entirety.  Daubenspeck is without knowledge or information sufficient to admit or deny the remaining allegations in paragraph 110.

111.    The Business Plan also identified "Karma Operating Assumptions" to meet the Karma Milestones, including:

- Engineering complete by 5/2010 – 3000 parts released
- Tooling release by 5/21/2010
- Valmet main production line ready -- 10/25/2010
- Start of Production -- February 2011

**ANSWER**:  To the extent the allegations in paragraph 111 refer to a April 2010 Business Plan, Daubenspeck refers to that document for its true and correct contents and denies any inaccurate characterization or interpretation of that document when read in context and in its

entirety.  Daubenspeck is without knowledge or information sufficient to admit or deny the

remaining allegations in paragraph 111.

112.    On or about April 22, 2010, Fisker Automotive and the DOE executed the non-public final term loan and credit facility for the ATVM Loan. Defendant DaMour signed the ATVM Loan agreement on behalf of Fisker Automotive as approved by Fisker Automotive's Board of Directors, including Defendants Lane, Daubenspeck, Richard Li Tzar Kai, Henrik Fisker, and Koehler.

**ANSWER**:  To the extent the allegations in paragraph 112 refer to a loan

agreement between Fisker Automotive and the DOE, Daubenspeck refers to that agreement for

its true and correct contents and denies any inaccurate characterization or interpretation of that

agreement when read in context and in its entirety.  Daubenspeck is without knowledge or

information sufficient to admit or deny the remaining allegations in paragraph 112, except

Daubenspeck admits that Fisker Automotive and the DOE entered into a Loan Arrangement and

Reimbursement Agreement on or around April 22, 2010 and that Defendant DaMour signed that

agreement on behalf of Fisker Automotive.

113.    Among other things, the ATVM Loan incorporated the Valmet Assembly Agreement as a "Project Document" and had multiple provisions requiring the Company, *inter alia*, to promptly tell the DOE if the Company missed any of the Karma milestones identified in the Karma Project timetable. In addition, the ATVM Loan incorporated the April 2010 Business Plan and similarly required the Company to tell the DOE if there were, *inter alia*, any changes or *expected changes* in the Company's ability to meet the milestone requirements identified therein.

**ANSWER**:  The allegations of paragraph 113 set forth conclusions of law to

which no response is required.  To the extent the allegations in paragraph 113 refers to a loan

agreement between Fisker Automotive and the DOE and the Valmet Assembly Agreement,

Daubenspeck refers to those agreements for their true and correct contents and denies any

inaccurate characterization or interpretation of those agreements when read in context and in

their entirety.  Daubenspeck is without knowledge or information sufficient to admit or deny the

remaining allegations in paragraph 113.

114.    On or about May 5, 2010, Fisker Automotive closed on the Series A-1 Round, raising $145 million. Of that $145 million, $27 million came from AEI through the investments of 347 private investors in AEI's Fisker SPVs, including Plaintiffs ASC and MCP.

**ANSWER**: Daubenspeck is without knowledge or information sufficient to admit

or deny the remaining allegations of paragraph 114, except Daubenspeck denies that $27 million

of the Series A-1 Round "came from AEI."

115.    The Series A-1 Round offering documents, including the CPPM and SOE, discussed the ATVM Loan at length, including its importance to the Company's ability to operate and the risks associated with the Company's failure to comply with the ATVM Loan terms. At no time prior to the May 5, 2010 close did Defendants disclose in any CPPM or SOE for the Series A-1 Round provided to Plaintiffs that: (i) that they had misled the DOE in connection with the CCL by submitting a Business Plan to the DOE in August 2009 that falsely reflected Fisker Automotive commencing production of the Karma in mid-2010 with sales of 6,000 Karmas in that year, as discussed above; (ii) it was impossible for the Company to meet the Production and Tooling Release milestone dates required under the Valmet Assembly Agreement and April 2010 Business Plan, because the Company's suppliers had stopped working on the Karma project months earlier, and, contrary to Defendants' statements to the DOE, in, e.g., the February 4, 2010 meeting at Orrick's office, not all of them had restarted work on the Karma project; (iii) the April 2010 Business Plan given to the DOE, upon which the ATVM Loan was executed, was based on materially false and understated costs for the Karma and Nina programs; (iv) Defendants' failure to disclose this information to the DOE violated the CCL issued in September 2009 and ATVM Loan terms; and (v) the financial information presented in the Series A-1 Round CPPM materially understated the cost information for the Karma and Nina programs.

**ANSWER**:  The allegations of paragraph 115 set forth conclusions of law to

which no response is required.  To the extent the allegations in paragraph 115 refer to Series A-1

offering documents, Daubenspeck refers to those documents for their true and correct contents

and denies any inaccurate characterization or interpretation of those documents when read in

context and in their entirety.  Daubenspeck is without knowledge or information sufficient to

admit or deny the remaining allegations in paragraph 115.

116.    Fisker Automotive began to receive funds under the ATVM Loan in or around May 2010. Under the ATVM Loan, Fisker Automotive would submit Advance Requests that, *inter alia*, required a certification by Fisker Automotive's Chief Financial Officer, that:

(i) All Milestones contemplated to be achieved as of the Requested Advance Date have been substantially completed and (ii) the Final Completion of Each Project **is**

**reasonably expected to occur** on or before the relevant Milestone Completion Date specified in the most recent Business Plan.

* * *

No Default or Event of Default has occurred or is continuing on the date hereof [through the funding of the Advance Request].

* * *

Since December 31, 2008, no event has occurred **or could reasonably be expected to occur** . . . with respect to either Project . . . that individually or in the aggregate, has had or **could reasonably be expected to have** a Material Adverse Effect.

(Emphasis added.)

**ANSWER**: The allegations of paragraph 116 set forth conclusions of law to which no response is required. To the extent the allegations in paragraph 116 refer to ATVM loan documents, Daubenspeck refers to those documents for their true and correct contents and denies any inaccurate characterization or interpretation of those documents when read in context and in their entirety. Daubenspeck is without knowledge or information sufficient to admit or deny the remaining allegations in paragraph 116.

117.     According to Weidner's qui tam complaint, beginning "[i]n May of 2010, immediately after Fisker initially drew down on the DOE loan, Fisker began to operate with three sets of company forecasts. . . . The first set for . . . internal purposes . . . was an accurate reflection of Fisker's financial forecasts. . . . The second was for investors, and reflected a very optimistic forecast. . . . The final set was for DOE, and was intended to be used only if DOE requested Fisker's financial forecasts, but was not accurate." Weidner alleged that "this process went on for approximately one and a half years."

**ANSWER**: To the extent the allegations in paragraph 117 refer to the Weidner qui tam complaint, Daubenspeck refers to that document for its true and correct contents and denies any inaccurate characterization or interpretation of that document when read in context and in its entirety. Daubenspeck is without knowledge or information sufficient to admit or deny the remaining allegations in paragraph 117.

118.    On or about June 17, 2010, Vassallo arranged for the KPCB FWG, the KPCB Managing Members, and other Kleiner Perkins partners to go on a "field trip" to Fisker Automotive's headquarters. Joining the KPCB FWG was Ryan Popple, who previously was the Senior Finance Director at Fisker Automotive's arch competitor, Tesla Motors.

**ANSWER**:  Paragraph 118 appears to quote from an unidentified document, and Daubenspeck refers to that document for its true and correct contents and denies any inaccurate characterization or interpretation of that document when read in context and in its entirety. Daubenspeck is without knowledge or information sufficient to admit or deny the remaining allegations in paragraph 118.

119.



**ANSWER**: To the extent the allegations in paragraph 119 refer to an email from Vassallo and various attachments thereto, Daubenspeck refers to that email and its attachments for their true and correct contents and denies any inaccurate characterization or interpretation of that email and its attachments when read in context and in their entirety.  Daubenspeck is without knowledge or information sufficient to admit or deny the remaining allegations in paragraph 119.

120.



**ANSWER**:  To the extent the allegations in paragraph 119 refer to an email from Vassallo and various attachments, Daubenspeck refers to that email and its attachments for their true and correct contents and denies any inaccurate characterization or interpretation of that email and its attachments when read in context and in their entirety.  Daubenspeck is without knowledge or information sufficient to admit or deny the remaining allegations in paragraph 120.

121.



**ANSWER**:  To the extent the allegations in paragraph 121 refer to a memorandum dated June 21, 2010, Daubenspeck refers to that memorandum for its true and correct contents and denies any inaccurate characterization or interpretation of that memorandum when read in context and in its entirety.  Daubenspeck is without knowledge or information sufficient to admit or deny the remaining allegations in paragraph 121.

122.     However, Fisker Automotive's failure to pay its suppliers and self-imposed design and engineering changes – which brought the Karma project to halt before the ATVM Loan was executed -- continued, triggering a domino effect of delays with suppliers who were supposed to manufacture these parts, as well as the difficulties Fisker Automotive was experiencing in even securing suppliers who could provide in reliably producible quantities the hundreds of unique components necessary for Valmet to manufacture the Karma.

**ANSWER**: Daubenspeck is without knowledge or information sufficient to

admit or deny the allegations in paragraph 122.

123.     These material delays were highlighted in the testimony and
accompanying exhibits of Robert Dupuis, Director of Program Management at Fisker
Automotive, whose deposition was taken in this action on March 21, 2017. His testimony and
contemporaneous Company reports demonstrated, *inter alia*, that Fisker Automotive repeatedly
missed multiple Karma pre-production milestones under the Project timetable, the April 2010
Business Plan, and the updated Business Plan sent to the DOE on November 15, 2010 (discussed
below) -- which Defendants knew made it impossible for the Company to meet the defined
February 2011 Karma start of production date. According to Mr. Dupuis, these delays were "well
known" throughout the Company, were reflected in multiple weekly and other periodic reports
and meetings that Defendants Fisker, Koehler, and DaMour received and/or participated in.

**ANSWER**: To the extent the allegations in paragraph 123 refer to the transcript

of Robert Dubpuis' deposition and the deposition exhibits marked in connection therewith,

Daubenspeck refers to the transcript and those exhibits for their true and correct contents and

denies any inaccurate characterization or interpretation of the transcript and those exhibits when

read in context and in their entirety.  Daubenspeck is without knowledge or information

sufficient to admit or deny the remaining allegations in paragraph 123.

124.     Indeed, Zuklie, who was reviewing the August 2010 investor "Roadshow
presentation" prepared by, *inter alia*, the Company and JP Morgan (the banker selected to raise
the $45 million in Fall of 2010), in an email to Defendant DaMour and others, questioned the
accuracy of the statement, "All parts sourced and released" in a chart in that presentation entitled
"Karma: On Path to February 2011 Launch," noting that "All" was potentially "too strong."

**ANSWER**: To the extent the allegations in paragraph 124 refer to an email from

Zuklie to Defendant Damour and an August 2010 investor "Roadshow presentation,"

Daubenspeck refers to those documents for their true and correct contents and denies any

inaccurate characterization or interpretation of those documents when read in context and in their

entirety.  Daubenspeck is without knowledge or information sufficient to admit or deny the

remaining allegations in paragraph 124.

125.    At this point in time, Defendant Kleiner Perkins owned 15.87% of the preferred stock of Fisker Automotive, and AEI, controlled by Defendant Daubenspeck, owned 29.08%.

**ANSWER**: The allegations of paragraph 25 set forth conclusions of law to which

no response is required.  To the extent that an answer is required, Daubenspeck denies that he

controlled AEI and denies that AEI owned 29.08% of the stock of Fisker Automotive.

Daubenspeck is without knowledge of information sufficient to admit or deny the remaining

allegations in paragraph 125.

126.    Nonetheless, between May 2010 and September 2010, Fisker Automotive submitted five Advance Requests and received approximately $125 million from DOE without informing DOE of these delays as required under the ATVM Loan terms. Defendant DaMour signed these Advance Requests on behalf of Fisker Automotive certifying, *inter alia*, that the Company was achieving and expected to achieve all relevant Karma project milestones.

**ANSWER**:  Daubenspeck is without knowledge of information sufficient to

admit or deny the allegations in paragraph 126.

127.    [1] The delays in the Karma's production caused in part by the continuing design changes and/or resourcing of suppliers also caused the Company's costs to exceed by far, and/or to be expected to exceed by far, the budgeted amounts. [2] Thus, in the fall of 2010, Defendants determined that the Company should expand the earlier offering of securities to raise capital. [3] A presentation for a Board of Directors meeting held on or about October 25, 2010, and attended by Defendants, reflects that Defendants were planning for at least a three month delay in the pre-production Karma milestones, stating, *inter alia*: "Shift [Karma] Development and Tooling by One Quarter." [4] Defendants were required to disclose to DOE this potential change in plan under the terms of the ATVM Loan. [5] They did not.

**ANSWER**:  Daubenspeck is without knowledge of information sufficient to

admit or deny the allegations in the first sentence of paragraph 127.  With respect to the second

sentence of paragraph 127, Daubenspeck denies that he had any part in determining whether or

not the Company "should expand the earlier offering of securities to raise capital," and is without

knowledge or information sufficient to admit or deny the remaining allegations in that sentence.

The third sentence of paragraph 127 refers to a Board of Directors presentation, and

Daubenspeck refers to that presentation for its true and correct contents and denies any

inaccurate characterization or interpretation of that presentation when read in context and in its entirety.  The fourth sentence of paragraph 127 sets forth conclusions of law to which no response is require.  Daubenspeck is without knowledge or information sufficient to admit or deny the remaining allegations in paragraph 127.

## IV.   **Defendants Falsely Tell DOE that Fisker Automotive Met the Karma Production Milestone and Misrepresent and Omit Material Facts in the Offering Documents and on Conference Calls, and Defendants Launch the Series B-1 and C-1 Rounds**

128.   [1] In November 2010, Fisker Automotive announced the Series B-1 Round with AEI as the placement agent. [2] AEI began soliciting investors shortly thereafter and housed the Series B-1 Round offering documents, including the Purchase Agreement, the CPPM, and SOE for that offering, on AEI's Venture Gateway. [3] Fisker Automotive's Board of Directors, management and significant shareholders – including Defendants Lane, Daubenspeck, Richard Li Tzar Kai, Henrik Fisker and Koehler, Defendant DaMour in his role as CFO, and controlling shareholders Defendant Kleiner Perkins (controlled by Defendant Lane) and non-party AEI (controlled by Defendant Daubenspeck) – participated in the drafting and/or approval of the statements in the Series B-1 Round Purchase Agreement, CPPM, and SOE given to investors. [4] These documents discussed at length, *inter alia*, the ATVM Loan, including its importance to the Company's ability to operate and the risks associated with the Company's failure to comply with the ATVM Loan terms.

**ANSWER**:  Daubenspeck admits the first and second sentences in paragraph 128. With respect to the third sentence, Daubenspeck denies that he participated in the drafting and/or approval of the statements in the Series B-1 Round Purchase Agreement, CPPM, and SOE given to investors.  Daubenspeck is without knowledge or information sufficient to admit or deny the allegations in the third sentence of paragraph 128, except that he denies that he controlled AEI and denies that he participated in the drafting or approval of the Series B-1 Round Purchase Agreement, CPPM, and SOE.  The fourth sentence of paragraph 128 purports to summarize certain of the contents of the Series B-1 Round Purchase Agreement, CPPM, and SOE given to investors, and Daubenspeck refers to those documents for their true and correct contents and denies any inaccurate characterization or interpretation of those documents when read in context

and in their entirety.  Daubenspeck is without knowledge or information sufficient to admit or

deny the remaining allegations in paragraph 128.

129.    The Investor Presentation issued in connection with that offering
contained the following chart entitled "Karma: On Path to February 2011 Launch". This chart
falsely reflected that all Karma pre-production milestones were met and/or anticipated to be met
– including FMVSS and EPA certification, defined earlier as a prerequisite for the Karma
February 2011 start of production of an "Ok to sell" vehicle, and also memorialized in the
Valmet Assembly Agreement and April 15, 2010 Business Plan:



**ANSWER**:  The allegations in paragraph 129 set forth conclusions of law to

which no response is required.   To the extent the allegations in paragraph 129 refer to an

Investor Presentation purportedly issued in connection with the Series B-1 offering,

Daubenspeck refers to that presentation for its true and correct contents and denies any

inaccurate characterization or interpretation of that presentation when read in context and in its

entirety.  Daubenspeck is without knowledge or information sufficient to admit or deny the

remaining allegations in paragraph 129.

130.    On November 15, 2010, Defendant DaMour sent to DOE Fisker
Automotive's updated Business Plan, which contained the same false and misleading chart
entitled "Karma: On Path to February 2011 Launch" as in the Series B-1 Offering CPPM, and
the Company's Quarterly Progress Report and Compliance Certificate. Neither the chart nor the
report and compliance certificate disclosed to DOE the material delays and missed milestones in
the Karma production.

**ANSWER**:  The allegations in paragraph 130 set forth conclusions of law to

which no response is required.  To the extent the allegations in paragraph 130 refer to an updated

Business Plan that Defendant Damour allegedly sent to the DOE, Daubenspeck refers to that

business plan for its true and correct contents and denies any inaccurate characterization or

interpretation of that business plan when read in context and in its entirety.  Daubenspeck is

without knowledge or information sufficient to admit or deny the remaining allegations in

paragraph 130.

131.    In November 2010, the Karma experienced another major setback when
the Company discovered that a key component of the Karma manufactured by Quantum and
called an "inverter" – which converted DC power into AC power required to power the Karma –
did not work and did not fit into the Karma chassis. This debacle necessitated a resourcing of the
inverter to another supplier, Magna – which was many months away from being able even to
produce the inverter -- and a redesign of the Karma. The domino effect on other components in
the Karma only further impaired the Company's ability to meet the required pre-production
milestones and the February 2011 start of Karma commercial production milestone.

**ANSWER**:  Daubenspeck is without knowledge or information sufficient to

admit or deny the allegations in paragraph 131.

132.    All of these issues were the subject of a Board of Directors meeting held
on December 3, 2010, attended by all Defendants, and Zuklie on behalf of Orrick. A presentation
at that meeting given by Defendant Koehler, entitled "Karma Product Readiness Review",
detailed the myriad undisclosed delays and missed Karma production milestones -- and the
causes of those delays – including the Company's failure to meet the Karma Production and
Tooling Release milestones in April and May of 2010, described above, which milestones were
not completed until June 30, 2010, representing a material delay, according to the testimony of
Mr. Dupuis. The presentation showed further that the Company would fail to meet any of the
upcoming required milestones required to meet the February 2011 start of commercial

production of the Karma. The presentation also expressly stated that "Pre-Production Builds have been delayed [due to] parts availability caused [by] late designs and design changes." None of these material adverse facts was disclosed to DOE, as required under the ATVM Loan or to Plaintiffs.

**ANSWER**:  To the extent the allegations in paragraph 130 refer to a Board of Directors presentation that was purportedly prepared in connection with a Fisker Automotive Board Meeting held on December 3, 2010, Daubenspeck refers to that presentation for its true and correct contents and denies any inaccurate characterization or interpretation of that presentation when read in context and in its entirety.  Daubenspeck is without knowledge or information sufficient to admit or deny the remaining allegations in paragraph 130.

133.    As reflected in the presentation, Defendants then secretly agreed to violate the definition of the Karma's start of production and "Ok to sell" as stated and/or depicted in the Valmet Assembly Agreement, the Business Plans submitted to the DOE, and the presentations given to investors. Specifically, as shown in the chart below, Defendants agreed to violate that definition, internally stating that "Test timing has 'Ok to sell' falling after SOP (Start of Production)." (Emphasis added.)



CONFIDENTIAL

BKOE00037751

**ANSWER**:  To the extent the allegations in paragraph 133 refer to a Board of Directors presentation that was purportedly prepared in connection with a Fisker Automotive Board Meeting held on December 3, 2010, Daubenspeck refers to that presentation for its true and correct contents and denies any inaccurate characterization or interpretation of that presentation when read in context and in its entirety.  Daubenspeck denies the remaining allegations in paragraph 133.

134.    Defendants did not disclose this material violation to the DOE, as required under the ATVM Loan. Nor did they update any investor presentations, which still contained the same misleading chart entitled "Karma: On Path to February 2011 Launch" that falsely reflected that all Karma pre-production milestones were met and/or anticipated to be met – including FMVSS and EPA certification occurring before the Karma February 2011 start of production.

**ANSWER**:  The allegations in paragraph 134 set forth conclusions of law to which no response is required.  To the extent the allegations in paragraph 134 refer to various investor presentations, Daubenspeck refers to those presentations for their true and correct contents and denies any inaccurate characterization or interpretation of those presentations when read in context and in their entirety.  Daubenspeck is without knowledge or information sufficient to admit or deny the remaining allegations in paragraph 134.

135.    On December 5, 2010, Popple sent an email and attachments to the KPCB FWG, the KPCB Managing Members, and others at Kleiner Perkins associated with its "green" investments, under the subject "Investment Decision: Fisker Series B-1."



**ANSWER**:  To the extent the allegations in paragraph 135 refer to a December 5, 2010 email and the attachments thereto, Daubenspeck refers to that email and its attachments for their true and correct contents and denies any inaccurate characterization or interpretation of that email and its attachments when read in context and in their entirety.  Daubenspeck is without knowledge or information sufficient to admit or deny the remaining allegations in paragraph 135.

136.

**ANSWER**:  To the extent the allegations in paragraph 136 refer to a December 5, 2010 email and the attachments thereto, Daubenspeck refers to that email and its attachments for their true and correct contents and denies any inaccurate characterization or interpretation of that email and its attachments when read in context and in their entirety.  Daubenspeck is without knowledge or information sufficient to admit or deny the remaining allegations in paragraph 136.

137.    None of this inside information used by the KPCB Managing Members in their investment decision was disclosed to investors such as Plaintiffs.

**ANSWER**:  To the extent the allegations in paragraph 137 refer to a December 5, 2010 email and the attachments thereto, Daubenspeck refers to that email and its attachments for their true and correct contents and denies any inaccurate characterization or interpretation of that email and its attachments when read in context and in their entirety.  Daubenspeck is without knowledge or information sufficient to admit or deny the remaining allegations in paragraph 137.

138.    Fisker Automotive submitted Advance Requests signed by Defendant DaMour in December 2010, January 2011, and February 2011, collecting another $47 million from DOE, while falsely certifying that the Karma was proceeding according to the agreed-upon Business Plan submitted to DOE in November 2010, and that Fisker Automotive "reasonably expected" it would meet the Karma Production Milestone.

**ANSWER**: The allegations of paragraph 138 set forth conclusions of law to which no response is required.  To the extent an answer is required, Daubenspeck is without knowledge or information sufficient to admit or deny the remaining allegations in paragraph 138.

139.

**ANSWER**: Paragraph 139 contains no allegations and therefore no answer is required.

140.    By the time the Board next met on February 28, 2011, Fisker Automotive's internal business plan confirmed a disaster consistent with what Defendants discussed at the December 3, 2010 meeting. All Defendants were present at this meeting. The presentations used at this meeting detailed the same undisclosed change in definition described at the December 3, 2010 Board meeting, where Defendants secretly redefined the Karma's start of production and "Ok to sell" to reflect the reality that the Karma production was far behind schedule. At this meeting, the Board decided that Fisker would issue another offering of securities to raise additional capital necessary in light of these undisclosed issues. The Series B-1 Round closed March 16, 2011, and raised an additional $190 million, including $27 million from AEI through investments from 285 investors, including certain Plaintiffs: I2BF, ASC, and MCP. At no time prior to that close did Defendants disclose in any CPPM or SOE provided to Plaintiffs and the other investors that: (i) production of the Karma had been delayed and that Fisker Automotive would not be able to fulfill the Karma Production Milestone; or (ii) that Fisker Automotive had defaulted on the ATVM Loan by falsely certifying in the Advance Requests, submitted from December 2010 through February 2011, that Karma production was proceeding according to the agreed-upon plan with DOE.

**ANSWER**:  Daubenspeck is without knowledge or information sufficient to admit or deny the allegations in paragraph 128, except that Daubenspeck admits that he attended the Fisker Automotive Board meeting held on or about December 3, 2010.

141.    The Series B-1 Round Preferred Stock Purchase Agreement placed on the Venture Gateway also falsely stated at ¶2.11:

> Disclosure. The Company has provided each Purchaser with all the information reasonably available to the Company that such Purchaser has requested for the purposes of determining whether to purchase the Shares. None of the Transaction Agreements nor any other documents delivered in connection with the transactions contemplated by the Transaction Agreements contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements herein and therein not misleading. To the Knowledge of the Company, there is no fact that has not been disclosed herein or otherwise by the Company to the Purchasers that would reasonably be likely to have a Material Adverse Effect on the Company. (Emphasis added.)

**ANSWER**: The allegations in paragraph 141 set forth conclusions of law to which no response is required.  To the extent that the allegations in paragraph 141 refer to the Series B-1 Round Preferred Stock Purchase Agreement, Daubenspeck refers to that purchase agreement for its true and correct contents and denies any inaccurate characterization or interpretation of that purchase agreement when read in context and in its entirety.  Daubenspeck denies the remaining allegations in paragraph 141.

142.    On March 17, 2011, Defendant DaMour submitted an Advance Request for $9,265,000, again certifying, *inter alia*, that all milestones triggered as of that date had been met.

**ANSWER**:  Daubenspeck is without knowledge or information sufficient to admit or deny the allegations in paragraph 142.

143.    On or about March 21, 2011, Defendants DaMour, Koehler, and Fisker delivered a non-public presentation to DOE officials which falsely reflected that the February 2011 Karma commercial production milestone under the ATVM Loan had been met in Q1 i.e. by the date of the meeting with the DOE. Fisker Automotive's failure to meet this milestone was an "Event of Default" under the ATVM Loan. By falsely certifying compliance with the ATVM Loan terms, Defendants temporarily avoided DOE's discovery of a default event concerning the Karma Production Milestone and improperly obtained approximately $20 million in three

separate Advance Requests between the end of March and May 2011 by falsely certifying compliance with the ATVM Loan terms.

**ANSWER**:  The allegations of paragraph 143 set forth conclusions of law to which no response is required.  To the extent an answer is required, Daubenspeck is without knowledge or information sufficient to admit or deny the allegations in paragraph 143.

144.   Fisker Automotive's Board of Directors, management and significant shareholders – including Defendants Lane, Daubenspeck, Richard Li Tzar Kai, Henrik Fisker and Koehler, Defendant DaMour in his role as CFO, and controlling shareholders Defendant Kleiner Perkins (controlled by Defendant Lane) and non-party AEI (controlled by Defendant Daubenspeck) – were aware of or recklessly disregarded the falsity of Fisker Automotive's March 2011 presentation to DOE. They were informed of the truth that Defendants hid from both DOE and Plaintiffs – that the Company had missed the Karma Production Milestone -- through, *inter alia*, a presentation made at the February 28 2011, Board of Directors meeting. An email exchange dated March 20, 2011, between Matt Paroly, Fisker's in-house counsel, and Kleiner Perkins partner Ryan Popple further confirmed that the Company had missed the commercial production milestone.

**ANSWER**:  The allegations of paragraph 144 set forth conclusions of law to which no response is required.  To the extent an answer is required, Daubenspeck denies the allegations in paragraph 144.

145.   Defendants withheld from the DOE this milestone miss even though several of them, including Defendant Lane and other Kleiner Perkins principals, routinely met with the DOE, and even though the ATVM Loan terms required full disclosure of such matters to the DOE.

**ANSWER**:  The allegations of paragraph 145 set forth conclusions of law to which no response is required.  To the extent an answer is required, Daubenspeck denies the allegations in paragraph 145.

146.   [1] In or around March 31, 2011, Advanced Equities solicited investors in connection with a $100 million offering of Series C-1 Round Preferred Stock. [2] AEI began soliciting investors shortly thereafter and housed the Series C-1 offering documents, including the Purchase Agreement, the CPPM, and the SOE for that offering, on AEI's Venture Gateway. [3] Fisker Automotive's Board of Directors, management and significant shareholders – including Defendants Lane, Daubenspeck, Richard Li Tzar Kai, Henrik Fisker and Koehler, Defendant DaMour in his role as CFO, and controlling shareholders Defendant Kleiner Perkins (controlled by Lane and Doerr) and non-party AEI (controlled by Daubenspeck) – participated in the drafting and/or approval of the statements in the Series C-1 Round Purchase Agreement,

CPPM, and SOE given to investors. [4] These statements discussed at length, *inter alia*, the ATVM Loan, including its importance to the Company's ability to operate and the risks associated with the Company's failure to comply with the ATVM Loan terms.

**ANSWER**:  Daubenspeck admits the first and second sentences in paragraph 146.

With respect to the third sentence of paragraph 146, Daubenspeck denies that he participated in

the drafting and/or approval of the statements in the Series C-1 Round Purchase Agreement,

CPPM, and SOE given to investors.  Daubenspeck is without knowledge or information

sufficient to admit or deny the remaining allegations in the third sentence of paragraph 146.  The

fourth sentence of paragraph 146 purports to summarize certain of the contents of the Series C-1

Round Purchase Agreement, CPPM, and SOE given to investors, and Daubenspeck refers to

those documents for their true and correct contents and denies any inaccurate characterization or

interpretation of those documents when read in context and in their entirety.   Daubenspeck is

without knowledge or information sufficient to admit or deny the remaining allegations in

paragraph 146.

147.    The CPPM and SOE documents made no disclosure of the material fact that the Company had in fact missed the Karma Production Milestone or that Fisker Automotive had falsely told DOE it had met that milestone.

**ANSWER**:  The allegations in paragraph 147 set forth conclusions of law to

which no response is required.  To the extent an answer is required, Daubenspeck denies the

allegations in paragraph 147.

148.    The Series C-1 Preferred Stock Purchase Agreement placed on the Venture Gateway also falsely stated at ¶2.11:

> Disclosure. The Company has provided each Purchaser with all the information reasonably available to the Company that such Purchaser has requested for the purposes of determining whether to purchase the Shares. None of the Transaction Agreements nor any other documents delivered in connection with the transactions contemplated by the Transaction Agreements contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements herein and therein not misleading. To the Knowledge of the Company, there is no fact that has not been disclosed herein or otherwise by the Company to

the Purchasers that would reasonably be likely to have a Material Adverse Effect on the Company.

(Emphasis added.)

**ANSWER**:  The allegations in paragraph 148 set forth conclusions of law to which no response is required.  To the extent an answer is required, Daubenspeck denies the allegations in paragraph 148.

149.  According to the GP Supercars arbitration claim discussed above:

In March 2011, Pizzuto attended the Geneva Auto Show. While there, he met with Lane who told him that he and the rest of the Board of Directors had just come from the Valmet factory where the Fisker Karmas were being produced. Lane represented that he observed that the Karmas were 'close to completion' and would be 'delivered shortly.' He was excited and stressed that 'Franco, we're almost there.' Lane never mentioned or disclosed that there were any technological or design problems with the Karmas, which could delay or prevent near-term production.

In April 2011, Pizzuto attended the Top Marques Auto Show in Monaco. The Fisker Karmas failed to arrive as planned for the European demonstration and test drive. Pizzuto was very upset by this negative development. To allay his concerns, Fisker took him for drinks at a nearby hotel and represented that the Karmas were delayed slightly, but that they were coming shortly.

(Emphasis added.)

**ANSWER**:  To the extent that the allegations in paragraph 149 refer to the GP Supercars arbitration claim, Daubenspeck refers to that document for its true and correct contents and denies any inaccurate characterization or interpretation of that document when read in context and in its entirety.  Daubenspeck is without knowledge or information sufficient to admit or deny the remaining allegations in paragraph 149.

150.  On April 6, 2011, AutoblogGreen published an article entitled "Electric vehicle newcomers still in front after first round, but for how long?" The portion of the article discussing Fisker Automotive quoted Defendants Lane and Henrik Fisker, and stated in relevant part:

One of the advocates of the newer entrants is Ray Lane, Managing Partner at Kleiner Perkins Caufield & Byers who is one of the main shareholders at Fisker. He told me:

> It's all about focus. Typically start-ups have to have one person that is 'the best' at something and that drives the whole culture. OEM's have lost that. They are monoliths playing out what they think the industry wants rather than trying to change the game. When you take Henrik [Fisker] out of the bureaucracy or have an entrepreneur like Elon, who isn't encumbered by "what the industry thinks", then magic happens. When the OEM's catch up, these companies need to retain what made them special.

So I asked Henrik Fisker what it was that made Fisker so special that he was going to be able to compete and win against the world's leading luxury car makers, and he said:

> Fisker Automotive's brand sends a clear message of 'caring' about our environment and our dependence of oil, combining this with extreme style and power, to evoke the emotional side, that made us fall in love with the automobile in the first place. This is a clear message that the driver will project by owning one of our cars: Responsible luxury.

**ANSWER**: To the extent the allegations in paragraph 150 refer to statements in the April 6, 2011 article entitled "Electric vehicle newcomers still in front after first round, but for how long?" that was published in *AutoblogGreen*, Daubenspeck refers to that article for its true and correct contents and denies any inaccurate characterization or interpretation of that article when read in context and in its entirety. Daubenspeck is without knowledge or information sufficient to admit or deny the remaining allegations in paragraph 150.

151.     On April 13, 2011, Defendants held a webcast conference call with investors, a recording of which was maintained for future viewing on AEI's Venture Gateway website. Participating on the conference call were Defendants Henrik Fisker, Koehler, and DaMour. During the call, Henrik Fisker falsely stated that commercial production of the Karma had begun, while referring investors to a PowerPoint chart falsely depicting that commercial production of the Karma had commenced. The PowerPoint and the webcast were stored on AEI's Venture Gateway for future replay.

**ANSWER**: Daubenspeck is without knowledge or information sufficient to admit or deny the allegations in paragraph 151, except Daubenspeck admits that Fisker

Automotive offering materials and other investor materials were made available to investors

through the Venture Gateway.

152.    During the same timeframe, on behalf of Fisker Automotive, Middlebury circulated a Confidential Private Placement Memorandum (the "April 2011 CPPM") to the Middlebury Plaintiffs, soliciting qualified investors to purchase as much as $25 million in "membership units" in Middlebury's affiliated special purpose vehicles ("SPV"), priced at $1.34 per unit (the "April 2011 Offering"). The membership units would be based exclusively on Middlebury's purchase of "Fisker [Automotive] Series C-1 Shares pursuant to the Fisker [Automotive] Series C-1 transaction documents" which could be viewed only by potential investors "by following the instructions set forth on Exhibit D" to the April 2011 CPPM (i.e. the Fisker Automotive documents could not be viewed without having the password included in the April 2011 CPPM).

**ANSWER**: Daubenspeck admits that Fisker Automotive sold securities and

made certain offering documents available to accredited investors.  To the extent the allegations

in paragraph 152 refer to those offering documents, Daubenspeck refers to the offering

documents for their true and correct contents and denies any inaccurate characterization or

interpretation of the offering documents when read in context and in its entirety.  Daubenspeck is

without knowledge or information sufficient to admit or deny the remaining allegations in

paragraph 152.

153.    On or around April 19, 2011, on behalf of Fisker Automotive, Middlebury circulated an email to the Middlebury Plaintiffs in connection with the April 2011 Offering attaching an LLC Membership Agreement between investors in the Middlebury special purpose vehicle (i.e. Middlebury Ventures II, LLC) and Fisker Automotive stating in part:

> The attached Middlebury SPV Member Acknowledgment Form must be completed before we can accept your completed investment in Fisker Automotive. We received this document today (Wednesday April 19th) and apologies for having not been able to send it out before now. **Fisker wants to ensure that each investor is an Accredited Investor as defined by the Securities Act and as such will not accept anyone [sic] investment without having the attached form executed**. (Emphasis added.)

**ANSWER**:  Daubenspeck admits that Fisker Automotive made certain offering

documents available and sold securities to accredited investors.  To the extent the allegations in

paragraph 153 refer to those offering documents, Daubenspeck refers to the offering documents

for their true and correct contents and denies any inaccurate characterization or interpretation of the offering documents when read in context and in its entirety.   Daubenspeck is without knowledge or information sufficient to admit or deny the remaining allegations in paragraph 153.

154. 

**ANSWER**: To the extent the allegations in paragraph 154 refer to an April 28, 2011 email from Vassallo and attachments thereto, Daubenspeck refers to those documents for their true and correct contents and denies any inaccurate characterization or interpretation of those documents when read in context and in their entirety.  Daubenspeck is without knowledge or information sufficient to admit or deny the remaining allegations in paragraph 154.

155.    None of this inside information used by the KPCB Managing Members in their investment decision was disclosed to investors such as Plaintiffs.

**ANSWER**: Daubenspeck is without knowledge or information sufficient to admit or deny the allegations in paragraph 155.

156. 

Similarly, none of this inside information was disclosed to other investors such as Plaintiffs.

**ANSWER**:  Daubenspeck is without knowledge or information sufficient to

admit or deny the allegations in paragraph 156.

157.    As of May 2011, AEI (controlled by Defendant Daubenspeck) owned 14.61%, Defendant Kleiner Perkins owned a 12.61%, and Defendant Li, through Ace, owned 10.15% of the voting shares in Fisker. Daubenspeck agreed with Kleiner Perkins and Lane that AEI would vote its shares as directed by Kleiner Perkins and Lane.

**ANSWER**:  Daubenspeck is without knowledge or information sufficient to

admit or deny the allegations in the first sentence of paragraph 157, except Daubenspeck admits

that certain Fisker Automotive stockholders invested in Fisker Automotive through SPVs formed

by AEI,  denies that he controlled AEI, denies that AEI owned 14.61% of the voting share in

Fisker, and denies the second sentence of paragraph 157.

158.    The Series C-1 Offering was oversubscribed and by early May 2011, Fisker Automotive raised an additional $115 million in private equity, including investments from Kleiner Perkins and AEI Fisker SPVs.

**ANSWER**:  Daubenspeck is without knowledge or information sufficient to

admit or deny the allegations in paragraph 158.

159.    On May 13, 2011, VentureBeat published an article headlined "Luxury hybrid electric car maker Fisker Automotive raises an extra $100M" stating in part:

> [Defendant] Lane, a managing partner at storied venture capital firm Kleiner Perkins Caufield & Byers, said Fisker Automotive also plans to go public in the future in an interview with the Wall Street Journal. The company is backed by Kleiner Perkins, as well as New Enterprise Associates and A123 Systems Inc. (NASDAQ:AONE). Fisker Automotive raised $190 million just two months ago to help fund the production of its electric cars.

**ANSWER**:  To the extent the allegations in paragraph 159 refer to statements in

the May 13, 2011 *VentureBeat* article entitled "Luxury hybrid electric car maker Fisker

Automotive raises an extra $100M," Daubenspeck refers to that article for its true and correct

contents and denies any inaccurate characterization or interpretation of that article when read in

context and in its entirety.  Daubenspeck is without knowledge or information sufficient to admit

or deny the remaining allegations in paragraph 159.

160.    On June 13, 2011, Automotive News published an article entitled "Electrifying 100," profiling Fisker Automotive and Ray Lane, stating in full:

RAY LANE

Managing partner, Kleiner Perkins Caufield & Byers Chairman, Fisker Automotive Chosen because: Kleiner Perkins Caufield & Byers had invested in other green tech plays such as solar power and biofuels but hadn't found any appealing transportation companies, said Lane, 64. Until he saw the Fisker Karma luxury plug-in hybrid, that is. It was an electric vehicle that would appeal to more than just green buyers, he figured. Kleiner Perkins Caufield & Byers invested what Lane calls 'a lot by our standards' in Fisker Automotive in 2008. Lane chairs the company's board.

Kleiner Perkins Caufield & Byers made a smaller investment in Think, a Norwegian producer of small city electric vehicles. That stake has since been sold back to Think. Lane says he isn't looking for more electric car companies to invest in - for now. But he is eagerly awaiting his Fisker Karma. Several thousand of the pricey EVs will be in consumer hands by the end of 2011, Lane says. He will receive Serial No. 2.

Quote: 'Reduce demand for oil by 5 to 10 percent, and you start to control pricing.'

**ANSWER**:  To the extent that  paragraph 160 refers to statements in the June 13, 2011 *Automotive News* article entitled "Electrifying 100," Daubenspeck refers to that article for its true and correct contents and denies any inaccurate characterization or interpretation of that document when read in context and in its entirety.  Daubenspeck is without knowledge or information sufficient to admit or deny the remaining allegations in paragraph 160.

## V.    DOE Discovers that Defendants Had Made Misrepresentations about Meeting the Karma Production Milestone and Halts Further Funding, and Defendants Mislead Investors in the Series D-1 Round as to the Status of the ATVM Loan and the Causes and Severity of Fisker Automotive's Production and Cash Flow Problems

161.    In June 2011, Fisker Automotive made a non-public presentation to the DOE that contradicted its March 2011 representation to the DOE that Fisker Automotive had met the February 2011 Karma commercial production commencement milestone under the ATVM Loan. Importantly, Fisker's March 2011 representation to the DOE of its satisfaction of that

milestone had avoided a default on the ATVM Loan as of February 2011, even as Fisker continued to draw approximately $20 million from March through May 2011. DOE immediately challenged this inconsistency, to which Fisker Automotive had no credible response.

       **ANSWER**:  Daubenspeck is without knowledge or information sufficient to

admit or deny the allegations in paragraph 161.

       162.     Believing it had been misled, DOE immediately froze the ATVM Loan and refused to allow Fisker Automotive to draw any further funds.

       **ANSWER**:  Daubenspeck is without knowledge or information sufficient to

admit or deny the allegations in paragraph 162.

       163.     Needing to raise cash to replace DOE loan funds that had been cut off, in July 2011, Fisker Automotive began preparations for a new round of private equity financing to raise approximately $150 million by issuing Series D-1 shares of Fisker Automotive. AEI again acted as the placement agent.

       **ANSWER**:  Daubenspeck is without knowledge or information sufficient to

admit or deny the allegations in paragraph 163, except Daubenspeck admits that AEI acted as the

placement agent for the Series D-1 Round.

       164.     [1] AEI began soliciting investors shortly thereafter and housed the Series D-1 offering documents, including the Purchase Agreement, the DNS, and the SOE for that offering, on AEI's Venture Gateway. [2] Fisker Automotive's Board of Directors, management and significant shareholders – including Defendants Lane, Daubenspeck, Richard Li Tzar Kai, Henrik Fisker and Koehler, Defendant DaMour in his role as CFO, and controlling shareholders Defendant Kleiner Perkins (controlled by Lane and Doerr) and non-party AEI (controlled by Daubenspeck) – participated in the drafting and/or approval of the statements in the Series D-1 Round Purchase Agreement, CPPM, and/or DNS and SOE given to investors. [3] These documents discussed at length, *inter alia*, the ATVM Loan, including its importance to the Company's ability to operate and the risks associated with the Company's failure to comply with the ATVM Loan terms.

       **ANSWER**:  Daubenspeck admits the first sentence in paragraph 164.  With

respect to the second sentence of paragraph 164, Daubenspeck denies that he participated in the

drafting and/or approval of the statements in the Series D-1 Round Purchase Agreement, CPPM,

DNS, and SOE given to investors.  Daubenspeck is without knowledge or information sufficient

to admit or deny the remaining allegations in the second sentence of paragraph 164.  The third

sentence of paragraph 164 purports to summarize certain of the contents of the Series D-1 Round

Purchase Agreement, CPPM, DNS, and SOE given to investors, and Daubenspeck refers to those

documents for their true and correct contents and denies any inaccurate characterization or

interpretation of those documents when read in context and in their entirety. Daubenspeck is

without knowledge or information sufficient to admit or deny the remaining allegations in

paragraph 164.

165.    The Purchase Agreement for the Series D-1 Round contained the same
representations as discussed above with respect to Series B-1 and C-1 Rounds Purchase
Agreements, falsely stating that:

> The Company has provided each Purchaser with all the information reasonably
> available to the Company that such Purchaser has requested for the purposes of
> determining whether to purchase the Shares. None of the Transaction Agreements
> nor any other documents delivered in connection with the transactions
> contemplated by the Transaction Agreements contain any untrue statement of a
> material fact or omit to state a material fact necessary to make the statements
> herein and therein not misleading.

(Emphasis added.)

**ANSWER**: The allegations in paragraph 165 set forth conclusions of law to

which no response is required. To the extent that the allegations in paragraph 165 refer to the

Series D-1 Round Purchase Agreement, Daubenspeck refers to that purchase agreement for its

true and correct contents and denies any inaccurate characterization or interpretation of that

purchase agreement when read in context and in its entirety. Daubenspeck denies the remaining

allegations in paragraph 165.

166.    The statements in the DNS, SOE, and Purchase Agreement were
materially false and misleading, because they omitted the material fact that DOE had frozen
Fisker Automotive's access to the ATVM Loan in June 2011, and that DOE had taken that action
as a result of its discovery of Defendants' false statement to DOE in March 2011 that the Karma
Production Milestone had been met.

**ANSWER**: The allegations in paragraph 166 set forth conclusions of law to

which no response is required. To the extent that the allegations in paragraph 166 refer to the

Series D-1 Round offering documents, Daubenspeck refers to those documents for their true and correct contents and denies any inaccurate characterization or interpretation of those documents when read in context and in their entirety.  Daubenspeck denies the remaining allegations in paragraph 166.

167.    Defendants prepared a PowerPoint presentation for distribution to potential investors and also held a conference call with analysts and/or investors on July 27, 2011, which was recorded. The PowerPoint and the webcast were stored on AEI's Venture Gateway for future replay. On the conference call for Fisker Automotive were Defendants Henrik Fisker, Bernhard Koehler and Joe DaMour.

**ANSWER**: Daubenspeck is without knowledge or information sufficient to admit or deny the remaining allegations in paragraph 167, except Daubenspeck admits that offering documents and investor materials were stored on the Venture Gateway, denies that he prepared any PowerPoint presentations for distribution to potential investors, and denies that he was involved with or participated in any conference call with analysts and/or investors on July 27, 2011.

168.    On that call, Defendant DaMour discussed the ATVM Loan (without disclosing that draws had been cut off) as well as Fisker Automotive's cash position, stating in part:

> We've already raised over $600 million worth of equity and <u>when you combine that with the Department of Energy loans, which we secured, which are $530 million – that's $1.1 billion of total capital already secured for the business.</u>

> It's important to emphasize the Department of Energy loans are low interest rate loans that we're drawing them down on approximately 2% interest rate. They are long term in nature. The loans are anywhere from 7 years with the Karma to 16 years for the Nina, 3 years interest only and then they amortize off for the remaining period. And in my experience, it's a quasi-equity structure. Again, it gives you an extremely [inaudible] capital base. There aren't any significant drop-offs or roll-offs in debt that would need to be refinanced at a critical point in the company's development phase.

> In this round and you can see if you go down to the equity funding, what we're targeting and we've laid into the 11 financials, we're targeting a raise of $150 million. To be conservative, we've assumed that we would raise $100 million in 2011 and then we would come back to market in the first half of 2012 to raise

$150 million additional. What that does, if you look at the very bottom of the page, is it allows us to keep our cash position very strong anywhere between $100 to $200 million minimum cash which we think is prudent and appropriate to run the business given the way we are scaling it up. But importantly, a significant cash cushion which provides significant security and comfort to our suppliers and our dealers and all the other major partners we have that run the business with us. So in sum, we know we are very well capitalized today.

(Emphasis added.)

**ANSWER**: Daubenspeck is without knowledge or information sufficient to

admit or deny the allegations in paragraph 168.

169.    In reality, as discussed above, DOE had frozen Fisker Automotive's access to the ATVM Loan, and there was no assurance those funds would ever again be available to the Company, rendering the Company's capital structure highly risky.

**ANSWER**: Daubenspeck is without knowledge or information sufficient to

admit or deny the allegations in paragraph 169.

170.    On August 21, 2011, the News Journal (Wilmington, Delaware) published the following article regarding Fisker Automotive's latest round of fundraising, including the "hype" that a Fisker IPO was just around the corner:

Fisker Automotive is using a flurry of hype surrounding its first car -- the $98,000 Karma hybrid -- to ask for another $200 million from investors, according to a web report from Fortune magazine. Fortune's report said the funding round is being characterized as a 'pre-IPO' round, suggesting that Fisker would not ask investors for more money before it offered its stock publicly.

John Gartner, an electric cars analyst at Pike Research, said 'it's a little unusual to put it that bluntly' but said the money Fisker is looking to raise is 'within reason' given that the company is hoping to produce and market thousands of high-end luxury hybrids.

Fisker insiders have been looking forward to an initial public offering for some time. Ray Lane, Fisker's chairman and managing partner at the venture capital firm Kleiner Perkins Caufield & Byers, told The News Journal last summer that the company would sell shares publicly once the Karma was on the road.

Contacted by email earlier this month, Lane said he could not 'speculate on IPO probability or timing.' Either way, Fisker appears to be capitalizing on some positive attention -- and even some star power on its side. Actor Leonardo DiCaprio was spotted in his silver version of the 2012 Fisker Karma, a $98,000 plug-in hybrid and the company's first car. DiCaprio was one of the first of around

3,000 Karma deposit-holders to get his car. Lane also took early delivery of a
silver Karma.

Delaware, which has $21.5 million invested in Fisker, also should get a closer
look at the car soon. Union Park Automotive in Wilmington, the state's only
Fisker dealer, is scheduled to receive its first Karma next month, says Fisker
spokesman Roger Ormisher. Delaware, ultimately, is to be a second home for
Anaheim, Calif.-based Fisker, which plans to produce its second line of hybrids at
a Newport-area plant formerly owned by General Motors. Production there is
scheduled to begin late next year, and the company is already hiring electrical and
mechanical engineers to retrofit equipment left in the facility.

Fisker would not appear to be short of cash, having raised north of $1 billion
publicly and privately. The company has raised $290 million privately just in the
last several months, which Gartner says likely gives the company confidence
about completing another large funding round.

**ANSWER**: To the extent the allegations in paragraph 170 refer to statements in

the August 21, 2011 *News Journal* article referenced therein, Daubenspeck refers to that article

for its true and correct contents and denies any inaccurate characterization or interpretation of

that article when read in context and in its entirety.  Daubenspeck is without knowledge or

information sufficient to admit or deny the remaining allegations in paragraph 170.

171.    On August 25, 2011, Fisker Automotive, desperate for cash as a result of
DOE's freezing of the ATVM Loan, attempted to submit an Advance Request to DOE. Michael
Mates, the DOE Senior Investment Officer monitoring the ATVM Loan, responded to this
request, indicating that DOE refused the Advance Request, thereby maintaining the freeze it had
put in place two months before. On behalf of DOE, Mates told Fisker Automotive to "withdraw"
the Advance Request – an alternative to DOE's formal denial of the Advance Request. Formal
denial could be triggered under the ATVM Loan only by an "Event of Default", which would
have to be publicly disclosed.

**ANSWER**:  Daubenspeck is without knowledge or information sufficient to

admit or deny the allegations in paragraph 171.

172.    On or about September 15, 2011, Fisker Automotive and AEI opened the
Series D-1 Round to investors. Around this same time, Fisker Automotive belatedly commenced
commercial production of the Karma.

**ANSWER**:  Daubenspeck admits that on or about September 15, 2011, Fisker Automotive opened the Series D-1 Round to investors.  Daubenspeck denies the remaining allegations in paragraph 172.

173.    On September 20, 2011, Fisker Automotive held a conference call with analysts and investors, which was recorded for future replay to potential investors through AEI's Venture Gateway. Defendant DaMour repeatedly "emphasized" the "importance" of the DOE loan to Fisker Automotive. He stated that the DOE loan is "secured" and that "a lot of well established companies that have been public for a long period of time … would love to have a debt structure that we've been able to achieve as a startup company" – thereby underscoring its significance to Fisker Automotive and hence, investors, especially with respect to the development of the Nina (Fisker Automotive's high-volume vehicle), which purportedly was on track to have a prototype built by 1Q12.

**ANSWER**:  Daubenspeck is without knowledge or information sufficient to admit or deny the allegations in paragraph 173, except Daubenspeck admits that offering documents and other investor materials were stored on the Venture Gateway i.

174.    On the call, Defendant DaMour made the following statements that were materially false and misleading in light of the undisclosed fact that DOE had frozen the ATVM Loan and that there was no assurance those funds would ever again be available to the Company, as discussed above:

> One of the things that I think is important to talk about and make sure you are aware is the structure of the DOE financing we've secured…. we've secured almost $360 million worth of financing. Approximately $200 million of that financing is already drawn down, and $170M was for Karma and that's completely drawn down. . . . $360M for the NINA and that amount we've drawn down about $30 million amount so between the NINA $360 million and Karma you've got a total of about $530 million of loans that have been made available to us.
> Importantly, these loans are committed loans with the US government with the Department of Energy and it's important to emphasize there has been quite of bit of discussion in the context of the budget debate that's being held between Congress and the White House about ways to save money and about possible reductions in appropriation money that the DOE has for these technology programs…It's important to emphasize to you all that the reductions they are talking about are appropriations that they've made to the Department of Energy on a total appropriation of $25 billion. The Department of Energy has already committed funds of approximately $8 billion, of which our funds, the $530 million, are already committed. And so when they talk about possible reductions in the total amount appropriated to the Department of Energy, it would really only

impact the monies that the DOE was previously appropriated but have not committed to a given borrower, and so this has no impact on the loans that we have already received from the Department of Energy.

Now importantly, the Karma loans -- they're three year interest only and then four year amortizing for a total of seven years. The NINA three years interest only, thirteen amortized for a total of sixteen years. The interest rates on the loan they're priced flat to Treasuries based on the duration of the loans and our average interest rate is about 2%. <u>That's important to emphasize because when you look at this, there are well established companies that have been public for a long period of time who would love to have a debt structure that we've been able to achieve as a startup company. This is long term debt, it's amortized off in a predictable fashion to allow for refinancing and it also has a very low interest rate which in a lot ways is almost a mezzanine structure. Now importantly, when you look at the financing issue of the Company, when you add to the $530 million of DOE debt</u>, we have over $600 million of equity that's already been raised and that's really the essence of the chart that we have in front of us.

(Emphasis added.)

**ANSWER**: Daubenspeck is without knowledge or information sufficient to admit or deny the allegations in paragraph 174, except Daubenspeck admits that offering documents and other investor materials were stored on the Venture Gateway.

175.    Starting on September 15, 2011 and ending on December 2, 2011, Fisker Automotive closed on twelve rounds of sales of Series D-1 stock, raising a total of approximately $86 million – including sales of membership units in the AEI SPVs. Throughout this period, the Series D-1 Round offering materials, including the Series D-1 Round Purchase Agreement, CPPM, DNS, SOE, and investor conference calls were accessed by Plaintiffs and the Class from AEI's Venture Gateway, where they were maintained. The statements in these documents and on the July 27, 2011 and September 20, 2011 investor conference calls were materially false and misleading because they omitted the material fact that DOE had frozen Fisker Automotive's access to the ATVM Loan in June 2011, and that DOE took that action as a result of Defendants' false statement to DOE in March 2011 that the Karma Production Milestone had been met.

**ANSWER**: Daubenspeck denies the last sentence of paragraph 175. Daubenspeck is without knowledge or information sufficient to admit or deny the remaining allegations in paragraph 175, except Daubenspeck admits that certain Fisker Automotive stockholders invested in the Company's Series D-1 Round through AEI SPVs and that offering documents and other investor materials were stored on the Venture Gateway.

176.     However, in September 2011, Defendant Lane and the KPCB FWG, in conjunction with Defendants Fisker, DaMour, and Koehler, determined that the Company needed to go on a drastic cost reduction program because the Karma's production costs were far higher than had been planned – and could even result in a net loss on sales -- and the Company's expenditures for the NINA were not being reimbursed by the DOE because the ATVM Loan had been frozen.

**ANSWER**:  Daubenspeck is without knowledge or information sufficient to admit or deny the allegations in paragraph 176.

177. ████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
███████

**ANSWER**:  Daubenspeck is without knowledge or information sufficient to admit or deny the allegations in paragraph 177.

178. ██████████████████████████████
██████████████████████████████████
████████████████████████████████████
████████████████████████████████████
██████████████████████████████████
████████████████████████████████
██████████████████████

**ANSWER**:  Daubenspeck is without knowledge or information sufficient to admit or deny the allegations in paragraph 178.

179.     None of this inside information used by the KPCB Managing Members in their investment decision was disclosed to other investors such as Plaintiffs.

**ANSWER**:  Daubenspeck is without knowledge or information sufficient to admit or deny the allegations in paragraph 179.

180. ████████████████████████████████
████████████████████████████████████
████████████████████████████████████
███████████████████████████████
█████████████████████

**ANSWER**:  Daubenspeck is without knowledge or information sufficient to admit or deny the allegations in paragraph 180.

181.    During this time period, a scandal erupted concerning Solyndra, another green energy start up with DOE funding, and Fisker Automotive became a political issue given its similar ties to DOE, becoming the subject of negative stories on major news networks like ABC, CBS, and Fox, as well as major newspapers. With Fisker Automotive in the middle of the Series D-1 Round and on the brink of bankruptcy, the negative publicity could significantly hamper Fisker Automotive's fundraising efforts. Kleiner Perkins quickly sprung into action, taking control of all lobbying and public relations on behalf of the Company (and itself). For example, Kleiner Perkins brought in a lobbying firm that it had on retainer, Bay Bridge Strategies, and hired a public relations firm, TSD Communications, Inc. ("TSD"), to combat any criticisms of Fisker Automotive, DOE, and Kleiner Perkins by the media and Congress. Vassallo and Keller headed up much of these efforts on Kleiner Perkins' behalf, which lasted through April 2013. The KPCB Managing Members were kept apprised of all these activities.

**ANSWER**:  Daubenspeck is without knowledge or information sufficient to admit or deny the allegations in paragraph 181.

182.    Among other things, TSD created media and lobbying plans to deflect attention away from: "questions about the business viability of Fisker"; and "questions about the relationship between Kleiner partners and the Administration" in connection with the DOE approving the ATVM Loan. TSD's media plan included disseminating a false "media narrative" about, *inter alia*, the current state of Fisker's operations to "[p]rotect prospective investors by emphasizing progress and concrete plans for production." TSD also undertook to create an "Inventory of enemies [stating] who are they, what are they saying about us, how can their credibility be undermined?" Vassallo and TSD created "Talking Points" to target audiences – including "confidential" Talking Points to be used to answer questions from Kleiner Perkins limited partners that made no mention of the Company's dire financial state.

**ANSWER**:  Daubenspeck is without knowledge or information sufficient to admit or deny the allegations in paragraph 182.

183.    In addition, according to an email among Defendants Fisker, Koehler, DaMour, Lane and others (including Doerr), the Company had "liaised" with DOE to combat any criticism of Fisker Automotive and the ATVM Loan. On October 20, 2011, DOE issued a press release on its website http://energy.gov, falsely stating as follows:

Two years ago, critics said we shouldn't be investing in American auto manufacturing because the industry wouldn't survive. They were wrong then and they're wrong today. From well-established names like Ford to innovative startups like Tesla and Fisker, America's auto industry is being reinvented, and the Department's loan program is helping play an important role.

* * *

About the Fisker Loan:

With the help of a $529 million loan, Fisker is producing high performance vehicles with an advanced hybrid electric powertrain that could significantly improve performance and fuel economy.

Fisker's loan has two parts. In the first part, Fisker used $169 million to support the engineers who developed the tools, equipment and manufacturing processes for Fisker's first vehicle, the Fisker Karma. That work was done Fisker's U.S. facilities, including its headquarters in Irvine, California which has 700 employees and plans to continue hiring. While the vehicles themselves are being assembled in Fisker's existing overseas facility, the Department's funding was only used for the U.S. operations. The money could not be, and was not, spent on overseas operations. The Karma also relies on an extensive network of hundreds of suppliers in more than a dozen U.S. states.

The larger portion of the loan -- $359 million – is supporting the production of Fisker's Nina vehicles. Fisker is using this funding to bring a shuttered General Motors plant in Delaware back to life and employing more than 2,500 workers. Fisker was attracted to this site in part by the opportunity to rehire some of the trained, dedicated workers who lost their jobs when that plant closed.

Fisker's production schedule was delayed by regulatory issues that were outside of its control, but the company has successfully raised more than $650 million in private sector investment to support its ongoing operations since closing its DOE loan.

(Emphasis added.)

**ANSWER**:  To the extent the allegations in paragraph 183 refer to statements in a October 20, 2011 DOE press release, Daubenspeck refers to that press release for its true and correct contents and denies any inaccurate characterization or interpretation of that press release when read in context and in its entirety.  Daubenspeck is without knowledge or information sufficient to admit or deny the remaining allegations in paragraph 183.

184.    On October 26, 2011, Fisker Automotive held a conference call with investors, which was stored on AEI's Venture Gateway for future replay. Defendants McDonnell, Henrik Fisker, Koehler, and DaMour participated on that call on behalf of the Company. Among other things, investors expressed concerns about the ATVM Loan in light of the recent bankruptcy filing of DOE loan guarantee recipient, Solyndra. Defendant Henrik Fisker

stated that there was no risk of losing the DOE loan and further that, "[w]e also have to follow the rules of the DOE loan which we have fully to a 100% … [a]t the end of the day if you are hiding something then of course you have to be nervous but <u>the fact [is] that we are not hiding anything and that we know we are 100% correct in everything we do</u>." (Emphasis added.)

      **ANSWER**: Daubenspeck is without knowledge or information sufficient to

admit or deny the remaining allegations in paragraph 184, except Daubenspeck admits that

offering documents and other investor materials were stored on the Venture Gateway.

      185.    At the same time, Kleiner Perkins took over the "media control" efforts.

      **ANSWER**: Daubenspeck is without knowledge or information sufficient to

admit or deny the allegations in paragraph 185.

      186.    As Fisker Automotive came under public scrutiny in fall 2011 due to the Solyndra scandal, Defendant Kleiner Perkins orchestrated a sophisticated "media control" effort to continue to deceive Plaintiffs and other investors, along with the public and politicians. This effort sought to promote the story that, "[O]ur production ramp up was delayed by regulatory issues", even though Kleiner Perkins, along with the other Defendants and DOE, knew that story was false.

      **ANSWER**: Daubenspeck is without knowledge or information sufficient to

admit or deny the allegations in paragraph 186.

      187.    In early October 2011, DOE retained Grant Thornton to audit Fisker Automotive's operations and controls. An internal nonpublic DOE document reveals that DOE/Grant Thornton discovered on or about October 28, 2011 that



The internal DOE document also reflects that on November 1, 2011,

      **ANSWER**: To the extent the allegations in paragraph 187 refer to an internal

nonpublic DOE document, Daubenspeck refers to that document for its true and correct contents

and denies any inaccurate characterization or interpretation of that document when read in

context and in its entirety. Daubenspeck is without knowledge or information sufficient to admit

or deny the remaining allegations in paragraph 187.

188. This document further reflects DOE's refusal to resume funding Fisker Automotive despite its dire financial position. Indeed, on or about November 7, 2011, Lane and Daubenspeck met with DOE officials to try to convince DOE to resume funding under the ATVM Loan (in addition to modifying the financial covenants) -- or to at least to reimburse the Company for the $30 million in Nina development expenses the Company had incurred -- but the DOE refused to do so.

**ANSWER**: To the extent the allegations in paragraph 188 refer to an internal

nonpublic DOE document, Daubenspeck refers to that document for its true and correct contents

and denies any inaccurate characterization or interpretation of that document when read in

context and in its entirety. Daubenspeck denies the remaining allegations in paragraph 188.

189. On November 15, 2011, Fisker Automotive confidentially told the DOE that it had received a $37 million "equity inject[ion]" and that its "cash [would now] run out" around December 15, 2011. Nonetheless, DOE still refused to resume funding Fisker Automotive, despite Fisker Automotive's entreaties, because Fisker Automotive was a financial black hole.

**ANSWER**: Daubenspeck is without knowledge or information sufficient to

admit or deny the allegations in paragraph 189.

190. As a consequence, after October 31, 2011, the statements and disclosures regarding Fisker Automotive's financial position and accounting controls in the D-1 Round offering materials, including the CPPM and/or DNS, SOE, and Purchase Agreement, were materially false and misleading because, in addition to the ATVM Loan Omissions, they omitted the existing material facts that: (i) Fisker Automotive's over ordering of obsolete and/or useless inventory, and lack of accounting and operational controls, had caused a liquidity crisis, bringing Fisker Automotive to the brink of insolvency; (ii) these material adverse control issues were structural in nature and, as a result, would only worsen with time, as the Company had ordered (or was contractually obligated to purchase) hundreds of millions of dollars in excess, unusable inventory that it still had to pay for – otherwise Fisker Automotive's suppliers would refuse to deliver any parts, bringing the Karma assembly line to a halt; and (iii) as a result of those structural operational and accounting control failures, DOE had refused to resume funding Fisker Automotive under the ATVM Loan despite the fact that the Company was on the brink of bankruptcy.

**ANSWER**: The allegations in paragraph 190 set forth conclusions of law to which no response is required.  To the extent an answer is required, Daubenspeck denies the allegations in paragraph 190.

191.   On November 18, 2011, the Calgary Herald (Alberta) published an article, based on an interview of Defendant Lane, entitled "Fisker on track to make electric sports cars, despite delays." The article stated in full:

> Fisker Automotive is on track to meet production goals for its electric sports cars in 2012 despite production delays that have sharply reduced the startup carmaker's projected deliveries this year.
>
> Production of Fisker's first vehicle, the plug-in hybrid Karma, was held up by faulty electrical harnesses and head-lights, topped off by a flood that damaged the leather for its interior, according to chairman Ray Lane. 'In production of a first vehicle, everything doesn't go the way you plan,' Lane said in a recent interview. 'Next year, we'll do exactly what we plan.'
>
> Fisker has long said it plans to sell 15,000 Karmas next year. But a spokesman later clarified the target was now 10,000 to 12,000. Some in the industry have questioned whether the vehicle's price tag - which starts at $96,000 - will make that goal unattainable in a weak economy. Fisker's fortunes have come under increased scrutiny in the two months since U.S. solar panel maker Solyndra filed for bankruptcy after securing a $535-million federal loan guarantee. Fisker itself received $529 million in loans from the U.S. Department of Energy under a program similar to the one that funded Solyndra's factory.
>
> Lane's comments come more than a week after Fisker battery supplier A123 Systems Inc. cut its 2011 revenue out-look 20 per cent, blaming a sharp cut in fourth-quarter orders from Fisker. A123 would not say by how much orders were cut back, and Fisker had no comment on the delays at the time.
>
> Lane, however, said Fisker would deliver 1,500 cars this year, a lot fewer than the 7,000 vehicles the company said it would sell this year when it began production of the Karma in Finland in March. The company is building about 150 vehicles a week, Lane said.
>
> The major delays, according to Lane, stemmed from faulty electrical harnesses and headlights. The final straw, however, came when leather for the vehicle's interior was damaged in a flood. 'The leather was useless. We had 250 cars parked and waiting for leather,' Lane said.

**ANSWER**:  To the extent the allegations in paragraph 191 refer to statements in the November 18, 2011 *Calgary Herald* article entitled, "Fisker on track to make electric sports

cars, despite delays," Daubenspeck refers to that article for its true and correct contents and

denies any inaccurate characterization or interpretation of that document when read in context

and in its entirety.  Daubenspeck is without knowledge or information sufficient to admit or deny

the remaining allegations in paragraph 191.

192.    On November 26, 2011, AutoblogGreen published an article about Fisker Automotive entitled "Fisker says Karma will meet 15,000 production target for 2012." The article, based on an interview with Lane, stated:

> A raft of production delays slowed the arrival of the first Fisker Karma. Though the initial round of vehicles were finally delivered, the delays mean that Fisker will only ship 1,500 of the four door plug-in hybrids in 2011, well short of the original target of 7,000. There has been an effort to turn Fisker into a scandal and these lower production numbers are enough to fan the flames. Fisker has received loans totaling $529 million from the Department of Energy, a number that puts the company within $6 million of the assistance lent to failed solar-panel maker Solyndra. Fisker's partners at A123 Systems have been forced to chop their earnings estimates for 2011, since fewer Karmas out the door means fewer A123 batteries sold. To some, it all has the look of failure.
>
> However, Fisker Chairman Ray Lane says that the issues in 2011 were a combination of difficulties faced by any start up - such as problems with the electrical system that didn't appear until production was underway - and some one-off disasters. For example, a flood soaked the initial shipment of leather delivered for the car's interior, leaving Fisker with 250 vehicles that were ready to go, except for seats, dashboards, steering wheels and every other surface that needed to be covered in cowhide.
>
> With the Freshman year drawing to a close, Lane is convinced that Fisker will hit its mark in 2012. According to Lane, Fisker still plans to meet projections of 15,000 Karmas delivered in 2012. A123 is taking a more cautious approach, projecting around 7,000 vehicles. Either number would actually be very good for a car that has a base price of $96,000. Even the 7,000-unit sales number would exceed the annual sales of such well-known $100k sedans as the Maserati Quattroporte or Audi R8. Those cars don't have any green chic, though, and that might make all the difference.

**ANSWER**:  To the extent the allegations in paragraph 192 refer refers to a

November 26, 2011 article published by AutoblogGreen, Daubenspeck refers to that article for

its true and correct contents and denies any inaccurate characterization or interpretation of that

article when read in context and in its entirety.  Daubenspeck is without knowledge or

information sufficient to admit or deny the remaining allegations in paragraph 192.

193.    On November 17, 2011, DOE Secretary Steven Chu appeared before Congress to defend the DOE's loan programs, including the Solyndra debacle. When asked if any other DOE loans were in trouble, Secretary Chu did not mention Fisker Automotive.

**ANSWER**:  Daubenspeck is without knowledge or information sufficient to

admit or deny the allegations in paragraph 193.

194.    On November 30, 2011, Fisker Automotive confidentially informed the DOE that a modest investment increase of $37 million at mid-month had nudged its available cash up to a still-thin $20 million. Fisker Automotive further advised the DOE that it had approximately $200 million in accounts payable – $120 million of which were overdue – as Fisker Automotive's liquidity crisis grew ever more grave.

**ANSWER**:  Daubenspeck is without knowledge or information sufficient to

admit or deny the allegations in paragraph 194.

195.    According to a confidential Quarterly Credit Report prepared by the DOE dated December 12, 2011, Fisker Automotive's Risk Rating was lowered from CCC+ to CCC, with a "Rating Justification" of "Deteriorating financial profile and/or Persistent Operational inefficiencies." The Report stated:

Background and Update:

There have been delays in the launch of the Karma from the timing specified in the business plan provided when the ATVM loan documents and FFB loan documents were executed (April 2010).

The February 2011 launch date was included as a required milestone in the Loan Arrangement and Reimbursement Program . . . . In a presentation delivered by Fisker to the DOE in March 2011, Fisker claimed that the launch milestone was met. In a subsequent presentation, Fisker presented new information calling into question whether the launch milestone had actually been met. After receiving the June 2011 presentation, DOE halted further funding of the loan.

Throughout November [2011] [a] Fisker investor told DOE that Fisker could not raise additional equity cash unless DOE agreed to move financial covenants and milestones that Fisker would begin to breach on December 31, 2011. During a series of internal discussions in November, DOE concluded it was in the government's best interest to move the milestones back by one year in order to remove the barrier to equity which in turn would provide sufficient liquidity and time for DOE to assess the situation and formulate an action plan and amended

LARA financial covenants and milestones. On December 5, DOE sent a letter to Fisker stating that it would move the covenants in order to enable commencement of an equity investment plan described in a December 5 letter to DOE from Fisker Chairman Ray Lane.

**ANSWER**: To the extent the allegations in paragraph 195 refer to a December 12, 2011Quarterly Credit Report prepared by the DOE, Daubenspeck refers to that report for its true and correct contents and denies any inaccurate characterization or interpretation of that report when read in context and in its entirety. Daubenspeck is without knowledge or information sufficient to admit or deny the remaining allegations in paragraph 195.

196.    The Quarterly Credit Report also stated that:

Fisker is raising this additional equity to fund long capital requirements, additional cost resulting from delays and last minute engineering changes associated with the Karma's project launch, and additional liquidity needed to fund cash short falls caused by the build-up of excessive inventory levels of Karma components and delays in assembly, shipping from Finland to the United States and being able to wholesale Karmas to dealers. Fisker's Board of Directors reacted to launch delays and problems with supply chain management including excessive inventories of some components and shortages of critical parts needed to complete the assembly of vehicles by appointing new executive (made public December 15) Tom LaSorda as Vice Chairman of Fisker and Richard Beattie as Fisker's Chief Commercial Officer. Fisker will prepare an updated business plan with the Assistance (sic) of these new executives.

**ANSWER**: To the extent the allegations in paragraph 196 refer to a December 12, 2011 Quarterly Credit Report prepared by the DOE, Daubenspeck refers to that report for its true and correct contents and denies any inaccurate characterization or interpretation of that report when read in context and in its entirety. Daubenspeck is without knowledge or information sufficient to admit or deny the remaining allegations in paragraph 195.

## VI.    Fisker Automotive Issues the December Capital Call

197.    On the verge of insolvency, Fisker Automotive's Board of Directors, management and significant shareholders – including Defendants Lane, Daubenspeck, Richard Li Tzar Kai, Henrik Fisker and Koehler, Defendant DaMour in his role as CFO, and controlling shareholders Defendant Kleiner Perkins (directed by Defendant Lane) and non-party AEI (directed by Defendant Daubenspeck) – determined to invoke an obscure provision in the

previously issued offering documents that would allow Fisker Automotive to institute a 40%
"pay to play" capital call provision (the "December Capital Call") on all current Fisker
Automotive investors.

   **ANSWER**:  Daubenspeck is without knowledge or information sufficient to

admit or deny the allegations in paragraph 197, except Daubenspeck denies that he was a

member of the Board of Directors of Fisker Automotive at the time of the December Capital

Call, denies that the "'pay to play' capital call provision" was "obscure" to any investor who

read the offering documents in question, and denies that he was involved with any of the

decisions alleged to have been made in paragraph 197.

   198. Thus, on December 8, 2011, Fisker Automotive's Board of Directors
unanimously approved the December Capital Call, which required funding beginning within as
soon as three weeks. The Information Statement for the December Capital Call sent to investors
stated that this action was taken after "[t]he Board ha[d] explored multiple financing alternatives
and transaction structures to meet the Company's current financial needs." Investors who chose
not to participate would be penalized by an automatic 50% reduction in the value of their Fisker
Automotive Securities as well as further dilution caused by the additional shares being issued.

   **ANSWER**:  To the extent the allegations in paragraph 198 refer to the

Information Statement for the December Capital Call, Daubenspeck refers to that document for

its true and correct contents and denies any inaccurate characterization or interpretation of that

document when read in context and in its entirety.  Daubenspeck is without knowledge or

information sufficient to admit or deny the allegations in paragraph 198, except Daubenspeck

denies that he was involved with approving the December Capital Call.

   199. On Sunday, December 11, 2011, Greg Osborn of Middlebury sent a
detailed email, purportedly based on his conversations with Fisker Automotive representatives,
to the Middlebury Plaintiffs and others describing the "pay to pay" plan for the December
Capital Call and stating that Fisker Automotive would hold an emergency conference call the
next day to explain the situation.

   **ANSWER**:  To the extent the allegations in paragraph 199 refer to a December

11, 2011 email by Greg Osborn, of Middlebury, Daubenspeck refers to that email for its true and

correct contents and denies any inaccurate characterization or interpretation of the email when

read in context and in its entirety.  Daubenspeck is without knowledge or information sufficient

to admit or deny the remaining allegations in paragraph 199.

      200.    Osborn attempted to mollify shocked investors by describing in detail how well things were going for Fisker Automotive and describing this forced investment as a prudent step towards an initial public offering. Specifically, Osborn stated:

> All,
>
> Happy Holidays. As you know, we have a call tomorrow regarding Fisker and it is IMPORTANT that you attend or follow up during the week with your representative. I personally apologize that I have not been able to respond one on one to all of the calls the last few (sic) days, but I have been traveling the last 10 days for various business issues and needed to be with my family this weekend. We have been trying to get as many of the facts as possible reference recent events at Fisker in preparation of tomorrow's call.
>
> The good news is the company;
>
> 1. Has completed approximately $100 mill in a series D funding.
>
> 2. Is operating at approximately 35 cars a day or near 10,000 a year. (full production based on 6 days a week)
>
> 3. Has received written confirmation of the DOE's plans to proceed
>
> 4. Has commitments for an additional $150 mill from current investors.
>
> For your review enclosed is the recent DOE letter and the Cap Table pre the Series D round. At the bottom of the email we cut and paste the 'waiver' that enabled the majority shareholders to perfect this offering and process (in orange) and a UNCONFIRMED general outline of how the deal alters your effective investment.(in purple)
>
> With that said, we wanted to inform you in advance of the importance and purpose of tomorrows call. This last minute email will most likely create more questions then (sic) answers, but it does bring to the forefront the current situation and what action is required by you by December 24th, 2011. Our experience is, after understanding the facts surrounding this and the benefits, the original reaction wears off a bit and the logic and the positives of the financial upside sets in. We will attempt to explain in detail the current environment the best we can and we will have Keith Daubenspeck, a Fisker Board member and Chairman of Advanced Equities join our call towards the end. We will also accept questions at the end via email. Please email Chris@middsec.com for questions during the call tomorrow of which we will try to reply.

* * *

The fact is that that there is now a 40% 'pay to play' requirement by all to be funded by Christmas for all Fisker investors. This was approved unanimously by the Fisker Board of Directors last Thursday. We share this with you now, because at first take it is very frustrating, no one likes a forced hand. What we don't want is for tomorrows call details to be overwhelmed by your initial response, hence this email may help manage that. The fact is... This offering increases the security of your investment while enhancing the total return and the potential timing of return of your investment.

We hope that after you have had the time to hear the call and understand the 'why's' and what a investor gets in return, that you will see it as quite attractive. Net net there are benefits and challenges investing with large institutions in late stage private equity. We were fortunate to have access to participate alongside these people Kleiner, NEA, Richard Lee [sic], Quatar Holdings [sic] as they have the deep pockets and can continue to fund and preserve a company.

For the record: All large investors have voted for this and are participating. We hadn't a choice as we are a minority shareholder.

Again the dirt is in the details, and tomorrow we will explain in detail the situation the best we can. Although no one likes having there (sic) hand forced, it is compelling and provides us with great leveraged upside and we encourage participation.

Reminder...WE DO NOT YET HAVE THE OFFICIAL TERM SHEET, but this is what we understand the Board has approved.
However, even without the term sheet, all funds above $10 mill have agreed to participate.

In summary, there is a 40% capital call, if you will.

1. If you participate for 40% of your original investment by Christmas, you will get 30% PENNY warrants on your new money and your original investment.

2. If you participate for 40% of your original investment by Jan 10th or so, you will get 15% PENNY warrant coverage on your new money and your original investment.

3. If you don't participate, you are converted to a 1/2 share of common. Or have a fixed cost of approximately $2.78 … a common share.

* * *

Based on preliminary analysis, if you participate prior to Christmas your break even is approximately $2.2 billion dollars post funding and you stay in a leveraged preferred situation and your cost drops to $1.07 a share. If you elect to pass, your break even is approximately $5.5Bill.

* * *

The public offering is still anticipated to be a Feb thru April goal. Markets permitting, pricing discussions suggest a $4 to $5 bill offering price.

THERE ARE NO GUARANTEES of such a offering. THERE IS MARKET AND OPERATIONAL RISK AND YOU COULD LOSE ALL OF YOUR INVESTMENT FOR MANY DIFFERENT REASONS. SEE DISCLAIMERS IN OFFERING DOCUMENTS.

But that is the plan and hopeful goal. So, if everything continues on track, we will hit our near first quarter goal and a very positive return. I provide a detailed example below reference this.

There are many reasons why the Company is doing this now and we hope tomorrow's call will assist in explaining it and see the many positives.

The bottom line, it was imperative that the Company and the Board be PROACTIVE vs. REACTIVE in managing the companies (sic) financial well being.

Allow me to explain. As per the last business plan, the company had suggested $150 mill in 2011 revenues and confirmed it needed to raise a total of $250mill in the 4th quarter of 2011 and the 1rst quarter of 2012 to assure the DOE funding. With some of the operational delays and the Solyndra situation, felt even more compelled to reduce market risk and secure its future. They felt with the angst surrounding Solyndra and the D.O.E coupled with manufacturing stalls with the EPA sticker, flooded leather etc, it was best to secure the DOE and the company quickly without depending on the public markets in Q1 2012 and/or future financings. This wait and see approach is perceived as too risky considering the never ending Euro Crisis. Hence they felt they should take control of their own destiny and secure their $650 mill in investments to date and the DOE funds now.

The terms they have proposed seem to do both. This funding secures our investment further and the companies [sic] prospects. In response to this offering the company.

1. Has a fully funded company

2. Secures the DOE loan follow thru without reliance on the public markets and to overcome 4th quarter production delays.

3. Enables the company to fully pursue the 2012 and 2013 business plans and launch of the NINA

4. Brings in a new tier one President and Vice Chair, who hales [sic] from a top 3 worldwide auto firm. Depending confirmation tomorrow, he will join the company to compliment the team post the funding.

5. Securing the above will allow for the S1 to filed post close accelerating the potential public offering described and disclaimed above.

In summary:

The company HAS successfully raised $98 Mill to date in the series D. All new funds in the Series D will get the additional warrant coverage on their new investment as well. The new terms have already secured an additional $150 mill on top of the $98 mill as committed by all the lead investors for a total of the $250 mill required for the DOE loan. We expect in excess e$300 mill secures a new Executive to the team.

Richard Lee [sic], Quatar [sic], Kleiner, Perkins [sic], AEI, and NEA are all participating. They all have board seats and they all voted for the offering. Other new investors in this round include, Eric Schmidt the Google CEO, John Chambers the Cisco CEO, the founder and Chairman of Salesforce.com. Participating investors include Ray Lane the Chairman of Hewlett Packard and Fisker, John Doers Family trust, John is the Chairman of Kleiner and on the Google and Amazon Boards, and myself.

In summary, the NEA (just took Groupon public) and the Kleiner team said of Fisker post this offering[:]

'With the Karma winning the Luxury Car of the Year award, the EPA and Solyndra issues behind it, a new industry President, fully funded and operational, we would expect Fisker to be one of the hottest offerings in early 2012.'

We look forward to speaking tomorrow. We remain encouraged that barring any unforeseen circumstances in the market or at the company, we will all have a very positive return on investment.

Our first reaction and probably yours….

How were they able to do this? We thought we had "full ratchet anti dilute" etc.

The board is also the majority shareholders in each class and used the below waiver to make the changes described herein.

(j) <u>Waiver of Adjustment of Conversion Price</u>. Notwithstanding anything herein to the contrary, any downward adjustment of the Conversion Price of Series D-X Preferred Stock may be waived, either prospectively or retroactively and either generally or in a particular instance, by the consent of vote of the holders of the majority of the outstanding shares of the Series D-X Preferred Stock. Notwithstanding anything herein to the contrary, any downward adjustment of the Conversion Price of Series A-1 Preferred Stock may be waived, either prospectively or retroactively and either generally or in a particular instance, by the consent or vote of the holders of at least seventy-five percent (75%) of the outstanding shares of the Series A-1 Preferred Stock. Notwithstanding anything herein to the contrary, any downward adjustment of the Conversion Price of Series B-1 Preferred Stock may be waived, either prospectively or retroactively and either generally or in a particular instance, by the consent or vote of the holders of the majority of the outstanding shares of the Series B-1 Preferred Stock. Notwithstanding anything herein to the contrary, any downward adjustment of the Conversion Price of Series C-1 Preferred Stock may be waived, either prospectively or retroactively and either generally or in a particular instance, by the consent or vote of the holders of the majority of the outstanding shares of the Series C-1 Preferred Stock. Notwithstanding anything herein to the contrary, any downward adjustment of the Conversion Price of Series D-1 Preferred Stock may be waived, either prospectively or retroactively and either generally or in a particular instance, by the consent or vote of the holders of the majority of the outstanding shares of the Series D-1 Preferred Stock. Any such waiver shall bind all future holders of shares of such series of Preferred Stock.

* * *

We hoped this helped, enjoy the DALLAS. New York GAME!

Regards,

The team.

**ANSWER**:  To the extent the allegations in paragraph 200 refer to a December 11, 2011 email by Greg Osborn, of Middlebury, Daubenspeck refers to that email for its true and correct contents, and denies any inaccurate characterization or interpretation of that email when read in context and in its entirety.  Daubenspeck is without knowledge or sufficient to admit or deny the remaining allegations in paragraph 81, except Daubenspeck denies the allegation that he was a director of Fisker Automotive at the time of the email referenced in paragraph 200.

201.    On December 15, 2011, Fisker Automotive, with AEI as the placement agent, made available to Plaintiffs and other investors the Information Statement and associated offering documents in connection with the December Capital Call. Fisker Automotive's Board of Directors, management and significant shareholders – including Defendants Lane, Daubenspeck, Richard Li Tzar Kai, Henrik Fisker and Koehler, Defendant DaMour in his role as CFO, and controlling shareholders Defendant Kleiner Perkins (directed by Defendants Lane and Doerr) and non-party AEI (directed by Defendant Daubenspeck) – participated in the drafting and/or approval of the Information Statement and the documents attached thereto, including: (i) the Executive Summary; (ii) the Investor Presentation; and (iii) the Purchase Agreement and SOE, which, *inter alia*, discussed the ATVM Loan at length, including its importance to the Company's ability to operate and the risks associated with the Company's failure to comply with the ATVM Loan terms. That same day, Osborn sent another email to the Middlebury Plaintiffs, attaching a cover letter from Defendant Henrik Fisker, the Fisker Automotive Holdings, Inc. Information Statement dated December 14, 2011 detailing the "pay to play" December Capital Call, and the Amended and Restated Series D-1 Round Preferred Stock Purchase Agreement. Osborn stated, "[o]ur counsel is currently altering the SPV documents so we can get them to you as soon as possible. We will have the proper SPV paperwork and wire instructions to you this afternoon." A conference call was also scheduled later that day.

**ANSWER**: Daubenspeck is without knowledge or information sufficient to

admit or deny the allegations in paragraph 201, except Daubenspeck admits the first sentence in

paragraph 201, and denies that he participated in the drafting and/or approval of the statements in

the December Capital Call offering documents.

202.    The cover letter from Defendant Henrik Fisker, which Fisker Automotive's Board of Directors had received and approved and was made available to all investors, extolled Fisker Automotive's progress and repeated the theme that the December Capital Call was merely a prudent business decision:

> Fisker Automotive continues to make tremendous progress. We are currently at a stable production rate of 25 Karma sedans per day and have been generating revenue of almost $2 million per day. I have personally engaged with many of our retailers and first Karma customers. The enthusiasm surrounding the Karma launch and the positive reception of the Karma by our retailers and customers is overwhelming. The Karma has also received amazing worldwide media recognition and accolades. Some recent examples include:
>
> • Top Gear "Luxury Car of the Year"
>
> • Automobile Magazine "Design of the Year"
>
> • Time Magazine "50 Best Inventions of the Year

That said, I realize that it has been a long, and sometimes difficult, road to get to where we are today. We have had several delays to the Karma program due to component part shortages, obtaining emissions and regulatory clearances and fine tuning the Karma to get it ready for customers. Consequently, we did not realize revenue as expected in 2011. We now believe that raising equity is a prudent course of action. Improving our cash position will allow us to continue to build momentum behind the Karma production and sales launch and maintain the 2013 launch timing of the Nina sedan.

Management and the Board of Directors have determined that it is in the best interest of Fisker Automotive to raise equity through the D-1 Financing Capital Call that is described in detail in the attached Information Statement. We have also received the approval of a requisite vote of the stockholders to proceed with the Series D-1 Financing Capital Call. I encourage you to carefully review the Information Statement and consider a further investment in Fisker Automotive.

Importantly, three of our major venture capital investors, Kleiner Perkins, NEA and Pacific Century, support this action and have already made, or committed to make, their capital calls, together totaling more than $57 million.

The entire Fisker team and I are grateful for the continued support of all of our investors. As we move forward, we are working extremely hard to reward this support by maximizing shareholder value.

(Emphasis added.)

**ANSWER**:  To the extent the allegations in paragraph 202 refer to a cover letter sent from Henrik Fisker to investors, Daubenspeck refers to that letter for its true and correct contents and denies any inaccurate characterization or interpretation of that letter when read in context and in its entirety.  Daubenspeck is without knowledge or sufficient to admit or deny the remaining allegations in paragraph 202.

203.    The Information Statement, which was made available to all investors, had a boxed and bold face warning to investors on its first page stating:

**NOTE THAT THIS INFORMATION STATEMENT CONTAINS TIME-SENSITIVE MATERIAL. IF YOU ACT BY WEDNESDAY, DECEMBER 28, 2011, YOU WILL RECEIVE ADDITIONAL EQUITY IN THE COMPANY, AND IF YOU DO NOT ACT BY JANUARY 20, 2012, YOU MAY LOSE 50% OF YOUR INVESTMENT IN THE COMPANY.**

**ANSWER**:  To the extent the allegations in paragraph 203 refer to an Information Statement prepared in connection with the Series D-1 Capital Call, Daubenspeck refers to that document for its true and correct contents and denies any inaccurate characterization or interpretation of that document when read in context and in its entirety.  Daubenspeck is without knowledge or information sufficient to admit or deny the remaining allegations in paragraph 203.

204.   The Executive Summary discussed the ATVM Loan and stated, "[a]lthough the DOE has indicated their support of the Company and our equity investment plan, and has furthermore agreed to delay the effective dates of the financial covenants in the DOE loan facility for approximately [one] year, we have elected not to submit any advanced requests for additional funding under the DOE loan facility until our discussions with the DOE are completed." (Emphasis added.) Notably, the Investor Presentation included in the Offering Documents reflected DOE funding Fisker for 2012 and 2013 with the remaining balance of $339 million under the ATVM Loan, even though the ATVM Loan had been frozen since June 2011.

**ANSWER**:  To the extent the allegations in paragraph 204 refer to an Information Statement prepared in connection with the Series D-1 Capital Call, Daubenspeck refers to that document for its true and correct contents and denies any inaccurate characterization or interpretation of that document when read in context and in its entirety.  Daubenspeck is without knowledge or information sufficient to admit or deny the remaining allegations in paragraph 204.

205.   On December 15, 2011, Fisker Automotive held a conference call with investors, a replay of which was made available for future listening, to explain the impact of the December Capital Call on current investors, as well as the status of the Company. Defendants McDonnell, Henrik Fisker, Koehler, and DaMour participated on that call on behalf of Fisker Automotive. They justified the need for the December Capital Call on the fiction that it was Fisker Automotive's decision to refrain from making a draw on the ATVM Loan while the covenant negotiations were ongoing, as stated in the Board-approved Information Statement quoted above. Also on that call, Defendant DaMour discussed the ATVM Loan, stating that, "[w]e're currently not drawing and that was a mutual agreement between us and the government as we work to finalize the revised covenants and milestones, but as you see, we have $340 million remaining to be drawn and that will be drawn through the 2012 and first half 2013 timeframe." (Emphasis added.)

**ANSWER**:  Daubenspeck is without knowledge or information sufficient to admit or deny the allegations in paragraph 205.

206.    In addition, in response to investor questions about the ATVM Loan, Defendant Henrik Fisker reiterated that "there is not a risk that they will not continue to fund because they have already given us a commitment by letter that they are committed to Fisker Automotive." (Emphasis added.)

**ANSWER**:  Daubenspeck is without knowledge or information sufficient to admit or deny the allegations in paragraph 206.

207.    Defendant Henrik Fisker also responded to a question about concerns of battery fires in light of the Chevrolet Volt's reported battery fire problems by stating that it "is not a risk for us, we have a different chemistry [a] liquid cooled battery."

**ANSWER**:  Daubenspeck is without knowledge or information sufficient to admit or deny the allegations in paragraph 207.

208.    DaMour further stated "with the money we raised in this round, [Fisker Automotive] can continue with the [Karma] indefinitely," even if Fisker Automotive received no further funds from the DOE or other outside capital. And, in response to specific questions regarding Fisker Automotive's business plan and whether the funding from the $300 million Series D Round would be sufficient to fund Fisker Automotive's business plan without another capital call or some other additional funding, Defendant DaMour stated "this is the last . . . private raise, and surely the last capital call. . . . The $300 [million] is enough to fund the complete plan as we have explained. . . . . We are at the point now that the . . . [Karma] is fully funded." (Emphasis added.)

**ANSWER**:  Daubenspeck is without knowledge or information sufficient to admit or deny the allegations in paragraph 208.

209.    The materials included in the Information Statement issued in connection with the December Capital Call and made available on AEI's Venture Gateway, including: the Executive Summary; the Investor Presentation; the SOE; and the above statements on the December 15 investor conference call, were materially false and misleading because they omitted: (i) the facts and the nature of DOE's freezing of Fisker Automotive's access to the ATVM Loan in June 2011, including that the DOE froze the ATVM Loan in June 2011 because DOE believed it had been misled when Fisker Automotive told DOE in March 2011 that the Karma Production Milestone had been met; (ii) the continued out-of-control inventory and supply chain mismanagement issues that had caused Fisker Automotive to order (or be contractually obligated to order) hundreds of millions of dollars in useless parts and inventory; (iii) that by no later than November 30, 2011, Fisker Automotive had $200 million in payables, of which $120 million were overdue, and therefore the vast majority of any funds Fisker Automotive raised would be used to pay past due bills – not for ongoing operations; and (iv) as a result of these aforementioned issues, DOE had refused Fisker Automotive's request to resume funding under the ATVM Loan.

**ANSWER**:  The allegations in paragraph 209 set forth conclusions of law to which no response is required.  To the extent an answer is required, the allegations of paragraph 209 are denied.

210.    Like the preceding Purchase Agreements, the Series D-1 Purchase Agreement for the December Capital Call placed on the Venture Gateway contained the same false representation at ¶2.11: "None of the Transaction Agreements nor any other documents delivered in connection with the transactions contemplated by the Transaction Agreements contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements herein and therein not misleading."

**ANSWER**:  The allegations in paragraph 210 set forth conclusions of law to which no response is required.  To the extent that the allegations in paragraph 210 refer to the Series D-1 Round Purchase Agreement for the December Capital Call, Daubenspeck refers to that purchase agreement for its true and correct contents and denies any inaccurate characterization or interpretation of that purchase agreement when read in context and in its entirety.  Daubenspeck denies the remaining allegations in paragraph 210, except he admits that Fisker Automotive offering documents were placed on the Venture Gateway.

211.    On December 21, 2011, the National Highway Traffic Safety Commission sent a non-public letter to Fisker "acknowledging" a Fisker Automotive report of a "safety recall campaign which [would] be conducted under Federal law" of 239 Fisker Karmas due a battery problem that could cause a fire.

**ANSWER**:  Daubenspeck is without knowledge or information sufficient to admit or deny the allegations in paragraph 211.

212.    On Thursday, December 29, 2011, *one day after* the first deadline to invest in the mandatory pay to play capital call, Fisker Automotive publicly announced its recall of 239 Fisker Karmas due to the battery fire issue.

**ANSWER**:  Daubenspeck is without knowledge or information sufficient to admit or deny the allegations in paragraph 91, except that he admits that Fisker Automotive publicly announced a recall of Karmas on or around December 29, 2011.

213.    According to a report in the News Journal (Wilmington, Delaware) dated December 30, 2011, "Fisker spokesman Roger Ormisher said customers were alerted of the faulty batteries last week -- and insists that the company is on top of the issue." The article also noted the seriousness of this issue, quoting John Gartner, an electric cars analyst at market research firm Pike Research, as saying customers likely expected more from Fisker's Karma, given its lofty price tag, and "[i]t's certainly not good for their company in their initial outing of the vehicle to have something come up so quickly . . . . It's a little surprising that it's happening now and it wasn't caught before the vehicle was released."

**ANSWER**:  To the extent the allegations in paragraph 92 refer to statements in

the December 30, 2011 *News Journal* article referenced therein, Daubenspeck refers to that

article for its true and correct contents and denies any inaccurate characterization or

interpretation of that article when read in context and in its entirety.   Daubenspeck is without

knowledge or information sufficient to admit or deny the remaining allegations in paragraph 213.

214.    At the same time, Tom LaSorda, the former President and CEO of Chrysler Group, whom Kleiner Perkins and Fisker Automotive brought into the Company, as announced on the December 15, 2011 conference call, began a "deep dive" into the Company's accounting and operating functions.

**ANSWER**:  Daubenspeck is without knowledge or information sufficient to

admit or deny the allegations in paragraph 214.

215.    In or around late December 2011 or early January 2012, Defendant Lane and other Fisker Automotive representatives met with DOE. A non-public PowerPoint presentation prepared by the DOE Loans Program Office entitled "Risk Management Committee Briefing" and dated January 4, 2012, summarized that meeting and the relevant events leading up to it, stating in part:

**Reminder – Events Leading Up to December Briefing**

**In 1H11, faulty components led to launch delays and business plans revisions**

- February 2011 - to date – Fisker repeatedly missed launch dates and downwardly revised sales and production

  - Main problems were faulty inverter and wiring, but there were numerous engineering changes occurring into late September.

  - These changes led to suppliers missing deadlines, in turn led to parts shortages, further delaying launch.

- 2011 production plan: Feb 2011 = 10k, June2011 = 4.5k, Sep = 3- 3.5k, Oct 2011 = 2k, Nov 2011 = 1.25k

- May 2011 -- DOE stopped funding loan pending approval revisions to business plan.

**By October 2011, mismanagement of the launch and supply chain (inventory) created a cash crisis:**

- Oct 13 – Fisker said it will make 2k, sell 1.7k cars during 2011

- Oct 28 – Fisker said it will make 1.2k, sell 542 cars during 2011, will be <u>out of cash Dec 1</u>.

    - Fisker over-ordered batteries, engines and other components – leading to $30m plus of excess inventory.

    - Poor oversight of complex supply chain – Fisker had significant accounting and payables management lapses.

- Nov 1 – Fisker said its cash would run out [around] Nov 4 without DOE loan and equity injection

- Nov 15 – Equity injected $37m, Fisker said cash will now run out [around] Dec 15.
- Nov 30 – <u>Fisker says $20m cash on hand, with [around] $200m in payables, [around] $120m of which were overdue.</u>

**ANSWER**:  To the extent the allegations in paragraph 215 refer to an internal nonpublic DOE PowerPoint presentation, Daubenspeck refers to that presentation for its true and correct contents and denies any inaccurate characterization or interpretation of that presentation when read in context and in its entirety.  Daubenspeck is without knowledge or information sufficient to admit or deny the remaining allegations in paragraph 215.

216.    In that PowerPoint presentation, the DOE discussed four "Potential Alternative Solutions." but stated that the "current PMD [Portfolio Management Division] proposal" to Fisker Automotive is "'All CPs, no dates' – DOE agree[s] to resumption of funding upon satisfaction of required CPs." It is reasonable to infer that "CPs" means "conditions precedent." Logically, then, the term "CPs" refers to DOE's requirement that, before DOE would loan the Company any more money under the ATVM Loan, Fisker Automotive must demonstrate to DOE's satisfaction that it had remedied Fisker Automotive's severe and structural deficiencies in its accounting and financial controls. One of the alternative solutions was for

Fisker Automotive to "Forego Nina," Fisker Automotive's more affordable hybrid electric car scheduled for later release. That alterative was explained as follows: "<u>DOE refuses to resume advances until [around] September time frame or later</u>. Fisker and <u>Kleiner Perkins</u> say they would forego the Nina, repay the $23m already advanced for Nina, and pursue sale or move the company to China or Russia (either of which would require first repaying DOE loan)." (Emphasis added.)

      **ANSWER**:  To the extent the allegations in paragraph 216 refer to an internal

nonpublic DOE PowerPoint presentation, Daubenspeck refers to that presentation for its true and

correct contents and denies any inaccurate characterization or interpretation of that presentation

when read in context and in its entirety.  Daubenspeck is without knowledge or information

sufficient to admit or deny the remaining allegations in paragraph 216.

      217.    On January 16, 2012, a meeting of Fisker Automotive's Board of Directors was held and attended by all Defendants (except Li or his representatives) as well as Doerr, Vassallo, and Popple. At that meeting, the Board discussed a letter sent earlier by DOE to Defendant Fisker on December 30, 2011, detailing the undisclosed causes of, *inter alia*, the Company's liquidity crisis and stating that DOE would only consider (i.e., not commit to) resuming funding under the ATVM Loan at the earliest in September 2012, and only if the Company demonstrated compliance with a long list of conditions precedent ("CPs") which DOE had detailed in writing.

      **ANSWER**:  Daubenspeck is without knowledge or information sufficient to

admit or deny the remaining allegations in paragraph 216, except Daubenspeck admits the he

attended the January 16, 2012 meeting as a Board observer, but denies that he was a member of

Fisker's Board of Directors at the time of this meeting.

      218.    At that meeting, LaSorda also gave his assessment of the results of his "deep dive" into the Company's accounting and operations. ███████████████
████████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████████████████
██████

**ANSWER**:  Daubenspeck is without knowledge or information sufficient to admit or deny the allegations in paragraph 218.

219.    Between January 18-20, 2012, Fisker Automotive's general counsel, Matthew Paroly, Defendant DaMour, and others (including Zucklie) exchanged revisions to the Company's SOE made available previously in connection with December Capital Call – including a revised statement concerning the negotiations with the DOE. None of the information discussed above concerning, *inter alia*, DOE's December 30, 2011 letter and conditions precedent for DOE to "consider" resuming funds, LaSorda's findings that the Company's financials were "not reliable", and the Company's off the books $38 million in accounts payable, was disclosed in the revised SOE or otherwise disclosed to all investors such as Plaintiffs.

**ANSWER**:  Daubenspeck is without knowledge or information sufficient to admit or deny the allegations in paragraph 219.

## VII.    Fisker Automotive Continues Raising Cash As It Implodes

220.    On February 7, 2012, the New Journal (Wilmington, Delaware) published an article entitled "Fisker slows work at former GM site, lays off 26." The article stated that:

> A cash crunch has forced Fisker Automotive to lay off 26 of about 100 workers refurbishing the former General Motors plant near Newport as a U.S. manufacturing base for the startup company. The layoffs, which affected both regular employees and subcontractors, come as Fisker trims expenses while it waits to qualify to draw down more cash from the Department of Energy, which conditionally promised to lend the automaker $529 million to help build its first two models and get its Delaware operations running.

> The company, which also laid off 40 to 45 workers at its California headquarters, must meet specific fundraising, production and sales goals to qualify for successive disbursements from the loan. Fisker is behind schedule for producing and selling its first model, the $108,000 Karma sedan. 'Until that happens, they're trying to preserve the cash that they have,' said Alan Levin, Delaware's director of economic development. 'And unfortunately, until they meet the milestone that DOE continues to set ... they're not able to access the additional capital that they need.'

> In recent weeks, the company has scaled back 2012 sales projections for the Karma luxury sports car, blaming mileage and emissions certification that took longer than expected. It also needed to recall sold models to fix a coolant hose problem and, later, to issue a software upgrade to tame a balky console computer. Fisker has said it would begin assembling the company's second plug-in hybrid model -- still with just the project name 'Nina' -- at the Boxwood Road plant in mid-2013. Prototypes were to begin rolling out of the factory this fall.

A Fisker spokesman said Monday that negotiations are under way with the Energy Department to modify the loan achievement goals to allow some cash to be drawn down. 'To date we have received $193 million of the $529 million Department of Energy loan, mostly for the Karma program, and received our last reimbursement in May 2011,' Fisker spokesman Roger Ormisher said in a statement Monday. 'We are renegotiating some terms of the DOE agreement for the $336 million balance of the loan related to the Project Nina program.' Ormisher said the exact terms of the loan conditions are confidential. 'The DOE can sometimes take a little bit of time,' Ormisher said. 'We can't keep going and going and going without that money.'

With design work on the Karma largely complete, 40 to 45 workers also have been let go recently at Fisker's head-quarters in Anaheim, Calif., where about 350 to 400 are employed. Subcontractors at the Delaware plant were told earlier this year that work would be unavailable through January. Now it looks like their return this month will be delayed, Levin said.

Glitches and delays

Fisker officials characterized the layoffs as part of the complicated process of getting a billion-dollar car company off the ground. 'A flex model of expanding and contracting staffing for development of new cars is routine in the automotive industry,' Ormisher wrote. 'Project Nina is already well-advanced. Much of the engineering, design and development is near complete, and we expect to ramp up operations again quickly.'

**ANSWER**:  To the extent the allegations in paragraph 220 refer to statements in the February 7, 2012 *News Journal* article entitled "Fisker slows work at former GM site, lays off 26," Daubenspeck refers to that article for its true and correct contents and denies any inaccurate characterization or interpretation of that article when read in context and in its entirety.  Daubenspeck is without knowledge or information sufficient to admit or deny the remaining allegations in paragraph 220.

221.     On February 17, 2012, Tom LaSorda confidentially informed Defendants Lane, Henrik Fisker, Koehler and Daubenspeck that he was resigning from the Board of Directors and would not agree to step up to the position of CEO, replacing Henrik Fisker, as had been planned. He wrote in an email: "My agreement to join was clearly based on information provided to me including accessing AEI's financial info on the Company. Obviously, the reality set in quickly. As I stated before it was like being misled." (Emphasis added.)

**ANSWER**:  To the extent the allegations in paragraph 221 refer to statements in a February 17, 2012 email from Tom LaSorda, Daubenspeck refers to that email for its true and correct contents and denies any inaccurate characterization or interpretation of that email when read in context and in its entirety.  Daubenspeck is without knowledge or information sufficient to admit or deny the remaining allegations in paragraph 221, except Daubenspeck admits that on February 17, 2012, Tom LaSorda advised him and others that he was resigning as CEO.

222.    In his February 17, 2012 email, stating facts also known to Defendants but hidden from Plaintiffs and other investors, he addressed the Company's lack of liquidity caused by its lack of functioning accounting controls: "We have 18m of cash. To preserve it, we won't pay suppliers again. Our commitments to payment plans will be in jeopardy again. This will drive a run to advanced payments and new terms all weakening our cash position." He also addressed the floundering Nina project: "Nina needs a total new business case before it can relaunch. Material costs need to be slashed by $8-10,000 and investment totals by over 150m to make it profitable."

**ANSWER**:  To the extent the allegations in paragraph 222 refer to statements in a February 17, 2012 email from Tom LaSorda, Daubenspeck refers to that email for its true and correct contents and denies any inaccurate characterization or interpretation of that email when read in context and in its entirety.  Daubenspeck is without knowledge or information sufficient to admit or deny the remaining allegations in paragraph 222, except Daubenspeck admits that, on February 17, 2012, Tom LaSorda advised him and others that he was resigning as CEO.

223.    However, for LaSorda to resign so quickly after joining the Company would be a disaster for the Company. Under pressure from Defendants, ███████████████ ███████ LaSorda agreed to stay with Fisker Automotive and take on the role of CEO. But he didn't last. Six months later he resigned again, this time for good. ████████ ███████████████████████████ ████████████████████

███████████████████████ ███████████████████

███



**ANSWER**:  Daubenspeck is without knowledge or information sufficient to

admit or deny the allegations in paragraph 223.

224.    Though Fisker Automotive raised approximately $300 million in the
Series D-1 Round, including the December Capital Call, Fisker Automotive's undisclosed lack
of accounting controls and inability to manage its supply chain and accounts payable made
another liquidity crisis inevitable. On February 22, 2012, Fisker Automotive held a conference
call to update investors about the Company's status, revisions to its business plan, and a change
in the Series D-1 Round of financing (the Series D-1 Round Extension), whereby the Company
wanted to raise an additional $100 million by the end of March. On the call for Fisker
Automotive were Defendants McDonnell, Henrik Fisker, Koehler, and DaMour.

**ANSWER**:  Daubenspeck is without knowledge or information sufficient to

admit or deny the allegations in paragraph 224.

225.    Among other things, Defendant Henrik Fisker acknowledged recent
negative press regarding the ATVM Loan, and characterized Fisker Automotive's problems as
"essentially driven by more political views around whether the government should be lending
money or not. And unfortunately, we have become somewhat a political football . . . ."

**ANSWER**:  To the extent the allegations in paragraph 225 refer to a transcript

and/or recording of the February 22, 2012 conference call referenced therein, Daubenspeck

refers to the transcript and/or recording for their true and correct contents and denies any

inaccurate characterization or interpretation of the transcript and/or recording when read in

context and in their entirety.  Daubenspeck is without knowledge or information sufficient to

admit or deny the remaining allegations in paragraph 225.

226.    Henrik Fisker further stated that Fisker Automotive's Board of Directors had made a decision that it was in Fisker Automotive's "better interests . . . in the future to pay back the [DOE] and basically get alternative financing." In furtherance of that decision, Henrik Fisker stated that Fisker Automotive's Board of Directors had engaged the Royal Bank of Canada ("RBC") to raise debt for Fisker Automotive. He also stated that they would continue negotiating with the DOE to obtain the remaining funds under the ATVM Loan.

**ANSWER**:  To the extent the allegations in paragraph 226 refer to a transcript

and/or recording of the February 22, 2012 conference call referenced therein, Daubenspeck

refers to the transcript and/or recording for their true and correct contents and denies any

inaccurate characterization or interpretation of the transcript and/or recording when read in

context and in their entirety.  Daubenspeck is without knowledge or information sufficient to

admit or deny the remaining allegations in paragraph 226.

227.    Critically, as stated earlier on the December 15, 2011 conference call, Defendant Henrik Fisker stated that with the completed Series D-1 financing, Fisker Automotive had a "Karma plan" whereby Fisker Automotive would be "self-sustaining as a company" with just the Fisker Karma, even without any other financing or the ATVM Loan. According to Defendant Henrik Fisker, any of the funds from the Series D-1 Extension Round were necessary only to allow Fisker Automotive to bring its more affordable follow-on vehicle the Nina to market.

**ANSWER**:  To the extent the allegations in paragraph 227 refer to a transcript

and/or recording of the December 15, 2011 and February 22, 2012 conference calls referenced

therein, Daubenspeck refers to the transcript and/or recording for their true and correct contents

and denies any inaccurate characterization or interpretation of the transcript and/or recording

when read in context and in their entirety.  Daubenspeck is without knowledge or information

sufficient to admit or deny the remaining allegations in paragraph 227.

228.    Fisker Automotive's liquidity crisis was so severe that Kleiner Perkins began putting together a $40 million bridge loan because the upcoming offering would not close in time to prevent the Company's insolvency. Lane began soliciting help from the Company's insider investors including, *inter alia*, Defendant Li. On February 24, 2012, Doerr sent an email

to several Kleiner Perkins partners, including Keller and the KPCB Managing Members – but excluding Defendant Lane – concerning a meeting Kleiner Perkins had set up with LaSorda to show their support for him and Fisker Automotive. Illustrating the gravity of the situation, Doerr stated, "There's so much angst now about what [Fisker Automotive] means for KPCB and the future of our funds, even folks' careers, that I favor . . . inviting all senior partners, [KPCB's Greentech] team" as well as other Kleiner Perkins partners to attend the meeting.

**ANSWER**:  To the extent the allegations in paragraph 228 refer to statements in a February 24, 2012 email from Doerr to several Kleiner Perkins partners, Daubenspeck refers to that email for its true and correct contents and denies any inaccurate characterization or interpretation of that email when read in context and in its entirety.  Daubenspeck is without knowledge or information sufficient to admit or deny the remaining allegations in paragraph 228.

229.    On February 26, 2012, Defendant Li rejected Lane's plea to join Kleiner Perkins in extending the bridge loan to Fisker Automotive, stating "[w]e are uncomfortable with the financial projections."

**ANSWER**:  Daubenspeck is without knowledge or information sufficient to admit or deny the allegations in paragraph 229.

230. 

**ANSWER**:  To the extent the allegations in paragraph 230 refer to statements in a February 27, 2012 email from Lane to several KPCB LLC partners, Daubenspeck refers to that email for its true and correct contents and denies any inaccurate characterization or interpretation of that email when read in context and in its entirety.  Daubenspeck is without knowledge or information sufficient to admit or deny the remaining allegations in paragraph 230.

231. 

**ANSWER**:  Daubenspeck is without knowledge or information sufficient to

admit or deny the allegations in paragraph 231.

232.    None of this inside information used by the KPCB Managing Members in their investment decision was disclosed to investors such as Plaintiffs.

**ANSWER**:  Daubenspeck is without knowledge or information sufficient to

admit or deny the allegations in paragraph 232.

233.    On February 28, 2012, Fisker Automotive announced that Defendant Henrik Fisker would resign as Fisker Automotive's CEO to be replaced by Tom LaSorda, who had joined Fisker Automotive two and half months earlier as its Vice Chairman. Notably, the confidential ATVM Loan contains a "Key Personnel" covenant requiring Henrik Fisker to be "responsible for the management of the borrower." The New York Times Blogs (Wheels) reported that day on the Company's conference call as well as a post-conference call interview with Fisker Automotive spokesman Ormisher, stating that:

> 'The D.O.E. funding has been played a lot in the media,' Mr. LaSorda said during Tuesday's call, before claiming that the company could be profitable as early as 2013 without the federal money, and with the Karma sedan as the company's primary revenue generator. The Nina launch date was uncertain, he said, but development was continuing, despite the halt in federal financing.
>
> Roger Ormisher, a Fisker spokesman, said in a telephone interview after the conference call that talks were continuing with the Energy Department on 'agreeable milestones and deadlines.' He added, however, that the company was 'exploring other revenue sources" in the event the loan was not renewed. 'But we still have confidence that we can reach an agreement with the D.O.E.,' he said.

**ANSWER**:  Daubenspeck is without knowledge or information sufficient to

admit or deny the allegations in the first sentence of paragraph 233, except Daubenspeck admits

that Henrik Fisker resigned as Fisker Automotive's CEO on or about February 28, 2012 and Tom

LaSorda was appointed Fisker Automotive's CEO thereafter.  Daubenspeck is without

knowledge or information sufficient to admit or deny the allegations in the second sentence of

paragraph 233.  To the extent the remaining allegations in paragraph 100 refer to statements in

the *New York Times Blogs (Wheels)* report referenced therein, Daubenspeck refers to that report

for its true and correct contents and denies any inaccurate characterization or interpretation of

that report when read in context and in its entirety.  Daubenspeck is without knowledge or

information sufficient to admit or deny the remaining allegations in paragraph 233.

234.    [1] On or about March 5, 2012, Advanced Equities solicited investors in connection with the Series D-1 Extension Round, making the offering documents, including the Purchase Agreement, the DNS, and the SOE, available on AEI's Venture Gateway. [2] Fisker Automotive's Board of Directors, management and significant shareholders – including Defendants Lane, Daubenspeck, Richard Li Tzar Kai, Henrik Fisker and Koehler, Defendant DaMour in his role as CFO, and controlling shareholders Defendant Kleiner Perkins (controlled by Defendant Lane) and non-party AEI (controlled by Defendant Daubenspeck) – approved the Series D-1 Extension Round, as well as the offering documents. [3] Investors would again face severe dilution of their investment if they did not purchase yet more Fisker Automotive Securities. [4] As with the prior Series D-1 Round offering documents, the statements in these documents regarding the DOE, the status of the ATVM Loan, DOE's reasons for not resuming funding, and Fisker Automotive's controls and accounting, as well as the representation that no material information had been omitted from any offering documents, were materially false and misleading because they omitted: (i) the facts and nature of DOE's freezing the ATVM Loan in June 2011, including that the DOE froze the ATVM Loan because DOE believed it had been misled when Fisker Automotive told DOE in March 2011 that the Karma Production Milestone had been met; (ii) the continued out-of-control inventory and supply chain management issues that had caused Fisker Automotive to order (or be contractually obligated to order) hundreds of millions of dollars in useless parts and inventory; and (iii) that it was these aforementioned issues, not "politics", that had caused DOE to refuse Fisker Automotive's request to resume funding under the ATVM Loan.

**ANSWER**:  Daubenspeck admits the first sentence in paragraph 234.  With

respect to the second sentence of paragraph 234, Daubenspeck denies that he participated in the

drafting and/or approval of the Series D-1 Extension Round offering materials given to investors.

Daubenspeck is without knowledge or information sufficient to admit or deny the remaining

allegations in the second sentence of paragraph 234.  Daubenspeck denies the remaining

allegations in paragraph 234.

235.    On or about March 22, 2012, Greg Osborn sent another email to the Middlebury Plaintiffs and other Fisker Automotive investors notifying them of this "pay to play" capital call. Osborn's email directed the Middlebury Plaintiffs to Fisker Automotive's offering documents online, stating:

Dear Fisker SPV Investors,

We are pleased to enclose for your review the current Middlebury Ventures 2 SPV documents for the Extended D-1 Round with a link to EXHIBIT D. Due to the magnitude of the offering documents including Exhibit D, we have separated the Middlebury SPV Ventures 2 and Middlebury Ventures 3 offering documents in two separate emails and have provided a link to EXHIBIT D, the 'CONFIDENTIAL & PROPRIETARY DISCLOSURE AND NOTICE STATEMENT DATED AS OF MARCH 5, 2012, INCLUDING, WITHOUT LIMITATION, COPIES OF ALL FISKER SERIES D-1 TRANSACTION DOCUMENTS'. This is to assist those of you with sensitive servers that block emails containing large amount of data. For your added convenience, we have provided the signature pages as a separate attachment. Please make sure you are filling out the proper SPV 2 or SPV 3 documents and wiring to the appropriate titled account.

In typical Fisker fashion this offering is time sensitive and rather rushed. Our apologies. Please note this is not our doing. It has been quite a task and we are pleased to have completed these documents along with Wollmuth Maher & Deutsch in such a timely fashion. Many of you have requested from us that we provide an exact percentage of your current investment needed to maintain your current position.

Since this is a moving number and the final amount of the D-1 Round will not be known until post closing, we are suggesting a 15% participation in the Series D-1 extension based on an ~ $110 million closing. (If you do not participate, there is a approximate 22% dilution based on a ~$100 million offering. Should the round grow to $150 million or more, these numbers would increase. Although the official closing date is Friday March 30th, 2012, The Middlebury SPV Funds need your funds in house Thursday March 29th so we can transfer the SPV funds direct to Fisker on the final closing date, Friday March 29th, 2012.

* * *

To access the Fisker Documents, (EXHIBIT D) please visit https://themiddleburygroup.securevdr.com/ and login. Then proceed to the Fisker D-1 Round Subscription Documents subfolder.
If you experience any difficulties during the login process, please contact Max Levine via telephone at (802) 377-5161 or via e-mail at Maxlevine@middsec.com.

**ANSWER**:  To the extent the allegations in paragraph 235 refer to a March 22, 2012 email from Greg Osborn, Daubenspeck refers to that email for its true and correct contents and denies any inaccurate characterization or interpretation of that email when read in context and in its entirety.  Daubenspeck is without knowledge or information sufficient to admit or deny the remaining allegations in paragraph 235.

236.



**ANSWER**:  To the extent the allegations in paragraph 236 refer to statements in a March 26, 2012 Quarterly Credit Report prepared by the DOE, Daubenspeck refers to that report for its true and correct contents and denies any inaccurate characterization or interpretation of that report when read in context and in its entirety.  Daubenspeck is without knowledge or information sufficient to admit or deny the remaining allegations in paragraph 236.

237.    On April 2, 2012, Fisker Automotive filed a Form D/A stating that it had raised $392 million in the entire D-1 Round, including the D-1 Extension. Of that amount, at least $34 million came from 277 investors in AEI's Fisker SPVs. Afterwards, Fisker Automotive and Defendant Lane continued to portray the Company as simply suffering the same problems common to any start-up automobile company and, having now turned the corner, Fisker Automotive was on the path to prosperity.

**ANSWER**:  Daubenspeck is without knowledge or information sufficient to admit or deny the allegations in paragraph 237.

238.    On April 19, 2012, the Detroit Free Press reported that "Fisker Automotive has laid off another dozen workers at the former General Motors plant in Delaware that it has been refitting with federal and state money to build a new sedan." The article stated further that

'[t]he layoffs, which occurred quietly Friday, come as California-based Fisker continues talks with the U.S. Energy Department to unfreeze loan money that could determine whether it ever builds a car at the plant. Meanwhile, the state continues to pay utility bills for the factory in hopes that Fisker will still provide jobs there.

For now, Fisker employs only a small maintenance team at the site 'protecting plant assets and maintaining the facility,' said Fisker spokesman Russell Datz. 'We have always had a flexible business model. The plant is now ready for the next phase of installing new production equipment.'

**ANSWER**:  To the extent the allegations in paragraph 238 refer to statements in the April 19, 2012 *Detroit Free Press* article referenced therein, Daubenspeck refers to that article for its true and correct contents and denies any inaccurate characterization or interpretation of that article when read in context and in its entirety.  Daubenspeck is without knowledge or information sufficient to admit or deny the remaining allegations in paragraph 238.

239.    On June 26, 2012, the Wall Street Journal Venture Capital Dispatch Blog published an article entitled "Fisker Pursues $87M Capital Raise, Debt Deal, Amid DOE Loan Suspension" and extensively quoted Defendant Lane, writing:

Even as it's trying to raise $87 million in new equity marketed to investors by brokerage firm Advanced Equities, along with the debt deal, the company is continuing to sell its first car, the luxury plug-in Karma. 'We have 1,700 cars sold now,' said Ray Lane, managing partner at Kleiner Perkins Caufield & Byers and director on Fisker's board.

In the first quarter, the company said it drew in $100 million in revenue. 'I'm looking at about $400 million in revenue this year. That would make it the fastest growing start-up ever,' Lane said.

These projections, he added, don't include sales in China and Middle East, where the company is building relation-ships with dealerships. Fisker Automotive, however, is not profitable, said Lane. The Irvine, Calif.-based company still needs new capital to finance operations and to start ordering parts and production tools to build its next car model, Atlantic, which is central to the viability of the business longer-term. 'You don't make money until volumes are up,' said Lane. The company needs to build the Atlantic, which would increase its volumes, and amortize its fixed costs across more units, as well as allow Fisker to negotiate better deals with suppliers. 'We can't move forward without the debt,' said Lane, referring to the Atlantic program.'

For a while, Irvine, Calif.-based Fisker was operating under the assumption that it has $529 million in federal loans, but last year the Department of Energy, which handles the loans, suspended issuing new checks because the car company missed some milestones. Fisker delayed the release of Karma and sold fewer Karmas than it promised under the DOE loan agreement. As a result of the loan suspension, Fisker stopped additional work on a plant in Delaware where it was planning to build the cars and laid off some employees.

The company has been using equity, the most expensive capital, to pay for the development of Atlantic to date. 'We spent $130 million on the Atlantic,' Lane said. 'No one wants to spend' more equity,' he said. That is the reason Fisker is in discussions with a syndicate of private lenders, led by the Royal Bank of Canada, he added.

A spokesman for the Royal Bank of Canada didn't respond to a request for comment. Roger Ormisher, spokesman for Fisker, declined to comment on any involvement of the bank. 'We've opened every door,' said Ormisher, adding that the company is evaluating different options. Negotiations with the DOE are ongoing, said Ormisher. He declined to discuss Fisker's cash-burn.

Should the deal with the DOE fall through and the company has to turn to private lenders, it will have to pay more than it would have in interest, said Lane. The attractiveness of the federal loan lay in its low interest rate. Under the private deal that's being negotiated now, the DOE may be partially or fully repaid the amount that it already loaned to Fisker, said Lane. In the meantime, Fisker is using the services of Advanced Equities, a Chicago-based broker, to raise a new tranche of its Series D-1 financing.

Advanced Equities, which started marketing the new tranche for Fisker in the past few days, is aiming to raise $87 million toward a $500 million target with several closings to be complete by July 16, according to a person familiar with the situation. As of early April, Fisker raised $392 million in that round.

The Series D-1 preferred shares are being sold for $1.46 each. Investors can pay an extra cent to get a warrant to buy another preferred D-1 share, and another cent to buy two shares of common stock, according to two people familiar with the offering.

'We've added warrants as a sweetener,' said Lane. Ormisher declined to comment on details of the funding. Advanced Equities' spokesman didn't respond to a request for comment. The structure of the deal essentially allows an investor to buy two preferred shares for the price of one. At the same time, the company's previous investors are not diluted until new investors exercise the warrant, and so for the time being, the valuation of the company remains higher than it would be if investors were sold two preferred shares for half the price.

The situation with the DOE, said Lane, 'caused us to accelerate capital raising.' That is leading to certain compromises. Advanced Equities has recently been served a Wells Notice from the Securities & Exchange Commission, which indicates the SEC may enforce action against it.

Asked why Kleiner Perkins is continuing to use Advanced Equities' services in light of the SEC investigation, Lane said: 'They are good at what they do.'

**ANSWER**:  To the extent the allegations in paragraph 239 refer to statements in the June 26, 2012 article entitled "Fisker Pursues $87M Capital Raise, Debt Deal, Amid DOE Loan Suspension" that appeared in the *Wall Street Journal Venture Capital Dispatch Blog*, Daubenspeck refers to that article for its true and correct contents and denies any inaccurate characterization or interpretation of that article when read in context and in its entirety. Daubenspeck is without knowledge or information sufficient to admit or deny the remaining allegations in paragraph 239.

240.    On July 6, 2012, 4WheelsNews reported that Jim Yost, a former executive at Ford Motor Co. and Dana Holdings Corporation, had replaced Defendant DaMour as Fisker Automotive's CFO and that DaMour would "stay on as a special advisor to the [C]ompany."

**ANSWER**: Daubenspeck is without knowledge or information sufficient to admit or deny the allegations in paragraph 240.

241.    Meanwhile, Fisker Automotive's liquidity crisis – caused by its undisclosed accounting control and supply chain issues – continued. A confidential DOE "Risk Management Committee Briefing" PowerPoint presentation dated August 2, 2012 stated that the DOE had "spoke[n] to Fisker board member and Kleiner Perkins Caufield & Byers managing partner Ray Lane, who confirmed that a waiver of existing financial covenants and milestones would facilitate an equity raise of at least $100 million." That presentation also reflected that Fisker Automotive had told the DOE that it was down to $12 million in cash, that the Company expected to run out of cash "within a month," and that it had "suspended Karma production through September . . . to preserve cash." Critically, the DOE was also told that "[w]eekly wholesale Karma sales had slowed significantly . . . [and] that Fisker had lowered its 2012 wholesale target from 4,000 to 2,250."

**ANSWER**:  To the extent that the allegations of paragraph 241 refer to a confidential DOE "Risk Management Committee Briefing" PowerPoint presentation dated August 2, 2012, Daubenspeck refers to that presentation for its true and correct contents and

denies any inaccurate characterization or interpretation of that presentation when read in context

and in its entirety.  Daubenspeck is without knowledge or information sufficient to admit or deny

the remaining allegations in paragraph 241.

242. 

**ANSWER**:  To the extent that the allegations of paragraph 242 refer to an August

9, 2012 email from LaSorda to Defendant Fisker, Daubenspeck refers to that email for its true

and correct contents and denies any inaccurate characterization or interpretation of that email

when read in context and in its entirety.  Daubenspeck is without knowledge or information

sufficient to admit or deny the remaining allegations in paragraph 242.

243. 

**ANSWER**:  To the extent that the allegations of paragraph 242 refer to an August

13, 2012 email from LaSorda to Doerr, Daubenspeck refers to that email for its true and correct

contents and denies any inaccurate characterization or interpretation of that email when read in

context and in its entirety.  Daubenspeck is without knowledge or information sufficient to admit

or deny the allegations in paragraph 242, except Daubenspeck denies that he controlled AEI.

244.    On August 14, 2012, LaSorda was replaced as CEO by the former head of
the Chevy Volt hybrid program, Tony Posawatz.

**ANSWER**:  Daubenspeck is without knowledge or information sufficient to

admit or deny the allegations in paragraph 244.

245.    In late August 2012, Fisker Automotive's Board of Directors,
management and significant shareholders – including Defendants Lane, Daubenspeck, Richard
Li Tzar Kai, Henrik Fisker and Koehler, Defendant DaMour in his role as CFO, and controlling
shareholders Defendant Kleiner Perkins (controlled by Defendant Lane) and non-party AEI
(controlled by Defendant Daubenspeck) – approved the issuance of offering documents in
connection with a Series E Round of financing that would occur in two parts. First, Fisker
Automotive, in dire need of cash, sought to raise at least $30 million in bridge loan financing,
which would convert into Series E Preferred stock if the full amount of the Series E offering was
actually raised. If Fisker Automotive raised that amount, the DOE agreed to waive Fisker
Automotive's covenant violations and not declare the Company in default of the ATVM Loan.
Fisker Automotive was able to raise $50 million by early September, satisfying the DOE's
waiver.

**ANSWER**: Daubenspeck is without knowledge or information sufficient to admit

or deny the allegations in paragraph 245, except Daubenspeck denies that he was a member of

Fisker Automotive's Board of Directors in late August 2012, and denies that he had any

involvement with the alleged approval of the Series E Round of financing.

246.    The Series E Offering was the second part. On August 15, 2012, Henrik
Fisker sent a letter to stockholders to discuss, among other things, the Series E-1 offering. He
stated in part:

> We believe the main obstacle to obtaining the necessary financing has been the
> uncertain status of the Company's senior secured loan from the Department of
> Energy (the "DOE"). Compounding the issues with the DOE loan has been the
> fact that the Company has been under a media microscope as a new company with
> new technology and also been the target of politically motivated PR attacks.
> Compared to an established automotive manufacturer, events relating to Fisker
> have been scrutinized and blown out of proportion, especially in the
> "blogosphere."
> Notwithstanding these allegations, we are pleased to inform you that we have
> reached an agreement in principle with the DOE that we expect will allow us to
> implement our business plan. Specifically, the DOE has indicated that, as part of
> an overall financing plan, the DOE would be willing to eliminate any past defaults
> related to project milestones and covenants and, in addition, waive compliance
> with project milestones and financial covenants through December 30, 2014. We
> expect that our discussions with the DOE will conclude favorably with a formal
> waiver agreement in the next few weeks. The effectiveness of the DOE waiver
> agreement is expected to be contingent upon timely and successful completion of
> a new equity financing. Importantly, the initial closing of the new equity raise will

be conditioned upon the execution and concurrent effectiveness of the formal waiver agreement with the DOE.

**ANSWER**:  To the extent the allegations in paragraph 246 refer to statements in a letter from Henrik Fisker to Fisker Automotive investors, Daubenspeck refers to that letter for its true and correct contents and denies any inaccurate characterization or interpretation of that letter when read in context and in its entirety.  Daubenspeck is without knowledge or information sufficient to admit or deny the remaining allegations in paragraph 246.

247.     On August 16, 2012, Reuters published an interview of Ray Lane in which he stated the Company was seeking to raise an additional $150 million to increase cash on Fisker Automotive's balance sheet and to fund development of Fisker Automotive's next model car. Lane held out the prospect of an upcoming IPO, which would save Fisker Automotive's investors, stating that "[o]nce Fisker breaks even, the company could pursue an initial public offering or a sale to a strategic investor, which could come in late 2013."

**ANSWER**:  To the extent the allegations in paragraph 247 refer to statements in the August 16, 2012 *Reuters* article referenced therein, Daubenspeck refers to that article for its true and correct contents and denies any inaccurate characterization or interpretation of that article when read in context and in its entirety.  Daubenspeck is without knowledge or information sufficient to admit or deny the remaining allegations in paragraph 247.

248.     On or about August 22, 2012, AEI, on behalf of Fisker Automotive, solicited investors in connection with the Series E Round offering, which was structured initially as a convertible debt offering of between $20,000,000 and $30,000,000 in the form of convertible promissory notes ("Bridge Financing") and up to an additional $150,000,000 in Series E-1 Preferred Stock.

**ANSWER**: Daubenspeck is without knowledge or information sufficient to admit or deny the allegations in paragraph 248, except Daubenspeck admits that Fisker Automotive retained AEI to help facilitate a Series E Round offering.

249.     AEI made the offering documents, including the Purchase Agreement, the DNS, and the SOE for the Series E Round available on AEI's Venture Gateway. Investors would again face severe dilution of their investment if they did not purchase yet more Fisker Automotive Securities. As with the prior Series D-1 Round offering documents, the statements in these documents regarding the DOE, the status of the ATVM Loan, DOE's reasons for not

resuming funding, and Fisker Automotive's controls and accounting, as well as the representation that no material information had been omitted from any offering documents, were materially false and misleading because they omitted: (i) the facts and nature of DOE's freezing of Fisker Automotive's access to the ATVM Loan in June 2011, including that DOE froze the ATVM Loan in June 2011 because DOE believed it had been misled when Fisker Automotive told DOE in March 2011 that the Karma Production Milestone had been met; (ii) the continued out-of-control inventory and supply chain management issues that had caused Fisker Automotive to order (or be contractually obligated to order) hundreds of millions of dollars in useless parts and inventory; and (iii) that it was these aforementioned issues, not "politics", that had caused DOE to refuse Fisker Automotive's request to resume funding under the ATVM Loan.

**ANSWER**:  Daubenspeck is without knowledge or information sufficient to admit or deny the remaining allegations in paragraph 249, except Daubenspeck denies the third sentence of paragraph 249, and admits that offering documents and other investor materials were stored on the Venture Gateway.

250.



**ANSWER**:  Daubenspeck is without knowledge or information sufficient to admit or deny the allegations in paragraph 250.

251.





**ANSWER**: Daubenspeck is without knowledge or information sufficient to

admit or deny the allegations in paragraph 251.

     252.   None of this inside information used by the KPCB Managing Members in their investment decision was disclosed to investors such as Plaintiffs. ████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
███████████████████████████████████████████

     **ANSWER**: Daubenspeck is without knowledge or information sufficient to

admit or deny the allegations in paragraph 252.

     253.   On or around September 19, 2012, Greg Osborn sent the Middlebury Plaintiffs and others another "pay to play" capital call to invest in Series E Fisker Automotive preferred stock through a renamed entity Ridgemakers SPV. Again, the prior investors' failure to participate would result is severe dilution of their current holdings. As with the previous offerings, investors were directed to view Fisker Automotive documents which were available only by "electronic… access."

     **ANSWER**: Daubenspeck is without knowledge or information sufficient to

admit or deny the allegations in paragraph 111, except he admits that Fisker Automotive sold

securities to accredited investors in September 2012.

     254.   Combined with the $50 million raised in the convertible bridge loan financing, Fisker Automotive raised approximately $104 million through this Series E private placement offering by October 1, 2012.

**ANSWER**: Daubenspeck is without knowledge or information sufficient to admit or deny the allegations in paragraph 112, except he admits that Fisker Automotive sold securities to accredited investors in September 2012.

255.    On or about October 16, 2012, Fisker Automotive's battery supplier, A123, filed for bankruptcy protection. Shortly thereafter, Fisker Automotive stopped production of the Karma, laid off another 40 employees, and retained an investment banking advisory firm to find a "strategic partner" to save the Company.

**ANSWER**: Daubenspeck is without knowledge or information sufficient to admit or deny the allegations in paragraph 255.

256.    On March 13, 2013, Defendant Henrik Fisker resigned from Fisker Automotive's Board of Directors. Shortly thereafter, it was announced that Fisker Automotive had hired the law firm of Kirkland & Ellis, PC to advise it on a possible bankruptcy filing.

**ANSWER**: Daubenspeck is without knowledge or information sufficient to admit or deny the allegations in paragraph 256.

257.    In April 2013, Fisker Automotive laid off another 160 employees (75% of its remaining workforce).

**ANSWER**: Daubenspeck is without knowledge or information sufficient to admit or deny the allegations in paragraph 257.

258.    On April 17, 2013, PrivCo, a private research firm, made available a detailed report ("the PrivCo Report") entitled "FISKER AUTOMOTIVE'S ROAD TO RUIN: How a 'Billion-Dollar Startup Became a Billion-Dollar Disaster'", which was "supported by over 11,000 pages of original never-before published documents obtained through multiple Freedom Of Information Act requests." The PrivCo Report also stated that "[a] Kleiner Perkins partner reached by PrivCo confirmed several facts on Fisker and Kleiner Perkin's [sic] investment in Fisker on condition of anonymity. . . . [and] PrivCo confirmed through sources familiar with the matter that <u>Kleiner Perkins Managing Partner Ray Lane had been 'encouraged to resign' as head of the firm, and had in fact resigned.</u>" (Emphasis in original.)

**ANSWER**: To the extent that the allegations of paragraph 258 refer to the PrivCo Report, Daubenspeck refers to that report for its true and correct contents and denies any inaccurate characterization or interpretation of that report when read in context and in its

entirety.  Daubenspeck is without knowledge or information sufficient to admit or deny the

remaining allegations in paragraph 258.

259.    On April 21, 2013, the U.S. Government reported that it had seized $21 million in cash from Fisker Automotive to fulfill the first loan payment.

**ANSWER**:  Daubenspeck is without knowledge or information sufficient to

admit or deny the allegations in paragraph 259.

260.    On April 24, 2013, the U.S. House of Representatives Subcommittee On Economic Growth, Job Creation And Regulatory Affairs Of The Committee On Oversight And Government Reform held a hearing to investigate Fisker Automotive's travails (the "House Fisker Hearing").

**ANSWER**:  Daubenspeck is without knowledge or information sufficient to

admit or deny the allegations in paragraph 260.

261.    Nicholas Whitcombe, the Supervisory Senior Investment Officer at the Department of Energy's Loan Program Office, testified that, regarding the ATVM Loan, the DOE "had all discussions … with Fisker senior executives and the board of directors." This would have included, at least, Defendants Lane, Daubenspeck, Henrik Fisker, Koehler and DaMour.

**ANSWER**:  To the extent that the allegations of paragraph 261 refer to testimony

given at the April 24, 2013 hearing held by the U.S. House of Representatives Subcommittee on

Economic Growth, Job Creation and Regulatory Affairs of the Committee on Oversight and

Government Reform, Daubenspeck refers to that testimony for its true and correct contents and

denies any inaccurate characterization or interpretation of that testimony when read in context

and in its entirety.  Daubenspeck is without knowledge or information sufficient to admit or deny

the allegations contained in the remaining allegations of the first sentence of paragraph 261,

except Daubenspeck denies the second sentence of paragraph 261.

262.    However, according to information brought to light in that hearing, on May 14th, 15th, and 24th 2011 -- just before DOE froze the ATVM Loan -- John Doerr and/or Ray Lane, of Kleiner Perkins, had meetings with Jonathan Silver, who was the director of this ATVM program at the time, and others at the Loan Program Office. The House Fisker Hearing

record also reflects that Mr. Doerr had meetings with Jonathan Silver on March 24, 2010, April 16, 2010, and October 4, 2010.

**ANSWER**: To the extent that the allegations of paragraph 262 refer to testimony

given at the April 24, 2013 hearing of the U.S. House of Representatives Subcommittee On

Economic Growth, Job Creation And Regulatory Affairs Of The Committee On Oversight And

Government Reform, Daubenspeck refers to that testimony for its true and correct contents and

denies any inaccurate characterization or interpretation of that testimony when read in context

and in its entirety.  Daubenspeck is without knowledge or information sufficient to admit or deny

the remaining allegations in paragraph 262.

263.    The evidence in the House Fisker Hearing record reflects that the DOE had waived earlier violations of certain required milestones and/or financial covenants under the ATVM Loan in 2010. Despite that fact, Mr. Whitcombe testified that when the DOE saw the information presented in the June 2011 meeting, which conflicted with Defendants' prior representation that Fisker Automotive had met the February 2011 Karma production milestone, "[w]e [the DOE] believe[d] it did not happen and, therefore, we took <u>decisive action</u>" to terminate further funding. (Emphasis added.)

**ANSWER**:  To the extent that the allegations of paragraph 263 refer to testimony

given at the April 24, 2013 hearing of the U.S. House of Representatives Subcommittee On

Economic Growth, Job Creation And Regulatory Affairs Of The Committee On Oversight And

Government Reform, Daubenspeck refers to that testimony for its true and correct contents and

denies any inaccurate characterization or interpretation of that testimony when read in context

and in its entirety.  Daubenspeck is without knowledge or information sufficient to admit or deny

the remaining allegations in paragraph 263.

264.    In addition, Mr. Whitcombe was asked at the hearing: "So after the DOE froze Fisker's loan in June of 2011, why did the DOE not make this public? If the taxpayer was in fact on the hook, don't you think that they had a right to know that the loan was not going smoothly?" Whitcombe responded stating "Fisker is responsible for raising its own capital and notifying investors of its situation. Having said that, as to why no press releases or no public notification were provided by the Department of Energy . . . . I don't have an answer, sir." (Emphasis added.)

**ANSWER**: To the extent that the allegations of paragraph 264 refer to testimony given at the April 24, 2013 hearing of the U.S. House of Representatives Subcommittee On Economic Growth, Job Creation And Regulatory Affairs Of The Committee On Oversight And Government Reform, Daubenspeck refers to that testimony for its true and correct contents and denies any inaccurate characterization or interpretation of that testimony when read in context and in its entirety. Daubenspeck is without knowledge or information sufficient to admit or deny the remaining allegations in paragraph 264.

265. Defendant Lane resigned from Fisker Automotive's Board of Directors in May 2013.

**ANSWER**: Daubenspeck is without knowledge or information sufficient to admit or deny the allegations in paragraph 265.

266. On September 17, 2013, the DOE put the remaining $168 million Fisker Automotive owed on the ATVM Loan out to bid in a public auction.

**ANSWER**: Daubenspeck is without knowledge or information sufficient to admit or deny the allegations in paragraph 266.

267. On November 22, 2013, Fisker Automotive filed for bankruptcy protection.

**ANSWER**: Daubenspeck is without knowledge or information sufficient to admit or deny the allegations in paragraph 267, except Daubenspeck admits that Fisker Automotive filed bankruptcy at some point well after he had stepped down as a director.

## FIRST CLAIM FOR RELIEF[2]

### For Violations of Section 12(a)(2) of the Securities Act Against All Defendants Except KPCB LLC, KPCB XII, KPCB XIII, KPCB Associates XII, and KPCB Associates XIII

268.    Plaintiffs incorporate by reference and reallege each of the foregoing paragraphs.

**ANSWER**: Daubenspeck incorporates by reference and realleges each of the

foregoing paragraphs as if fully set forth herein.

269.    Plaintiffs do not claim for purposes of this Count that the Defendants against whom it is asserted committed intentional or reckless misconduct or acted with scienter or fraudulent intent.

**ANSWER**:  Paragraph 127 contains allegations that do not require a response by

Daubenspeck in light of the Court's Order.  In addition, paragraph 127 sets forth conclusions of

law to which no response is required.  To the extent an answer is required, Daubenspeck denies

each and every allegation in paragraph 269.

270.    This Count is asserted against Defendants Fisker, Koehler, DaMour, Lane, Li, Daubenspeck and McDonnell ("Section 12 Defendants") with respect to Plaintiffs' purchases in the Series C-1 Round, the Series D-1 Round, the December Capital Call, the Series D-1 Extension, and the Series E-1 Round.

**ANSWER**:  Daubenspeck admits that Plaintiffs purport to assert this count

against Defendants Fisker, Koehler, DaMour, Lane, Li, Daubenspeck and McDonnell with

respect to Plaintiffs' purchases in the Series C-1 Round, the Series D-1 Round, the December

Capital Call, the Series D-1 Extension, and the Series E-1 Round, but deny that Plaintiffs are

entitled to any such relief.

---

[2] In its September 9, 2015 Order (D.I. 70), the Court dismissed Counts I and II alleging violations of the Securities Act. Counts I and II are pled herein solely to preserve Plaintiffs' rights in connection with any appeal of the Order.

271.    Fisker Automotive is the issuer of the Fisker Automotive Securities the Fisker Automotive Plaintiffs purchased, and from which the Fisker Automotive Securities the Middlebury Plaintiffs purchased are derived. The Section 12 Defendants were sellers and offerors and/or solicitors of purchasers of the Fisker Automotive Securities offered, including to Plaintiffs. Plaintiffs purchased these securities as a result of the material omissions set forth below.

**ANSWER**:  Paragraph 271 contains allegations that do not require a response by

Daubenspeck in light of the Court's Order.  In addition, paragraph 271 sets forth conclusions of

law to which no response is required.  To the extent an answer is required, Daubenspeck denies

each and every allegation in paragraph 271, except Daubenspeck admits that Fisker Automotive

was the issuer of the Fisker Automotive Securities.

272.    Specifically, as to Fisker Automotive's operations described herein, all of the offering materials including Prospectuses/Private Placement Memoranda and other offering documents made available to purchasers of Fisker Automotive Securities, as described above, and public statements by Defendants Lane, Henrik Fisker, DaMour, Koehler and/or McDonnell described above, omitted material information because they failed to disclose the facts that (i) Fisker Automotive had in fact not met the February 2011 Fisker Karma commercial production milestone under the ATVM Loan covenants, as represented to the DOE in March 2011; (ii) the Section 12 Defendants falsely told the DOE in March 2011 that this milestone had been met; (iii) in June of 2011, the Section 12 Defendants gave a presentation to the DOE that contradicted the earlier representation to the DOE that Fisker Automotive had complied with the February 2011 Karma commercial production milestone; and (iv) as a result, the DOE enforced its Drawstop Notice, thereby halting any further advancements under the ATVM Loan in June 2011.

**ANSWER**:  Paragraph 272 contains allegations that do not require a response by

Daubenspeck in light of the Court's Order.  In addition, paragraph 272 sets forth conclusions of

law to which no response is required.  To the extent an answer is required, Daubenspeck denies

each and every allegation in paragraph 272.

273.    As Mr. Whitcombe testified, the DOE "took decisive action" to cut off further funding as soon as this contradictory information was presented to them in June 2011. In addition, the confidential Quarterly Credit Report prepared by the DOE dated December 12, 2011 (described above), which was made public in the PrivCo Report dated April 17, 2013, also confirms the omitted material facts described above, stating that in June 2011, "Fisker presented new information calling into question whether the [February 2011] launch milestone had been met. After receiving the June 2011 presentation, DOE halted further funding of the loan." In addition, another confidential DOE document made available in the PrivCO Report states that after DOE enforced the Drawstop Notice in June 2011, "in follow-up meetings with [Defendants

Fisker, Koehler, and DaMour] . . . Fisker gave varied and incomplete explanations" as to whether the milestone had been met and thus, "loan draws were not resumed."

**ANSWER**: Paragraph 273 contains allegations that do not require a response by

Daubenspeck in light of the Court's Order.  To the extent an answer is required, Daubenspeck is

without knowledge or information sufficient to admit or deny the allegations in paragraph 273.

274.    In addition, in connection with the December 2011 "pay to play" capital call described above, the Section 12 Defendants omitted the material fact that Fisker Automotive had notified NHTSA on December 21, 2011 that it would recall 239 Fisker Karmas due to battery fires. Fisker Automotive publicly announced that recall on December 29, 2011 -- exactly one day after this financing round closed. This NHTSA document first became public as part of the PrivCo Report.

**ANSWER**: Paragraph 274 contains allegations that do not require a response by

Daubenspeck in light of the Court's Order.  To the extent an answer is required, (a) the first

sentence of paragraph 274 sets forth conclusions of law to which no response is required; (b)

Daubenspeck is without knowledge or information sufficient to admit or deny the allegations in

the second and third sentences of paragraph 274, except that he admits that Fisker Automotive

publicly announced a recall of Karmas on or around December 29, 2011.

275.    Another confidential DOE document described above, also revealed in the PrivCo Report, demonstrates that the Section 12 Defendants failed to disclose material facts to Plaintiffs in the offering documents described above associated with the December 2011 "pay to play" round. Specifically, the Section 12 Defendants omitted the material fact that Fisker Automotive owed $200 million in payables as of no later than November 30, 2011, of which $120 million were overdue – while, at the same time, Fisker Automotive had only had $20 million in cash "on hand" and was burning cash so fast that it would be out money by around December 15th. In this connection, Defendant DaMour's statement on the December 15, 2011 conference call, discussed above that, inter alia, "this is the last . . . private raise, and surely the last capital call. . . . The $300 [million] is enough to fund the complete plan as we have explained. . . . We are at the point now that the . . . [Karma] is fully funded," also omitted the material fact that the vast majority of the funds raised in the capital call would simply go to pay down existing obligations rather than fund Fisker Automotive's business plan going forward. The same is true with similar statements made on the February 22, 2012 conference call described above whereby Henrik Fisker repeated the assertion that Fisker Automotive could be "self-sustaining as a company" without additional funds.

**ANSWER**:  Paragraph 275 contains allegations that do not require a response by Daubenspeck in light of the Court's Order.  In addition, paragraph 275 sets forth conclusions of law to which no response is required.  To the extent an answer is required, Daubenspeck denies each and every allegation in paragraph 275.

276.     The offering documents in connection with the March 2012 and September 2012 offerings, described above, were also materially false and misleading because they did not disclose that Defendant Henrik Fisker's stepping down from the day to day management of Fisker Automotive as its CEO in February 2012 caused Fisker Automotive to be in default of the ATVM Loan "Key Personnel" covenant requiring him to be "responsible for the management of the borrower."

**ANSWER**:  Paragraph 276 contains allegations that do not require a response by Daubenspeck in light of the Court's Order.  In addition, paragraph 276 sets forth conclusions of law to which no response is required.  To the extent an answer is required, Daubenspeck denies each and every allegation in paragraph 276.

277.     The Section 12 Defendants were obligated to make a reasonable and diligent investigation of the statements made in various offering documents to ensure such statements were true and that there was no omission of material fact required to be stated in order to make the statements contained therein not misleading. None of the Section 12 Defendants made a reasonable investigation or possessed reasonable grounds for the belief that their statements were accurate and complete in all material respects. Had they done so, these Defendants would have known of the material omissions alleged herein.

**ANSWER**:  Paragraph 277 contains allegations that do not require a response by Daubenspeck in light of the Court's Order.  In addition, paragraph 277 sets forth conclusions of law to which no response is required.  To the extent an answer is required, Daubenspeck denies each and every allegation in paragraph 277.

278.     At the time they purchased Fisker Automotive Securities, Plaintiffs did not know, and by the reasonable exercise of care could not have known, of the material omitted facts alleged herein.

**ANSWER**:  Paragraph 278 contains allegations that do not require a response by Daubenspeck in light of the Court's Order.  In addition, paragraph 278 sets forth conclusions of

law to which no response is required.  To the extent an answer is required, Daubenspeck denies

each and every allegation in paragraph 278.

279.    In connection with the sale of Fisker Automotive Securities, these Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce and the United States Mails.

**ANSWER**:  Paragraph 279 contains allegations that do not require a response by

Daubenspeck in light of the Court's Order.  In addition, paragraph 279 sets forth conclusions of

law to which no response is required.  To the extent an answer is required, Daubenspeck denies

each and every allegation in paragraph 279.

280.    This action is brought within one year after the discovery of the material omissions.

**ANSWER**:  Paragraph 280 contains allegations that do not require a response by

Daubenspeck in light of the Court's Order.  In addition, paragraph 280 sets forth conclusions of

law to which no response is required.  To the extent an answer is required, Daubenspeck denies

each and every allegation in paragraph 280.

281.    By reason of the foregoing, the Section 12 Defendants have violated Section 12(a)(2) of the Securities Act and are liable to Plaintiffs, which have been damaged by reason of such violations.

**ANSWER**:  Paragraph 281 contains allegations that do not require a response by

Daubenspeck in light of the Court's Order.  In addition, paragraph 281 sets forth conclusions of

law to which no response is required.  To the extent an answer is required, Daubenspeck denies

each and every allegation in paragraph 281.

282.    Accordingly, Plaintiffs have the right to rescind and recover the consideration paid for their Fisker Automotive Securities and hereby elect to rescind and tender their Fisker Automotive Securities to the Section 12 Defendants.

**ANSWER**:  Paragraph 282 contains allegations that do not require a response by

Daubenspeck in light of the Court's Order.  In addition, paragraph 282 sets forth conclusions of

law to which no response is required.  To the extent an answer is required, Daubenspeck denies

each and every allegation in paragraph 282.

## SECOND CLAIM FOR RELIEF
### For Violations of Section 15 of the Securities Act Against Defendants KPCB LLC, Ray Lane, Henrik Fisker, Bernhard Koehler, Joe DaMour, Keith Daubenspeck, and Richard Li Tzar Kai

283.    Plaintiffs repeat and reallege each and every allegation contained above. This count is asserted against KPCB LLC, Ray Lane, Henrik Fisker, Bernhard Koehler, Joe DaMour, Keith Daubenspeck, and Richard Li Tzar Kai (the "Section 15 Defendants"), and is based upon Section 15 of the Securities Act.

**ANSWER**: Daubenspeck incorporates by reference and realleges each of the

foregoing paragraphs as if fully set forth herein.  Daubenspeck admits that Plaintiffs purportedly

assert this count against KPCB LLC, Ray Lane, Henrik Fisker, Bernhard Koehler, Joe DaMour,

Keith Daubenspeck, and Richard Li Tzar Kai under Section 15 of the Securities Act, but denies

that Plaintiffs are entitled to any such relief.

284.    Plaintiffs do not claim, for purposes of this Count, that the Section 15 Defendants committed intentional or reckless misconduct or acted with scienter or fraudulent intent.

**ANSWER**:  Paragraph 284 contains allegations that do not require a response by

Daubenspeck in light of the Court's Order.  In addition, paragraph 284 sets forth conclusions of

law to which no response is required.  To the extent an answer is required, Daubenspeck denies

each and every allegation in paragraph 284.

285.    This Count is asserted against these Defendants with respect to Plaintiffs' purchases in the Series C-1 Round, the Series D-1 Round, the December Capital Call, the Series D-1 Extension, and the Series E-1 Round.

**ANSWER**:  Daubenspeck admits that Plaintiffs purportedly assert this count

against KPCB LLC, Ray Lane, Henrik Fisker, Bernhard Koehler, Joe DaMour, Keith

Daubenspeck, and Richard Li Tzar Kai with respect to Plaintiffs' purchases in the Series C-1

Round, the Series D-1 Round, the December Capital Call, the Series D-1 Extension, and the

Series E-1 Round, but denies that Plaintiffs are entitled to any such relief.

286.    The Section 15 Defendants, by virtue of their senior management
positions, stock ownership, directorships and specific acts were, at the time of the wrongs alleged
herein and as set forth herein, each a controlling person of Fisker Automotive. The Section 15
Defendants had the power and influence and exercised the same to cause Fisker Automotive to
disseminate offering documents that omitted material information.

**ANSWER**: Paragraph 286 contains allegations that do not require a response by

Daubenspeck in light of the Court's Order.  In addition, paragraph 286 sets forth conclusions of

law to which no response is required.  To the extent an answer is required, Daubenspeck denies

each and every allegation in paragraph 286.

287.    Based on each Section 15 Defendant's having been a signatory to the
offering documents and/or having otherwise participated in the process which allowed the
offerings to be completed, and the Section 15 Defendants' conduct alleged herein, the Section 15
Defendants are jointly and severally liable for Fisker Automotive's violations of Section 12(a)(2)
of the Securities Act.

**ANSWER**:  Paragraph 287 contains allegations that do not require a response by

Daubenspeck in light of the Court's Order.  In addition, paragraph 287 sets forth conclusions of

law to which no response is required.  To the extent an answer is required, Daubenspeck denies

each and every allegation in paragraph 287.

### THIRD CLAIM FOR RELIEF

**For Violation of Section 10(b) of the Exchange Act and Rule 10b-5
Promulgated Thereunder Against All Defendants Except Kleiner Perkins,
KPCB XII, KPCB XIII, KPCB Associates XII, KPCB Associates XIII,
and McDonnell**

288.    Plaintiffs repeat and reallege each and every allegation contained above.

**ANSWER**: Daubenspeck incorporates by reference and realleges each of the

foregoing paragraphs as if fully set forth herein.

289.    This Count is asserted against defendants Fisker, Koehler, DaMour, Lane, Li and Daubenspeck ("Section 10b Defendants") for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**ANSWER**:  Daubenspeck admits that Plaintiffs purport to assert this count against defendants Fisker, Koehler, DaMour, Lane, Li and Daubenspeck for alleged violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but denies that Plaintiffs are entitled to any such relief.

290.    This Count is asserted against these Defendants with respect to Plaintiffs' purchases in the Series C-1 Round, the Series D-1 Round, the December Capital Call, the Series D-1 Extension, and the Series E-1 Round.

**ANSWER**:  Daubenspeck admits that Plaintiffs purport to assert this count against defendants Fisker, Koehler, DaMour, Lane, Li and Daubenspeck with respect to Plaintiffs' supposed purchases in the Series C-1 Round, the Series D-1 Round, the December Capital Call, the Series D-1 Extension, and the Series E-1 Round, but denies that Plaintiffs are entitled to any such relief.

291.    The Section 10b Defendants knowingly or with deliberate recklessness disseminated or approved materially false and misleading statements specified herein in that they failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

**ANSWER**:  Paragraph 291 sets forth conclusions of law to which no response is required.  To the extent an answer is required, Daubenspeck denies each and every allegation in paragraph 291.

292.    The Section 10b Defendants individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse information about the business, operations and future prospects of the Company as specified herein.

**ANSWER**:  Paragraph 292 sets forth conclusions of law to which no response is required.  To the extent an answer is required, Daubenspeck denies each and every allegation in paragraph 292.

293.    The Section 10b Defendants had actual knowledge of the material omission of facts set forth herein, or acted with deliberate reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them. The Section 10b Defendants' material omissions in offering documents described above and Defendants Lane's, Fisker's, DaMour's, Koehler's and/or McDonnell's statements described above were made knowingly or recklessly and for the purpose and effect of concealing material information from Plaintiffs.

**ANSWER**:  Paragraph 293 sets forth conclusions of law to which no response is required.  To the extent an answer is required, Daubenspeck denies each and every allegation in paragraph 293.

294.    Specifically, the Purchase Agreements, CPPMs, DNSs, and SOEs and/or other offering documents made available to purchasers of Fisker Automotive Securities, as described above, and public statements by Defendants Lane, Henrik Fisker, DaMour, Koehler and/or McDonnell described above, were materially misleading and/or omitted material information because they failed to disclose the material facts that, *inter alia*: (i) the Section 10b Defendants had misled the DOE in connection with the CCL by submitting a Business Plan to the DOE in August 2009 that falsely reflected Fisker Automotive commencing production of the Karma in mid-2010 with sales of 6,000 Karmas in that year, as discussed above; (ii) it was impossible for the Company to meet the Production and Tooling Release milestone dates required under the Valmet Assembly Agreement and April 2010 Business Plan, because the Company's suppliers had stopped working on the Karma project months earlier, and, contrary to Defendants' statements to the DOE, in, e.g., the February 4, 2010 meeting at Orrick's office, not all of them had restarted work on the Karma project; (iii) the April 2010 Business Plan given to the DOE, upon which the ATVM Loan was executed, was based on materially false and understated costs for the Karma and Nina programs; (iv) the Section 10b Defendants' failure to disclose this information to the DOE violated the CCL issued in September 2009 and ATVM Loan terms; (v) the financial information presented in the Series A-1 Round CPPM materially understated the cost information for the Karma and Nina programs; and (vi) Fisker Automotive had defaulted on the ATVM Loan by, inter alia, falsely certifying compliance with the ATVM Loan terms in its monthly Compliance Certificates and the Advance Requests that Fisker Automotive submitted between May 2010 and September 2010, receiving approximately $125 million from DOE.

**ANSWER**:  Paragraph 294 sets forth conclusions of law to which no response is required.  To the extent an answer is required, Daubenspeck denies each and every allegation in paragraph 294.

295.    Further, the above referenced offering materials were materially false and/or misleading because they failed to disclose the material facts that: (i) the production of the Karma had been delayed and that Fisker Automotive would not be able to fulfill the Karma Production Milestone; (ii) the Section 10b Defendants secretly violated the definition of the

Karma start of production milestone agreed to with the DOE to cover up the Karma production delays by pretending that required milestones for "Ok to sell" fell after the start of production rather than before the start of production, as mandated under the ATVM Loan and reflected in investor presentations; and (iii) Fisker Automotive had defaulted on the ATVM Loan by, inter alia, falsely certifying compliance with the ATVM Loan terms in its monthly Compliance Certificates and the Advance Requests that Fisker Automotive submitted between December 2010 through February 2011, totaling approximately $47 million.

**ANSWER**:  Paragraph 295 sets forth conclusions of law to which no response is required.  To the extent an answer is required, Daubenspeck denies each and every allegation in paragraph 295.

296.    The Section 10b Defendants failed to disclose the facts that: (i) Fisker Automotive had not met the February 2011 Fisker Karma commercial production milestone under the ATVM Loan covenants; (ii) the Section 10b Defendants had knowingly, or recklessly, falsely told the DOE in March 2011 that Fisker Automotive had complied with that milestone; (iii) in June of 2011, the Section 10b Defendants had given a presentation to the DOE that contradicted the earlier representation to the DOE that Fisker Automotive had complied with the February 2011 Karma commercial production milestone under the ATVM Loan covenants; and (iv) as a result, the DOE halted any further advancements under the ATVM Loan in June 2011 because DOE officials believed they had been misled by the Section 10b Defendants in the March 2011 presentation.

**ANSWER**:  Paragraph 296 sets forth conclusions of law to which no response is required.  To the extent an answer is required, Daubenspeck denies each and every allegation in paragraph 296.

297.    The Section 10b Defendants' knowing or reckless disregard of the aforementioned facts is also strongly supported by detailed confidential DOE documents and the testimony of Mr. Whitcombe. As demonstrated above, Mr. Whitcombe testified that DOE officials worked closely with Fisker Automotive's executives, Board of Directors, Ray Lane and non-defendant John Doerr (also of Kleiner Perkins) regarding the ATVM Loan. A confidential Quarterly Credit Report prepared by the DOE dated December 12, 2011(described above) , which was first made public in the PrivCo Report, also confirms the omitted facts described above, stating that in June 2011, "Fisker presented new information calling into question whether the [February 2011] launch milestone had been met. After receiving the June 2011 presentation, DOE halted further funding of the loan."

**ANSWER**:  Paragraph 297 sets forth conclusions of law to which no response is required.  To the extent an answer is required, Daubenspeck denies each and every allegation in paragraph 297.

298.    As Mr. Whitcombe testified at the House Fisker Hearing, so clear was the fact that Fisker Automotive had not met the February 2011 Fisker Karma commercial production milestone as the Section 10b Defendants falsely told the DOE in March 2011, that the DOE "took decisive action" to cut off further funding when this contradictory information was presented to them in June 2011. The DOE refused to waive this milestone despite that fact that DOE had earlier waived other financial covenants and/or milestones under the ATVM Loan, further evidencing an inference that the DOE believed the Section 10b Defendants had misled the DOE in March 2011 as to the fulfillment of that milestone. Indeed, the Section 10b Defendants' scienter is further supported in another confidential DOE document revealed in the PrivCo Report, stating that after June 2011, "in follow-up meetings with [Defendants Fisker, Koehler, and DaMour] . . . Fisker gave varied and incomplete explanations" as to their failure to meet the February 2011 milestone and thus, "loan draws were not resumed."

**ANSWER**:  Paragraph 298 sets forth conclusions of law to which no response is required.  To the extent an answer is required, Daubenspeck denies each and every allegation in paragraph 298.

299.    In addition, in connection with the December 2011 "pay to play" capital call described above, the Section 10b Defendants omitted the material fact that Fisker Automotive had notified NHTSA on December 21, 2011 that it would recall 239 Fisker Karmas necessitated by battery fires. Fisker Automotive publicly announced that recall on December 29, 2011 -- exactly one day after this financing round closed. This NHTSA document first became public as part of the PrivCo Report.

**ANSWER**:  The first sentence of paragraph 299 sets forth conclusions of law to which no response is required.  Daubenspeck is without knowledge or information sufficient to admit or deny the allegations in the second and third sentences of paragraph 299, except that he admits that Fisker Automotive publicly announced a recall of Karmas on or around December 29, 2011.

300.    In addition, another confidential DOE document described above, also revealed in the PrivCo Report, demonstrates that Defendants omitted material facts in the offering documents described above associated with the December 2011 "pay to play" round. Specifically, Defendants knowingly or recklessly concealed the material fact that Fisker Automotive had $200 million in payables as of no later than November 30, 2011, of which $120 million were overdue – while, at the same time, Fisker Automotive had only had $20 million in cash "on hand" and was burning cash so fast that it would be out of money by around December 15th. In this connection, among other things, Defendant DaMour's statement on the December 15, 2011 conference call, above, that, "this is the last . . . private raise, and surely the last capital call. . . . The $300 [million] is enough to fund the complete plan as we have explained. . . . We are at the point now that the . . . [Karma] is fully funded," was also knowingly or recklessly

materially false and misleading because the vast majority of the funds raised in the capital call would simply go to pay down existing obligations rather than fund Fisker Automotive's business plan going forward as DaMour stated. The same is true with similar statements made on the February 22, 2012 conference call described above whereby Henrik Fisker repeated the assertion that Fisker Automotive could be a "self-sustaining as a company" without additional funds.

   **ANSWER**: Paragraph 300 sets forth conclusions of law to which no response is

required. To the extent an answer is required, Daubenspeck denies each and every allegation in

paragraph 300.

   301. In addition, the offering documents in connection with the March 2012 and September 2012 offerings described above were materially false and misleading because the Section 10b Defendants knowingly or recklessly concealed the material fact that Defendant Henrik Fisker's stepping down from the day to day management of Fisker Automotive as its CEO in February 2012 caused Fisker Automotive to be in default of the ATVM Loan "Key Personnel" covenant requiring him to be "responsible for the management of the borrower."

   **ANSWER**: Paragraph 301 sets forth conclusions of law to which no response is

required. To the extent an answer is required, Daubenspeck denies each and every allegation in

paragraph 301.

   302. As demonstrated by statements at all relevant times, if the Section 10b Defendants did not have actual knowledge of the omissions alleged, they were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

   **ANSWER**: Paragraph 302 sets forth conclusions of law to which no response is

required. To the extent an answer is required, Daubenspeck denies each and every allegation in

paragraph 302.

   303. Had Plaintiffs known the truth regarding the material facts not revealed to them – including Fisker Automotive's failure to meet the February 2011 Fisker Karma commercial production milestone and the Section 10b Defendants' misleading of the DOE in their March 2011 presentation as to Fisker Automotive's fulfillment of that milestone, the DOE's issuance of the Drawstop Notice in June 2011, the December 2011 recall due to battery fires and/or that the Section 10b Defendants had concealed the Company's notification to NHTSA on December 21, 2011 of the recall, the fact that the funds raised in the December 2011 capital call would largely go to pay down $200 million in payables rather than funding the Company's business plan to make it a self-sustaining company as Defendants represented, and/or Fisker Automotive's default of the DOE confidential "Key Personnel" loan covenant -- Plaintiffs would not have purchased or otherwise acquired their Fisker Automotive Securities, or, if Plaintiffs had

purchased such securities, they would not have done so at the artificially inflated prices which they paid.

   **ANSWER**:  Paragraph 303 sets forth conclusions of law to which no response is

required.  To the extent an answer is required, Daubenspeck denies each and every allegation in

paragraph 303, except that he is without sufficient knowledge or information to admit or deny

what the Plaintiffs would or would not have done under various hypothetical circumstances such

as those posed in paragraph 303.

   304. The Section 10b Defendants were motivated to conceal the aforementioned material information and otherwise mislead Plaintiffs and other investors in order to protect Defendants' own investments in and executive/control positions with Fisker Automotive. Specifically, the Section 10b Defendants concealed this material information from Plaintiffs and other investors because they needed huge sums of additional cash to fund Fisker Automotive to position the Company for a sale or an initial public offering ("IPO"). The Section 10b Defendants stood to make huge profits in either transaction. But, without Plaintiffs' and other investors' money, Fisker Automotive was not a viable company -- a fact that would render Defendants' investments in Fisker Automotive worthless and threaten their executive/control positions. The fact that KPCB LLC, through its two top partners, non-Defendant John Doerr and Defendant Lane, took an active role in dealing with the DOE on behalf of Fisker Automotive, as described above, not only is strong evidence of Lane's and Kleiner Perkins' actual knowledge and concealment of the material facts that were concealed from Plaintiffs and other investors, but also supports a strong inference of motive, as described above.

   **ANSWER**:  Paragraph 304 sets forth conclusions of law to which no response is

required.  To the extent an answer is required, Daubenspeck denies each and every allegation in

paragraph 304.

   305. At the time they purchased Fisker Automotive Securities, Plaintiffs did not know, and by the reasonable exercise of care could not have known, of the material omitted facts alleged herein, which made the offering materials described herein, and upon which Plaintiffs relied, materially false and misleading.

   **ANSWER**:  Paragraph 305 sets forth conclusions of law to which no response is

required.  To the extent an answer is required, Daubenspeck denies each and every allegation in

paragraph 305.

   306. By virtue of the foregoing, the Section 10b Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**ANSWER**:  Paragraph 306 sets forth conclusions of law to which no response is required.  To the extent an answer is required, Daubenspeck denies each and every allegation in paragraph 306.

307.    As a direct and proximate result of the Section 10b Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchases of Fisker Automotive Securities.

**ANSWER**:  Paragraph 307 sets forth conclusions of law to which no response is required.  To the extent an answer is required, Daubenspeck denies each and every allegation in paragraph 307.

### FOURTH CLAIM FOR RELIEF

**For Violation of Section 20(a) of the Exchange Act Against Defendants
KPCB LLC, Ray Lane, Henrik Fisker, Joe DaMour,
Bernhard Koehler, Keith Daubenspeck, and Richard Li Tzar Kai**

308.    Plaintiffs repeat and reallege each and every allegation contained above.

**ANSWER**: Daubenspeck incorporates by reference and realleges each of the foregoing paragraphs as if fully set forth herein.

309.    This Count is asserted against KPCB LLC, Ray Lane, Henrik Fisker, Joe DaMour, Bernhard Koehler, Keith Daubenspeck, and Richard Li Tzar Kai (the "Section 20 Defendants"), for violations of Section 20(a) of the Exchange Act.

**ANSWER**:  Daubenspeck admits that Plaintiffs purport to assert this count against KPCB LLC, Ray Lane, Henrik Fisker, Joe DaMour, Bernhard Koehler, Keith Daubenspeck, and Richard Li Tzar Kai under Section 20(a) of the Exchange Act, but denies that Plaintiffs are entitled to any such relief.

310.    This Count is asserted against these Defendants with respect to Plaintiffs' purchases in the Series C-1 Round, the Series D-1 Round, the December Capital Call, the Series D-1 Extension, and the Series E-1 Round.

**ANSWER**: Daubenspeck admits that Plaintiffs purport to assert this count against KPCB LLC, Ray Lane, Henrik Fisker, Joe DaMour, Bernhard Koehler, Keith Daubenspeck, and

Richard Li Tzar Kai with respect to Plaintiffs' purchases in the Series C-1 Round, the Series D-1 Round, the December Capital Call, the Series D-1 Extension, and the Series E-1 Round, but denies that Plaintiffs are entitled to any such relief.

311.    The Section 20 Defendants acted as controlling persons of Fisker Automotive within the meaning of Section 20(a) of the Exchange Act.

**ANSWER**:  Paragraph 311 sets forth conclusions of law to which no response is required.  To the extent an answer is required, Daubenspeck denies each and every allegation in paragraph 311.

312.    By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the material omissions withheld from the investing public, the Section 20 Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Fisker Automotive, including the contents and dissemination of the various statements which Plaintiffs contend omit material information.

**ANSWER**:  Paragraph 312 sets forth conclusions of law to which no response is required.  To the extent an answer is required, Daubenspeck denies each and every allegation in paragraph 312.

313.    The Section 20 Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged to have omitted material information prior to these statements being issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

**ANSWER**:  Paragraph 313 sets forth conclusions of law to which no response is required.  To the extent an answer is required, Daubenspeck denies each and every allegation in paragraph 313.

314.    As set forth above, each Section 10b Defendant, as well as Fisker Automotive, violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Section 20 Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate cause result of the Section 20 Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchases of Fisker Automotive Securities.

**ANSWER**:  Paragraph 314 sets forth conclusions of law to which no response is required.  To the extent an answer is required, Daubenspeck denies each and every allegation in paragraph 314.

## FIFTH CLAIM FOR RELIEF

### For Fraud Against All Defendants Except McDonnell

315.    Plaintiffs repeat and reallege each and every allegation contained above.

**ANSWER**: Daubenspeck incorporates by reference and realleges each of the foregoing paragraphs as if fully set forth herein.

316.    This Count is asserted against defendants Fisker, Koehler, DaMour, Lane, Li, KPCB LLC, KPCB XII, KPCB Associates XII, KPCB XIII, KPCB Associates XIII and Daubenspeck ("Fraud Defendants") for fraud with respect to Plaintiffs' purchases in the Series A-1 Round, the Series B-1 Round, the Series C-1 Round, the Series D-1 Round, the December Capital Call, the Series D-1 Extension, and the Series E-1 Round.

**ANSWER**:  Daubenspeck admits that Plaintiffs purport to assert this count against defendants Fisker, Koehler, DaMour, Lane, Li, KPCB LLC, KPCB XII, KPCB Associates XII, KPCB XIII, KPCB Associates XIII and Daubenspeck for fraud with respect to Plaintiffs' purchases in the Series A-1 Round, the Series B-1 Round, the Series C-1 Round, the Series D-1 Round, the December Capital Call, the Series D-1 Extension, and the Series E-1 Round, but denies that Plaintiffs are entitled to any such relief.

317.    The purchase agreements through which the Fraud Defendants issued Fisker Automotive stock in the Offerings at issue here each contained a paragraph stating:

> Governing Law. This Agreement and all acts and transactions pursuant hereto and the rights and obligations of the parties hereto shall be governed, construed, and interpreted in accordance with the laws of the State of Delaware, without giving effect to principles of conflicts of law.

**ANSWER**:  To the extent that the allegations of paragraph 317 refer to the content of various purchase agreements, Daubenspeck refers to those purchase agreements for

their true and correct contents and denies any inaccurate characterization or interpretation of the

those purchase agreement when read in context and in their entirety.

318.    The Fraud Defendants knowingly, intentionally, or with reckless indifference to the truth approved, made, disseminated or caused to be disseminated materially false and misleading statements specified herein while concealing material facts in order to induce Plaintiffs to invest in Fisker Automotive.

**ANSWER**:  Paragraph 318 sets forth conclusions of law to which no response is

required.  To the extent an answer is required, Daubenspeck denies each and every allegation in

paragraph 318.

319.    The Fraud Defendants, individually and in concert, directly and indirectly, engaged and participated in a continuous course of conduct to misrepresent and conceal adverse information about the business, operations and future prospects of Fisker Automotive, as described herein.

**ANSWER**:  Paragraph 319 sets forth conclusions of law to which no response is

required.  To the extent an answer is required, Daubenspeck denies each and every allegation in

paragraph 319.

320.    The Fraud Defendants had actual knowledge of the material omission of facts set forth herein, or acted with deliberate reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them. The Fraud Defendants' material omissions in offering documents described above and their materially false and misleading statements described above were made knowingly or recklessly and for the purpose and effect of concealing material information from Plaintiffs.

**ANSWER**:  Paragraph 320 sets forth conclusions of law to which no response is

required.  To the extent an answer is required, Daubenspeck denies each and every allegation in

paragraph 320.

321.    The Fraud Defendants knew or recklessly disregarded that the information provided to investors was materially false and/or misleading as described by the ATVM Loan and Cash Burn Omissions in light of, *inter alia*, the undisclosed information in the Board materials and presentations given to all Defendants as described herein.

**ANSWER**:  Paragraph 321 sets forth conclusions of law to which no response is required.  To the extent an answer is required, Daubenspeck denies each and every allegation in paragraph 321.

322.     In connection with the Series A-1 Round, at no time prior to the May 5, 2010 close did the Fraud Defendants disclose in any CPPM or SOE for the Series A-1 Round provided to Plaintiffs that, *inter alia*: (i) that they had misled the DOE in connection with the CCL by submitting a Business Plan to the DOE in August 2009 that falsely reflected Fisker Automotive commencing production of the Karma in mid-2010 with sales of 6,000 Karmas in that year, as discussed above; (ii) it was impossible for the Company to meet the Production and Tooling Release milestone dates required under the Valmet Assembly Agreement and April 2010 Business Plan, because the Company's suppliers had stopped working on the Karma project months earlier, and, contrary to the Fraud Defendants' statements to the DOE, in, e.g., the February 4, 2010 meeting at Orrick's office, not all of them had restarted work on the Karma project; (iii) the April 2010 Business Plan given to the DOE, upon which the ATVM Loan was executed, was based on materially false and understated costs for the Karma and Nina programs; (iv) the Fraud Defendants' failure to disclose this information to the DOE violated the CCL issued in September 2009 and ATVM Loan terms; (v) the financial information presented in the Series A-1 Round CPPM materially understated the cost information for the Karma and Nina programs; and (vi) Fisker Automotive had defaulted on the ATVM Loan by, inter alia, falsely certifying compliance with the ATVM Loan terms in its monthly Compliance Certificates and the Advance Requests that Fisker Automotive submitted between May 2010 and September 2010, receiving approximately $125 million from DOE.

**ANSWER**:  Paragraph 322 sets forth conclusions of law to which no response is required.  To the extent an answer is required, Daubenspeck denies each and every allegation in paragraph 322.

323.     In connection with Series B-1 Round, at no time prior to the March 16, 2011 close did the Fraud Defendants disclose in any CPPM or SOE provided to Plaintiffs and other investors that: (i) production of the Karma had been delayed and that Fisker Automotive would not be able to fulfill the Karma Production Milestone; (ii) that the Fraud Defendants secretly violated the definition of the Karma start of production milestone agreed to with the DOE to cover up the Karma production delays by pretending that required milestones for "Ok to sell" fell after the start of production rather than before the start of production, as mandated under the ATVM Loan and reflected in investor presentations; and (iii) Fisker Automotive had defaulted on the ATVM Loan by, inter alia, falsely certifying compliance with the ATVM Loan terms in its monthly Compliance Certificates and the Advance Requests that Fisker Automotive submitted between December 2010 through February 2011, totaling approximately $47 million.

**ANSWER**:  Paragraph 323 sets forth conclusions of law to which no response is required.  To the extent an answer is required, Daubenspeck denies each and every allegation in paragraph 323.

324.    In connection with the Series C-1 Round, the Fraud Defendants failed to disclose the facts that: (i) Fisker Automotive had not met the February 2011 Fisker Karma commercial production milestone under the ATVM Loan covenants; (ii) the Fraud Defendants had knowingly, or recklessly, falsely told the DOE in March 2011 that Fisker Automotive had complied with that milestone; (iii) in June of 2011, the Fraud Defendants gave a presentation to the DOE that contradicted the earlier representation to the DOE that Fisker Automotive had complied with the February 2011 Karma commercial production milestone under the ATVM Loan covenants; and (iv) as a result, the DOE halted any further advancements under the ATVM Loan in June 2011 because DOE officials believed they had been misled by the Fraud Defendants in the March 2011 presentation.

**ANSWER**:  Paragraph 324 sets forth conclusions of law to which no response is required.  To the extent an answer is required, Daubenspeck denies each and every allegation in paragraph 324.

325.    The Fraud Defendants' knowing, intentional or reckless disregard of the aforementioned facts is also strongly supported by detailed confidential DOE documents and the testimony of Mr. Whitcombe. As demonstrated above, Mr. Whitcombe testified that DOE officials worked closely with Fisker Automotive's executives, Board of Directors, Ray Lane and non-defendant John Doerr (also of KPCB LLC) regarding the ATVM Loan. A confidential Quarterly Credit Report prepared by the DOE dated December 12, 2011(described above) , which was first made public in the PrivCo Report, also confirms the omitted facts described above, stating that in June 2011, "Fisker presented new information calling into question whether the [February 2011] launch milestone had been met. After receiving the June 2011 presentation, DOE halted further funding of the loan."

**ANSWER**:  Paragraph 325 sets forth conclusions of law to which no response is required.  To the extent an answer is required, Daubenspeck denies each and every allegation in paragraph 325.

326.    As Mr. Whitcombe testified at the House Fisker Hearing, so clear was the fact that Fisker Automotive had not met the February 2011 Fisker Karma commercial production milestone as the Fraud Defendants falsely told the DOE in March 2011, that the DOE "took decisive action" to cut off further funding when this contradictory information was presented to them in June 2011. The DOE refused to waive this milestone despite that fact that DOE had earlier waived other financial covenants and/or milestones under the ATVM Loan, further evidencing an inference that the DOE believed the Fraud Defendants had misled the DOE in

March 2011 as to the fulfillment of that milestone. Indeed, the Fraud Defendants' scienter is further supported in another confidential DOE document revealed in the PrivCo Report, stating that after June 2011, "in follow-up meetings with [Defendants Fisker, Koehler, and DaMour] . . . Fisker gave varied and incomplete explanations" as to their failure to meet the February 2011 milestone and thus, "loan draws were not resumed."

   **ANSWER**: Paragraph 326 sets forth conclusions of law to which no response is

required.  To the extent an answer is required, Daubenspeck is without information or knowledge

sufficient to admit or deny the allegations in paragraph 326.

   327. In addition, in connection with the December 2011 "pay to play" capital call described above, the Fraud Defendants were aware, but failed to disclose the material fact that Fisker Automotive had notified NHTSA on December 21, 2011 that it would recall 239 Fisker Karmas necessitated by battery fires. Fisker Automotive publicly announced that recall on December 29, 2011 -- exactly one day after this financing round closed. This NHTSA document first became public as part of the PrivCo Report.

   **ANSWER**: The first sentence of paragraph 327 sets forth conclusions of law to

which no response is required.  Daubenspeck is without knowledge or information sufficient to

admit or deny the allegations in the second and third sentences of paragraph 227, except that he

admits that Fisker Automotive publicly announced a recall of Karmas on or around

December 29, 2011.

   328. In addition, another confidential DOE document described above, also revealed in the PrivCo Report, demonstrates that Defendants concealed material facts by omitting them from the offering documents described above associated with the December 2011 "pay to play" round. Specifically, the Fraud Defendants knowingly or recklessly concealed the material fact that Fisker Automotive had $200 million in payables as of no later than November 30, 2011, of which $120 million were overdue – while, at the same time, Fisker Automotive had only had $20 million in cash "on hand" and was burning cash so fast that it would be out of money by around December 15th. In this connection, among other things, Defendant DaMour's statement on the December 15, 2011 conference call, above, that, "this is the last . . . private raise, and surely the last capital call. . . . The $300 [million] is enough to fund the complete plan as we have explained. . . . We are at the point now that the . . . [Karma] is fully funded," was also knowingly or recklessly materially false and misleading because the vast majority of the funds raised in the capital call would simply go to pay down existing obligations rather than fund Fisker Automotive's business plan going forward as DaMour stated. The same is true with similar statements made on the February 22, 2012 conference call described above whereby Henrik Fisker repeated the assertion that Fisker Automotive could be a "self-sustaining as a company" without additional funds.

**ANSWER**:  Paragraph 328 sets forth conclusions of law to which no response is required.  To the extent an answer is required, Daubenspeck denies each and every allegation in paragraph 328.

329.    In addition, the offering documents in connection with the March 2012 and September 2012 offerings described above were materially false and misleading because the Fraud Defendants knowingly or recklessly concealed the material fact that Defendant Henrik Fisker's stepping down from the day to day management of Fisker Automotive as its CEO in February 2012 caused Fisker Automotive to be in default of the ATVM Loan "Key Personnel" covenant requiring him to be "responsible for the management of the borrower."

**ANSWER**:  Paragraph 329 sets forth conclusions of law to which no response is required.  To the extent an answer is required, Daubenspeck denies each and every allegation in paragraph 329.

330.    As a consequence, the Fraud Defendants also falsely stated, and/or caused to be stated, in the Purchase Agreement for each offering of Fisker Automotive Securities that "[n]one of the Transaction Agreements nor any other documents delivered in connection with the transactions contemplated by the Transaction Agreements contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements herein and therein not misleading."

**ANSWER**:  Paragraph 330 sets forth conclusions of law to which no response is required.  To the extent an answer is required, Daubenspeck denies each and every allegation in paragraph 330.

331.    As demonstrated above, at all relevant times, the Fraud Defendants had actual knowledge or recklessly disregarded that their statements regarding Fisker Automotive were false and misleading; the Fraud Defendants intentionally omitted critical facts that they were aware of concerning the Company in order to induce Plaintiffs and other investors to invest in Fisker Automotive.

**ANSWER**:  Paragraph 331 sets forth conclusions of law to which no response is required.  To the extent an answer is required, Daubenspeck denies each and every allegation in paragraph 331.

332.    In addition, Defendant KPCB LLC, through KPCB XII and XIII, invested its clients' funds in each of the Series A-1 through E-1 Rounds. As detailed above, the investment decision packages used by the KPCB Managing Members in their investment

decisions contained material inside information that contradicted the information provided generally to outside shareholders and/or investors such as Plaintiffs and showed the true state of Fisker Automotive's disastrous operations. The KPCB Managing Members are all experienced and sophisticated business people, many of whom such as Lane, Doerr, and Schlein sit on numerous boards of directors. Given their deep business experience and sophistication, they would know that it was unlawful to utilize the contradictory inside information about Fisker Automotive obtained through their designated director on Fisker Automotive's board of directors – Defendant Lane (who owed fiduciary obligations to all shareholders) -- and/or through the KPCB FWG members who worked directly with Fisker Automotive's officers and management, that was not made available to other shareholders and/or investors such as Plaintiffs.

**ANSWER**: Paragraph 332 sets forth conclusions of law to which no response is required. To the extent an answer is required, Daubenspeck is without knowledge or information sufficient to admit or deny the allegations in paragraph 332.

333. Had Plaintiffs known the truth regarding the material facts not revealed to them – including Fisker Automotive's failure to meet the February 2011 Fisker Karma commercial production milestone and the Fraud Defendants' misleading of the DOE in their March 2011 presentation as to Fisker Automotive's fulfillment of that milestone, the DOE's issuance of the Drawstop Notice and halting any further funding of Fisker Automotive in June 2011, the December 2011 recall due to battery fires and/or that Defendants had concealed the Company's notification to NHTSA on December 21, 2011 of the recall, the fact that the funds raised in the December 2011 capital call would largely go to pay down $200 million in payables rather than funding the Company's business plan to make it a self-sustaining company as the Fraud Defendants represented, and/or Fisker's default of the DOE confidential "Key Personnel" loan covenant -- Plaintiffs would not have purchased or otherwise acquired their Fisker Automotive Securities.

**ANSWER**: Paragraph 333 sets forth conclusions of law to which no response is required. To the extent an answer is required, Daubenspeck denies each and every allegation in paragraph 333, except that he is without sufficient knowledge or information to admit or deny what the Plaintiffs would or would not have done under various hypothetical circumstances such as those posed in paragraph 333.

334. The Fraud Defendants made such false and misleading statements and concealed critical information necessary to make the statements made, in light of the circumstances under which they were made, not misleading, with the intent that Plaintiffs rely on such statements.

**ANSWER**:  Paragraph 334 sets forth conclusions of law to which no response is required.  To the extent an answer is required, Daubenspeck denies each and every allegation in paragraph 334.

335.    Plaintiff reasonably believed and relied on the Fraud Defendants' false and misleading statements about Fisker Automotive and were unaware that the Fraud Defendants were concealing critical information about the Company necessary to make the statements made, in light of the circumstances under which they were made, not misleading. As a result, Plaintiffs were induced to invest millions of dollars in Fisker Automotive.

**ANSWER**:  Paragraph 335 sets forth conclusions of law to which no response is required.  To the extent an answer is required, Daubenspeck denies each and every allegation in paragraph 335.

336.    As a direct and proximate result of the Fraud Defendants' actions, Plaintiffs suffered damages in connection with their purchases of Fisker Automotive Securities.

**ANSWER**:  Paragraph 336 sets forth conclusions of law to which no response is required.  To the extent an answer is required, Daubenspeck denies each and every allegation in paragraph 336.

## SIXTH CLAIM FOR RELIEF

### Aiding and Abetting Fraud Against KPCB LLC, KPCB XII, KPCB XIII, KPCB Associates XII and KPCB Associates XIII

337.    Plaintiffs repeat and reallege each and every allegation contained above.

**ANSWER**:  Daubenspeck incorporates by reference and realleges each of the foregoing paragraphs as if fully set forth herein.

338.    This Count is asserted against defendants KPCB LLC, KPCB XII, KPCB XIII, KPCB Associates XII and KPCB Associates XIII ("AA Defendants") for aiding and abetting fraud.

**ANSWER**:  Daubenspeck is not required to respond to the allegations in paragraph 328 because this count is not directed at him.

339.   To the extent that, arguendo, any of the AA Defendants did not make any statements to Plaintiffs in the offering documents described above, each knowingly participated and assisted in the fraud as alleged in Fifth Claim for Relief above.

**ANSWER**:  Daubenspeck is not required to respond to the allegations in paragraph 339 because this count is not directed at him.

340.   Each of the AA Defendants had actual knowledge of, and rendered substantial assistance, in connection with the fraud.

**ANSWER**:  Daubenspeck is not required to respond to the allegations in paragraph 340 because this count is not directed at him.

341.   As a direct and proximate result of the actions of the AA Defendants, Plaintiffs suffered damages in connection with their purchases of Fisker Automotive Securities.

**ANSWER**:  Daubenspeck is not required to respond to the allegations in paragraph 341 because this count is not directed at him.

## AFFIRMATIVE DEFENSES

Daubenspeck asserts the following separate and affirmative defenses:

1.   The Complaint, including each Count, claim, and allegation contained therein, fails to state a claim against Daubenspeck upon which relief can be granted.

2.   Each Count, claim, and allegation against Daubenspeck in the Complaint is barred, in whole or in part, because they fail to comply with the pleading requirements of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4.

3.   Plaintiffs lack standing to assert any claims against Daubenspeck.

4.   Plaintiffs' claims against Daubenspeck are barred because the harm allegedly suffered, if any, was caused by factors, persons, or entities other than Daubenspeck.

5.   Plaintiffs' claims against Daubenspeck are barred because Daubenspeck acted in good faith and did not directly or indirectly induce the act or acts constituting the alleged

violation(s) or cause(s) of action.  Furthermore, Daubenspeck did not "make" any of the alleged misrepresentations or omissions.

6.      Plaintiffs' claims against Daubenspeck are barred because Daubenspeck, after reasonable investigation and due diligence, did not know, and in the exercise of reasonable care could not have known, that any misrepresentations or omissions existed in any of the statements allegedly supporting Plaintiffs' claims.

7.      Plaintiffs' claims are barred in whole or in part by the applicable statute(s) of limitations.

8.      Plaintiffs' claims are barred in whole or in part by the doctrines of waiver, estoppel, ratification, unclean hands, laches and/or other related doctrines and principles.

9.      Plaintiffs' claims are barred in whole or in part because Plaintiffs have not sustained any cognizable injury.

10.      Plaintiffs' claims are barred in whole or in part because Plaintiffs were expressly advised of the material facts and risks to Fisker Automotive that the Complaint alleges were the cause of Plaintiffs' purported damages, and they voluntarily assumed that risk.

11.      Plaintiffs' claims are barred in whole or in part because some or all of the matters now claimed by Plaintiffs to be the subject of misrepresentations or omissions were publicly disclosed or were in the public domain and, as such, were available to Plaintiffs at all times.

12.      Plaintiffs' claims are barred in whole or in part because, at the time they purchased Fisker Automotive securities, Plaintiffs had actual or constructive knowledge of some or all of the facts alleged in the Complaint upon which liability is asserted, and, therefore, each such Plaintiff assumed the risk that the value of their Fisker Automotive securities could decline.

13.     Plaintiffs' claims are barred in whole or in part because Plaintiffs would have acquired Fisker Automotive securities even if they had known, at the time they acquired the securities, of the allegedly untrue statements of material fact, omissions of material fact, misleading statements or other allegedly wrongful conduct (none being admitted).

14.     Plaintiffs' claims are barred in whole or in part because, when they acquired Fisker Automotive securities, Plaintiffs knew, or in the exercise of reasonable care should have known, of the facts allegedly misrepresented or omitted, and each Plaintiff was negligent and this negligence was a cause-in-fact and a proximate cause of any alleged damages.

15.     Plaintiffs' claims are barred in whole or in part because, to the extent Plaintiffs have suffered any damages (which is denied), such damages were caused by that plaintiff's own negligence in failing to conduct a reasonably diligent investigation of the risks associated with its investment .

16.     Plaintiffs' claims are barred in whole or in part because, to the extent Plaintiffs have suffered any damages (which is denied), they have failed to mitigate those damages.

17.     Because Plaintiffs cannot establish the primary liability necessary to support their claims against Daubenspeck for "control person" liability under Section 20(a) of the Exchange Act, such claims are barred.

18.     Because Plaintiffs cannot establish Daubenspeck controlled any pertinent entity or person, as the term "controlled" is defined by the Exchange Act and under the case law, such claims are barred.

19.     Without admitting that Plaintiffs suffered damages, or that Daubenspeck is or should be liable for any such damages, Daubenspeck asserts that the liability of Daubenspeck

and any other responsible persons, named or unnamed, should be apportioned according to their relative degrees of fault, and any alleged liability of Daubenspeck should be reduced accordingly.

20.    Any damages recovery by plaintiffs or a member of the putative Class is subject to an offset for the amount of tax benefits actually received by that plaintiff through its investments.

21.    To the extent applicable, Daubenspeck incorporates by reference, as though fully set forth herein, any pertinent defenses raised by any other defendant to this action.

22.    Daubenspeck reserves the right to amend the above answer and affirmative defenses consistent with further discovery and evidence throughout the pendency of this action.

## PRAYER FOR RELIEF

WHEREFORE, Daubenspeck requests that the Court dismiss all claims against Daubenspeck with prejudice, grant judgment in favor of Daubenspeck and against Plaintiffs, and grant Daubenspeck such other or further relief as the Court deems just and equitable.

*/s/ M. Duncan Grant*
M. Duncan Grant (DE Bar No. 2994)
Christopher B. Chuff (DE Bar No. 5729)
PEPPER HAMILTON LLP
Hercules Plaza, Suite 5100
1313 N. Market Street
P.O. Box 1709
Wilmington, DE  19899-1709
(302) 777-6500
*grantm@pepperlaw.com*
*chuffc@pepperlaw.com*

Dated: November 9, 2018          *Attorneys for Defendant Keith Daubenspeck*